BRENT M. RESH
(Nevada Bar No. 14940)
BRENT RESH LAW, PLLC
2401 La Solana Way
Las Vegas, NV 89102
(702) 781-6903
brent@brentreshlaw.com

JESSICA L. BLOME
(Cal. Bar No. 314898, pro hac vice)
J. RAE LOVKO
(Cal. Bar No. 208855, pro hac vice)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com
rlovko@greenfirelaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| LAURA LEIGH, individually, and WILD HORSE EDUCATION, a non-profit corporation,<br><br>*Plaintiffs*,<br><br>v.<br><br>INTERIOR BOARD OF LAND APPEALS, UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and KG MINING INC.,<br><br>    *Defendants*. | Case No. 3:25-cv-00152-MMD-CSD<br><br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |

1    To all parties and their attorneys of record:

2    PLEASE TAKE NOTICE that Plaintiffs Laura Leigh, individually, and Wild Horse

3    Education, a non-profit corporation, hereby move for summary judgment against Defendants

4    Interior Board of Land Appeals, United States Department of Interior, Bureau of Land

5    Management, and KG Mining Inc. pursuant to the court's scheduling order of May 1, 2025 (Dkt.

6    40), Rule 56 of the Federal Rules of Civil Procedure, and Local Rule 56-1.  Plaintiffs' motion is

7    supported by the accompanying Memorandum of Points and Authorities and Declaration of

8    Laura Leigh; the accompanying Request for Judicial Notice and Declaration of Jennifer Rae

9    Lovko; the Administrative Record; and any written and oral argument and authorities that are

10    presented at or before the hearing on this motion.

11

12    DATED:  August 29, 2025,                    Respectfully Submitted,

13                                                        */s/ Jennifer Rae Lovko*
                                                          Jessica L. Blome
14                                                        (Cal. Bar No. 314898, pro hac vice)
                                                          Jennifer Rae Lovko
15                                                        (Cal. Bar No. 208855, pro hac vice)
                                                          GREENFIRE LAW, PC
16                                                        2748 Adeline Street, Suite A
                                                          Berkeley, CA 94707
17                                                        (510) 900-9502
                                                          jblome@greenfirelaw.com
18                                                        rlovko@greenfirelaw.com
19
                                                          */s/ Brent M. Resh*
20                                                        Brent M. Resh
                                                          (Nevada Bar No. 14940)
21                                                        BRENT RESH LAW, PLLC
                                                          2401 La Solana Way
22                                                        Las Vegas, NV 89102
                                                          (702) 781-6903
23                                                        brent@brentreshlaw.com
24
                                                          *Attorneys for Plaintiffs*
25

26

27

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................... 1

II.  LEGAL FRAMEWORK ................................................................................. 1

    A.   IBLA and Administrative Standing ..................................................... 1

    B.   Administrative Procedure Act and Scope of Review ........................... 3

III. STATEMENT OF MATERIAL FACTS ......................................................... 4

IV.  ADMINISTRATIVE PROCEDURE STANDING ........................................ 11

V.   ARTICLE III STANDING ............................................................................ 12

    A.   Injury In Fact ....................................................................................... 12

    B.   Traceability and Redressability .......................................................... 14

VI.  ARGUMENT ................................................................................................. 15

    A.   The IBLA committed procedural error. ............................................. 15

    B.   The IBLA decision contains factual and legal errors. ....................... 17

        1.   Error No. 1 ...................................................................................... 19

        2.   Error No. 2 ...................................................................................... 20

        3.   Error No. 3 ...................................................................................... 21

            **a.**   W. Watersheds Project ............................................................. 21

            **b.**   Cascadia Wildlands .................................................................. 24

            **c.**   Lujan v. Defs. Of Wildlife ........................................................ 25

            **d.**   Walsh ........................................................................................ 27

VII. CONCLUSION .............................................................................................. 29

1

## TABLE OF AUTHORITIES

2

3

**Cases**

4    *Am. Horse Prot. Asso. v. Frizzell*, 403 F. Supp. 1206 (D. Nev. 1975) ........................................ 15

5    *Am. Stewards of Liberty v. DOI*, 370 F. Supp. 3d 711 (W.D. Tex. 2019) .................................. 20

6    *Baker v. United States*, 613 F.2d 224 (9th Cir. 1980) ................................................................. 3

7    *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87
     (1983) ...................................................................................................................................... 19

8    *Bd. Of Cnty. Comm'rs of Rocky Mt. Wild v. United States BLM*, 584 F. Supp. 3d 949 (D.
     Colo. 2022) ............................................................................................................................. 13

9    *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ....................................... 4, 5

10   *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388 (1987) .............................................................. 12

11   *Clifton Cap. Grp., LLC*, 66 F.4th 1214 (9th Cir. 2023) ............................................................... 19

12   *Ecosystem Inv., Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287 (5th Cir. 2018) .......... 13

13   *Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118 (2d Cir. 2020) ...................... 12

     *Friends of Earth v. United States Navy*, 841 F.2d 927 (9th Cir. 1988) ..................................... 12

14   *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976 (9th Cir. 1985) ......................... 19

15   *Golden IT, LLC v. United States*, No. 24-1893C, 2025 U.S. Claims LEXIS 1820, at *29-
     30 (Fed. Cl. July 14, 2025) ....................................................................................................... 4

16   *Gunpowder Riverkeeper v. FERC*, 807 F.3d 267 (D.C. Cir. 2015) ............................................. 12

17   *Harrison v. Hickel*, 6 F.3d 1347 (9th Cir. 1993) .......................................................................... 3

18   *Hughes v. Rowe*, 449 U.S. 5 (1980) ........................................................................................... 21

19   *In re Lee*, 277 F.3d 1338 (Fed. Cir. 2002) .................................................................................. 20

20   *Ken Warren Outdoors, Inc. v. United States DOI*, No. 87-3691, 1988 U.S. App. LEXIS
     21598, at *1 n.1 (9th Cir. July 5, 1988) ..................................................................................... 4

21   *League of Wilderness Defs. v. United States Forest Serv.*, 549 F.3d 1211 (9th Cir. 2008).... 19, 23

22   *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ........................................................... 20

23   *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................. 14, 16, 24, 28

24   *Marcus v. Dir., Office of Workers' Comp. Programs, U. S. Dep't of Labor*, 548 F.2d 1044
     (D.C. Cir. 1976) ...................................................................................................................... 20

25   *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209
     (2012)...................................................................................................................................... 12

26   *NLRB v. Ashkenazy Prop. Mgmt. Corp.*, 817 F.2d 74 (9th Cir. 1987) ....................................... 20

27

28

*NOW, Wash., D.C. Chapter v. Soc. Sec. Admin. of Dep't of Health & Human Servs.*, 736 F.2d 727 (D.C.C. 1984) ................................................................................................ 4

*Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir. 1994) ........................... 19

*W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011) .................... 12, 13

*Wyoming v. United States DOI*, 839 F.3d 938 (10th Cir. 2016) ...................................... 10

*Wyoming v. United States DOI*, No. 14-CV-0248, 2015 U.S. Dist. LEXIS 189415, at *12-13 (D. Wyo. Apr. 21, 2015) ........................................................................................... 10

**Statutes**

16 U.S.C. § 1331 ............................................................................................................ 12

16 U.S.C. § 1333(b) ......................................................................................................... 9

17 U.S.C. § 1331 ............................................................................................................ 12

17 U.S.C. § 1333(a) ........................................................................................................ 12

5 U.S.C. § 551 .................................................................................................................. 3

5 U.S.C. § 702 ................................................................................................................ 11

5 U.S.C. § 706 .................................................................................................................. 4

5 U.S.C. § 706(2) ................................................................................................... 1, 3, 17

5 U.S.C. § 706(2)(A) ...................................................................................................... 17

5 U.S.C. § 706(2)(D) ...................................................................................................... 17

5 U.S.C. §§ 701-706 ........................................................................................................ 3

**Regulations**

43 C.F.R. § 4.1(b)(4) ........................................................................................................ 1

43 C.F.R. § 4.21 ............................................................................................................... 3

43 C.F.R. § 4.402(a) ......................................................................................................... 2

43 C.F.R. § 4.403 ............................................................................................................. 1

43 C.F.R. § 4.405(b)(2) .................................................................................................... 2

43 C.F.R. § 4.409 ............................................................................................................. 2

43 C.F.R. § 4.409(g) .................................................................................................... 3, 20

43 C.F.R. § 4.410(b) ......................................................................................................... 2

43 C.F.R. § 4700.0-1 ...................................................................................................... 12

43 C.F.R. § 4700.0-3 ...................................................................................................... 12

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Plaintiffs Laura Leigh and Wild Horse Education (WHE) seek judicial review of the Order issued by the Interior Board of Land Appeals (IBLA or Board) on September 23, 2024, in *Wild Horse Education et al.*, IBLA 2024-0229. In the underlying matter before the IBLA, Laura Leigh, WHE member Tammi Adams, and WHE filed a Notice of Appeal and Petition to Stay the July 8, 2024, Record of Decision issued by the Bureau of Land Management (BLM), which approved the Bald Mountain Mine Plan of Operations Amendment Juniper Project (Juniper Project).[1]

The IBLA dismissed the appeal and petition, erroneously concluding that Ms. Leigh, Member Adams, and WHE lacked standing. This decision violated the Administrative Procedure Act (APA), 5 U.S.C. § 706(2) because the Board committed significant and prejudicial legal, factual, and procedural errors. These errors are based on the Board adjudicating the issue of the proper scope of the Project's impacted area without briefing or benefit of the complete administrative record, ignoring material facts, failing to articulate a rational connection between the facts found and its ruling, and erroneously interpreting and applying legal precedent. Accordingly, Plaintiffs ask this Court to vacate the IBLA Order dismissing the underlying matter for lack of standing and remand the matter to the IBLA for consideration of the merits of Plaintiffs' appeal.

### II.    LEGAL FRAMEWORK

#### A. IBLA and Administrative Standing

The IBLA is an appellate review body whose administrative judges decide appeals from BLM decisions relating to the use and disposition of public lands and their resources. *See* 43 C.F.R. § 4.1(b)(4)). To initiate an appeal of a BLM decision, an appellant files a notice of appeal, a statement of standing, and a copy of the challenged record of decision. *See id.* at § 4.403. The notice of appeal need not include a full statement of an appellant's concerns. *See* Leigh Decl. at ¶ 8. An appellant also may file a petition for stay at the same time the notice of appeal is filed. *See id.* at

---

[1] While the Notice of Appeal and Petition for Stay were filed by WHE, Laura Leigh, and Tammi Adams, here the Plaintiffs are WHE and Laura Leigh. To the extent that any of the administrative record references Tammi Adams, it remains relevant insofar as Ms. Adams is a member and volunteer of WHE. *See* Leigh Decl. at ¶ 7.

§ 4.405(b)(2). Within 30 days thereafter, the appellant must file a statement of reasons, which identifies the legal or factual errors alleged to be made in the challenged decision. *See id*. at § 4.410(b). The statement of reasons does not require the appellant persuasively establish that BLM actually committed error in its decision, but rather, the appellant need only articulate "some basis" for the IBLA to review the decision. *Wyoming Outdoor Council, et al*., 164 IBLA 84, 94 (2004), attached as **Exh. F8** to Plaintiff's Request for Judicial Notice (RJN), p. 146. Ultimately, the merits of an appeal are based on the Board's review of the full administrative record. *See* 43 C.F.R. § 4.406; *Williams Field Services Company*, 193 IBLA 11, 20 (2018), attached as **Exh. F3** to RJN, p. 104; *Petroleum Fuels Offshore, LLC*, 189 IBLA 213, 215 (2017), attached as **Exh. F4** to RJN, p. 110.

Prior to determining the merits of an appeal, the IBLA may rule upon a motion to dismiss for lack of standing. *See* 43 C.F.R. § 4.409; *The Mandan, Hidatsa & Arikara Nation*, 196 IBLA 309, 317 (2021), attached as **Exh. F1** to RJN, p. 37. Administrative standing before the IBLA is established by regulation,[2] providing that "[a]ny person or entity that is a party to the case and is adversely affected by an appealable decision of [BLM] has the right to appeal to the Board." 43 C.F.R. § 4.402(a). "Party to the case" is a person or entity that has participated in the process leading to the decision on appeal, such as by commenting on an environmental document. 43 C.F.R. § 4.401. To be adversely affected means a person "has a legally cognizable interest, and the decision on appeal has caused or is substantially likely to cause injury to that interest." *Id.* When an organization alleges representational standing, "it must demonstrate that one or more of its members has a legally cognizable interest in the subject matter of the appeal, coinciding with the organization's purposes, that is or may be negatively affected by the decision." *W. Watersheds Project*, 185 IBLA 293, 298-99 (2016), attached as **Exh. F5** to RJN, pp. 115- 116.

The IBLA has "long held" that a legally cognizable interest "may be based on a cultural, recreational, or aesthetic interest in the use and enjoyment of the land (or its resources) or even an

---

[2] The IBLA is not an Article III court; however, judicial decisions on standing can "provide a useful guide as to the types of interests which have been deemed relevant and the concerns which are properly considered in adjudicating administrative appeals." *In re Pacific Coast Molybdenum*, 68 IBLA 325, 331-32 (1982), attached as **Exh. F13** to RJN, pp. 195-196.

interest in adjacent land (or its resources)." *Becharof Corp.*, 147 IBLA 117, 129 (1998), attached as **Exh. F9** to RJN, p. 165; *see also* 43 C.F.R § 4.401; *Coalition of Concerned National Park Retirees*, 165 IBLA 79, 84 (2005), attached as **Exh. F7** to RJN, p. 130. In showing that the interest is adversely impacted by the challenged decision, an appellant must make "colorable allegations." *Becharof Corp.*, 147 IBLA at 129, **Exh. F9** to RJN, p. 165. However, "the appellant need not prove that an adverse effect will in fact occur." *Id.*

In reviewing a motion to dismiss for lack of standing, the Board considers assertions in an appellant's notice of appeal, statement of standing, statement of reasons, as well as statements made in any associated briefing and accompanying declarations. *See Ctr. for Biological Diversity*, 195 IBLA 298, 302 (2020), attached as **Exh. F2** to RJN, p. 81; *Oregon Natural Resources Council*, 78 IBLA 124, 126 (1983), attached as **Exh. F12** to RJN, p. 186; Order in *Frank Campbell*, 2018-0072 (2019), pp. 2-5, attached as **Exh. F14** to RJN, pp. 202-205. Hearings on such motions need not be held, although the Board may order a hearing if there are significant factual or legal issues. *See* 43 C.F.R. § 4.409(g).

### B. Administrative Procedure Act and Scope of Review

Judicial review of decisions by the IBLA is conducted under the APA. *See* 5 U.S.C. §§ 551, 701-06; 43 C.F.R. § 4.21; *Baker v. United States*, 613 F.2d 224, 226 (9th Cir. 1980); *Harrison v. Hickel*, 6 F.3d 1347, 1353 (9th Cir. 1993). When examining an agency's actions under the APA, a court will generally consider whether (1) the agency action is lawful; (2) the agency complied with procedural requirements; and (3) the agency adequately supported its factual findings and decisions. *See Golden IT, LLC v. United States*, No. 24-1893C, 2025 U.S. Claims LEXIS 1820, at *29-30 (Fed. Cl. July 14, 2025).

Sections 706(2)(A) through (D),[3] which apply to all cases involving agency action, *see Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971), provide:

---

[3] Section 706(2)(E) applies only where the agency action is based on a public adjudicatory hearing, and in such an instance, the reviewing court applies a substantial evidence standard of review. *See Citizens to Pres. Overton Park, Inc.*, 401 U.S. at 414; *Ken Warren Outdoors, Inc. v. United States DOI*, No. 87-3691, 1988 U.S. App. LEXIS 21598, at *1 n.1 (9th Cir. July 5, 1988). Section 706(2)(F) provides that the reviewing court may conduct a de novo trial of facts

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall …
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law …
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706. In addressing these generally applicable provisions, the reviewing court must engage in "substantial inquiry" of an agency decision. *Citizens to Pres. Overton Park, Inc.*, 401 U.S. at 415.

## III.    STATEMENT OF MATERIAL FACTS

KG Mining Inc. (KG Mining) operates the Bald Mountain Mine, a large-scale, open-pit gold mine located in Nevada, primarily on lands administered by BLM. *See* AR_252. In 2020, KG Mining proposed to amend and expand its plan of operations for the North Operations Area (NOA) of the Mine, commonly referred to as the Juniper Project. *See* AR_037, AR_253. The Juniper Project authorizes the expansion, modification, or development of seven open pits, 13 authorized rock disposal areas, and various heap leach facilities, a disposal area, interpit areas, process areas, ancillary areas, and supporting facilities. *See* AR_036-AR_037. It also authorizes conducting of planned concurrent reclamation activities, implementing a growth media stockpile management program, applying a road design strategy to select haul roads, creating haul road placement zones

---

underlying an agency action where the agency's factfinding procedures were inadequate. *See Citizens to Pres. Overton Park, Inc.*, 401 U.S. at 414-15; *NOW, Wash., D.C. Chapter v. Soc. Sec. Admin. of Dep't of Health & Human Servs.*, 736 F.2d 727, 738-42 (D.C.C. 1984). Here, Plaintiffs' Motion for Summary Judgment focuses only on errors in violation of Sections 706(2)(A)-(D).

for three haul roads, reestablishing the Top Pit underground mine, creating a sequencing and backfill schedule for the Poker Flats Pit, increasing the height of the Poker Flats heap, and reusing spent heap leach ore. *See id*. As approved, the Juniper Project extends the authorized NOA Plan boundary in five areas totaling 3,425 acres. *See* AR_037. Life-of-mine surface disturbance in the NOA would increase from 10,782 acres to 14,752 acres, resulting in a net surface disturbance increase of about 3,969 acres (expansion area). *See id*. Mine life would extend an additional 11 years. *See id*.

The expansion area is located within the Triple B Herd Management Area (HMA) of the Triple B Complex. *See* AR_253. The Triple B Complex consists of the Triple B HMA, the Maverick-Medicine HMA, and the Cherry Springs Wild Horse Territory (WHT). *See* Leigh Decl. at ¶ 13; 2017 Antelope and Triple B Complexes Gather Plan Excerpt, pp. 3-4, attached as **Exh. A** to RJN, pp. 4-5. A portion of the Antelope Valley HMA is managed as part of the Triple B Complex because highway 93 cuts it off entirely from the rest of the Antelope Valley HMA. *See id.* This portion of the Antelope Valley HMA is referred to by BLM as "Antelope Valley West of U.S. Highway 93." *See id.*

In the draft environmental impact analysis (DEIS) for the Jupiter Project, BLM's cumulative impact analysis identified the maximum cumulative effect study area (CESA) as containing 19,377,103 acres. *See* Leigh Decl. at ¶ 14; Jupiter Project DEIS Excerpt, p. F-7 and Fig. 3.1-1, attached as **Exh. B** to RJN, pp. 16, 13. Within the scope of this maximum CESA is the entirety of the Triple B Complex, including all of the Triple B HMA, the Maverick-Medicine HMA, Antelope Valley West of U.S. Highway 93 HMA, and the Cherry Springs WHT. *See* Leigh Decl. at ¶ 15; **Exh. B** to RJN, p. 13 (Figure 3.11-1). It also includes the Antelope Complex, Pancake Complex, and Moriah Herd Area. *See id.* When looking at cumulative impacts on wild horses, the CESA was limited to a review of impacts in the Triple B HMA (which consists of 1,232,717 acres) – despite BLM saying in the Draft EIS that "[w]ild horses move freely throughout the [Triple B C]omplex and the adjacent Cherry Springs Wild Horse Territory." **Exh. B** to RJN, p. 12; *see also* **Exh. B** to RJN, p. 15; Leigh Decl. at ¶ 16; AR_253. Even so, BLM said the estimated cumulative surface disturbance in this HMA from past, present, and reasonably foreseeable future actions was more

1    than 104,000 acres. *See* Leigh Decl. at ¶ 16; AR_011; Jupiter Project FEIS Excerpt, p. J-12,

2    attached as **Exh. C** to RJN, p.19.

3        BLM invited the public to submit scoping comments on the Project, which was followed by

4    the DEIS, final environmental impact statement (FEIS), and Record of Decision. *See* AR_012,

5    AR_026-AR_076. WHE and Laura Leigh provided timely comments in response to scoping and the

6    DEIS. *See* AR_012, AR_023, AR_231-249. In these comments, they noted (1) The Project's direct

7    environmental destruction and negative cumulative impacts outweighed any benefit from the

8    continued operations and expansion of the Bald Mountain Gold Mine; (2) Not only will thousands

9    of acres be removed from the Triple B HMA by the Project (in addition to the more than 140,000

10   already removed from the HMA cumulatively), but the Project also will remove the Triple B

11   horses' access to forage and water and increase vehicle collisions that are already an issue with the

12   existing mine; BLM's environmental review refused to acknowledge and address mitigation for the

13   significant acreage and resources that will be lost to wild horses and burros; (3) BLM's

14   environmental review refused to acknowledge and address mitigation for the significant acreage

15   and resources that will be lost to wild horses and burros; (4) These impacts will affect the entire

16   ecosystem that requires the land to survive and migrates throughout the area; these impacts are

17   direct, permanent, and extend beyond the Project's boundaries; (5) BLM did not provide methods,

18   data, nor analysis of the cumulative impacts to the Triple B wild horses; (6) Because BLM has no

19   Herd Management Area Plan (HMAP) for the Triple B horses, BLM's analysis also was not based

20   on any management objectives specific to these horses; and (7) At minimum, in light of the lack of

21   HMAPs, the draft EIS should have included all census data, seasonal use data, foaling season

22   information, genetic data, and all data pertaining to wild horse use in, around, and through the

23   project area and throughout the neighboring HMAs so that impact and appropriate mitigation

24   measures could be analyzed and thoroughly addressed. *See* AR_231-249. While the comments

25   focused on impacts to wild horses, they also addressed how BLM's violation of NEPA impacted

26   other animal species and humans. *See id.*

27        On August 12, 2024, WHE, Laura Leigh, and Tammi Adams filed a Notice of Appeal and

28   Petition for Stay with the IBLA based on BLM's violation of the National Environmental Policy

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1   Act (NEPA) and the Wild and Free-Roaming Horses and Burros Act (Wild Horse Act). *See*

2   AR_001-AR_025.[4] *See id.* BLM, as a respondent, and KG Mining, as an intervenor, responded with

3   motions to dismiss, asserting the appellants lacked standing. AR_141-AR_152, AR_166-AR_186.

4   Both BLM and KG Mining acknowledged that the appellants were "a party to the case," but they

5   argued the appellants were not "adversely impacted" because the appellants had not identified

6   sufficient facts or presented sufficient evidence to show a causal relationship between the Juniper

7   Project and their alleged injury. *See* AR_143-AR_147; AR_168-AR_169. They also argued the

8   merits of the appellant's petition, attempting to show that BLM had sufficiently addressed possible

9   impacts to wild horses. *See* AR_143-AR_145; AR_168.

10          At the time the motions to dismiss were filed, the complete administrative record had yet to

11   be prepared or filed.[5] *See* AR_251. BLM and KG Mining nonetheless cited to the DEIS and FEIS in

12   their motions to dismiss, noting that the Board could access these documents on BLM's ePlanning

13   website at https://eplanning.blm.gov/eplanning-ui/project/ 2011567/570. *See* AR_142, AR_167.

14          In their filings, the appellants made colorable allegations supported by facts to show they

15   have legally cognizable interests that will be adversely impacted by the Jupiter Project. As regards

16   their interests, the appellants established that WHE is a non-profit organization whose mission is

17   the protection of wild horses and burros on public lands, including wild horses in the Triple B

18   Complex; WHE and its members appreciate the natural beauty and behaviors of these horses; WHE

19

20   ---

[4]This violation is based upon BLM's failure to adequately address the direct and cumulative
21   impacts of the Jupiter Project on the wild horses of the Triple B Complex. More specifically, the
     appellants alleged BLM did not take a hard look at the Project's impacts because the agency (1)
22   could not meaningfully address impact and mitigation measures without creating an HMAP for
     Triple B Complex of HMAs; (2) approved the Project without addressing the habitat requirements
23   of the Triple B horses; (3) did not adequately evaluate the direct and cumulative environmental
     impacts to the Triple B Complex wild horses, habitat, rangeland health, and water resources; and
24   (4) approved the Project based on missing, inadequate, limited, and anecdotal/out-of-date
     information, thereby demonstrating a lack of scientific integrity. *See* AR_003-AR_007. The
25   Statement of Reasons elaborated on BLM's violation of NEPA and the Wild Horse Act. *See*
     AR_210-AR_249.
26   [5] In an order granting KG Mining's request to intervene, the Board said it would set a deadline
27   for filing of the administrative record "after we adjudicate the motions to dismiss, if necessary."
     AR_251. Because the Board granted BLM's and KG Mining's motions to dismiss, the
28   administrative record was never filed. *See* Leigh Decl. at ¶ 11.

7

and its members regularly visit the wild horses in the Triple B Complex and intend to do so into the continuing future; volunteers with the organization have attended roundups in the HMAs of the Complex. *See* AR_014; *see also* Leigh Decl. at ¶¶ 17-22. Ms. Leigh, the President and founder of WHE, has been documenting and enjoying wild horses in the Complex since 2011, including wild horses in the Triple B HMA. *See* AR_022-AR_023, AR_165; *see also* Leigh Decl. at ¶ 28. Based on her visits, she has been able to document the movement of the Triple B horses between the HMAs of the Complex, noting that this movement "is significant." AR_165. She plans to continue visiting these horses in to the coming future. *See* AR_022-AR_023.

The interests of WHE and its members are harmed by the challenged Record of Decision because of the Project's impacts to the Triple B Complex wild horses, a public resource. The appellants explained that BLM's analysis of the direct and cumulative impacts on the wild horses in the Triple B Complex was inadequate because it did not adequately address impacts to the wild horses' habitat, including impacts to forage and water resources relied upon by these horses. AR_004.

As regards direct impacts, the Jupiter Project will result in the Triple B horses losing approximately 4,000 acres of habitat. *See* AR_215. In and of itself, this loss of habitat and resources is significant.[6] *See id.* Yet, the impact is even more meaningful when one considers past actions affecting these horses, which have already resulted in the Triple B horses losing 140,000+ acres of habitat. *See* AR_004, AR_216.

Pursuant to the Wild Free Roaming Horse and Burro Act, BLM has a duty to manage and protect the Triple B horses. *See* AR_222. However, BLM may conduct gather operations to remove "excess" horses. *See* AR_011. The determination of whether excess horses exist is based on the

---

[6]In their response to BLM's motion to dismiss, the appellants noted "the thousands of acres being removed with [the Jupiter Project] is essentially some of the most prolific rangeland, habitat, and resources found in the Triple B Complex." AR_156. They further said that it is inconceivable the loss of land caused by the Jupiter Project would not impact forage available to the Triple B horses because BLM itself admitted that the Project will result in a loss of 16,286 AUMs of forage to livestock. *See* AR_214-AR_215. This, in turn, "equates to removal of 1,000 AUMs of critical forage for the wild horses, without mitigation." *Id*. AUM, or animal unit month, represents the amount of forage needed to sustain an animal for one month. *See* BLM Wild Horses and Burros Management Handbook Excerpt, p.56, attached as **Exh. D** to RJN, p. 22.

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1   appropriate management levels (AML) set by BLM[7] and deterioration of rangeland health.[8] *See*

2   AR_214, AR_226, AR_227.

3        The loss of habitat and resources from the Jupiter Project extension area means the horses

4   will be pushed into other areas of the Triple B Complex, including areas where water sources are

5   nonexistent or have been in disrepair for decades. *See* AR_004, AR_011, AR_159, AR_195,

6   AR_200-AR_201, AR_215, AR_217, AR_219-AR_220, AR_225-AR_227; Leigh Decl. at ¶ 36.

7   This will lead to BLM more quickly determining that rangeland health is deteriorating (the same

8   number of horses cannot thrive in the Complex when acres and resources are taken away), leading

9   to the agency conducting gather operations to permanently remove horses that otherwise might

10  have been able to live there. *See* AR_011, AR_159, AR_227-AR_228; Leigh Decl. at ¶ 36. As the

11  appellants explained:

12       Resulting irreparable and imminent harms to the Triple B Complex wild horses
         and Appellants shall occur from the Bald Mountain Mine Juniper Project mine
13       expansion, … coupled with the proposed unsustainable and permanent
         groundwater use/removal, resulting in wild horses' lack of habitat, forage, and
14       water resources, and Nevada BLM then claiming an "excess" of Triple B wild
         horses impacting thriving natural ecological balance and the significant/
15       impending permanent removal and placement of Triple B wild horses into private
         off-limits holding facilities. Appellants have witnessed this failure in the
16       Agency's carrying out of NEPA planning and procedures time and time again.

17  AR_011; *see also* AR_159. And:

18

19       BLM utilizes "loss of habitat" and "insufficient resources" as justification for
         removals and the "zeroing out" of wild horse herds. … Historical removal actions
20       by Nevada BLM are clearly documented repeatedly. Other "multiple uses"

21  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [7]BLM defines AML as "[t]he number of adult horses or burros (expressed as a range with an
22  upper and lower limit) to be managed within an HMA. Forage for [wild horses and burros]
    (AUMs) is allocated based on the AML upper limit." *See* Leigh Decl. at ¶ 35; **Exh. D** to RJN, p.
23  22. For the Triple B HMA, BLM set the AML as 250-518 wild horses. *See* AR_214. For the
    Triple B Complex as a whole, BLM set the AML as 482-821 wild horses. *See id.*
24  [8] The provisions addressing BLM's authority to remove excess horses from public lands in found
    in the Wild Free Roaming Horse and Burro Act at 16 U.S. Code § 1333(b), which states that
25  BLM must remove horses in excess of AML where necessary to "to restore a thriving natural
    ecological balance to the range, and protect the range from the deterioration associated with
26  overpopulation." BLM cannot remove horses simply because the number of horses exceeds
    AML; the agency must also demonstrate that rangeland health assessments indicate degradation
27  is happening or is imminent. *See* 16 U.S.C. § 1333(b); *Wyoming v. United States DOI*, No. 14-
    CV-0248, 2015 U.S. Dist. LEXIS 189415, at *12-13 (D. Wyo. Apr. 21, 2015), *affirmed by*
28  *Wyoming v. United States DOI*, 839 F.3d 938, 944 (10th Cir. 2016); AR_20438.

deplete resources and remove critical habitat from HMAs, and then BLM declares
an "excess" of wild horse and "declining range resources" = removal.

AR_227.

Gather operations usually are based on EAs that are adopted prior to removing horses. *See* Leigh Decl. at ¶ 24. Over the past decade, most of the EAs authorize gather operations for a ten-year period of time. *See id.* BLM already has approved a ten-year gather plan for the Triple B Complex. See AR_227; Leigh Decl. at ¶ 25. When BLM engages in documenting and assessing gather operations in the Triple B Complex, the agency frequently announces the gather for the Complex as a whole rather than specific to any HMA within the Complex. *See* Leigh Decl. at ¶ 23; July 2022 Triple B Complex Gather Notice, attached as **Exh. E** to RJN. BLM treats the appropriate management level (AML) for each HMA in the Complex collectively in planning for gathers and accounting of a total when this is done. *See id.* Thus, "the threat of instantaneous and unsupported removal" is not hypothetical, and BLM can use the loss of habit caused by the Jupiter Project to justify the immediate removal of wild horses from the Complex. *See* AR_227-AR_228; Leigh Decl. at ¶ 37.

Moreover, by failing to adequately consider cumulative impacts (such as those involving other mines, oil fields, and geothermal energy production sites),[9] additional impacts to the Triple B horses were ignored. *See* AR_004-AR_006, AR_017, AR_214-AR_222. For example, BLM should have accessed cumulative impacts to foaling seasons and horse migration routes, as well as health implications to horses caused by noise, the use of various chemicals, increased human presence, and increased motor vehicle use. *See* AR_005-AR_006, AR_017.

On September 23, 2024, the IBLA issued an order granting BLM's and KG Mining's motions to dismiss and dismissed the appellants appeal for lack of standing.[10] *See* AR_252. The IBLA also denied the appellant's petition for stay as a result. *See id.* In so ruling, the Board found

---

[9] "The Triple B Complex contains 20 active metal mines, 6 active mineral material mines, 3 active oil fields, and 2 active geothermal energy production sites as of March 2021." AR_213-AR_214.

[10] The Board found the appellants satisfied the requirement of being a "party to a case" but found Ms. Leigh and Ms. Adams had not shown they were "adversely affected" by BLM's adoption of the Jupiter Project. *See* AR_255.

10

1    that while the appellants had a strong interest in wild horses, had visited the Triple B Complex in

2    the past, and planned to visit the Complex in the future, they had not presented evidence that they

3    "ever visited or viewed wild horses at or near the Mine or the public lands that may be impacted by

4    the Juniper Project." AR_257.

5    **IV.    Administrative Procedure Standing**

6        The APA grants a right of judicial review to "[a] person suffering legal wrong because of

7    agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. §702. Plaintiffs

8    averring a claim based on the APA must satisfy its "statutory requirements for standing" by

9    showing "their alleged injury is within the zone of interests protected by the statute allegedly

10   violated." *Friends of Earth v. United States Navy*, 841 F.2d 927, 932 (9th Cir. 1988). The zone of

11   interest analysis "is not meant to be especially demanding." *See id.* (quoting *Clarke v. Securities*

12   *Indus. Ass'n*, 479 U.S. 388 (1987)). The Supreme Court has emphasized that a plaintiff's claim need

13   only "arguably" fall within the zone of interest, which "indicate[s] that the benefit of any doubt

14   goes to the plaintiff." *Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 128 (2d Cir.

15   2020) (citing to *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S.

16   209, 224-225 (2012).)

17       Plaintiffs' challenge to BLM's approval of the Jupiter Project rests upon violations of NEPA

18   and the Wild Horse Act. The zone of interests protected by NEPA are environmental values, which

19   are to be construed "very broadly." *See Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 274 (D.C.

20   Cir. 2015). This includes aesthetic, recreational and conservational interests in the quality of public

21   lands and the animals that reside thereon. *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d

22   472, 484 (9th Cir. 2011); *Ecosystem Inv., Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287,

23   294-95 (5th Cir. 2018); *Bd. Of Cnty. Comm'rs of Rocky Mt. Wild v. United States BLM*, 584 F.

24   Supp. 3d 949, 963 (D. Colo. 2022).

25       Plaintiffs consist of an individual and organization averring aesthetic, recreational, and

26   conservational injuries that fall within NEPA's zone of interests. *See* Leigh Decl. at ¶¶ 17-23, 26-

27   28. Thus, they have a clear right to pursue the relief requested under the APA.

28

The Wild Horse Act provides the statutory authority by which the BLM manages wild horses and burros on public lands. *See* 16 U.S.C. § 1331 *et seq*. The congressional findings and declaration of policy for the Act state:

> Congress finds and declares that wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene. It is the policy of Congress that wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death; and to accomplish this they are to be considered in the area where presently found, as an integral part of the natural system of the public lands.

17 U.S.C. § 1331. This Congressional finding requires that management activities affecting wild horses be conducted at the minimal feasible level. *See id*. at § 1333(a). BLM's regulations mandating HMAPs were adopted to implement the Wild Horse Act. *See* 43 C.F.R. §§ 4700.0-1-4700.0-3.

Plaintiffs consist of American people with an interest in ensuring that wild free-roaming horses are treated as an integral part of public lands and that management activities are conducted at the minimal level feasible. *See* Leigh Decl. at ¶¶ 17-23, 26-28. As such, they are within the zone of interests to be protected and have a clear right to pursue the relief requested.

## V.    Article III Standing

Under Article III, a plaintiff must establish the following elements in order to demonstrate standing: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Standing can apply to an individual, or where an organization is the plaintiff, it can sue on behalf of its member when at least one of its members would otherwise have standing. *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 483 (9th Cir. 2011); *Physicians Comm. for Responsible Med. v. EPA*, 292 F. App'x 543, 545 (9th Cir. 2008).

### A. Injury In Fact

To satisfy the injury in fact requirement, "a plaintiff asserting a procedural injury must show that the procedures in question are designed to protect some threatened concrete interest of his that

is the ultimate basis of his standing." *W. Watersheds Project*, 632 F.3d at 485 (9th Cir. 2011). For example, "[i]nterpreting NEPA broadly, [courts] have recognized standing for individuals and groups of individuals who sue to require preparation of an EIS, when they contend that a challenged federal action will adversely affect the environment." *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1179 (9th Cir. 2004). Additionally, standing exists where plaintiffs challenge an agency action that deprived them of their opportunity to comment. *See McGarry v. Sec'y of the Treasury*, 853 F.2d 981, 984 (D.C. Cir. 1988) (holding that in such cases, plaintiffs need only state that "had the opportunity been made available, it would have commented upon" the agency action). For cases involving the Wild Horse Act and NEPA, it is clear that a party "who observes or works with animals of a particular species in the very area of the world where that species is threatened by a federal decision" may claim standing "since some animals that might have been the subject of his interest will no longer exist." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 567 (1992); *see also Am. Horse Prot. Asso. v. Frizzell*, 403 F. Supp. 1206, 1214 (D. Nev. 1975) (finding an injury in fact where aesthetic or environmental interests are impacted).

WHE is a national nonprofit corporation dedicated to research, journalism, and public education concerning the activities and operations of federal and state management of the free roaming horse and wild burro populations. *See* Leigh Decl. at ¶¶ 17-19. Its mission is to protect and preserve wild horses and burros on range, including the horses in the HMAs and WHT within the Triple B Complex. *See id.* at ¶¶ 18, 21. In support of this mission, WHE frequently submits comments during the NEPA process and participates in public hearings – this includes submitting comments during NEPA review of the Jupiter Project. *See id.* at ¶¶ 20, 29. WHE and its members enjoy visiting wild horses in multiple HMAs, including those in the Triple B Complex, and appreciate the natural beauty and behaviors of the herds in a natural environment. *See id.* at ¶¶ 22, 28a. Since 2011, WHE has sent Laura Leigh and/or volunteers to observe every gather operation that has been conducted in the Triple B Complex. *See id.* at ¶ 28b.

Since 2011, Laura Leigh also has personally been visiting the Triple B Complex to document, photograph, and enjoy wild horses; she has known many of the Triple B horses since their birth. *See id.* at ¶ 26. For the past decade, she has been visiting the Triple B horses once per

13

month. *See id.* at ¶ 27. During these visits, she has documented the movement of horses between the Complex's HMAs, and based on this, she is aware the movement between the HMAs is significant. *See id.* She plans to continue visiting these horses into the coming future. *See id.*

By documenting the horses' movements, it is obvious that her visits have included visits to all of the HMAs and the WHT located within the Triple B Complex. *See id.* at ¶ 28. Specific to the Triple B HMA, Ms. Leigh has visited the Triple B HMA on average eight times per year. *See id.* at ¶ 28a. As regards gather operations, she observed a roundup in the Triple B HMA in 2022. *See id.* at ¶ 28c. On approximately September 1, 2024, she went into the Triple B HMA and took photographs of some of the horses, including "Little Dove," a horse that she has known since birth. *See id.* at ¶ 28d. During this visit, Ms. Leigh saw many horses roaming through the acres that are included in the expansion area of the Jupiter Project. *See id.* In late April or early June of 2025, she again visited the Triple B HMA and drove through the expansion area of the Jupiter Project. *See id.* at ¶ 28e. As a result of the Project, there was a lot of traffic and disturbed, muddy earth. *See id.* She did not see Little Dove or many of the horses that had been there in 2024; instead, she only saw 2 dun stallions. *See id.*

These facts demonstrate that WHE and Laura Leigh have concrete interests in observing, enjoying, documenting, and protecting the horses in the Triple B Complex. And, BLM's decision to adopt the Jupiter Project – without creating an HMAP and without taking a hard look at the Project's direct and cumulative impacts on the horses that migrate throughout the Complex – endangers these horses' very ability to thrive and remain in the Complex. *See* AR_003-AR_007, AR_12, AR_17, AR_23, AR_156, AR_159, AR_195, AR_200-AR_201, AR_210-AR_249, AR_231-AR_249; Leigh Decl. at ¶¶ 32-38. Thus, the Plaintiffs have established injury in fact. WHE's and Ms. Leigh's interests are threatened "since some animals that [are] the subject of [their] interest will no longer exist." *Lujan*, 504 U.S. at 567 (1992).

**B. Traceability and Redressability**

Each and every injury addressed above is predicated upon BLM's failure to follow the Wild Horse Act and NEPA. The Jupiter Project will remove acreage and resources from the Triple B horses, thereby directing impacting their ability to thrive; the Jupiter Project will prompt earlier and

14

1   more frequent gathers of wild horses because the number of wild horses allotted for under BLM's

2   AML will have less habitat and resources. *See* AR_003-AR_007, AR_12, AR_17, AR_23,

3   AR_156, AR_159, AR_195, AR_200-AR_201, AR_210-AR_249, AR_231-AR_249; Leigh Decl.

4   at ¶¶ 32-38. The relief being sought will allow the Plaintiffs to seek a stay of the Project and have

5   their legal challenge addressed on its merits. By doing so, Plaintiffs can ensure BLM complies with

6   the law, thereby rectifying injury to Plaintiffs' individual and organizational interests.

7   **VI.    ARGUMENT**

8            **A. The IBLA committed procedural error.**

9            To demonstrate administrative standing to bring a procedural claim—such as one alleging a

10  NEPA violation—an appellant must show a causal relationship between the approved action and

11  alleged injury to a legally cognizable interest. *See Center for Biological Diversity*, 195 IBLA 298,

12  302 (2020). This relationship requires the appellant to show he has visited the project area "or

13  adjacent/nearby lands likely to be affected by" the project. *Western Watersheds Project*, 185 IBLA

14  293, 300 (2016). The question of whether a party has standing is a "threshold matter" that must be

15  addressed before turning to the merits of an appeal. *Robert M. Sayre*, 131 IBLA 337, 339 (1994);

16  *see also The Mandan, Hidatsa & Arikara Nation*, 196 IBLA 309 (2021) (finding that an appellant

17  need not make a "merits-based showing" to demonstrate that it has administrative standing); *Frank*

18  *Stebly*, 109 IBLA 242, 245 (1989) (finding administrative law judge erred by equating an

19  appellant's ability to prevail on the merits with lack of standing when [c]learly, the two should be

20  distinguished"). And relatedly, even when the merits of an appeal are to be ruled upon, the IBLA's

21  regulations state such review must be based on the Board's consideration of a complete

22  administrative record. *See* 43 C.F.R. § 4.406; *Williams Field Services Company*, 193 IBLA at 20;

23  *Petroleum Fuels Offshore, LLC*, 189 IBLA at 215.

24           The appellants asserted that the area impacted by the Jupiter Project includes the entirety of

25  the Triple B Complex, which consists of the Triple B HMA, Maverick-Medicine HMA, and the

26  Cherry Springs Wild Horse Territory (WHT). *See* Leigh Decl. at ¶ 13; **Exh. A** to RJN, pp. 4-5;

27  AR_006, AR_008, AR_213-AR_214. The Board found the evidence showed Laura Leigh and

28  Tammi Adams had visited the Triple B Complex in the past and intended to continue doing so in

15

1   the future, and it recognized the Appellants alleged the cumulative impacts of the Jupiter Project

2   would affect wild horses in the Triple B Complex. *See* AR_256-AR_257. Nevertheless, the Board

3   ruled Appellants had failed to establish their interest was adversely impacted for the reason that the

4   Triple B Complex encompasses 2,059,987 acres and the Juniper Project only directly disturbs 3,969

5   acres in the Triple B HMA. *See* AR_257-AR_258.

6          The Board was not unambiguous in identifying the geographic area it considered to be

7   relevant to the Jupiter Project's impacts, but it did note that BLM's draft EIS analyzed "potential

8   impacts to the wild horses in the 1,232,717-acre Triple B Herd Management Area (HMA)." *See*

9   AR_253. Thus, the Board adjudicated the merits of the appellants' claim regarding the appropriate

10  scope or geographic boundaries of the Project's impacted area, denying that it extended to the

11  whole of the Complex and all of the Triple B horses.

12         Furthermore, in finding that the impacted area was less than the Triple B Complex and

13  suggesting it, at most, was properly limited to the boundaries of the Triple B HMA, the Board cited

14  to pages 3-224 through 3-228 of the DEIS. *See* AR_253 n. 9. Significantly, neither BLM nor KG

15  Mining referenced these pages in their motions to dismiss.[11] And, as the administrative record had

16  yet to be filed, this means the Board not only looked at evidence not addressed in the briefing, but

17  the Board's consideration of such evidence occurred without review of the complete record.

18         The prejudice resulting from such a *sua sponte* and limited review is significant because had

19  the Board sought to accurately portray BLM's cumulative effects study area (CESA), it should have

20  noted, at a minimum, that (1) BLM's maximum CESA for the Jupiter Project addressed a

21  19,377,103-acre area, encompassing Elko, Eureka, and White Pine Counties. *See* **Exh. B** to RJN, p.

22  16. This maximum CESA included the entirety of the Triple B Complex, as well as the Antelope

23  Complex, Pancake Complex, and Moriah Herd Area. *See* Leigh Decl. at ¶ 15; **Exh. B** to RJN, p. 13

24  (Fig. 3.11-1). Even a review of the five pages relied upon by the Board, which set BLM's CESA for

25  wild horses as the Triple B HMA, contains BLM's acknowledgement that wild horses move freely

26  throughout the Triple B Complex's three HMAs, as well as the adjacent Cherry Springs Wild Horse

27  ─────────────────────
[11] While BLM and KG Mining reference the DEIS in their motions, neither directed the Board to

28  pages 3-224 through 3-228. KG Mining did reference Fig. 3.11-1. AR_171.

Territory – which supports the appellant's assertion that their interest in these wild horses and the harm to them is not geographically constrained to the Triple B HMA. *See* **Exh. B** to RJN, p. 12.

In conclusion, the Board made a determination regarding the proper scope of the Jupiter Project's geographic impact by acting, on its own initiative, to selectively peruse and cite to BLM's DEIS, when an adjudication of the merits was not only improper, but also, the complete administrative record was not yet available to the parties or the Board. *See* 43 C.F.R. § 4.406; *Clifton Cap. Grp., LLC*, 66 F.4th 1214, 1217 (9th Cir. 2023); *Petroleum Fuels Offshore, LLC*, 189 IBLA 213, 215 (2017), **Exh. F4** to RJN, p. 110. As such, the order was issued without observance of procedure required by law, and summary judgment should be granted. *See* 5 U.S.C. § 706(2)(D).

## B. The IBLA decision contains factual and legal errors.

In reviewing a decision of an administrative agency under 5 U.S.C. § 706(2)(A), the reviewing court must evaluate whether "the agency has 'considered the relevant factors and articulated a rational connection between the facts found and the choice made.'" *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 982 (9th Cir. 1985) (quoting *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105 (1983).

> Because the arbitrary and capricious standard focuses on the rationality of an agency's decisionmaking process rather than on the rationality of the actual decision, "it is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." Thus, the grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record. The agency must make plain its course of inquiry, its analysis and its reasoning.

*Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994) (internal citations omitted); *see also League of Wilderness Defs. v. United States Forest Serv.*, 549 F.3d 1211, 1218 (9th Cir. 2008) (where an agency's decision was made with an "almost complete failure" to address relevant facts, it cannot survive arbitrary and capricious review).

The APA also provides that "the reviewing court shall decide all relevant questions of law." *See* 5 U.S.C. § 706(2). The failure to address a relevant factor may be both arbitrary and a legal error. *See In re Lee*, 277 F.3d 1338, 1344 (Fed. Cir. 2002). Legal error also occurs where an administrative agency ignores or misinterprets applicable law. *See* 5 U.S.C. § 706(2)(A) (agency actions must be set aside if not in accordance with law); *Loper Bright Enters. v. Raimondo*, 603

17

1  U.S. 369, 391-92 (2024) (incorrect interpretation of statute violates APA); *NLRB v. Ashkenazy*

2  *Prop. Mgmt. Corp.*, 817 F.2d 74, 75 (9th Cir. 1987) (administrative agency is not free to ignore

3  precedential law*); Marcus v. Dir., Office of Workers' Comp. Programs, U. S. Dep't of Labor*, 548

4  F.2d 1044, 1051 (D.C. Cir. 1976) (reviewing court examines whether administrative tribunal's

5  decision is consistent with applicable law); *Am. Stewards of Liberty v. DOI*, 370 F. Supp. 3d 711,

6  725 (W.D. Tex. 2019) (agency decisions that disregard applicable law must be set aside under the

7  APA).

8        Here, the Board's order relied only upon a handful of statements, which can be summarized

9  as follows:

10   •   The Jupiter Project extends the NOA mine life by 11 years and disturbs an additional
         3,969 acres of public lands, increasing the total life-of-mine surface disturbance in the
11       NOA to 14,752 acres.

12   •   The Triple B Complex consists of multiple HMAs and encompasses 2,059,987 acres.

13   •   BLM analyzed potential impacts of the Jupiter Project on wild horses in the Triple B
14       HMA, which consists of 1,232,717 acres.[12]

15   •   Ms. Leigh and Ms. Adams both submitted comments on the DEIS.

16   •   Both Ms. Leigh and Ms. Adams assert that they have a strong interest in wild horses and
         have visited the Triple B Complex to view the wild horses in the past and plan to visit
17       the Complex in the future.

18   •   The appellants assert the cumulative impacts from Jupiter Project significantly increase
19       the potential for wild horse gathers and removals, permanent sterilization and
         application of a plethora of fertility control procedures, and interferes with and adversely
20       affects their recreation and enjoyment of the Triple B Complex wild horses.

21   •   Ms. Adams claims that she has flown over the Bald Mountain Mine by commercial jet,
22       but other than this claim, the appellants have presented no evidence that Ms. Leigh or
         Ms. Adams "

23  *See* AR_252-AR_258. Based on these facts, the Board concluded "there is no evidence that Leigh

24  or Adams has ever visited or viewed wild horses at or near the Mine or the public lands that may be

25

26  ───────────────
[12] Not only did the Board ignore material facts in the papers filed by the parties, but as mentioned
27  above, when the Board chose to look at the DEIS, it cherry-picked content and ignored the scope
    of BLM's maximum CESA, as well as BLM's recognition that the Triple B horses reside
28  throughout the Complex and migrate between the HMAs and WHT.

impacted by the Juniper Project. Rather, the evidence shows only that Leigh and Adams have visited the Triple B Complex to view the wild horses." AR_257.

### 1.      Error No. 1

The IBLA completely ignored numerous material facts without explaining any basis for doing so.[13] Specifically, the Board's order makes no mention of the following:

- The wild horses in the Triple B HMA roam and move freely within and between the other HMAs of the Triple B Complex. This movement is significant. *See* AR_022.

- Wild Horse Education is a non-profit organization whose "mission encompasses the protection of wild horses (and burros) as well as the health of the American West public lands upon which they habitat and depend on for survival." AR_14

- Wild Horse Education and its members advocate for and enjoy visiting wild horses in multiple HMAs, *including the Triple B Complex HMAs*, and appreciate the natural beauty and behaviors of the herds in a natural environment. *See id.*

- Volunteers with Wild Horse Education "have attended roundups *in the Triple B Complex HMAs*, and regularly *visit the HMA* for enjoyment, documentation, and recreation." *Id.* (emphasis added).

- Ms. Leigh's experience with the horses in the Triple B Complex is extensive. She has visited them since 2011, and for the past decade, she has visited them on a monthly basis. Ms. Leigh has known and photographed many of the horses from birth. *See* AR_022, AR_165.

- Through her visits, Ms. Leigh has documented the horses' movement *between the HMAs of the Complex*. *See* AR_022.

- The Jupiter Project directly impacts wild horses as a result of approximately 4,000 acres being removed for their use in the Triple B HMA. This acreage is some of the most prolific rangeland, habitat, and resources found in the Triple B Complex. *See* AR_156, AR_215.

- The direct impact is even more meaningful when one considers past actions affecting these horses, which have already resulted in the Triple B horses losing 140,000+ acres of habitat. *See* AR_004, AR_216.

---

[13]While the appellants' presentation of these facts was not always clear and direct, as they were unrepresented by counsel, they are not are not held to as stringent a pleading standard as represented parties. *See Hughes v. Rowe*, 449 U.S. 5, 15 (1980). Many individuals and organizations, including WHE and Laura Leigh, have appeared unrepresented before the IBLA, and in the past, the IBLA has taken steps to facilitate regular citizens' right to the protection offered by the IBLA. *See* Leigh Decl. at ¶ 6.

- The loss of habitat impacts BLM's analysis of when excess wild horses must be gathered and permanently removed from the Triple B Complex because decisions to conduct a gather are based on AML and deterioration of rangeland health. By losing approximately 4,000 acres (including the resources within this acreage), even if the population of horses is within AML, the range will more quickly experience impacts by the horses. And, BLM will rely upon this loss of habitat and impact on the range to justify a gather operation, as it has done in the past. *See* AR_011, AR_159, AR_214, AR_226, AR_227.

- BLM already has approved a ten-year gather plan for the Triple B Complex. Thus, "the threat of instantaneous and unsupported removal" is not hypothetical, and BLM can use the loss of habit caused by the Jupiter Project to justify the immediate removal of wild horses from the Complex. *See* AR_227-AR_228.

- In addition to direct impacts, BLM's failure to adequately consider cumulative impacts (such as those involving other mines, oil fields, and geothermal energy production sites), additional impacts to the Triple B horses have been ignored. This includes potential impacts to foaling seasons and horse migration routes, as well as health implications to horses caused by noise, the use of various chemicals, increased human presence, and increased motor vehicle use. *See* AR_004-AR_006, AR_017, AR_213-AR_222.

By ignoring these facts, the Board ignored the reason why the area impacted by the Jupiter Project is not merely the approximately 4,000 acres directly disturbed by the NOA expansion. The expansion also directly impacts the horses in the Triple B HMA, as well as in the Maverick-Medicine HMA and Antelope Valley HMA. In addition, these facts demonstrate that Wild Horse Education and its members have been in each of the HMAs in the Complex.[14]

The failure of the Board to address these facts in any way does not survive arbitrary and capricious review under the APA. *See League of Wilderness Defs.*, 549 F.3d at 1218.

## 2.    Error No. 2

The Board failed to articulate a rational connection between the facts found and its ruling. Even on the facts considered by the Board, it is unclear why it ruled as it did. As addressed above in Section VI.A, the Board suggests that the impacted area may include the entirety of the Triple B HMA – although this is not explicitly stated. Instead, the ruling only says the record doesn't

---

[14] To the extent the IBLA would have found standing had the appellants specifically stated they had visited the Triple B HMA, had this been made clear, Ms. Leigh could have provided additional facts. *See* Leigh Decl. at ¶ 28. It was within the Board's authority to request a hearing for this purpose. *See* 43 C.F.R. § 4.409(g).

1  establish the appellants visited or viewed areas on "public lands that may be impacted by the

2  Juniper Project." AR_257. No rationale connects the considered facts to this conclusion, especially

3  in light of the Board acknowledging (but not dismissing) the appellants' contention that the

4  cumulative impacts from Jupiter Project significantly increase the potential for wild horse gathers

5  and removals, permanent sterilization and application of a plethora of fertility control procedures,

6  and interferes with and adversely affects their recreation and enjoyment of the Triple B Complex

7  wild horses. *See* AR_256.

8              **3.      Error No. 3**

9          The IBLA order concludes that the appellants lacked standing because they visited horses

10  "within a large area containing the project" but not the "project area" or "the public lands that may

11  be affected by the Juniper Project." AR_258. In this regard, the Board seemed most focused on the

12  number of acres involved and less on the scope of the Project's impact. In support of its conclusion,

13  the Board relied primarily upon an Order in *Elyse R. Gardner Walsh, Laura Leigh & Wild Horse*

14  *Education*, (2018) – an order without precedential authority. *See* AR_168-AR_169. It also

15  references *W. Watersheds Project*, 185 IBLA 293 (2015); *Cascadia Wildlands*, 188 IBLA 7 (2016);

16  *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992). *See* AR_258 n. 250. The Board committed legal

17  error in its interpretation and application of these sources.

18              ***a.      W. Watersheds Project***

19          In *W. Watersheds Project*, the Board stated an appellant must make colorable allegations of

20  an adverse effect that "are sufficient to establish a causal relationship between the approved action

21  and the injury alleged." *W. Watershed Project*, 185 IBLA at 299, **Exh. F5** to RJN, p. 116. In that

22  case, the IBLA found standing had not been demonstrated because the appellant had not shown any

23  of its members had ever visited the area *averred by appellant* to be impacted by the challenged

24  BLM decision. *See id.* at 300-01, **Exh. F5** to RJN, p. 117. The facts, however, clearly differentiate

25  this finding as compared to Laura Leigh's and Wild Horse Education's standing.

26          There, BLM adopted a vegetation treatment project within the boundaries of two

27  watersheds. *See id.* at 294, **Exh. F5** to RJN, p. 113. The boundaries of the watersheds encompassed

28  646,441 acres. *See id*. The vegetation treatments, however, were limited to "seven vegetation

treatment units." *Id.* "Importantly, BLM denoted the total acres in each of the seven treatment units, the target acreage and the maximum number of acres to be treated." *Id.* at 296, **Exh. F5** to RJN, p. 114. More specifically:

> The seven vegetation treatment units are denoted as follows, with the approximate numbers of acres targeted for treatment/total acreage in each of the units: Huntington (9,650/38,575); Diamond Mountain (7,450/24,845); Buck Mountain (5,800/29,111); Bald Mountain (10,300/51,520); Pancake (1,450/14,292); Monte Cristo (4,000/40,360); and Hamilton (6,800/27,218).

*Id.* at 294 n. 2, **Exh. F5** to RJN, p. 113. Or, in total, the challenged action involved treatment of 45,450 acres in seven units that encompass 225,921 acres. *See id.*

The appellant challenged approval of the project, asserting that the action would endanger wildlife within the seven vegetation treatment units. *See id.* at 297-99, **Exh. F5** to RJN, pp. 115-116. In support of this assertion, Kenneth Cole, the director of Western Watershed Project, submitted a declaration that addressed the manner in which vegetation treatments can impact the sage-grouse population. *See id.* at 299, **Exh. F5** to RJN, p. 116. "Were similar consequences to occur in the case of the treatment areas associated with the [challenged plan], Cole indicates that his use and enjoyment of these areas, particularly of the scenery, sage-grouse, and other wildlife, would be negatively affected." *Id.* The declaration did not address impacts outside these project areas, cumulative or otherwise.

Kenneth Cole also stated he had visited the Newark and Huntington watershed on at least two occasions in 2011 and intended to do so again at some "indefinite" time in the future. *See id.* at 300, **Exh. F5** to RJN, pp. 116-117. However, he did not state he had visited "any of the specific areas where vegetation treatments … are to take place (or adjacent/nearby lands likely to be affected by such activities)." *Id.* Based on this, the IBLA concluded the appellant had not demonstrated it or its members "held *a legally cognizable interest at the time* [BLM approved the project in 2015]." *Id.* (emphasis in original).

Here, the Board's order depicts the *W. Watersheds Project* decision as holding that "an appellant had not established a legally cognizable interest that is substantially likely to be injured by a decision authorizing vegetation treatments when its member had visited the 577,528 acre

---

project area but had not visited any of the areas to be treated." AR_258 n. 50. This depiction is incomplete, and the decision does not support the conclusion that Laura Leigh and Wild Horse Education lack standing.

In *W. Watershed Project*, the Board's conclusion was not based on the fact that the project area contained 577, 528 acres, but rather, the Board focused on the scope of the area impacted by the project. This scope was clearly delineated by BLM to seven treatment units with total and target acreage identified. *See id*. at 294 n. 2, 296, **Exh. F5** to RJN, p. 113. And, the appellant did not argue that the impact extended beyond this acreage. Thus, the appellant was required to make colorable allegations that its members visited this delineated acreage. *See id.* at 300-01, **Exh. F5** to RJN, pp. 116-117. This would be true whether the project area contained 577,528 acres or 5 acres.

The IBLA erred in relying upon the *W. Watershed Project* decision to conclude that dismissal was warranted. Unlike that case, BLM has not limited the impact of the Bald Mountain Mine expansion to a specifically defined area. Indeed, the agency acknowledges that potential cumulative impacts exceed far beyond the Project's boundaries. *See* **Exh. B** to RJN, pp.11-12, 15, 16, 11. Also, Laura Leigh and WHE do not aver that the impact is limited to the boundaries of the Jupiter Project's approximately 4,000 acres of expansion and surface disturbance, but instead, the impacts extend throughout the Triple B Complex because (a) their challenge addresses the cumulative impacts of the Jupiter Project, and (b) the wild horses of the Triple B Complex move throughout three HMAs, including the Triple B HMA, which is directly impacted by the Project. *See* AR_004, AR_011, AR_159, AR_165, AR_195, AR_200-AR_201, AR_215, AR_217, AR_219-AR_220, AR_225-AR_228; *see also* Leigh Decl. at ¶¶ 32-38; **Exh. B** to RJN, p. 12.

And unlike the appellant in *W. Watershed Project*, here the evidence clearly establishes that Laura Leigh and WHE have a legally cognizable interest as Ms. Leigh and WHE members "have attended roundups in the Triple B Complex HMAs and regularly visit the HMA for enjoyment, documentation, and more." AR_014; *see also* Leigh Decl. at ¶ 17-28. They also "intend to continue regular visits in 2024 and beyond, documenting and enjoying wild horses on the Triple B Complex HMAs, including adjacent herd areas." AR_015.

23

Based on this, the Board was unreasonable in concluding that WHE and its members' contact with the at-issue wild horses and Jupiter Project's impacts was similar to that established by Kenneth Cole and Western Watershed Project.

### b. *Cascadia Wildlands*

In *Cascadia Wildlands*, the appellants challenged BLM's decision to conduct timber sales in the South Yamhill River Watershed Enhancement. *See Cascadia Wildlands*, 188 IBLA at 8-9, attached as **Exh. F6** to RJN, pp. 120-121. The Board recognized that the appellants, which consisted of two organizations, had made broad assertions that its members hiked and engaged in recreational activities in the *project area*. *See id.* at 11, **Exh. F6** to RJN, p. 123. But, these assertions were not corroborated by "a supporting statement of any kind." *Id.* Further, the appellants did not identify any of its members by name and had not given any specifics regarding when such visits had occurred. *See id.*

As regards *future use*, the appellants' assertions were "unconnected to the land subject to the timber sale." *Id.* at 12, **Exh. F6** to RJN, p. 124. In this regard, the Board focused on the timber sale covering 344 acres while the area visited by appellants encompassed a larger area covering 1,168 acres. *See id.* Notably, the 344 acres were "located behind a locked gate and 'not considered a destination point for recreational users.'" *Id.* (citation omitted). Nothing in the *Cascadia Wildlands* decision suggests the appellants believed the impacts of the timber sale exceeded the project's 344 acres.

Here, the Board's mention of *Cascadia Wildlands* focuses on use of 1,168 acres and ignores all other relevant findings associated with the case. *See* AR_258 n. 50.

Laura Leigh and WHE have provided both broad assertions, as well as specific statements identifying the names of two members that have visited the impacted area (Laura Leigh and Tammi Adams) and identifying when these members visited the impacted areas. *See* AR_022, AR_022-AR_024, AR_165; *see also* Leigh Decl. at ¶ 28. And, unlike *Cascadia Wildlands*, the Jupiter Project's expansion is not secured behind a gate nor does it limit the expansion's effects by ensuring the horses in the Complex will not visit the impacted area. Instead, the record shows that the Project will permanently remove approximately 4,000 acres

24

1    from the Triple B horses' habitat, with its attendant resources. *See* AR_004, AR_011, AR_159,

2    AR_165, AR_195, AR_200-AR_201, AR_215, AR_217, AR_219-AR_220, AR_225-AR_228;

3    *see also* Leigh Decl. at ¶¶ 28, 32-38.

4           Plainly, the *Cascadia Wildlands* decision does not command a ruling that Laura Leigh

5    and WHE lack standing.

6               **c.**      ***Lujan v. Defs. Of Wildlife***

7           In *Lujan*, the plaintiffs challenged a Department of the Interior rule that interpreted the

8    Endangered Species Act to apply "only to actions within the United States or on the high seas."

9    504 U.S. at 557-58. They averred "the lack of consultation with respect to certain funded

10    activities abroad 'increases the rate of extinction of endangered and threatened species.'" *Id.* at

11    562 (citation omitted). In addressing standing at the summary judgment stage, the plaintiffs' case

12    was dismissed for lack of Article III standing. *See id.* at 563. On appeal, the U.S. Supreme Court

13    noted:

14         To survive the Secretary's summary judgment motion, respondents had to submit
     affidavits or other evidence showing, through specific facts, not only that listed

15         species were in fact being threatened by funded activities abroad, but also that one
     or more of respondents' members would thereby be "directly" affected apart from

16         their "'special interest' in the subject."

17    *Id.*

18           In this regard, the plaintiffs submitted a declaration from one of its members that

19    demonstrated she had observed crocodiles in Egypt in 1986, these crocodiles were suffering

20    harm because of U.S. participation in Egypt's water infrastructure development, and as a result,

21    her interest in observing the crocodiles was affected. *See id.* at 563. They also submitted another

22    member's declaration, which showed she had traveled to Sri Lanka in 1981 and observed the

23    habitat of Asian elephants and leopards. *See id.* Although she did not actually see any of these

24    animals, a U.S. development project in the area would harm the species and her future ability to

25    view them. *See id.* Significantly, she did not know when she might again visit the area. *See id.*

26    The Court found these declarations insufficient to demonstrate standing because "'some day'

27    intentions – without any description of a concrete plans, or indeed even any specification of

28

1   *when* the some day will be – do not support a finding of the 'actual or imminent' injury that our

2   cases require." *Id.* at 564.

3          The Court also noted that while the desire to observe an animal species is a cognizable

4   interest, plaintiffs need to demonstrate more than aver use of "portions of an ecosystem not

5   perceptibly affected by the unlawful action in question." *Id.* at 566. However, a party "who

6   observes or works with animals of a particular species in the very area of the world where that

7   species is threatened by a federal decision" may plausibly claim standing, "since some animals

8   that might have been the subject of his interest will no longer exist."[15]  *Id.* at 567. On the other

9   hand, "[i]t goes beyond the limit … and into pure speculation and fantasy, to say that anyone

10  who observes or works with an endangered species, anywhere in the world, is appreciably

11  harmed by a single project affecting some portion of that species with which he has no more

12  specific connection." *Id.* at 567.

13         The Board quotes *Lujan*'s ruling for the proposition that a party must use the impacted

14  area and "not an area roughly in the vicinity of it." AR_258. No recognition is given to the

15  Court's language that where animals are involved, the scope of the impacted area may be large.

16  *See Lujan*, 504 U.S. at 566-67.

17         WHE's "mission encompasses the protection of wild horses (and burros) as well as the

18  health of the American West public lands upon which they habitat and depend on for survival."

19  AR_014. Its members have a long-standing relationship with the specific horses in the Triple B

---

[15] The Ninth Circuit has cited to this language in *Lujan* with approval. In *Beck v. U.S. Dep't of Commerce*, the case focused on a regulation interpreting the Marine Mammal Protection Act as it applied to Alaskan Natives who use sea otters to make clothing and crafts. *See Beck v. U.S. Dep't of Commerce*, 982 F.2d 1332, 1334 (9th Cir. 1992). An intervenor organization demonstrated that its mission involves the protection and preservation of sea otters, and its members have studied, observed, and enjoyed sea otters in Alaska. *See id.* at 1340. The organization explained that "any permitted takings of sea otters by Alaska natives will result in increased illegal taking as the market in sea otter fur is revived. This, in turn, will affect other sea otter populations." *Id.* at 1341. The Court noted that one "who observes or works with animals of a particular species in the *very area of the world where that species is threatened* by a federal decision" may plausibly claim such harm, "since some animals that might have been the subject of his interest will no longer exist." *Id.* at 1340 (emphasis in the original) (quoting *Lujan*, 504 U.S. at 567). Accordingly, the Court found the intervenor had established standing. *See id.* at 1341.

1   Complex, which has involved monitoring gathers in the Complex HMAs, documenting

2   migration of the herds among these HMAs, and visiting the Complex to appreciate the natural

3   beauty and behaviors of the herds. *See* AR_008, AR_010, AR_022- AR_025, AR_156, AR_165,

4   AR_195-AR_196, AR_197- AR_198, AR_209, *see also* Leigh Decl. at ¶¶ 17-28. Direct and

5   cumulative impacts from the Jupiter Project will harm the interests of WHE and Laura Leigh

6   since some horses that are the subject of their interest will gathered and removed or otherwise

7   harmed. *See* AR_004, AR_011, AR_159, AR_165, AR_195, AR_200-AR_201, AR_215,

8   AR_217, AR_219-AR_220, AR_225-AR_228; *see also* Leigh Decl. at ¶¶ 32-38.

9        *Lujan* does not support the Board's order. Instead, it supports a finding that the appellants

10   made colorable allegations sufficient to show adverse impact. *See Lujan*, 504 U.S. at 566; *Beck*,

11   982 F.2d at 1340-41.

12                    ***d.    Walsh***

13        In *Walsh*, the appellants challenged BLM's approval of the Gold Bar Mine Project. *See*

14   *Walsh* at 1-2 (January 23, 2018), attached as **Exh. F15** to RJN. BLM analyzed impacts to horses

15   in the Roberts Mountain HMA, where the Project was located, as well as in the Roberts

16   Mountain Herd Area (HA), Fish Creek North HMA, and Kobeh Valley HA, where access roads

17   to the mine were located. *See id*. at 3, **Exh. F15** to RJN, p. 211. The agency concluded "the

18   Project would have 'unavoidable adverse impacts' (loss of forage), 'irreversible and irretrievable

19   commitments of resources' (loss of forage on 154 unreclaimed acres), and that the 'majority of

20   impacts to wild horses would be long-term because successful revegetation of disturbed areas

21   could take several years after the cessation of mining.'" *Id*. at 4, **Exh. F15** to RJN, p. 212.

22        KG Mining argued in its Motion to Dismiss that the *Walsh* order should be considered by

23   the Board for its persuasive value. In response, the appellants noted that the order should not be

24   considered because of the unique circumstances surrounding that appeal. *See* AR_197. There,

25   Laura Leigh and WHE submitted a Notice of Appeal and Petition for Stay, which was

26   accompanied by an initial declaration from Ms. Leigh. *See Walsh* at 5 n. 22, **Exh. F15** to RJN, p.

27   5. After BLM opposed the petition, the Board issued an order to show cause on appellants as

28   they did not timely respond to the opposition. *See* Leigh Decl. at ¶ 39. Laura Leigh and WHE did

1  not meet the deadline to file any response or supplemental declarations because the

2  organization's vice-president and Ms. Leigh's close friend died unexpectedly and suddenly from

3  a heart attack. *See id.*; AR_197. Ms. Leigh was too distraught to adequately address the appeal

4  and issues of standing. *See* Leigh Decl. at ¶ 39. Therefore, the only evidence before IBLA on

5  behalf of Laura Leigh and WHE consisted of Ms. Leigh's initial statement that she

6  communicated with BLM regularly and had visited "the Roberts Mountain, Fish Creek and

7  Whistler [W]ild Horse Herd Management Areas (HMAs) and the Kobeh Valley and Robert's

8  Mountain Herd Areas (HAs), as well as multiple wild horse areas within and around the Project

9  area." *Id.* at 7, **Exh. F15** to RJN, p. 215.

10      The Board ruled this was not sufficient to establish standing.

11      Without any added details and specifics on when, where, and for what purpose
        she visited these areas, including any details specifying that she has visited the

12      project area, we are unable to find she has demonstrated that she has a legally
        cognizable interest that is or is substantially likely to be injured by BLM's

13      decision.

14  *Id.,* **Exh. F15** to RJN, pp. 215-216.

15      In addition, the IBLA noted the only impact averred by appellants was that the BLM

16  decision would cause "imminent, irreparable harm to the safety of wild horses" based upon a

17  procedural violation of NEPA. *Id.* at 8-9, **Exh. F15** to RJN, pp. 216-217. The IBLA ruled that "a

18  procedural violation of NEPA is not itself sufficient" to establish adverse impact. *Id.* at 9, **Exh.

19  F15** to RJN**,** p. 217. As a result, the Board concluded the appellants had not "alleged or shown

20  how development of this mine is likely to cause irreparable harm to wild horses in or near the

21  Project area." *Id.* at 10, **Exh. F15** to RJN, p. 218.

22      Here, the IBLA recognized that *Walsh* is not binding but found it has "persuasive value

23  and informs our analysis because its facts are very similar to those before us now." AR_258. The

24  truth, however, is that the facts are not similar. Here, the record does give details and specifics on

25  when, where, and for what purpose, the appellants visited the impacted area. *See* AR_008,

26  AR_010, AR_022- AR_025, AR_156, AR_165, AR_195-AR_196, AR_197- AR_198, AR_209,

27  *see also* Leigh Decl. at ¶¶ 17-28. The impact averred by appellants also is not based solely on

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

procedural harm, but instead, Plaintiffs have demonstrated that the Project's direct and circumstantial effects will result in the horses losing land and resources, as well as an increased likelihood that BLM will gather and remove the horses. *See* AR_004, AR_011, AR_159, AR_165, AR_195, AR_200-AR_201, AR_215, AR_217, AR_219-AR_220, AR_225-AR_228; *see also* Leigh Decl. at ¶¶ 32-38.

In conclusion, the Board's order relies upon decisions and an order that do not support the Board's dismissal of Laura Leigh's and WHE's appeal. Had the Board looked at the facts in those cases, it should have concluded they did not command dismissal. This legal error, in violation of the APA, warrants a ruling that the order be set aside and the matter remanded to the IBLA. *See* 5 U.S.C. § 706(2).

**VII.    CONCLUSION**

For the foregoing reasons, the court should grant Plaintiffs' Motion for Summary Judgment, reverse the IBLA's order dismissing Plaintiffs' administrative appeal for lack of standing, and remand the matter to the IBLA for consideration of the merits of Plaintiffs' claims.

//

//

//

//

//

//

//

DATED:  August 29, 2025,              Respectfully Submitted,

*/s/ Jennifer Rae Lovko*
Jessica L. Blome
(Cal. Bar No. 314898, pro hac vice)
Jennifer Rae Lovko
(Cal. Bar No. 208855, pro hac vice
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com
rlovko@greenfirelaw.com

*/s/ Brent M. Resh*
Brent M. Resh
(Nevada Bar No. 14940)
BRENT RESH LAW, PLLC
2401 La Solana Way
Las Vegas, NV 89102
(702) 781-6903
brent@brentreshlaw.com

*Attorneys for Plaintiffs*

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF