**EXHIBIT F11**

**Frank Stebly,
109 IBLA 242 (1989)**

## *109 IBLA 242; 1989 IBLA LEXIS 108*

Interior Board of Land Appeals

June 16, 1989, Decided

IBLA 87-782

*Department of Interior Board of Land Appeals          Decisions*

**Reporter**
109 IBLA 242 *; 1989 IBLA LEXIS 108 **

# FRANK STEBLY v. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT

## Core Terms

plant, site, coal, foot, groundwater, pond, air, regulatory authority, adversely affect, aquifer, notice, truck, significant impact, reclamation, sediment, mile, pile, surface water, state law, contaminate, highway, onsite, spoil, permit application, surface coal, permeability, diversion, issuance, bedrock, pollute

## Headnotes

1. Administrative Procedure: Standing -- National Environmental Policy Act of 1969: Environmental Statements -- Surface Mining Control and Reclamation Act of 1977: Permits: Hearings

An individual who submits proof of residing within three-fourths of a mile of a coal preparation plant, and shows that he may be adversely affected by traffic and air pollution caused by coal trucks transporting coal to the plant has standing within the meaning of 30 CFR 700.5 to seek review of OSMRE's approval of a permit to operate the plant.

2. National Environmental Policy Act of 1969: Environmental Statements -- Surface Mining Control and Reclamation Act of 1977: Hydrologic System Protection: Generally

A determination that approval of a permit for a coal preparation plant will not have a significant impact on groundwater, based on an environmental assessment, will be affirmed on appeal if the record establishes that a careful review of environmental problems has been undertaken; relevant environmental concerns have been identified; **[\*\*2]** and the final determination is reasonable in light of the environmental analysis.

3. Surface Mining Control and Reclamation Act of 1977: Permits: Approval

Under 30 CFR 773.15(b) (1987), the regulatory authority shall, prior to approval of a permit for a surface mining and reclamation operation, make a finding that **[\*243]** any operation owned or controlled by the applicant is not currently in violation of SMCRA or in violation of any Federal law, rule, or regulation, or any state law, rule, or regulation enacted pursuant to Federal law, rule, or regulation pertaining to air or water environmental protection.

## Counsel

109 IBLA 242, *243; 1989 IBLA LEXIS 108, **2

APPEARANCES:

David A. Bricklin, Esq., Seattle, Washington, for appellant

Ralph O. Canaday, Esq., Denver, Colorado, for the Office of Surface Mining Reclamation and Enforcement.

# Action

**[**1]**

**[*242]** Appeal from a decision of Administrative Law Judge Sweitzer dismissing an application for review of permit WA-0002.

Reversed in part and affirmed in part.

**Opinion By:** MULLEN

# Opinion

OPINION BY ADMINISTRATIVE JUDGE MULLEN

**_Frank Stebly_** has appealed from a decision of Administrative Law Judge Harvey C. Sweitzer, dated July 31, 1987, dismissing his application for review of permit WA-0002.

On April 8, 1987, the Office of Surface Mining Reclamation and Enforcement (OSMRE) published notice of its approval of this permit, which authorizes Palmer Coking Coal Company (Palmer) **[**3]** to wash coal at its McKay Preparation Plant (McKay Plant) in King County, Washington. [1] The notice provided that any person with an interest which is or may be adversely affected by OSMRE's action could request an adjudicatory hearing in accordance with section 514(c) of the Surface Mining Control and Reclamation Act of 1977 (SMCRA), _30 U.S.C. § 1264(c)_ (1982). **_Stebly_** subsequently filed an application for review of the Palmer permit approval.

In his application for permit review, **_Stebly_** asked that OSMRE rescind its approval of permit WA-0002 and return the matter for disapproval or further review. **_Stebly_** alleged that he resided in close proximity to the McKay Plant and would be adversely affected by the proposal's impacts on traffic, groundwater quality, surface water quantity and quality, fisheries, and noise levels. Appellant charged that OSMRE erred when finding **[**4]** that no significant impacts (FONSI) would result from operations at the McKay Plant. Specifically, appellant charged that OSMRE's environmental assessment (EA) inadequately considered traffic related impacts, such as the number of trucks which would be required to haul coal to and from the plant; the impact to groundwater caused by wastes percolating into an aquifer beneath the permit site; the impact to surface water caused by runoff from new roads on the permit site; the impact on fish resulting from withdrawal of water from Ginder Creek; and the impact of truck and equipment noise on the surrounding residential community. **_Stebly_** contended that OSMRE erred in failing to prepare an environmental impact statement (EIS) and violated _30 CFR 773.15(b)_, infra.

**[*244]** The permit area for Palmer's McKay Plant contains 12.2 acres of private land on which coal-washing facilities have existed for over 50 years. [2] Prior to approving WA-0002, OSMRE approved a permit application

---

[1] Surface coal mining operations in Washington on non-Federal and non-Indian lands are conducted under the Washington Federal program. _30 CFR 947.700_.

[2] The present coal-washing process has been in operation onsite since 1936. A coal mine (#11) located under the present site was closed in 1927. As of July 1985, Palmer operated its Section 12 mine in conjunction with the McKay Plant (Exh. 2 at 9; Exh. 1 at 38).

109 IBLA 242, *244; 1989 IBLA LEXIS 108, **4

submitted by Pacific Coast Coal Company (Pacific) for the John Henry No. 1 mine. [3] Pacific proposed to construct a coal-processing facility on the site of this mine. Prior to completion of this facility, Pacific **[\*\*5]** intends to lease the McKay Plant from Palmer (Exh. 5 at iii; Tr. 24). All coal to be washed at the McKay Plant site would come from Pacific's John Henry No. 1 mine, located approximately 1 mile northeast of the McKay Plant on the east side of Highway 169, a north-south running road. Run-of-mine coal would be trucked to the McKay Plant via the highway. The McKay Plant and **_Stebly_**'s residence are to the west of the highway (Exh. 1 at 12). **_Stebly_** resides approximately one-half to three-fourths of a mile from the McKay Plant and travels the highway at least once a week (Exh. 1 at 4; Tr. 141).

In the decision on appeal, **[\*\*6]** Judge Sweitzer found that OSMRE had identified and considered all environmental issues raised by appellant and that no evidence to suggest any significant impact was found by the agency. Id. at 8. Judge Sweitzer noted that many of the impacts identified had been considered in an EIS previously prepared for the John Henry No. 1 mine, and that OSMRE had found the concerns identified in the EIS to be of the same magnitude and kind as those expressed for the McKay Plant. Finding that **_Stebly_** offered only unsubstantiated allegations of environmental harm, Judge Sweitzer dismissed appellant's application for review. An alternate basis for dismissal was the Judge's finding that **_Stebly_** was not adversely affected by OSMRE's action and, therefore, lacked standing.

[1] In his statement of reasons, **_Stebly_** begins by challenging the finding that he lacks standing. Section 514(c) of SMCRA authorizes "any person with an interest which is or may be adversely affected" to request a hearing on the reasons for the grant of a permit. This standard is repeated at _30 CFR 775.11(a)_. A definition of the above-quoted phrase is provided by _30 CFR 700.5_:

<u>Person having an interest which is or may</u> **[\*\*7]** <u>be adversely affected</u> or person with a valid legal interest shall include any person --

(a) Who uses any resource of economic, recreational, aesthetic, or environmental value that may be adversely affected by coal exploration or surface coal mining and reclamation operations or any related action of the Secretary or the State regulatory authority; or

 **[\*245]** (b) Whose property is or may be adversely affected by coal exploration or surface coal mining and reclamation operations or any related action of the Secretary or the State regulatory authority. [Emphasis in original.]

In _Natural Resources Defense Council, Inc. v. Office of Surface Mining Reclamation and Enforcement, 89 IBLA 1, 7, 92_ I.D. 389, 393 (1985), the Board found that petitioners who alleged that they lived near a minesite, used the area of the mine for recreation, and relied on a source of water that would be threatened by the mine had standing to seek review of the permit application.

In the present case, **_Stebly_** alleged and proved [4] that he lives less than 1 mile from the McKay processing plant and drives at least once a week on the highway that will be used by the coal trucks operating between the **[\*\*8]** John Henry No. 1 mine and the McKay Plant. Appellant may be adversely affected by the traffic and air pollution caused by such trucks and noise from the plant. As the Supreme Court held in _Gladstone, Realtors v. City of_

---

[3] An EIS examining the impacts of the John Henry No. 1 mine and its proposed onsite preparation plant has been prepared by OSMRE (Exh. 5).

[4] At a hearing, petitioner must <u>prove</u> the facts essential to support his claim to standing. _NAACP, Boston Chapter v. Harris, 607 F.2d 514, 526 (1st Cir. 1979)_. Allegations in a complaint may suffice to overcome a motion to dismiss and yet fail at summary judgment when the district court can reasonably expect a more specific factual demonstration of the plaintiff's entitlement to standing.

*Bellwood, 441 U.S. 91, 99 (1979)*, the injury may be actual or threatened. [5] These effects, whether regarded as threatened injuries to **_Stebly_**'s aesthetic or environmental interest, come within the meaning of *30 CFR 700.5*.

**[**9]**

In this case Judge Sweitzer erred because he equated **_Stebly_**'s failure to prevail on the merits with a lack of standing. Clearly, the two should be distinguished. "[T]he question of standing is whether the litigant is **[*246]** entitled to have the court decide the merits of the dispute or particular issue." Warth v. Seldin, 442 U.S. 490, 498 (1975). In this case, **_Stebly_** established his entitlement to have the merits of his claim reviewed. Judge Sweitzer's holding that **_Stebly_** lacks standing must be reversed.

Evidence at the hearing before Judge Sweitzer revealed that the EA did not accurately describe the traffic impacts that would be occasioned by coal trucks crossing Highway 169 at the John Henry No. 1 mine access road intersection. The EA predicted that approximately 8 crossings would occur per hour, but OSMRE revised this figure to 13 crossings per hour under questioning by counsel for **_Stebly_** (EA at 17, 30; Tr. 57).

While it is clear that OSMRE miscalculated the frequency of trucks that would be ferrying coal from the mine to the McKay Plant, the existence of this miscalculation does not automatically render the EA invalid. Such incremental increase in truck traffic **[**10]** does not, by itself, alter OSMRE's finding that no significant impacts would occur.

On the subject of groundwater, OSMRE hydrologist Lynn Shown testified that the permit site (WA-0002) was underlain by a "nearly impermeable glacial till," and below that was bedrock of the Puget group (Tr. 83). Shown had reviewed logs for four bore holes drilled by Palmer on the permit site. Three of these holes were 25 feet deep; the fourth was "close to 50 feet" (Tr. 84, 89). Based on permeability tests done on similar material in the McKay No. 12 mine, [6] Shown estimated the permeability of the glacial till underlying the permit site to be from 1 to 90 feet per year, i.e., water would move through the till at the rate of 1 to 90 feet per year (Tr. 85). Because the four bore holes indicated that the till was dry below 12 to 15 feet, Shown felt that the permeability of the till was "towards the lower end of the scale" (Tr. 88-89).

**[**11]**

According to Shown, OSMRE possessed no information from direct data regarding rock deeper than 50 feet on the permit site (Tr. 89). Asked for his opinion as to whether there was groundwater beneath the permit site, Shown answered, "There probably is somewhere, if you drill deep enough. There may be. * * * I can't say whether there is an aquifer right under the site or not" (Tr. 89, 94, 96). Shown further stated that he relied on information furnished by Palmer to conclude that there were no private wells within one-half mile of the permit site and did not further inquire whether wells were present within a mile of the site (Tr. 89-91). The witness also acknowledged that he did not know the location of the recharge area for the water used by the City of Black Diamond (Tr. 92). The permit site is located in sec. 11, T. 21 N., R. 6 E., Willamette Meridian, less than 1 mile north of the city.

---

[5] The Gladstone, Realtors case focused on the standing requirements for seeking judicial review in an Article III court. Although determinations of judicial standing are not strictly relevant to a discussion of administrative standing, they may provide a useful guide as to the types of interests which are properly considered in adjudicating administrative appeals. *Koniag, Inc. v. Andrus, 580 F.2d 601, 611 (D.C. Cir.)*, cert. denied, **439 U.S. 1052 (1978)**; *Donald Pay, 85 IBLA 283, 285 (1985)*. Such determination may be particularly appropriate here because OSMRE relied on Article III notions of standing in promulgating *30 CFR 700.5*. In the preamble to this regulation, OSMRE quotes with approval from H.R. Rep. No. 218, 95th Cong., 1st Sess. 90 (1977):

"It is the intent of the Committee that the phrase 'any person having an interest which is or may be adversely affected' shall be construed to be coterminous with the broadest standing requirements enunciated by the United States Supreme Court. Any resident of the United States injured in any manner through failure of any operator to comply with the provisions of this act, regulations issued thereto, order, or permits issued by the Secretary, may bring an action for damages in U.S. district court." (Emphasis added).

[6] This mine is located in sec. 12, T. 21 N., R. 6 E., Willamette Meridian. The John Henry No. 1 mine is located in secs. 11 through 14 of the same township.

109 IBLA 242, *246; 1989 IBLA LEXIS 108, **11

Shown stated that all drainage from the 12.2-acre permit site is collected in a single sediment pond for removal of suspended solids (Tr. 95; **[*247]** Exh. 1 at 32). Water from this pond would then be discharged into a lowland area where it would infiltrate the groundwater system or be **[**12]** subject to evapotranspiration by trees. Id. The ground in this lowland area is composed of permeable materials (Tr. 95). Any discharge entering this area must satisfy effluent limitations under the Washington Pollution Control Act and would be subject to a National Pollution Discharge Elimination System discharge permit (Exh. 1 at 2).

On the day of the hearing, July 7, 1987, Shown was made aware of a report commissioned by the Environmental Protection Agency (EPA) to evaluate "the Palmer Coking Coal facility's status within the EPA's Uncontrolled Waste Program" (Tr. 99; Exh. 2, July 7, 1987, at 1-2). This report is dated October 1986, [7] some 5 months prior to OSMRE's notice of approval of permit WA-0002. The report states that three wells exist within one-half mile of the site, with the closest being approximately 1,000 feet from the site (Exh. 2, Apr. 2, 1987, at 1). The "site" examined by EPA appears to be 120 acres in area, almost 10 times larger than the area subject to WA-0002 (Exh. 2, October 1986, at 2, 5). Two of these wells are potable water wells; the third is exploratory. No examination of the current use or conditions of these wells was made (Exh. 2, Apr. 2, **[**13]** 1987, at 2).

EPA's report generally agreed with Shown's description of the area geology. The report stated that bedrock was located approximately 100 feet below the surface. A "compact, unsorted, sandy, silty, clayey, and gravelly till," approximately 10 to 50 feet thick was above bedrock; above the till was well-sorted, stratified gravel and sand of similar thickness (Exh. 2, October 1986, at 6). It is likely that the till is too compacted to support an aquifer, but groundwater may be encountered in the bedrock or, as a perched or seasonal aquifer, in the permeable sand and gravel glacial unit above bedrock. Id. at 7.

The primary concern of EPA in commissioning this report was the "alleged disposal of paint sludges in the site waste coal spoils pile" (Exh. 2, October 1986, at 1). The area of interest was a relatively flat spoils pile of recent use. Eight bore holes **[**14]** were drilled in this area by EPA and three surface soil samples taken to determine the presence of contaminants on EPA's hazardous substance list. Organic and inorganic substances were detected, indicating that chlorinated solvents, paints, and oil contaminated with Aroclor 1248 may have been disposed of onsite. EPA found that clay and native materials appeared to restrict the downward migration of oil and probably the associated contamination. Id. at iii, 5, 13, 17.

Shown questioned the relevance of EPA's report after determining that the spoils pile sampled by EPA and an older spoils pile were located northwest of the onsite sedimentation pond and were not within the 12.2-acre permit site. All drainage from the 12.2-acre permit site flows westerly into the onsite sedimentation pond, and any discharge from the pond flows westerly into a large waste water disposal area (Tr. 119-20; Exh. 2, October 1986, at 4).

  **[*248]** *Stebly* contends that the evidence regarding groundwater raises substantial questions as to whether OSMRE acted reasonably in issuing a FONSI. Such a standard of review, appellant contends, does not require proof that the challenged project will in fact cause **[**15]** significant impacts to the environment.

[2] A determination that a proposed action will not have a significant impact on the quality of the human environment, based on an EA, will be affirmed on appeal if the record establishes that a careful review of environmental problems has been made, relevant environmental concerns have been identified, and the final determination is reasonable in light of the environmental analysis. *Glacier-Two Medicine Alliance, 88 IBLA 133, 140 (1985).* Our review of the record reveals that OSMRE acted reasonably in finding that no significant impacts to groundwater would be occasioned by issuance of WA-0002.

The theory underlying ***Stebly***'s challenge to OSMRE's groundwater analysis is clearly set forth in repeated questions to hydrologist Shown and in argument to Judge Sweitzer:

_____

[7] This report was amended on or about May 7, 1987, to reflect information set forth in correspondence with Palmer (Exh. 1, May 7, 1987, at 1).

179

109 IBLA 242, *248; 1989 IBLA LEXIS 108, **15

Q: Let's assume we had a drinking water aquifer  * * *  three hundred feet  down, and water in the soil turned out to be * * * moving at 50 feet per year.  That would mean, if this water were contaminated, it would reach the aquifer  in about six years, is that right?

* * * * * * *

* * * The issue is, are there hazardous materials on site  now, which the waste water from this **[\*\*16]** sedimentation pond  can cause to percolate down into the ground water system.  [Emphasis added.]

(Tr. 87-88, 118, see also Tr. 106, 108).

Hearing evidence demonstrates that water used in washing coal  at the McKay Plant  will flow into a sedimentation pond  (Tr. 108; Exh. 1 at 32).  After settling, waters in this pond  will be discharged  westerly [8] and monitored in compliance with _30 CFR 816.41_ and 947.700(e) (Exh. 1 at 35; Exh. 2 at 4).  Waters discharged  from this pond must satisfy State effluent limitations and will not flow towards the spoils  pile  in which EPA found solvents, paints, and oil (Exh. 1 at 2, 13-14; Exh. 2 at 4).  Absent contamination of the discharged  waters or the intersection of the discharged  waters with the spoils  pile,  the risk of contaminating any aquifer  [9] that may underlie the discharged waters is minor.  This holding is especially  **[\*249]** appropriate in light of the fact that the McKay Plant  has been operating for 50 years without apparent harm.  Accordingly, we do not accept appellant's contentions that the facts in the record raise substantial questions regarding whether the agency's FONSI was properly issued.

**[\*\*17]**

Appellant argues that OSMRE made no evaluation of the impacts on the surface water  resulting from Palmer's daily withdrawal of 8,700 cubic feet  of water from Ginder Creek.  Without such an evaluation, **_Stebly_** contends, the agency had no reasonable basis for concluding that there will be no significant impacts to surface water.

Appellant's argument overlooks the analysis undertaken by OSMRE prior to issuing  the permit for the John Henry No. 1 mine.  As explained in Exhibit 1 at page 38:

The hydrologic impacts associated with the permitting of the McKay Preparation  Plant  are addressed within the July 1985 Cumulative Hydrologic Impact Assessment (CHIA) which was prepared for the Pacific Coast Coal Company John Henry No. 1 mine.  * * *.

At the time of OSMRE's consideration for approval of a permit application for the John Henry No. 1 mine, OSMRE accounted for the potential cumulative impacts of that mine along with Palmer Coking Company's Section 12 mine.  The coal preparation  plant  which is the subject of this application [i.e., the McKay Preparation  Plant]  was at that time operating as part of the Section 12 mine.  The operations discussed in this application are a subset of  **[\*\*18]** and were contained within operations that were considered under the July 1985 cumulative impact assessment.

In the CHIA, baseline data was compiled by OSMRE to determine the quantity, quality, and seasonal variation of surface  and groundwater.  This data was then compared with projected changes due to mining.  Among the principal findings of the CHIA were:

1.  Surface  water use in the area is limited to the maintenance of aquatic habitat and recreational/aesthetic uses.

2.  The town of Black Diamond obtains water for its municipal supply from springs located outside the cumulative impact area.

---

[8] Coal  fines excavated from the sedimentation  pond  will be stored onsite  until water content is reduced, transported to the waste area, and then returned for disposal at the John Henry No. 1 mine (Exh. 1 at 12, 37).

[9] OSMRE's technical analysis states that "no aquifer  exists below the permit area" (Exh. 1 at 36).  This conclusion does not entirely square with that of OSMRE hydrologist Shown, quoted supra.

109 IBLA 242, *249; 1989 IBLA LEXIS 108, **18

3.  Indicator parameters related to hydrologic concerns include changes in watershed runoff and sediment yield, peak discharges from disturbed areas, and the surface water  parameters of total dissolved solids and heavy metals (iron, manganese, and arsenic).

(Exh. 1 at A-2 and A-3).

OSMRE concluded from the CHIA that no material damage to the hydrologic balance is expected for the above parameters.  Moreover, cumulative impacts to the quantity of flow are expected to be insignificant with respect to **[*250]** seasonal and annual yield and peak flows (Exh. 1 at A-3).  These conclusions may **[**19]** be properly incorporated by OSMRE into the decision document that it issued for the McKay Plant.  Given this extensive analysis in advance of issuing  permit WA-0002 to Palmer, we find no merit in appellant's argument that OSMRE had no reasonable basis in issuing  a FONSI.

Appellant's challenge to OSMRE's finding that air quality would not be significantly impacted by the McKay Plant was answered in hearing testimony by Dr. Michael Ruby, a consulting engineer in air pollution  control and resource economics, and Kenneth Wangerud, OSMRE project leader.  In response to the question whether he would anticipate adverse environmental  air impacts from the McKay Plant,  Dr. Ruby responded:

A.  It all depends on what's in that plan.  There's no information there for me to determine that.  For example, if there were thermal driers in the plant,  it's quite conceivable that it would.  If there were pneumatic breakers, it's quite conceivable.  If all of the separation were going on with heavy media, no, probably there wouldn't be a lot. But there's just absolutely no way I could tell from reading the thing.  There would be conveyance points.  It depends on whether or not they use a mechanical **[**20]** dewatering, or whether they're using other approaches.  It depends on how wet or how dry the materials are at all different points.  With adequate presentation of information, one could make the evaluation.  I can't.  [Emphasis added.]

(Tr. 165-66).

When asked whether his "concerns [would] be as great," Dr. Ruby answered:

A.  What I am saying is that if there were no thermal drier, if there is no pneumatic breaker, then the sources of air pollution  are significantly less.  If it's a heavy media operation, then there probably aren't any, or so few as to really not cause us a lot of concern in that portion of the plant.  [Emphasis added.]

(Tr. 176).

Following Dr. Ruby's testimony, OSMRE witness Wangerud described the McKay Plant  in these terms:

Dr. Ruby mentioned heavy wet media preparation  plant.  That is, in fact, what this plant  is.  It's a jig type wet process heavy media separation process.  When the coal  enters the jigs, it is immersed in water and as soon as it enters the preparation  plant  it is submersed in water and it remains wet and all of the coal  and the refuse that you see coming out of the plant  is dripping, literally dripping with water. It goes into the **[**21]** stock piles  on the ground.

(Tr. 199).

 **[*251]** Thus, it appears from the testimony of appellant's witness, Dr. Ruby, that the sources of air pollution  from the McKay Plant  are few or none.  This conclusion supports, rather than contradicts, OSMRE's issuance  of a FONSI.

Moreover, it appears that the agency considered air quality in some detail in the EIS it prepared for the John Henry No. 1 mine.  As noted above, the proposal for this mine included a coal-processing plant.  Particulate emissions for a variety of mining  activities are set forth at table 4.5.1.  See also EIS at 3-24 and 4-41 through 4-45.

[3] Appellant's final argument on appeal focuses on 30 CFR 773.15(b)(1).  This regulation  provides:

109 IBLA 242, *251; 1989 IBLA LEXIS 108, **21

(b) Review of violations. (1) The regulatory authority  shall make a finding that any surface  coal  mining  and reclamation  operation owned or controlled by the applicant is not currently in violation of the Act or in violation of any Federal law, rule, or regulation,  or any State law, rule, or regulation  enacted pursuant to Federal law, rule, or regulation  pertaining to air or water environmental  protection.  If such a finding cannot be made the regulatory authority  shall **[**22]** require the applicant, before the issuance  of the permit, to either --

(i) Submit to the regulatory authority  proof that the current violation has been or is in the process of being corrected to the satisfaction of the agency that has jurisdiction over the violation; or

(ii) Establish for the regulatory authority  that the applicant has filed and is presently pursuing, in good faith, a direct administrative or judicial appeal to contest the validity of the current violation.

In support of his argument, *Stebly* offered as evidence at the hearing a letter from the Washington Department of Ecology to Pacific, dated June 30, 1987, noting that the State had been advised that Pacific was diverting water from Ginder Creek for its mining  operation.  The letter observed that Pacific had previously advised the State that the diversion "was approved through use of a vested right held by Palmer Coking Coal  Company." State records showed, however, that Palmer had filed a claim to a vested right for diversion from Ginder Lake, not Ginder Creek; the records also showed that Pacific held a water right permit (S1-24203P) to Ginder Lake.  The purpose of the State's letter was to inquire by what right **[**23]** Pacific was diverting water from Ginder Creek.  Enclosed with the letter was an application to be used in the event that Pacific sought to change its point of diversion in permit S1-24203P.

*Stebly* argues that the State's June 30, 1987, letter establishes that Palmer was in violation of State law.  A change in diversion point can only be permitted pursuant to Ch 90.03, RCW, appellant contends, and therefore OSMRE's finding that Palmer was not in violation of State or Federal law was improper and incorrect.

 **[*252]** We do not agree that OSMRE erred in issuing  a finding that Palmer was not in violation of applicable law. To begin, it is clear that even if the State's June 30, 1987, letter could be deemed a notice  of violation, this letter was issued more than 2 months after OSMRE approved permit WA-0002.  Thus, no notice  of violation had been rendered at the time of permit issuance.

Again assuming that the State's June 30, 1987, letter is a notice  of violation by Palmer, we hold that appellant has failed to show that the statute (Ch 90.03 RCW) he asserts has been violated is a "State law, rule, or regulation enacted pursuant to Federal law, rule, or regulation  pertaining to **[**24]** air or water environmental  protection." The above-quoted language is taken directly from *30 CFR 773.15(b)(1)*.  The preamble to this regulation  (formerly 30 CFR 786.17(c)) notes that this rule has been clarified "to indicate that only violations of those State laws which are passed to implement Federal air or water environmental  protection laws" are within the meaning of the regulation.  44 FR 15100 (Mar. 13, 1979).

Counsel for OSMRE notes that "the permit requirements for the change in point of diversion under Washington State law (RCWA § 90.03.380 (1962)) are not based on a state law enacted pursuant to a Federal law." The current method of appropriation for beneficial use, counsel explains, had its beginning when the 1917 legislature repealed an 1891 statute and passed a new act which is the basis for the present system of prior appropriation (OSMRE Brief, July 20, 1987, at 11).  Our review of Washington law reveals counsel's statements to be accurate.

The preamble to *30 CFR 773.15(b)* makes clear that the regulatory authority  was to examine Palmer's permit application and other available information for notices  of violation.  48 FR 44364 (Sept. 28, 1983); 54 FR 8985 (Mar. 2, 1989).  **[**25]** A similar requirement is imposed by section 510(c) of SMCRA, *30 U.S.C. § 1716(c)* (1982). We do not read the State's letter of June 30, 1987, to be a notice  of violation by Palmer.  This letter is an inquiry directed to Pacific and nowhere alleges that Palmer has withdrawn water in violation of law.

The provisions of *30 CFR 773.15(b)*, which were in effect at all relevant times, required the regulatory authority  to make a finding that any surface  coal  mining  and reclamation  operation "owned or controlled by the applicant"

109 IBLA 242, *252; 1989 IBLA LEXIS 108, **25

was not in violation of applicable law. [10] Appellant has offered no proof in support of his allegation that Palmer owns or controls any of Pacific's operations.  Thus, there is no support for his argument that, because of the "close relationship" between Palmer and Pacific, OSMRE should have examined Pacific's record of compliance with environmental  laws when making its finding under *30 CFR 773.15(b)*.

 **[\*\*26]**

 **[\*253]**  Therefore, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, *43 CFR 4.1*, the decision of Administrative Law Judge Sweitzer is reversed in part and affirmed in part.

R. W. Mullen
Administrative Judge

**Concur By:** HARRIS

**Concur:**

I concur: Bruce R. Harris, Administrative Judge.

Department of Interior Board of Land Appeals          Decisions

---

**End of Document**

---

[10] Following issuance  of WA-0002 to Palmer, OSMRE amended *30 CFR 773.15* and considerably expanded the definition of "owned or controlled." 53 FR 38890 (Oct. 3, 1988); 54 FR 8991 (Mar. 2, 1989).

183