# EXHIBIT F14
## Order in *Frank Campbell*, 2018-0072 (2019)



United States Department of the Interior
Office of Hearings and Appeals
Interior Board of Land Appeals
801 N. Quincy St., Suite 300
Arlington, VA 22203

703-235-3750                                   703-235-8349 (fax)

March 15, 2019

| | | |
|---|---|---|
| IBLA 2018-72 | ) | DOI-BLM-UT-C020-2018-0008-EA |
| | ) | |
| FRANK CAMPBELL | ) | Right-of-Way |
| | ) | |
| | ) | Motion to Dismiss Granted |

ORDER

     Frank Campbell has appealed from a December 26, 2017, decision issued by the Richfield (Utah) Field Office, Bureau of Land Management (BLM). In the decision, BLM approved the issuance of a right-of-way (ROW) grant, UTU-91520, to the Fremont Irrigation Company (FIC) for the portion of its Canal Piping Water Conservation Project (the Project) located on BLM-managed public lands. On September 10, 2018, Mr. Campbell filed a petition for a stay of BLM's decision because construction on the ROW grant would soon begin. We denied Mr. Campbell's petition in an order dated November 14, 2018.

     BLM has filed a motion to dismiss Mr. Campbell's appeal, arguing that Mr. Campbell lacks standing because he has not articulated a legally cognizable interest that has been adversely affected by BLM's decision. Mr. Campbell opposes the motion.

     As explained below, because we find that Mr. Campbell does not show he is adversely affected by BLM's decision to issue a ROW to FIC, we lack jurisdiction over his appeal and grant BLM's motion to dismiss the appeal.

*BLM's Decision to Grant a ROW to FIC*

     The FIC supplies irrigation water to approximately 10,000 acres within Wayne County, Utah, including secondary irrigation water to the towns of Fremont, Loa, Lyman,

201

and Bicknell.[1]  Water is diverted from the Mill Meadow Reservoir into the irrigation system through the natural Fremont River course into earthen canals and distributed to adjacent farm lands for irrigation.[2]  The Canal Piping Water Conservation Project, which would be funded and authorized by the Bureau of Reclamation (BOR), involves the construction of new underground water piping to convey water to a new hydroelectric facility and the elimination of portions of existing open and unlined earthen canals (the High Line, Fremont Loa, and Loa Town canals).[3]

BOR and BLM jointly prepared an environmental assessment (EA) analyzing the potential impacts of the Project.  As described in the EA, the Project would help improve the efficiency of the existing irrigation system and reduce the amount of water lost to seepage and evaporation, thus improving water conservation.[4]  BLM's role in the Project would be to authorize issuance of a ROW grant for the portion of the pipeline crossing BLM-managed lands.[5]

On December 26, 2017, the BLM Field Office Manager issued a finding of no significant impact and a Decision Record authorizing issuance of a ROW grant to FIC for the portion of the Project crossing BLM-managed lands.  Mr. Campbell timely appealed that decision.

On December 14, 2018, BLM filed a motion to dismiss Mr. Campbell's appeal, arguing that he has not shown he has a legally cognizable interest that is adversely affected by BLM's decision, and therefore lacks standing to pursue his appeal.[6]  Mr. Campbell opposes BLM's motion, directing the Board to his notice of appeal (NOA) and statement of reasons (SOR) as evidence of his standing.[7]

---

[1] Final Environmental Assessment, Fremont Irrigation Company Canal Piping Water Conservation Project, Wayne County, Utah (PRO-EA-15-001; DOI-BLM-UT-C020-2018-0008-EA) (December 2017) (EA) at 2.
[2] *Id.*
[3] *Id.* at 1.
[4] EA at 2-3.
[5] *Id.* at 5; *see id.* at 7 (specifying that out of a total of 31,400 linear feet of pipeline to be installed for the Project, 9,000 linear feet of pipeline would be installed on BLM lands).
[6] Motion to Dismiss at 4.
[7] Opposition to Motion to Dismiss.

*The Requirement to Have Standing to Appeal*

To appeal from a BLM decision, an appellant must have standing under 43 C.F.R. § 4.410(a). This regulation requires an appellant to demonstrate that it is both a "party to a case" and "adversely affected" by the decision it seeks to appeal.[8] An appellant must demonstrate both elements of standing to proceed; if either element is lacking, the Board must dismiss the appeal for lack of jurisdiction.[9]

A party to a case

> is one who has taken action that is the subject of the decision on appeal, is the object of that decision, or has otherwise participated in the process leading to the decision under appeal, *e.g.*, by filing a mining claim or application for use of public lands, by commenting on an environmental document, or by filing a protest to a proposed action.[10]

The second element of standing, adverse effect, is met when the appellant shows that it has a legally cognizable interest, and the decision on appeal has caused or is substantially likely to cause injury to that interest.[11] A legally cognizable interest may be an economic or property interest in affected lands, or cultural, recreational, or aesthetic use and enjoyment of the affected public lands.[12] To show an adverse effect, an appellant has the burden "to make colorable allegations of an adverse effect, supported by specific facts set forth in an affidavit, declaration, or other statement of an affected individual, that are sufficient to establish a causal relationship between the approved action and the injury alleged."[13] The appellant does not need to prove that the adverse effect will in fact occur, but "the threat of injury and its effect on the appellant must be more than hypothetical . . . . Mere speculation that an injury might occur in the future will not suffice."[14]

---

[8] 43 C.F.R. § 4.410(a).
[9] *Wildlands Defense*, 192 IBLA 209, 214 (2018); *Western Watersheds Project*, 192 IBLA 72, 76 (2017); *Cascadia Wildlands*, 188 IBLA 7, 9 (2016).
[10] 43 C.F.R. § 4.410(b).
[11] *Id.* § 4.410(d).
[12] *Western Watersheds Project*, 192 IBLA at 77.
[13] *Powder River Basin Resource Council*, 180 IBLA 32, 44 (2010); *see Wildlands Defense*, 192 IBLA at 214.
[14] *Powder River Basin Resource Council*, 180 IBLA at 45 (internal citations omitted); *Wildlands Defense*, 192 IBLA at 214-15 (citing *Legal & Safety Employer Research Inc.*,

3

IBLA 2018-72

*Mr. Campbell Has Not Met His Burden to Demonstrate That He Is Adversely Affected by BLM's Decision*

Mr. Campbell is a party to a case under our regulations because he submitted comments on the EA that BLM prepared with BOR to analyze the impacts of the Project.[15] Standing therefore depends on whether Mr. Campbell has demonstrated that he is adversely affected by BLM's decision.

In his NOA and SOR, Mr. Campbell explains that

> The town of Fremont and most homes in the area sit between two main irrigation water ways, the Loa Ditch and the High-Line Canal. The water ways were constructed a little over one hundred years ago and have served to distribute irrigation water to area farmers. The Loa Ditch has also served to catch and remove flood waters that come off an area called the Ledges. The Ledges are a steep and rocky slope that sits along side the town of Fremont.
>
> \*\*\*
>
> Home sites were selected and homes built with the knowledge that the Loa Ditch would collect and route flood water away from the sites. So, we have over a one hundred year precedence where the Loa Ditch has protected Fremont homes from the monsoonal rains that frequently occur in the July and August time frame. It is understood the original intent was to distribute irrigation water but the fact remains that the Loa Ditch has also served as the only flood control structure which protects the homes in Fremont.[16]

Mr. Campbell contends that filling in the open canal system will accelerate flooding events and that flood waters will run off the Ledges into the homes of

---

154 IBLA 167, 172 (2001) ("Standing will only be recognized where the threat of injury is real and immediate.")).
[15] 43 C.F.R. § 4.410(b); EA, Appendix E at 1-11.
[16] NOA at 1-2; SOR at 2-3.

4

residents.[17] He states that there are forty-two homes in Fremont, and that "as many as one half" may be adversely impacted by flooding as a result of the Project.[18] He further states that when property owners in the Fremont area learned of this potential change to flood control, the owners signed a petition expressing concern about the potential damage to their homes or property resulting from the Project and the plan to eliminate the Loa Ditch and a portion of the High Line Canal.[19] The petition, which Mr. Campbell attached to his SOR, identifies Mr. Campbell as one of the property owners.[20]

In support of his assertion that flooding will occur, Mr. Campbell relies on statements in the EA acknowledging that the Project "could result in alterations to storm water routing;" that "[i]f canals are not maintained they could become bypassed resulting in changes in flood locations and intensities;" and that the "extent and level of potential impacts is not well understood because seepage flow paths in the area are not well understood."[21] Mr. Campbell also submitted photographs with his SOR that he contends "show the canal and its location just uphill of nearly all the homes of the Fremont area" as well as "drainages coming off the Ledges" with flood waters flowing into the canal.[22] He states that "[n]ot maintaining the canal to its current capacity or worse closing the canal, will put approximately half the homes in Fremont at risk to flood waters resulting from summer monsoon rains."[23]

Mr. Campbell also contends that the Project will adversely affect approximately 500-600 acres of pasturelands that are located on private lands and receive water that seeps from the existing ditches and canals.[24] He states that these lands "have been in existence for nearly 100 years and are of significant importance to those who depend on them to graze their cattle."[25] According to Mr. Campbell, BOR's action of filling in ditches and canals will result in these lands losing their water and becoming unproductive.[26]

---

[17] NOA at 4-5; SOR at 4.
[18] SOR at 3, 4.
[19] NOA at 2; SOR at 3-4.
[20] SOR, Attachment A.
[21] NOA at 4 (quoting EA at 26); SOR at 4 (same).
[22] SOR at 4-5.
[23] *Id.* at 5.
[24] NOA at 3; SOR at 5.
[25] NOA at 3; SOR at 5.
[26] SOR at 5.

We find that Mr. Campbell has not met his burden to demonstrate that he is adversely affected by BLM's decision. First, he has shown no legally cognizable interest in the private pasturelands he asserts will lose water as a result of the Project. He does not claim to own or have any interest in these lands, stating only generally that "land owners of the 600 acres will be damaged to some extent."[27] He therefore cannot establish any adverse effect to a legally cognizable interest based on this allegation.

Second, with respect to his claims about flooding from the Project, Mr. Campbell has a legally cognizable interest based on his ownership of property in Fremont, in proximity to the Ledges and portions of the canal system. But the injury to that interest that he alleges will occur because of the Project – the flooding of his home – would result, not from BLM's grant of a ROW, but from BOR's actions to fill in and eliminate portions of ditches and canals on private lands.[28] As explained in the EA, BOR's role in the Project is to "authorize, provide funding for, and enter into an agreement allowing FIC to convey water via new underground water piping to a new hydroelectric plant," and "eliminating portions of existing open and unlined earthen canals . . . ."[29] The decision on appeal, however, is BLM's decision to authorize FIC to install underground pipelines on BLM-managed lands; BLM's decision does not authorize any action to fill in or eliminate any portion of the existing canal system.[30] There is therefore no causal relationship between BLM's decision and the injury alleged by Mr. Campbell.[31] Consequently, Mr. Campbell has not established that he is substantially likely to suffer an injury to a legally cognizable interest as a result of BLM's decision.

---

[27] *Id.* at 6; *see id.* at 7 ("Property owners would be significantly affected by the loss of surface and ground waters caused by the piping of the existing water ways.").

[28] *See* EA at 6 (describing the Project as including the installation of pipeline on private lands and BLM-managed lands and the elimination of existing open canal on private lands) and Figure 1; *see also* Email from BOR to BLM (Nov. 1, 2017) (noting that back filling would occur on private lands, except for on "a small (less than 500 ft) stretch of BLM land") (Administrative Record, Doc. 38).

[29] EA at 1.

[30] *See* ROW Grant UTU-91520 (Jan. 24, 2018) (authorizing the construction, operation, maintenance, and termination of an irrigation water pipeline on approximately 12.68 acres of Federal lands in Wayne County, Utah) (Administrative Record, Doc. 55).

[31] *See Center for Biological Diversity*, 181 IBLA 325, 340 (2012) ("'There must be colorable allegations of adverse effect and . . . a causal relationship between the action undertaken and the injury alleged. . . .'" (quoting *Santa Fe Northwest Information Council, Inc.*, 174 IBLA 83, 103 (2008))).

Our determination is consistent with previous Board decisions finding that when multiple agencies are involved in a project, the Board's jurisdiction is limited to considering the adequacy or impacts of BLM's decision. For example, in *Hoosier Environmental Council*,[32] the appellant challenged a BLM decision approving a ROW for a natural gas pipeline crossing approximately 17 miles of public lands; the pipeline authorized by the ROW was part of 140-mile pipeline authorized by the Federal Energy Regulatory Commission (FERC). We stated that the only question properly before the Board was whether FERC's EA "adequately addressed the impacts engendered by those segments of the pipeline crossing Federal lands."[33] We explained: "BLM did not purport to approve the pipeline project; FERC approved that. BLM merely approved issuance of the right-of-way across various parcels of Federal land."[34] We reached a similar conclusion in *Rural Alliance for Military Accountability*,[35] where the appellant challenged a BLM decision granting ROWs for certain facilities at a military installation. We concluded that the appellant was concerned about the military's actions at the site and that we had no authority over those concerns.[36] Just as in *Hoosier Environmental Council*, we found that the scope of the appeal was limited "to those issues that have a nexus to BLM's decision that is distinct" from the issues flowing from the military's authority.[37]

And here, we must reach the same conclusion. The alleged injury Mr. Campbell complains of would result from BOR's actions, rather than BLM's decision approving the ROW grant to FIC. Because there is no nexus between the potential for flooding from filling in ditches and canals and BLM's decision, Mr. Campbell does not meet his burden to establish his standing to pursue his appeal.

---

[32] 109 IBLA 160 (1989).
[33] *Id.* at 166.
[34] *Id.*; *see also Wyoming Independent Producers Association*, 133 IBLA 65, 70-71 (1995) ("When we review the adverse effects of which the Associations complain, we find that it is the FERC decision that adversely affects them rather than that of BLM. . . . Accordingly, the motions to dismiss the appeals filed by the Associates . . . are granted.").
[35] 163 IBLA 131 (2004).
[36] *Id.* at 134.
[37] *Id.* at 134-35.

7

Accordingly, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior,[38] we grant BLM's motion to dismiss the appeal and remove the appeal from our docket.

/s/
Amy B. Sosin
Administrative Judge

I concur:

/s/
James F. Roberts
Acting Chief Administrative Judge

---

[38] 43 C.F.R. § 4.1.