# EXHIBIT F15

Order in *Elyse R. Gardner Walsh,
Laura Leigh & Wild Horse Education*,
2018-0035 (2018)



# United States Department of the Interior
## Office of Hearings and Appeals
### Interior Board of Land Appeals
801 N. Quincy St., Suite 300
Arlington, VA 22203

703-235-3750                    703-235-8349 (fax)

January 23, 2018

| | |
|---|---|
| IBLA 2018-35 | ) NVN-091037 |
| | ) |
| ELYSE R. GARDNER WALSH, | ) Mining Plan of Operations |
| LAURA LEIGH & WILD HORSE | ) |
| EDUCATION | ) Appeal by Laura Leigh and Wild |
| | ) Horse Education Dismissed; |
| | ) Petition for Stay Denied |

## ORDER

  Elyse R. Gardner Walsh, Laura Leigh, and Wild Horse Education (collectively, Appellants) appeal from and petition to stay the effect of a November 7, 2017, Record of Decision and Plan of Operations Approval (ROD) by the Field Manager, Mount Lewis (Nevada) Field Office, Battle Mountain District, Bureau of Land Management (BLM). The ROD was based on an October 2017 Final Environmental Impact Statement (EIS), DOI-BLM-NV-B010-2015-0010-EIS, prepared pursuant to section 102(2)(C) of the National Environmental Policy Act of 1969 (NEPA),[1] and applicable implementing rules.[2] In the ROD, BLM approved a proposed mining plan of operations (POp), NVN-091037, submitted by a Canadian company, McEwen Mining, Inc. (MMI), for the Gold Bar Mine Project (Project). We granted MMI's Motion to Intervene by Order dated December 27, 2017, and here address only Appellants' petition for a stay during the pendency of this appeal.

  MMI and BLM oppose Appellants' stay petition. Under the rule at 43 C.F.R. § 4.21, we may grant a stay only if one or more Appellant has standing and shows sufficient justification under all four stay criteria enumerated in 43 C.F.R.

---

[1] 42 U.S.C. § 4332(2)(C) (2012).
[2] 40 C.F.R. Parts 1500-1508; 43 C.F.R. Part 46.

IBLA 2018-35

§ 4.21(b)(1), including a showing that the appellant will suffer immediate and irreparable harm if its stay petition is denied.[3] Leigh has not demonstrated by affidavit or other evidence that she or the organization she represents, Wild Horse Education (WHE), has a legally cognizable interest that is or is substantially likely to be injured by the ROD and, therefore, neither has shown they have standing under 43 C.F.R. § 4.410. Accordingly, we dismiss these appeals. Although Walsh adequately showed she has standing to pursue this appeal based on her use of the lands impacted by the Project, she has not carried her burden to demonstrate a sufficient likelihood of immediate and irreparable harm to justify our granting her stay request, which we therefore deny.

## BACKGROUND

MMI proposed, pursuant to the Mining Laws of the United States,[4] to undertake an open pit gold mining operation in the Roberts Mountains that would disturb approximately 1,154 acres of public (971) and private (183) land within a 5,362-acre Project area located 30 miles northwest of Eureka in Eureka County, Nevada. The Project would consist of four open pits; waste rock disposal areas; facilities for crushing, screening, and agglomeration; a heap leaching facility; an adsorption, desorption, and recovery plant; production water wells; ancillary facilities; and mine access roads.[5] The expected life of the Project is close to 20 years: "[O]ne year of construction; seven years of mining operations (i.e., five years of active mining and two years of residual heap leaching); approximately six years of reclamation following cessation of mining and active leaching on the heap leach pad (HLP); and approximately 4.5 years of monitoring after reclamation is completed."[6]

### BLM's Environmental Review and ROD

In order to address likely environmental impacts of the proposed mine, BLM engaged in a scoping process, prepared a draft EIS, responded to public comments, and issued a final EIS addressing various resources that would be impacted,

---

[3] *See* 43 C.F.R. § 4.21(b)(1)(iii).
[4] *See* 30 U.S.C. §§ 21-54 (2012); 43 C.F.R. Subpart 3809.
[5] ROD at 2.
[6] *Id.* at 25.

2

IBLA 2018-35

including wild horses.[7] In the EIS, BLM analyzed the "direct and indirect impacts to wild horses for the Proposed Action" that will occur within the Plan boundary (5,364 acres) and along the access roads (43 miles) to the Project, which are located within the Roberts Mountain Herd Area (HA), the Roberts Mountain Herd Management Area (HMA), the Fish Creek North HMA, and the Kobeh Valley HA.[8] BLM found "[w]ild horse distribution varies throughout the year" and "unrestricted movement across the area is known to occur."[9] It also found:

> Since a fence between the Roberts Mountain HA and HMA boundaries does not exist, it is not unusual for a number of wild horses to move out of the HMA boundaries. With increases in population above the [authorized management level (AML)], wild horses have continued to expand outside of the boundaries into the Roberts Mountain HA. Horses have also spread north outside of the HA boundary. During the most recent inventory completed in September 2015, approximately 70 percent of the horses were located outside of the [Roberts Mountain] HMA boundary.[10]

The AML for the Roberts Mountain and Fish Creek North HMAs is 160 wild horses (no burros).[11] While BLM may conduct gathers if the AML for an HMA is exceeded, "[w]ild horses and burros cannot be relocated somewhere else within the District and new HMAs cannot be created for them. Nor is BLM allowed to expand the HMAs beyond the 1971 HA boundaries to replace habitat lost."[12]

---

[7] *See* EIS Chapter 3 – Affected Environment, Section 3.22 (Wild Horses) at 3-267 to 3-277; EIS Chapter 4 – Environmental Consequences and Cumulative Effects, Sections 4.22 and 4.46 (Wild Horses) at 4-186 to 4-193, 4-269 to 271; *see also* 82 Fed. Reg. 12462 (Mar. 3, 2017); 82 Fed. Reg. 46830 (Oct. 6, 2017); Draft and Final EIS, ROD, and related documents are available at https://eplanning.blm.gov/epl-frontoffice/eplanning/planAndProject Site.do?method Nam6e=dispatchToPatternPage&currentPageId=68143 (last visited Dec. 18, 2017).
[8] EIS at 3-267; *see id.* at 3-268; *see also id.* at 3-270 ("HAs are not designated for long-term management of wild horses under the [1986] RMP. However, HMAs are designated for long-term management under the RMP.").
[9] *Id.* at 3-273.
[10] *Id.*
[11] *Id.* at 3-272.
[12] *Id.*

3

IBLA 2018-35

BLM found direct impacts to wild horses from approval of the POp would "include loss of habitat, a reduction in forage availability, and possible mortality or injury from vehicle collisions."[13] It found those impacts "would be moderate and localized within the immediate Project area," "haul traffic may impede wild horse travel within the Roberts Mountain Complex HMA since this road bisects the northern portion and is located between two Primary Use Areas,"[14] and that "with one estimated haul truck every two minutes, or 30 per hour on a 24-hour basis within the active mine area, there would be a high potential for injury to wild horses if they chose to continue to move through the areas once actual mining activities begin."[15] Indirect impacts would include "displacement from the Project area and possible changes in use patterns principally due to the increased vehicle and haul traffic and mine activities (e.g., mine blasting), and increased presence of humans."[16] BLM then added:

> Changes to wild horse distribution and use patterns are expected and could be moderate and long term within the project area (localized) and minor or negligible in rest of the HMA (regional). East-west movement near the southeast corner of the Project area would likely cease due to the construction and presence of the processing and administrative facilities, heap leach pad and fencing and security gates proposed in that area.[17]

BLM found the Project would have "unavoidable adverse impacts" (loss of forage), "irreversible and irretrievable commitments of resources" (loss of forage on 154 unreclaimed acres), and that the "majority of impacts to wild horses would be long-term because successful revegetation of disturbed areas could take several years after the cessation of mining."[18]

---

[13] *Id.* at 4-187; *see id.* ("The Proposed Action would have a long-term impact from removal of 718 acres of existing vegetation communities within the Plan boundary.").
[14] *Id.* at 4-188; *see id.* at 4-189 ("Similarly, increased light vehicle traffic on the Roberts Creek Road by an estimated 40 light vehicle trips per day, would increase the risk of vehicle collisions with wild horses. Signage, speed restrictions and the use of reflectors would help to reduce this risk.").
[15] *Id.* at 4-188.
[16] *Id.* at 4-189.
[17] *Id.*
[18] *Id.* at 4-190.

4

The EIS also identifies "primary use areas" and "areas of concern" for wild horses that are in and around the Project area and through which its roads will pass. The Project area is adjacent to primary use areas and areas of concern, more than half of the Project area is within a wild horse "area of concern," and virtually the entire length of its access road passes through HMAs, with roughly 80% passing through "primary use areas" and "areas of concern."[19]

Based on the Final EIS, the Field Manager selected the Proposed Action, subject to operating, reclamation, and monitoring requirements, plus Environmental Protection Measures (EPM).[20] He determined the Project "will not cause unnecessary or undue degradation of the public lands and is consistent with applicable legal requirements" and that the Proposed Action conformed to the applicable land-use plan, the 1986 Shoshone-Eureka Resource Management Plan (RMP).[21] This appeal from the ROD and petition to stay its effect were timely filed by Walsh, Leigh, and WHE.[22]

## DISCUSSION

Appellants state their purpose in bringing this appeal is to ensure that BLM fully and completely analyzes "impacts to wild horses and appropriately mitigate[s] those impacts."[23] According to them: "Approving the FEIS is irresponsible to wild horses, a designated resource in the project area, prior to a revision or amendment to the existing RMP."[24] Moreover, Appellants assert that BLM's actions are

---

[19] *Id.* at 3-269 (Gold Bar EIS Project – Wild Horse Resources, Fig. 3.22-1); *see id.* at 3-273 ("Plan boundary encompasses . . . 3,159 acres of Areas of Concern . . . . Both Primary Use Areas and Areas of Concern may be impacted by the Project[.]").
[20] ROD at 17; *see id.* at 3-17, 27-39 (EPMs).
[21] *Id.* at 3; *see id.* at 17-19.
[22] Notice of Appeal, Statement of Standing, Petition for Stay, Statement of Reasons, Declaration of Elyse R. Gardner Walsh, dated Nov. 5, 2017 (Walsh Declaration), and Declaration of Laura Leigh, dated Dec. 4, 2017 (Leigh Declaration), filed Dec. 7, 2017 (Appeal).
[23] Appeal at 4.
[24] Appeal at 14; *see id.* at 16 ("Approving the Plan without first ensuring protections for wild horses is irresponsible and inequitable."), 17 ("A free roaming horse or burro standing within legally designated boundary lines [is] afforded protection under law. Inaccurate, inept, lazy, inequitable boundary lines place that legal protection in jeopardy.") (citing Wild Free-Roaming Horses and Burros Act, 16 U.S.C. §§ 1331-1340 (2012)).

5

IBLA 2018-35

contrary to its mandate to "'take any action necessary to prevent unnecessary or undue degradation of the lands.'"[25]

We here address Appellants' petition to stay implementation of the ROD during the pendency of this appeal. But before we consider their petition, we must first address whether any of them has standing to pursue this appeal.

*Walsh has Adequately Shown Standing to Appeal and Petition for a Stay of the ROD.*

Since Walsh, Leigh, and WHE "participated in the process leading to the decision under appeal" and are parties to a case under 43 C.F.R. § 4.410(b),[26] they must each show they were adversely affected, which requires them to show that "the decision on appeal has caused or is substantially likely to cause injury to [a legally cognizable] interest."[27] The burden is on each of them to make colorable allegations, supported by specific facts set forth in an affidavit, declaration, or statement, of a causal relationship between the approved action and the injury they allege.[28]

Walsh, a self-styled "wild horse advocate," joined in this appeal and filed a sworn declaration stating she has "travelled to the project area and the Roberts Mountain HMA/HA."[29] She goes on to detail her most recent visit at the location of the proposed activities:

> On June 9, 2017, I drove out to the Gold Bar Mine open pit. I needed to look at this project area, specifically in the present time. I wanted to see if I found evidence of wild horses in the area. I found such evidence in the form of manure droppings in the area, making particular note of

---

[25] Appeal at 15 (quoting section 302(b), Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. § 1732(b) (2012)).
[26] *See* EIS at 6-51 (Walsh), 6-89 (Leigh/WHE); *Western Watersheds Project*, 189 IBLA 310, 313 (2017).
[27] 43 C.F.R. § 4.410(d); *see Western Watersheds Project*, 185 IBLA 293, 298 (2015).
[28] *The Fund for Animals, Inc.*, 163 IBLA 172, 176 (2004); *Southern Utah Wilderness Alliance*, 127 IBLA 325, 327 (1993); *Colorado Open Space Council*, 109 IBLA 274, 280 (1989).
[29] Walsh Declaration at 1; *see* Appeal at 3 ("Appellants . . . regularly visit the affected areas including the project area itself, [and] intend to continue to visit these areas in the immediate and foreseeable future . . . .").

6

IBLA 2018-35

> a fresh stud pile, a collection of horse manure, within 30 feet of the top of the open pit. A stud pile represents numerous wild stallions (always more than one) leaving their "calling card" of manure, with each visiting stallion leaving his contribution, his "I was here" manure to the pile. I have at least one photograph I took of this evidence of the presence of the wild horses at the mine site. I will be returning to continue to monitor the wild horses in the area.[30]

We find she visited the "[P]roject area and the Roberts Mountain HMA/HA" in connection with her interest in wild horses that use those areas, recently traveled to the mine site to assess whether they were then using that area, and that she will continue doing so in the future. Based on her sworn declaration and the specifics presented therein, particularly her most recent visit to the mine and Project area, we conclude that Walsh has adequately shown her standing to appeal and petition for a stay of the ROD.

WHE and Leigh claim they have standing based on Leigh, who is also the WHE President. Since an organization such as WHE may demonstrate standing by showing one of its members has a legally cognizable interest in the subject matter of the appeal, both its and Leigh's standing are based exclusively on her declaration.[31]

In her supporting declaration, Leigh avers she regularly communicated with BLM on its management of wild horses in the District and that she is distressed by its "disregard" of her concerns.[32] Beyond those communications and concerns, she states: "I have visited the Roberts Mountain, Fish Creek and Whistler [W]ild Horse Herd Management Areas (HMAs) and the Kobeh Valley and Robert's Mountain Herd Areas (HAs), as well as multiple wild horse areas within and around the Project area."[33] These areas encompass roughly 200,000 acres.[34] Without any added details and specifics on when, where, and for what purpose she visited these areas, including any details specifying that she has visited the project area, we are unable to find she has demonstrated that she has a legally cognizable interest that

---

[30] Walsh Declaration at 1.
[31] *See, e.g., Board of County Commissioners of Pitkin County, Colorado*, 186 IBLA 288, 308-10 (2015).
[32] Leigh Declaration.
[33] *Id.*
[34] *See* EIS at 3-269, 3-272.

7

IBLA 2018-35

is or is substantially likely to be injured by BLM's decision.[35]  We therefore find that Leigh does not have standing.  And since WHE's standing is dependent on Leigh's standing, we further conclude that WHE does not have standing to pursue this appeal.

We therefore dismiss Leigh and WHE as parties to this appeal and proceed to consider whether Walsh has met her burden to show sufficient justification for a stay of the ROD.

*Walsh has not Carried her Burden to Justify our Staying the Effect of BLM's Approval of the Project POp.*

Under 43 C.F.R. § 3809.803, BLM's decision to approve the Project POp "go[es] into effect immediately," and remains in effect during the pendency of the present appeal, unless the Board grants a stay in accordance with 43 C.F.R. § 4.21(b).[36]  Under 43 C.F.R. § 4.21(b), an appellant, who petitions for a stay, bears the burden of demonstrating sufficient justification for the stay, satisfying each of the following four criteria:  (1) The relative harm to the parties if the stay is granted or denied; (2) the likelihood of the appellant's success on the merits; (3) the likelihood of immediate and irreparable harm if the stay is not granted; and (4) whether the public interest favors granting the stay.[37]  Failure to satisfy any one of the criteria requires denial of the petition.  Here, we focus on the third stay criterion – whether Walsh has provided sufficient justification that denial of a stay will result in immediate and irreparable harm.

Appellants claim BLM's decision "will lead to imminent, irreparable harm to the safety of wild horses" that are recognized as a public resource.[38]  They note "environmental harm, by its nature, is often permanent or irreparable" and that a failure to comply with the procedural requirements of NEPA generally causes irreparable injury "by injuring the rights of affected members of the public to

---

[35] *See, e.g., Cascadia Wildlands*, 188 IBLA 7, 10 (2016) ("The information provided by a member of an organization must 'provide as much specific evidence as possible about what interests are allegedly injured and what the connections are between those interests and the decision [the organization] seeks to appeal.'") (quoting *Western Watersheds Project v. BLM*, 182 IBLA 1, 6 (2012)).
[36] *See* ROD at 26.
[37] *Oregon Natural Resources Council Action*, 148 IBLA 186, 188 (1999).
[38] Appeal at 8 (citing Wild Free Roaming Horses and Burros Act, 16 U.S.C. § 1331 (2012)).

8

IBLA 2018-35

participate and be fully informed of the agency's decision-making process under NEPA."[39] We first address Appellants' suggestion that irreparable harm may properly be presumed in this case simply because there might be a NEPA violation.

As the Board ruled in *Friends of Animals and Craig C. Downer*:

> Appellants are correct that Federal courts have found that procedural violations of NEPA support claims of irreparable injury; however, these same courts have emphasized that "a procedural violation of NEPA is not itself sufficient to establish irreparable injury." Like the Federal courts, we find that a procedural violation alone is insufficient justification of the likelihood of immediate and irreparable harm to justify a stay. As we have held here, based on the record to date, Appellants have not provided sufficient justification for the likelihood of any other immediate and irreparable harm, so any alleged NEPA violation alone does not justify a stay.[40]

Accordingly, regardless of any NEPA claims, Walsh is still required to show there will be immediate and irreparable harm if the decision on appeal is implemented during the pendency of this appeal.[41]

Appellants seeking to demonstrate a likelihood of immediate and irreparable harm must present a sufficient justification that shows the alleged harm is likely to occur.[42] Bare allegations of harm associated with BLM's approval of the proposed Project, without any supporting evidence establishing the likelihood of immediate and irreparable harm, are not sufficient to support issuance of a stay.[43] Appellants

---

[39] *Id.*

[40] 188 IBLA 394, 401 (2016) (quoting *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 24 (D.D.C. 2009)); *see Western Watersheds Project (WWP)*, 192 IBLA 72, 84 (2017).

[41] *See id.; see also Sierra Club v. U.S. Forest Service*, 843 F.2d 1190, 1195-96 (9th Cir. 1988); *Save the Yaak Committee v. Block*, 840 F.2d 714, 722 (9th Cir. 1988).

[42] 43 C.F.R. § 4.21(b)(1); *see Wisconsin Gas Co. v. Fed. Energy Regulatory Com.*, 758 F.2d 669, 674 (D.C. Cir. 1985) (an appellant seeking a stay must "substantiate the claim that irreparable injury is 'likely' to occur).

[43] *See WWP*, 192 IBLA at 85; *Wallace Forest Conservation Area Advisory Committee*, 191 IBLA 338, 341, 342-43 ("Appellant does not specify what part of the 600-acre project area its members use or explain how the [approved] vegetation treatments will injure that use. . . . [T]he harm to Appellant from denying a stay is

9

must show immediate and irreparable harm is likely to occur if a stay is denied, not just pose a hypothetical, claim such harm is theoretically possible, or allege it is "'liable to occur at some indefinite time.'"[44]

We do not find Walsh's arguments or the record provide support for her claim that the approved Gold Bar Mine Project is likely to cause immediate and irreparable harm to the herd or individual wild horses. As to the immediacy of any harm, we note that before any mining or other activity related to the Project POp can occur, it will be subject to further review and approval by BLM and other Federal, State, and local agencies.[45] Nor has Walsh alleged or shown how development of this mine is likely to cause irreparable harm to wild horses in or near the Project area. After all, the EIS states only that there may be some harm somewhere to some wild horses at some time, which simply does not support Walsh's allegation of immediate and irreparable harm.[46]

We conclude, based on the pleadings and the record, that Walsh has not carried her burden to demonstrate that a stay should be granted in this case because she has not shown a sufficient likelihood of immediate and irreparable harm if this stay petition is not granted.

---

vague and supported only by bare allegations.") (2017)); *Heal Utah*, 191 IBLA 103, 108 (2017); *Friends of Animals*, 188 IBLA at 399.

[44] *Wisconsin Gas Co.*, 758 F.2d at 674 (quoting *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931)); *see Friends of Animals*, 188 IBLA at 399; *Heal Utah*, 191 IBLA at 108; *WWP*, 192 IBLA at 85; *Umpqua Watersheds*, 191 IBLA 1, 8-9 (2017).

[45] *See* ROD at 25 ("MMI is responsible for obtaining any use rights or local, state or [F]ederal permits, licenses or reviews that may be required before operations begin"), 26 (BLM must accept MMI's proposed financial guarantee for more than $15 million before any work may begin); EIS at 1-12 ("[I]mplementing the Proposed Action would require authorizing actions from other [F]ederal, state, and local agencies with jurisdiction over certain aspects of the proposed Project") (Table 1.6-1, List of Potential Permits and Approvals); *see also* 43 C.F.R. §§ 3809.401(d), 3809.412, 3809.500.

[46] *See* EIS at 6-89 ("Impacts to wild horses, in general, are anticipated to be moderate within the Project area and minor or negligible in the entire HMA, and it is not anticipated to cause the need to reduce the wild horse AML or impact the genetic health of the population.") (response to Leigh comments), 6-93 (response to Walsh comments).

10

IBLA 2018-35

     We conclude, based on the pleadings and the record, that Walsh has not carried her burden to demonstrate that a stay should be granted in this case because she has not shown a sufficient likelihood of immediate and irreparable harm if this stay petition is not granted.

     Accordingly, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior,[47] we dismiss Leigh and WHE as parties to this appeal and deny Walsh's petition to stay the effect of BLM's ROD and approval of the proposed POp.

                                                /s/
                                                James K. Jackson
                                                Administrative Judge

I concur:

/s/
Amy B. Sosin
Administrative Judge

---

[47] 43 C.F.R. § 4.1.

11