BRENT M. RESH
(Nevada Bar No. 14940)
BRENT RESH LAW, PLLC
2401 La Solana Way
Las Vegas, NV 89102
(702) 781-6903
brent@brentreshlaw.com

JESSICA L. BLOME
(Cal. Bar No. 314898, admitted pro hac vice)
J. RAE LOVKO
(Cal. Bar No. 208855, admitted pro hac vice)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com
rlovko@greenfirelaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| WILD HORSE EDUCATION, a non-profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT,<br><br>Defendant. | CASE NO. 3:25-CV-00152-MMD-CSD<br><br>**DECLARATION OF LAURA LEIGH IN SUPPORT OF PLAINTIFF'S OPPOSITION TO FEDERAL DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT AND CROSS-MOTION FOR SUMMARY JUDGMENT** |

I, LAURA LEIGH, declare that if called as a witness in this action I would competently testify of my own personal knowledge, as follows:

1.    I am the Founder and President of Plaintiff Wild Horse Education (WHE).

2.    Wild Horse Education, which was founded in 2011, is a national non-profit corporation formed for the purpose of educating the public about the plight of wild horses and

1  burros on public land, and in the government warehousing system for these animals including

2  sale and final disposition; working to end the inhumane treatment of these heritage animals;

3  encouraging the creation of a sane, scientifically-based management strategy for these animals in

4  the wild (through management plans); promoting public adoptions and support for those who

5  adopt; assisting the public to advocate for the welfare of wild horses and burros.

6      3.    In 2016 and 2017, I also volunteered with BLM and was trained to assist the

7  agency with backlogs in monitoring, logging data, field survey backlogs, and NEPA document

8  drafting.

9      4.    As regards operations to gather and remove wild horses, the Wild and Free-

10  Roaming Horses and Burros Act provides that excess horses must be "humanely captured and

11  removed." 16 U.S.C § 1333(b)(2)(B) & (C). To address this, BLM developed its Comprehensive

12  Animal Welfare Program (CAWP), which developed welfare standards for the humane handling

13  of horses and burros. The CAWP Standards for Wild Horse and Burro Gathers were prepared on

14  June 30, 2015, and the CAWP Standards for Off-Range Corral Facilities, Transportation, and

15  Adoption/Sale Events were prepared on January 29, 2016.

16      5.    BLM created a self-assessment tool to analyze the efficacy of the CAWP

17  Standards. As early as 2015, BLM said annual evaluations of CAWP would be conducted, with

18  the initial evaluation of the Standards and self-assessment tool to begin in 2017.

19      6.    When I volunteered with BLM, I was trained on how to use this tool. I am

20  unaware, however, of BLM actually ever evaluating the efficacy of the Standards or self-

21  assessment tool.

22      7.    Attached hereto as Exhibit A is a true and correct copy of a fact sheet created by

23  BLM on CAWP and its standards.

24      8.    In keeping with Wild Horse Education's mission and goals, the organization also

25  independently attends gather operations to conduct their own assessment of the CAWP

26  Standards. Wild Horse Education has a longstanding interest in ensuring that BLM treats wild

27  horses and burros humanely, and this interest has focused on BLM's assessment of and

28

1    compliance with the CAWP Standards.

2        9.    Attached hereto as <u>Exhibit B</u> is a true and correct copy of the September 28, 2019

3    FOIA request that I submitted to BLM on behalf of Wild Horse Education.

4        10.    Attached hereto as <u>Exhibit C</u> is a true and correct copy of BLM's October 7, 2019

5    initial response to my FOIA request.

6        11.    On various occasions between 2020 and the filing of Wild Horse Education's

7    complaint in the above-captioned case, I contacted BLM numerous times to inquire about the

8    FOIA request. When responding, BLM repeatedly stated that it was experiencing a backlog of

9    FOIA requests.

10        12.    In 2023 and 2025, BLM wrote to me to ask whether Wild Horse Education

11    remained interested in receiving the requested documents. I responded affirmatively on both

12    occasions. Attached hereto as <u>Exhibit F</u> and <u>Exhibit G</u> is a true and correct copy of BLM's 2023

13    and 2025 e-mails to me.

14        13.    On March 18, 2025, having received absolutely no documents from BLM in

15    response to the FOIA request, Wild Horse Education filed the complaint in this case.

16        14.    Attached hereto as <u>Exhibit D</u> is a true and correct copy of BLM's cover letter

17    accompanying the document production on April 9, 2025.

18        15.    Attached hereto as <u>Exhibit E</u> is a true and correct copy of BLM's cover letter

19    accompanying the document production on July 22, 2025.

20        16.    BLM's response to the FOIA request, which took BLM over 4.5 years to

21    complete, demonstrated that the agency did not conduct any evaluations of the CAWP Standards.

22        17.    Because BLM's response to the FOIA request was only complete through the date

23    of the initial request (e.g., September 28, 2019), Wild Horse Education will be submitting a new

24    FOIA request that mirrors the initial request in the near future. This new request will seek

25    documents between September 28, 2019 and the present.

26        18.    Since its formation, Wild Horse Education has made over 100 FOIA request to

27    BLM. Repeatedly and consistently, BLM has unreasonably delayed producing responsive

28

---

DECLARATION OF LAURA LEIGH IN SUPPORT OF PLAINTIFF'S OPPOSITION TO FEDERAL
DEFENDANTS' FIRST AMENDED COMPLAINT AND PLAINTIFF'S CROSS-MOTION FOR SUMMARY
JUDGMENT
3

documents. In fact, one of Wild Horse Education's FOIA requests was filed over *ten years ago*, and BLM still has not responded.

   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

   Dated this 26th day of January, 2026,

_____
LAURA LEIGH

**EXHIBIT A**



**U.S. Department of the Interior**
**Bureau of Land Management**

Wild Horse and Burro
# Comprehensive Animal Welfare Program
Fact Sheet

**What is the BLM's Comprehensive Animal Welfare Program?**



The Bureau of Land Management is committed to the health, welfare and safety of all wild horses and burros under the agency's management and care. The Comprehensive Animal Welfare Program formalizes that commitment by establishing standard operating procedures and handling practices for wild horses and burros. The BLM re-affirmed the program in Permanent Instruction Memorandum 2021-002.

**What is "animal welfare"?**

Animal welfare is the physical and psychological well-being of animals and how they cope with their environments. Animal welfare science considers three aspects of the animal's physical and psychological state: body, mind and behavior. The "body" is about an animal's health, function, nutrition, growth, and freedom from injury and disease. The "mind" includes an animal's emotional state, pleasures, suffering and fear. "Behavior" refers to an animal's innate and learned characteristics inherent to a horse or burro.

**How does the Comprehensive Animal Welfare Program protect animal welfare?**

The program was developed to ensure wild horses and burros are consistently treated with care and compassion. All BLM, volunteer, partner and contractor staff are required to adhere to program standards when performing official duties. This includes operations on the range, during gathers, at off-range corrals, pastures and adoption events, when transporting animals and after animals are placed into private care by adoption. The program also establishes requirements for frequent training by BLM, volunteer, partners and contractor staff and it implements assessments of BLM and contractor operations to monitor compliance.

**What standards and handling practices are in place?**

The BLM currently has handling practices and standards in place for gather operations, transportation, off-range corrals, and adoption and sale events. Program standards for off-range pastures, following placement into private care by adoption and during on-the-range operations (excluding gathers) are under development.

**How are the Comprehensive Animal Welfare Program standards developed?**

The BLM developed the standards in collaboration with veterinarians and animal welfare experts from the School of Veterinary Medicine at the University of California, Davis and based on extensive experience and knowledge of handling wild horses and burros. This knowledge and experience is important considering that wild horses and burros have little to no experience or history with human contact.

**Does the BLM monitor and report compliance with the Comprehensive Animal Welfare Program?**

Compliance with the program is monitored by assessments conducted by a BLM team and through self-assessments conducted by the BLM staff responsible for the activity. For example, during gathers an on-site team, which would include team members from other BLM offices, may conduct an assessment of the gather to determine compliance in addition to a self-assessment completed by the on-site team. In the coming years, expert independent third-party assessments will also be used to conduct welfare assessments. Assessment reports are provided to BLM personnel and made available at BLM.gov/WHB/AnimalWelfare.

**What are some examples of standards in place to safeguard animal welfare during gathers?**

One of the BLM's top priorities during gather operations is to ensure safe and humane treatment. A few examples of the many standards in place include not pursuing animals to a point of exhaustion and covering all gates and panels at the holding pen with at least 48 inches of material such as snow fence to create a visual barrier for the animals.

**What happens when there is non-compliance with the Comprehensive Animal Welfare Program?**

Any actions taken during BLM operations that do not comply with the program must be documented in any self-assessments completed by the BLM staff responsible for the operation. Non-compliant actions observed during internal assessments are documented in the Assessment Report, which includes an overall rating of compliance. Ratings of less than 70% compliance require an additional assessment of the operation, when possible. Non-compliance at any time may result in corrective actions by BLM management and/or contracting officers, as appropriate to the situation.

Depending on the operation and the nature of the non-compliance issue, corrective actions may include: stopping operations until the non-compliance issue(s) is/are resolved, providing additional training and education, or developing a plan to bring operations into compliance. Egregious or willful acts of abuse will result in a non-compliance rating in the Assessment Report and will result in immediate corrective action.

**When will independent third-party assessments take place?**

The BLM began conducting self assessments and internal assessments at gathers in 2021 and will continue to conduct assessments of operations for which standards have been developed as part of its efforts to refine and enhance its assessment tools. The BLM plans to begin third-party assessments in 2023.

**What can the public do if they witness a non-conformance with the Comprehensive Animal Welfare Program?**

Any member of the public who observes or has factual information that a federally protected (untitled) wild horse or wild burro has been treated inhumanely, including potential non-conformance with the program, is asked to contact the BLM at wildhorse@blm.gov or 866-468-7826 with your name, contact information, and specific information about what was observed.

**Where can I find more information about the Comprehensive Animal Welfare Program?**

More information about the program can be found at BLM.gov/WHB/AnimalWelfare.

**EXHIBIT B**

Laura Leigh 216 Lemmon Dr #316 Reno, NV 89506

FOIA/PA Specialist
Bureau of Land Management
Nevada State Office
1340 Financial Blvd. Reno, NV 89502

Sept 28, 2019

FOIA Coordinator:

Pursuant to the Freedom of Information Act, 5 U.S.C. Sec. 552-et seq., I, as representative of Wild Horse Education (WHE) request that a copy of the following documents, or documents containing the following information, be provided to me:

• Any and all correspondence, meeting notes, telephone records, operation evaluation sheets, pertaining to the the evaluation, training, proposed changes, effectiveness of the Comprehensive Animal Welfare Policy (CAWP) from November 2015 to the present.

• In 2015 the BLM stated they would be evaluating the effectiveness of CAWP and implementing appropriate changes.

• To date no performance evaluation has been made public. No proposed changes have been made public.

• Individuals with this information would include, but not limited to: Alan Shepherd, Ruth Thompson, Gus Warr, Dean Bolstad.

All of the above requested information includes any reports, memos, e- mails/electronic text messages communication on any kind, letters, phone logs and records, meeting minutes, photos, maps, work orders, or any other information related to "CAWP" evaluation from 2015- present day.

I (WHE) request a fee waiver as a nonprofit involved in disseminating critical information to the public on agency decision making protocols, in addition:

WHE meets the factors entitling WHE to a fee waiver under the Freedom of Information Act. See 5 U.S.C. § 552(a)(4)(A)(iii). See also 43 C.F.R. Part 2, Appendix D. Under the fee waiver provisions as enacted by Congress, a requester qualifies for a fee waiver if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii). Through its own FOIA regulations, the Department of Interior has articulated the following four-part test to determine if a requestor meets the statutory requirements for a fee waiver: (1) Do the records concern the operations or activities of the government?; (2) If so, will disclosure likely contribute to public understanding of these operations and activities?; (3) If so, will release of the requested information contribute significantly to public understanding?; and (4) Is disclosure primarily in the requestor's commercial interest? See 43 C.F.R. Part 2, Appendix D.

WHE meets the four-part test articulated in the Department of the Interior regulations implementing FOIA, and, therefore, BLM must waive the fees associated this FOIA request.

WHE is actively engaged in informing the public of how the process of management (wild horses and their environment), reflected in this request, have been previously determined and determined agency wide. The disclosure of information is vital to public understanding of agency decision making (criteria 1, 2 and 3). WHE is a registered nonprofit .A commercial interest is one that furthers a commercial, trade, or profit interest. WHE has no commercial interest in obtaining this information and requested fee waiver. Rather, WHE is a not-for-profit group that strives to protect the natural resources and wild horses, and to inform the public on BLM management. Nowhere in WHE's mission statement, by-laws, or charter, does the organization state a profit- motive goal.

It is clearly in the public interest that this requested information be released and disseminated.

Electronic Format Request: I request that the information I seek be provided in electronic format and sent to: Laura@WildHorseEducation.org

I look forward to your prompt attention to this matter.

Sincerely,

Laura Leigh

216 Lemmon Dr Reno, NV 89506

# EXHIBIT C

On Mon, Oct 7, 2019 at 10:03 AM FOIA, BLM_WO <blm_wo_foia@blm.gov> wrote:

Good afternoon Ms. Leigh,

Our FOIA office received a FOIA request dated September 28, 2019 and received in our office September 30, 2019.  We assigned it control number 2020-00032.  Please cite this number in any future communications regarding your request.

In your request you asked for the following:

" Any and all correspondence, meeting notes, telephone records, operation evaluation sheets, pertaining to the the evaluation, training, proposed changes, effectiveness of the Comprehensive Animal Welfare Policy (CAWP) from November 2015 to the present."

We have received your fee waiver request and it will be processed accordingly. In the interim, we have classified you as an "other" requester. As such, we may charge you for some of our search and duplication costs, but we will not charge you for our review costs; you are also entitled to up to 2 hours of search time and 100 pages of photocopies (or an equivalent volume) for free. See 43 C.F.R. § 2.39. If, after taking into consideration your fee category entitlements, our processing costs are less than $50.00, we will not bill you because the cost of collection would be greater than the fee collected. See 43 C.F.R. § 2.49(a)(1).

We use Multitrack Processing to process FOIA requests. The Simple track is for requests that can be processed in one to five workdays. The Normal track is for requests that can be processed in six to twenty workdays. The Complex track is for requests that can be processed in twenty-one to sixty workdays. The Exceptional/Voluminous track is for requests requiring more than sixty workdays for processing. The Expedited track is for requests that have been granted expedited processing. Within each track, requests are usually processed on a first-in, first-out basis.

This request falls into the **Exceptional/Voluminous** track.

Even though we normally process requests on a first-in, first-out basis, because of the nature of your request and the circumstances surrounding this request, we will prioritize and process your request as the records become available.

If you have any questions, please contact us at BLM_WO_FOIA@blm.gov or 202-912-7650. Thank you for your interest in public lands and in programs and activities of the BLM.



Washington Office FOIA Coordinators
Bureau of Land Management
Phone: 202-912-7650
Fax: 202-245-0027
BLM_WO_FOIA@blm.gov

# EXHIBIT D





# United States Department of the Interior

### BUREAU OF LAND MANAGEMENT
Washington, D.C.  20240
http://www.blm.gov

*April 9, 2025*

*In Reply Refer To:*
1278-FOIA (640)
FOIA# 2019-001585

Via email: laura@wildhorseeducation.org

Wild Horse Education (WHE)
Laura Leigh
216 Lemmon Dr
Reno, NV 89506

Dear Ms. Leigh:

This letter is a final response to your Freedom of Information Act (FOIA) request, dated October 7, 2019. The tracking number is 2019-001585. In your letter, you asked for the following:

> "Any and all correspondence, meeting notes, telephone records, operation evaluation sheets, pertaining to the the evaluation, training, proposed changes, effectiveness of the Comprehensive Animal Welfare Policy (CAWP)."

For this final response, BLM is providing 307 pages which is determined to be responsive to your request. We are providing (204) pages which are being released in full. Additionally, (21) pages are withheld in part, and (82) are fully withheld under Exemption 5 of the FOIA.

Exemption 5 allows an agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party ... in litigation with the agency."  5 U.S.C. § 552(b)(5).  Exemption 5 therefore incorporates the privileges that protect materials from discovery in litigation, including the deliberative process, attorney work-product, attorney-client, and commercial information privileges.  We are withholding the requested record in full under Exemption 5 because it qualifies to be withheld both because it meets the Exemption 5 threshold of being inter-agency or intra-agency and under the following privilege.

*Deliberative Process Privilege*

The deliberative process privilege protects the decision-making process of government agencies and encourages the frank exchange of ideas on legal or policy matters by ensuring agencies are not forced to operate in a fishbowl.  A number of policy purposes have been attributed to the

2

deliberative process privilege, such as: (1) assuring that subordinates will feel free to provide the decisionmaker with their uninhibited opinions and recommendations; (2) protecting against premature disclosure of proposed policies; and (3) protecting against confusing the issues and misleading the public.

The deliberative process privilege protects materials that are both predecisional and deliberative. The privilege covers records that reflect the give-and-take of the consultative process and may include recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency.

The materials that have been withheld under the deliberative process privilege of Exemption 5 are both predecisional and deliberative. They do not contain or represent formal or informal agency policies or decisions. They are the result of frank and open discussions among employees of the Department of the Interior. Their contents have been held confidential by all parties and public dissemination of this information would expose the agency's decision-making process in such a way as to discourage candid discussion within the agency, and thereby undermine its ability to perform its mandated functions.

The deliberative process privilege does not apply to records created 25 years or more before the date on which the records were requested.

If you have any questions regarding this request, please contact Kenneth Perry, BLM Government Information Specialist, at (720) 281-1649 or via email at BLM_WO_FOIA@blm.gov.

> Sincerely,
> Ryan Witt
> FOIA Officer
> Bureau of Land Management

| | |
|---|---|
| **From:** | Kane, Albert J - APHIS |
| **To:** | Rittenhouse, Bruce H |
| **Cc:** | Waddell, Holle; Shepherd, Alan B |
| **Subject:** | [EXTERNAL] RE: CAWP IM |
| **Date:** | Friday, June 28, 2019 11:45:37 AM |
| **Importance:** | High |

I think your comments in the IM are good. b(5) DPP ███████████████

█████████████████████████████████████

As far as the comments in your email … the "Comprehensive" part of CAWP means the welfare Program applies to all BLM horses everywhere under BLM management at all times by anyone interacting with them, including volunteers.

The process is as follows:
1) establish overall goals and specific objective, establish the correct mindset
2) establish standards, SOPs, "guidelines"
3) train everyone on them
4) internal auditing for compliance with your internal standards
5) report the results
6) revisit and revise as needed
7) invite external auditing using your internal standards
8) report the results
9) revisit and revise as needed
10) repeat

Each of these should be done in every area of the WH&B Program:
1) on-the-range
2) during gathers
3) at ORC
4) during all aspects of transportation
5) at adoptions/TIP/storefronts
6) at ORP
7) following adoption prior to titling

The only components of the Program that have been developed are the guidelines for 1) gathers and 2) ORC, transportation and adoption events and 3) the training module for gathers. Remaining to be developed would be the guidelines for 3) on-the-range, 4) ORPs and 5) post adoption compliance including all the steps 4-10 above. The "at adoptions" part has become more complicated because we now have more things like TIP trainers, storefronts etc. … but the CAWP guidelines should apply to all of these, employees, contractors, volunteers, adopters etc.

IMO b(5) DPP ███████████████████
    ██████████████████
    ███████████████████████████████
    ███████████████████████████████
    ██████████████████



Thanks for helping the IM move forward!
Take care,
Al


---------------------------------------
Albert Kane, DVM, MPVM, PhD (epi)
Advisor, APHIS/BLM WH&B Partnership
USDA APHIS Veterinary Services
2150 Centre Ave, Bldg B, MS 2E6
Ft Collins, CO 80526-8117
PH O: (970) 494-7234     Gov C: (970) 219-2409


**From:** Rittenhouse, Bruce [mailto:brittenh@blm.gov]
**Sent:** Thursday, June 27, 2019 2:40 PM
**To:** Kane, Albert J - APHIS <albert.j.kane@usda.gov>
**Subject:** CAWP IM

Al

I had a few minor edits/comments to the CAWP IM and wanted to run them by you for your thoughts.  One thing I noticed but didn't comment on was is there any need to include volunteers complying with CAWP standards as well.  We have expanded

volunteers to work satellite adoption events but for the most part they don't have any role in animal handling.  What about the volunteers we have in darting programs?  It may not be an issue but work are working at adoption events and other work, such as darting.  This is probably a non-issue but wanted to run it by you.

--
**NOTE NEW OFFICE PHONE NUMBER**

Bruce Rittenhouse
Acting Division Chief. Wild Horses and Burros (WO-260)
303-239-3614 (desk)
720-454-5747 (mobile)
brittenh@blm.gov
https://www.blm.gov/programs/wild-horse-and-burro

"*I'm just a simple man trying to make my way in the universe*"

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

| | |
|---|---|
| **From:** | Stratton, Joseph A |
| **To:** | Bolstad, Dean O; Waddell, Holle; Shepherd, Alan B; Anna-Maria Easley |
| **Subject:** | Attached are documents related to CAWP status |
| **Date:** | Friday, April 28, 2017 11:29:02 AM |
| **Attachments:** | AssessmentTool_OffRangeCorrals-Transportation-Adoptions_paper_2016-03-04.xlsx |
| | CAWP STANDARDS Off Range Corral Transport Adoption_FINAL_2016-01-29.docx |
| **Importance:** | High |

All, attached are the Final SOP's for ORC, Transportation, and adoption and the assessment tool.

We agreed to comments by May 12 and I will set up a call for May 12th to discuss. joe

| Standard Section 2 Part: | Criteria for Transportation | Major/Minor | Compliant | Comments (deficiencies, circumstances, outcome) |
|---|---|---|---|---|
| | **Documentation:  Review on day of assessment** | | | |
| II.A | Transport:  Current EIA and other required paperwork of receiving state | **Major** | Yes / No / NA | |
| IV.C | Transport:  Directions and contact phone numbers for facility or adoption events provided to haulers | **Major** | Yes / No / NA | |
| V. *[Section 1 III.B.5]* | Report of any WH&B that was recumbent or dead on arrival | **Major** | Yes / No / NA | |
| | **Loading and Unloading Facilities** | | | |
| I.A | Facilities are in safe and proper working condition; gates and doors swing freely, latch or tie easily as designed | **Major** | Yes / No | |
| I.C | No holes, gaps , openings, protruding surfaces, or sharp edges | **Major** | Yes / No | |
| I.B | Side panels of loading ramp/chute are ≥ 6' high and fully covered, e.g. plywood or metal without holes | **Major** | Yes / No/ NA | |
| I.D | Ramp/chute has non-slip surface, no holes or obstacles | **Major** | Yes / No/ NA | |
| I.E | Trailers must be aligned such that no gaps exist that could cause injury | **Major** | Yes / No /NA | |
| I.F | Clearance allowance between ground and floor of stock trailer is ≤ 12" for burros, ≤ 18" for horses | Minor | Yes / No/ NA | |
| | **Trailer Design** | | | |
| III.A.1 | Straight deck or stock trailer, no double-deck, two-tiered (pot)  trailers | **Major** | Yes / No | Type _____ |
| III.A.2 | Vehicle has covered roof containing WH&Bs such that they cannot escape | **Major** | Yes / No | |
| III.B | All WH&Bs during loading and unloading have adequate headroom, maintain normal posture with all four feet on floor and  no head contact with roof | **Major** | Yes / No | |
| III.C | Gate/Door height and width allows free movement | **Major** | Yes / No | |
| III.D | Gates/Doors open and close easily, latch securely | **Major** | Yes / No | |
| III.E | Ramps have non-slip surface and are maintained in safe & proper working condition | **Major** | Yes / No / NA | |
| III.F | Vehicle > 18' and < 40' has partition to provide 2 compartments; Vehicle ≥ 40' has partitions for ≥ 3 compartments | **Major** | Yes / No | # Compartments: ____ |
| III.H | Partitions and panels inside trailer free of sharp edges or holes | **Major** | Yes / No | |
| III.I | Inside lining of trailer is strong to withstand kicking | **Major** | Yes / No | |
| III.J | Surfaces and floors of trailer cleaned prior to shipping event | **Major** | Yes / No | |
| III.J | Floor of vehicle has non-skid material | **Major** | Yes / No | |

| III.G | Partition gates used to distribute load into compartments during travel | Minor | Yes / No | |
|-------|-------------------------------------------------------------------------|-------|----------|---|

# COMPREHENSIVE ANIMAL WELFARE PROGRAM

# STANDARDS

## OFF-RANGE CORRAL FACILITIES

## TRANSPORTATION

## ADOPTION EVENTS

Developed by

The Bureau of Land Management
Wild Horse and Burro Program

in collaboration with

Carolyn L. Stull, PhD
Kathryn E. Holcomb, PhD
University of California, Davis
School of Veterinary Medicine

January 29, 2016

## TABLE OF CONTENTS

**PREFACE** ................................................................................................................... 2

**Section 1. OFF-RANGE CORRAL FACILITY STANDARDS** ............................................... 3

     I.    FACILITY PERSONNEL ............................................................ 3
     II.   FACILITY DESIGN ................................................................. 3
     III.  RECEIVING WILD HORSE AND BURROS ................................ 5
     IV.  CARE OF WILD HORSE AND BURROS ................................... 6
     V.   HANDLING WILD HORSES AND BURROS ............................. 10

**Section 2. TRANSPORTATION STANDARDS TO ANOTHER OFF-RANGE CORRAL FACILITY, OFF-RANGE PASTURE, ECO-SANCTUARY, OR ADOPTION EVENT** .......................................... 13

     I.    LOADING AND UNLOADING FACILITIES ............................. 13
     II.   CARE OF WILD HORSES AND BURROS DURING TRANSPORT PREPARATION PROCEDURES ...................................................................... 14
     III.  VEHICLES ........................................................................ 14
     IV.  TRANSPORT PROCEDURES ............................................... 15
     V.   RECEIVING PROCEDURES ................................................. 16

**Section 3. ADOPTION EVENT STANDARDS** .............................................................. 17

     I.    ADOPTION EVENT PERSONNEL ......................................... 17
     II.   SATELLITE FACILITY DESIGN ............................................. 17
     III.  EUTHANASIA  PROCEDURES AT SATELLITE FACILITIES ...... 18
     IV.  CARCASS DISPOSAL AT SATELLITE FACILITIES .................. 19
     V.   CARE OF WILD HORSES AND BURROS RECEIVED AT SATELLITE FACILITIES ........ 18
     VI.  HANDLING WILD HORSES AND BURROS AT SATELLITE FACILITIES .................... 19

**REQUIRED DOCUMENTATION AND RESPONSIBILITIES OF AUTHORIZED OFFICER** ................. 20

**PROPOSED CAWP COMPONENTS FOR OFF-RANGE CORRAL FACILITIES, TRANSPORTATION, AND ADOPTION EVENTS** ................................................................. 22

# PREFACE

The Bureau of Land Management (BLM) estimates that 58,150 wild horses and burros (WH&Bs) are roaming on BLM-managed rangelands in 10 Western states, based on the latest data available, compiled as of March 1, 2015. Wild horses and burros have virtually no natural predators and their herd sizes can double about every four years. As a result, the agency must remove thousands of animals from the range each year to control herd sizes.

The Bureau of Land Management manages many off-range corral facilities throughout the U.S. The primary mission of the off-range corral facilities is to act as a holding and preparation facility that accepts WH&Bs from gather/removal operations and prepares them for adoption to the public or placement into off-range pastures. As of November 2015, there are 16,182 WH&Bs in off-range corral facilities.

The design of each facility is organized to handle large numbers of WH&Bs with pens, corrals, alleys, and loading/unloading areas that facilitate animal movement. There are multiple pens and corrals to sort animals for compatibility and care upon arrival to the facility. Each pen or corral offers all animals continuous water accessibility and quality feed on a daily basis.

The BLM strives to place horses removed from the range into private homes that provide quality care. Horses placed in off-range corral facilities are made available to the public for adoption or sale at adoption events held throughout the U.S. and through the BLM's Adopt or Sales Program (http://www.blm.gov/wo/st/en/prog/whbprogram/adoption_program/schedule.html). The off-range corral facility transitions WH&Bs to hay diets, performs necessary vaccinations and deworming procedures, provides hoof care and may train WH&Bs. Other WH&Bs, due to age, temperament, or other factors, may not be adopted or sold and subsequently are placed in off-range pastures. These facilities are designed to provide unadoptable wild horses with humane life-long care in a natural setting off the public rangelands. There are approximately 46,016 WH&Bs being cared for in off-range pastures (November 2015). All WH&Bs residing in both off-range corral facilities and off-range pastures, like those roaming Western public rangelands, are protected by the BLM under the 1971 Wild Free-Roaming Horses and Burros Act, as amended.

The BLM has been criticized by the public and animal protection organizations on their handling and care of wild horses and burros especially during the gathering activities and transitioning of the horses from public lands to off-range facilities. Some of the issues include the transportation conditions of the horses, facility design, environmental conditions, handling practices, and nutrition. Agricultural and research animal industries have developed assessment or auditing programs to verify humane care and handling of their industry's animals. These industries are performing both internal and 3rd-party audits for animal welfare to assure their stakeholders and provide transparency on how these animals are provided care and proper handling. Assessment programs based on standards have multifaceted benefits in providing education to employees and assurance to societal entities that their programs are responsible for properly handling and providing care for the animals. An assessment welfare program reported routinely to the public will increase transparency concerning the humane treatment of BLM's WH&Bs, as recommended by the 2008 US Government Accountability Office.

STANDARDS

> **Deficiency Definitions**
>
> **Major Deficiency**: impacts welfare of WH&Bs; usually is a procedure. Appropriate wording is "must," "unacceptable," "prohibited."
>
> **Minor Deficiency:** a reporting deficiency (lack of, not enough detail) or involves an uncontrollable situation. Appropriate wording is "should."

WH&Bs = Wild horses and burros

## SECTION 1.

## OFF-RANGE CORRAL FACILITY STANDARDS

I.   **FACILITY PERSONNEL**

    A.  Facility management establishes and implements standards of care, treatment, and handling of WH&Bs, and communicates expectations to all personnel to ensure the humane care and treatment of all WH&Bs at the facility. (**major**)

    ■  The facility must have employees with training, skills, and experience to observe, move, and handle the WH&Bs on the facility. (**major**)

    C.  The facility must have personnel that can properly maintain the working chute systems and facility infrastructure to provide for the safe housing, movement, and processing of the WH&Bs. (**major**)

    ■  The facility should be staffed by appropriate office staff for record maintenance and recording. (minor)

II.  **FACILITY DESIGN**

    ■  Facilities must be operated in a manner to provide a safe, clean and supportive environment for all WH&Bs. (**major**)

■ WH&Bs must be allowed to exist in an undisturbed environment unless being prepared for health procedures, identification, adoption events, or transportation. (**major**)

■ All WH&Bs must have adequate space to move freely within a pen enclosure. (**major**)

■ The facility must have a sufficient number of pens available to sort WH&Bs according to sex, age, temperament, health status, or physical condition as needed. **(major)**

■ Facility fences, gates, alleys, tubs, and working chutes must be constructed of stout materials and must be maintained in proper working condition. **(major)**

■ Fences in pens, alleys, and working chute systems must be not less than 6 feet high for horses, 5 feet high for burros, and the bottom rail must not be more than 12 inches from ground level. **(major)**

■ Fences must be of stout design and be maintained in proper condition with no holes, gaps, or sharp edges which could result in WH&Bs being injured. **(major )**

■ All WH&Bs within a pen must have adequate dry space to rest. **(major)**

■ Ground surfaces in pens must be maintained to promote drainage, reduce wet ground conditions, and allow for routine manure removal. **(major)**

■ Watering systems in WH&B holding pens must provide unlimited access to clean water appropriate for livestock at all times. **(major)**

■ Feeding areas must be accessible to all WH&Bs in the enclosure and maintained as a dry area without excessive manure accumulation. **(major)**

■ An appropriate squeeze chute maintained in proper working order must be available for safely restraining WH&Bs for necessary procedures at the facility including hoof trimming. **(major)**

■ Facilities must provide access to shade and shelter (wind breaks) in pens designated for compromised animals needing special care (i.e., injured or weak animals). Additional provisions for shade and shelter (wind breaks) will be evaluated and determined by managers as appropriate for their region, the function of their facility and the condition of the animals under their care. **(major)**

■ Shelter structures should be designed or constructed to reduce the risk for injury of the WH&Bs and maintained to avoid excessive manure and mud. (minor)

**III.   RECEIVING WILD HORSES AND BURROS**

■ Loading and Unloading Facilities

1. Facilities in areas for loading and unloading WH&Bs must be maintained in a safe and proper working condition, including gates and doors that swing freely and latch or tie easily as designed. (**major**)

2. The side panels of the loading chute must be a minimum of 6 feet high and covered with materials such as plywood or metal without holes that may cause injury. (**major**)

3. There must be no holes, gaps or openings, protruding surfaces, or sharp edges present in fence panels or other structures that may cause escape or possible injury. (**major**)

4. Loading and unloading ramps must have a non-slip surface and be maintained in a safe and proper working condition to prevent slips and falls. Examples of non-slip floors would include, but not be limited to, rubber mats, sand, shavings, and steel reinforcement rods or rough surfaces built into the ramp. There must be no holes in flooring or items that cause an animal to trip. (**major**)

5. Trailers must be properly aligned with loading and unloading chutes and panels with no gaps between the chute/panel and floor or sides of the trailer creating a situation where a WH&B could injure itself. (**major**)

6. Stock trailers should be positioned for loading and unloading such that there is no more than 12" clearance between the ground and floor of the trailer for burros and 18" for horses. (minor)

■ Receiving Procedures

1. All unloading of WH&Bs must be performed during daylight hours except when unforeseen circumstances develop and the Authorized Officer approves of the use of supplemental light. (**major**)

2. At the time of unloading, WH&Bs must be inspected by facility personnel to look for signs of infectious disease, sickness or injury and take appropriate steps if these conditions are observed. (**major**)

3. Any WH&B needing immediate veterinary attention must be identified and separated as necessary for examination, and a consultation with a veterinarian must be conducted within 4 hours. (**major**)

4. An authorized, properly trained, and experienced person, as well as euthanasia equipment and supplies, must be available immediately following unloading in the event that the emergency euthanasia of an animal is required. Euthanasia must be done in compliance with BLM Euthanasia policy. (**major**)

5. The receiving Authorized Officer must document any WH&B that is recumbent or dead upon arrival at the destination. (**major**)

6. Reporting of animals received from gather operations or from another BLM facility must be done in compliance with BLM policy. (**major**)

7. WH&Bs received from a gather must remain segregated from resident animals at the facility until a negative test for Equine Infectious Anemia (EIA) can be confirmed. (**major**)

8. Newly arrived WH&Bs must immediately be provided hay and water upon unloading. (**major**)

9. When WH&Bs are received from gather operations or from another facility, the receiving facility should unload them in a manner to minimize stress. (minor)

10. WH&Bs should be penned with WH&Bs of like age, sex, and temperament. (minor)

11. Newly arrived WH&Bs should be observed for signs that they may have difficulty transitioning to hay in a domestic setting. (minor)

IV.     **CARE OF WILD HORSE AND BURROS**

    A. Veterinarian

      1.  Routine presence by an on-site or on-call veterinarian must be provided at each facility with records of those visits maintained at the facility. (**major**)

      2.  A veterinarian must be available to collect and submit blood samples for Equine Infectious Anemia (EIA) testing and rabies immunization. (**major**)

      3.  Health care protocols must be in accordance with Program guidelines and accepted by the facility veterinarian for preventive health care procedures (vaccinations, deworming, hoof trimming, freeze marking). Medical treatments will be prescribed by or performed under the supervision of a veterinarian. Surgical procedures will only be performed by a veterinarian. (**major**)

      4.  WH&B deaths in a facility should be discussed with the facility veterinarian to review the probable causes of death. (minor)

      5.  If multiple animals die due to a related cause or unknown cause(s), a post-mortem examination or necropsy should be performed by the facility's on-call or on-site veterinarian to identify the cause of death where possible. Laboratory testing should be performed when possible to aid in determining the cause of death or related underlying factors that may be present when these are not readily apparent during the gross examination. (minor)

      6.  If a series of unexplained deaths occurs, facility quarantine measures must be considered with input from the attending veterinarian until the cause has been determined or when indicated until adequate bio-security measures are in place to prevent the spread of disease. Coordination with State and/or Federal Animal Health Officials in consultation with the attending veterinarian must be done if this occurs. (**major**)

    ■ Bio-Security

      1.  Authorized Officers must consult with the on-site or on-call veterinarian(s) to establish and review biosecurity and health care decisions. (**major**)

2. Newly arrived WH&Bs from gather operations must not be co-mingled with resident animals at the facility. (**major**)

3. Pens should be provided to segregate sick, infectious, injured, or weak WH&Bs from other healthy individuals in the facility when possible. (minor )

4. Hazardous or infectious biological waste (i.e., sharps, needles, blood samples, etc.) must be properly disposed in labeled containers. (**major**)

5. Working chute and tub systems should be routinely cleaned and disinfected to reduce the risk of disease transmission, especially after moving contagious WH&Bs through the system. (minor)

C. Feed and Water

1. Quality hay must be provided daily to WH&Bs in the amount of 2-3% of their body weight per day. **(major)**

2. Fresh, clean water appropriate for livestock must be accessible to WH&Bs located in holding pens at all times. (**major**)

3. Water troughs and watering systems must be checked daily to ensure they are clean and operating correctly. (**major**)

4. Feeding sites must allow all WH&Bs within a pen simultaneous access to hay. (**major**)

5. Newly arrived WH&Bs from gather operations may be fed grass hay and transitioned to alfalfa. (minor)

6. Salt and/or mineral blocks should be provided in holding pens at all times. (minor)

7. Supplemental feeds should be provided to address the nutritional needs of the WH&Bs, if needed. (minor)

■ Preparation Procedures

1. Facilities must identify individual WH&Bs and maintain inventories in accordance with BLM policy. This includes unmarked WH&Bs as well as those provided a freeze-mark. **(major)**

2. Facilities must conduct Equine Infectious Anemia (EIA) testing and apply freeze-marks within 30 days of receiving WH&Bs, unless directed by the facility veterinarian when age or physical condition requires a delay. (**major**)

3.  WH&Bs receiving a freeze-mark must be recorded on the animal preparation record using the approved Signalment Key. (**major**)

4.  Foals born in the facility should be freeze-marked no earlier than 3 months of age. (minor)

5.  WH&Bs must be evaluated daily by facility personnel to identify animals in poor body condition, poor hoof condition, injured, or in need of veterinary evaluation/treatment, and/or supplemental feeding. (**major**)

6.  Facilities must adhere to the current BLM vaccination policy. (**major**)

7.  Foals must be tested for EIA and vaccinated when weaned or at 6 months of age. (**major**)

8.  Hoof trimming must be performed twice per year at minimum or as necessary to maintain hooves in a proper condition. (**major**)

9.  Castration of stallions and jack burros must be performed by a veterinarian using general anesthesia. If a surgical plane of anesthesia is not reached initially animals must be re-dosed or the procedure postponed until the problem can be resolved. (**major**)

10. Stallions and jack burros should be castrated as soon as approved by the on-site veterinarian for the procedure in accordance with BLM policy. (minor)

11. WH&Bs being prepared for freeze-marking, blood collection, vaccination, hoof trimming, sorting, and other care treatments should be handled to minimize stress and injuries (minor).

■ Euthanasia Procedures

1.  The decision to euthanize and method of euthanasia must be directed by the Authorized Officer(s) who may consult with the on-site/on-call veterinarian. (**major**)

2.  Euthanasia must be done in compliance with BLM Euthanasia policy. (**major**)

3.  An authorized, properly trained, and experienced person, as well as euthanasia equipment and supplies, must be available at off-range corral facilities in the event that the emergency euthanasia of an animal is required. (**major**)

4. Any WH&B that dies or is euthanized must be documented including the circumstances, freeze brand ID if present, a description of the age, sex, color of the animal and the reason the animal was euthanized. A death record must be entered into the WHBPS. (**major**)

5. If an animal is euthanized due to an unknown cause, a post-mortem examination or necropsy should be performed by the facility's on-call or on-site veterinarian to identify the cause of death where possible.  Laboratory testing should be performed when possible to aid in determining the cause of death or related underlying factors that may be present when these are not readily apparent during the gross examination. (minor)

■ Carcass Disposal

1. The Authorized Officer must ensure that appropriate procedures are in place for the timely disposal of carcasses when necessary at off-range corral facilities. (**major**)

2. Disposal of carcasses must be in accordance with applicable state and local laws. (**major**)

## V.    HANDLING WILD HORSES AND BURROS

A. Willful Acts of Abuse

1. Hitting, kicking, or beating any WH&Bs in an abusive manner is prohibited. (**major**)

2. Dragging a recumbent WH&Bs without a sled, side board or slip sheet is prohibited. Ropes used for moving the recumbent animal must be attached to the sled, slide board, or slip sheet. (**major**)

3. There should be no deliberate driving of WH&Bs into other animals, closed gates, panels, or other equipment. (minor)

4. There should be no deliberate slamming of gates and doors on WH&Bs. (minor)

5. There should be no excessive noise (e.g., constant yelling) or sudden activity causing WH&Bs to become unnecessarily flighty, disturbed or agitated. (minor)

■ General Handling

1. All sorting, loading or unloading of WH&Bs must be performed during daylight hours except when unforeseen circumstances develop and the Authorized Officer approves of the use of supplemental light. (**major**)

2. Halters and ropes tied to a WH&B may be used to roll, turn, position, or load a recumbent animal, but a WH&B must not be dragged across the ground by a halter or rope attached to its body while in a recumbent position. (**major**)

3. WH&Bs should be moved into and out of pens in a manner that will minimize stress and injury. (minor)

4. When possible, WH&Bs should be allowed to move at their own pace to new pens or sorting/handling locations. (minor)

5. WH&Bs should be handled to enter runways or chutes in a forward direction. (minor)

6. Any unattended WH&Bs or a single WH&B should not remain in single-file alleyways, runways or chutes longer than 30 minutes. (minor)

7. No equipment should be operated in such a manner as to cause flighty behavior or injury to WH&Bs. (minor)

■ Handling Aids

1. Handling aids such as flags and shaker paddles must be the primary tools for driving and moving WH&Bs during handling and transport procedures. Contact of the flag or paddle end of primary handling aids with a WH&B is allowed. Ropes looped around the hindquarters may be used from horseback or on foot to assist in moving an animal forward or during loading. **(major)**

2. Electric prods must not be used routinely as a driving aid or handling tool. Electric prods may be used in limited circumstances only if the following guidelines are followed:

    a. Electric prods must only be a commercially available make and model that uses DC battery power with batteries fully charged at all times. (**major**)

    b. The electric prod device must never be disguised or concealed. (**major**)

c.  Electric prods must only be used after three attempts using other handling aids (flag, shaker paddle, voice or body position)  have been tried unsuccessfully to move the WH&Bs. (**major**)

d.  Electric prods must only be picked up when intended to deliver a stimulus; these devices are not constantly carried by the handlers. (**major**)

e.  Space in front of an animal should be available for the WH&B to move forward prior to application of the electric prod. (**major**)

f.  Electric prods must never be applied to the face, genitals, anus, or underside of the tail of a WH&B. (**major**)

g.  Electric prods must not be applied to any one WH&B more than three times during a procedure (e.g., sorting, loading) except in extreme cases with the approval of the Authorized Officer. Each exception must be approved at the time by the Authorized Officer. (**major**)

## SECTION 2.

## TRANSPORTATION STANDARDS TO ANOTHER OFF-RANGE CORRAL FACILITY, OFF-RANGE PASTURE, ECO-SANCTUARY OR ADOPTION EVENT

**I.    LOADING AND UNLOADING FACILITIES**

■ Facilities in areas for loading and unloading WH&Bs must be maintained in a safe and proper working condition, including gates and doors that swing freely and latch or tie easily as designed. (**major**)

■ The side panels of the loading chute must be a minimum of 6 feet high and covered with materials such as plywood or metal without holes that may cause injury. (**major**)

■ There must be no holes, gaps or openings, protruding surfaces, or sharp edges present in fence panels or other structures that may allow escape or cause possible injury. (**major**)

■ Loading and unloading ramps must have a non-slip surface and be maintained in a safe and proper working condition to prevent slips and falls. Examples of non-slip floors would include, but not be limited to, rubber mats, sand, shavings, and steel reinforcement rods or rough surfaces built into the ramp. There must be no holes in flooring or items that cause an animal to trip. (**major**)

■ Trailers must be properly aligned with loading and unloading chutes and panels with no gaps between the chute/panel and floor or sides of the trailer creating a situation where a WH&B could injure itself. (**major**)

■ Stock trailers should be positioned for loading and unloading such that there is no more than 12" clearance between the ground and floor of the trailer for burros and 18" for horses. (minor)

II.    **CARE OF WILD HORSES AND BURROS DURING TRANSPORT PREPARATION PROCEDURES**

A.  WH&Bs being transferred to another off-range corral facility, off-range pasture, eco-sanctuary or adoption event must have a current negative EIA test, be in a state of health appropriate for a Certificate of Veterinary Inspection (CVI), and be accompanied by appropriate paperwork as required by the laws of the receiving state. **(major)**

B.  WH&Bs being transferred to another off-range corral facility, off-range pasture, eco-sanctuary or adoption event must be fit to endure the travel. (**major**)

> 1.  WH&Bs that are non-ambulatory, blind in both eyes, or severely injured must not be loaded and shipped unless it is to receive immediate veterinary care or euthanasia (**major**)
>
> 2.  WH&Bs that are weak or debilitated must not be transported without the approval of Authorized Officer in consultation with the on-site veterinarian. Appropriate actions for their care during transport must be taken according to the Authorized Officer. (**major**)

C.  WH&Bs being transferred to another off-range corral facility, off-range pasture, eco-sanctuary, or adoption event must be sorted prior to shipping to ensure compatibility and minimize aggressive behavior that may cause injury during transport. (**major**)

D.  Except for exceptional circumstances including but not limited to trap site adoptions, WH&Bs being offered for adoption should have received primary and booster vaccinations as well as deworming medications prior to adoption. (minor)

III.    **VEHICLES**

A.  Straight deck trailers or stock trailers must be used for transporting WH&Bs to another off-range corral facility, off-range pasture, eco-sanctuary or adoption event. **(major)**

> 1.  Two-tiered or double deck trailers are prohibited. **(major)**
>
> 2.  Transport vehicles for WH&Bs must have a covered roof containing them such that WH&Bs cannot escape. **(major)**

B. WH&Bs must have adequate headroom during loading and unloading and must be able to maintain a normal posture with all four feet on the floor during transport without contacting the roof. **(major)**

C. The width and height of all gates and doors must allow WH&Bs to move through freely. **(major)**

D. All gates and doors must open and close easily and be able to be secured in a closed position. **(major)**

E. Loading and unloading ramps of vehicles must have a non-slip surface and be maintained in a safe and proper working condition to prevent slips and falls. Examples of non-slip flooring would include, but not be limited to, rubber mats, sand, shavings, and steel reinforcement rods built into ramp. There must be no holes in the flooring or items that can cause an animal to trip. **(major)**

F. Transport vehicles more than 18 feet and less than 40 feet in length must have a minimum of one partition gate providing two compartments; transport vehicles 40 feet or longer must have at least two partition gates to provide a minimum of three compartments. **(major)**

G. Partition gates in transport vehicles should be used to distribute the load into compartments during travel. (minor)

H. All partitions and panels inside of trailers must be free of sharp edges or holes that could cause injury to WH&Bs. **(major)**

I. The inner lining of all trailers must be strong enough to withstand failure by kicking that would lead to injuries. **(major)**

J. Surfaces and floors of trailers must be cleaned of dirt, manure and other organic matter prior to the beginning of a shipping event, and must have non-skid material on the trailer floor, such as, wood shavings, rubber non-skid mats etc. **(major)**

IV. **TRANSPORT PROCEDURES**

A. WH&Bs must be loaded at the following rates: **(major)**

1. 12 square feet per adult horse.

2. 6.0 square feet per dependent horse foal.

3. 8.0 square feet per adult burro or yearling horse.

    4.  4.0 square feet per dependent burro foal

B. Planned drive time from off-range corral facility to another off-range corral facility, off-range pasture, eco-sanctuary, or adoption must not exceed 24 hours without unloading. (**major**)

C. Trucking companies or haulers must be provided directions and contact phone numbers for the facility or adoption location. **(major**)

D. A transportation event that is longer than 24 hours will require unloading and a minimum rest period of 8 hours with access to hay and water prior to being re-loaded and sent to the final destination. **(major**)

E. While in transit, WH&Bs must be observed by the transport driver a minimum of once every 8 hours. **(major)**

F. Non-ambulatory or recumbent WH&Bs must be evaluated on the trailer and either euthanized or removed from the trailers using a sled, slide board or slip sheet. (**major**)

G. WH&Bs should not be allowed to remain standing on straight-deck and stock trailers while not in transport for a combined period of greater than three (3) hours. (minor)

## V.   RECEIVING PROCEDURES

See Section 1. Off-range Corral Standards, Part III. B. 1-5 and 8-11.

<span style="color:blue">SECTION 3.</span>

<span style="color:#8B4513">ADOPTION EVENT STANDARDS</span>

I. **ADOPTION EVENT PERSONNEL**

   A. BLM establishes and implements standards of care, treatment, and handling of WH&Bs, and communicates expectations to all personnel to ensure the humane care and treatment of all WH&Bs at the adoption event. **(major)**

   B. The adoption event must have employees with training, skills, and experience to observe, move, and handle the WH&Bs at the event. **(major)**

   C. The adoption event must have maintenance staff that can properly maintain the facilities to provide for the safe housing, movement, and processing of the WH&Bs. **(major)**

II. **SATELLITE FACILITY DESIGN**

   A. All satellite facilities must be operated in a manner to provide a safe, clean and supportive environment for all WH&Bs. **(major)**

   B. The satellite facility must have a sufficient number of pens available to sort WH&Bs according to sex, temperament, or physical condition as needed. (**major**)

   C. The satellite facility's fences, gates, alleys, and working chutes must be constructed of stout materials and must be maintained in proper working condition. (**major**)

   D. Fences in adoption pens, alleys, and working chute systems must not be less than 6 feet high for horses and 5 feet high for burros. (**major**)

   E. Adoption pen fences must be of stout design and must be maintained in proper condition with no holes, gaps, or sharp edges that could result in WH&Bs being injured. (**major**)

   F. Watering systems in WH&B adoption holding pens must provide unlimited access to clean water appropriate for livestock at all times. (**major**)

   G. Adoption pen feeding areas must be accessible to all WH&Bs in the pen at the same time. (**major**)

   H. Ground surfaces in adoption pens should promote drainage to reduce wet ground conditions. (minor)

I. WH&Bs in pens at the satellite facility should be maintained at a stocking density such that when at rest all WH&Bs occupy no more than half the pen area. (minor)

## III.  CARE OF WILD HORSES AND BURROS RECEIVED AT SATELLITE FACILITIES

A.  Provisions to provide care by a veterinarian in a timely manner on-site, on call, or by transporting an animal to a veterinarian must be made in advance**. (major)**

B.  Provisions for medical care (treatments including euthanasia if necessary) at adoption events will be made in accordance with BLM policy and carried out as described above for preparation facilities (Section 1. Off-range Corral Facility Standards, Part IV. A. 1-6). (**major**)

C.  WH&Bs must be sorted upon arrival at adoption events into pens with animals of appropriate age and temperament such that animals can promptly begin a period of rest, eating, and drinking with limited disturbance. **(major)**

D.  All WH&Bs must have adequate space to move freely within an adoption facility pen. **(major)**

E.  WH&Bs, to the greatest extent possible, must be allowed to exist in an undisturbed environment after arriving at an adoption facility until the adoption event begins. **(major)**

F.  Quality hay must be provided to WH&Bs in the amount of 2-3% of their body weight per day upon unloading following transport and daily during the adoption event. **(major)**

G.  WH&Bs at adoption events may be supplemented with feed or water supplements to address the stress of transport. (minor)

H.  WH&Bs will be sorted during the adoption event in a manner to reduce stress and opportunity for injury. (minor)

I.  WH&Bs transported for more than 12 hours to an adoption event should be allowed a rest period of 5 hours or more prior to formal viewing by the adopting public. (minor)

## IV.  EUTHANASIA PROCEDURES AT SATELLITE FACILITIES

See Section 1. Off-range Corral Facility Standards, Part IV. E. 1-4.

**V.    CARCASS DISPOSAL AT SATELLITE FACILITIES**

See Section 1. Off-range Corral Facility Standards, Part IV. F. 1-2.

**VI.    HANDLING WILD HORSES AND BURROS AT SATELLITE FACILITIES**

A.    Willful Actus of Abuse

See Section 1. Off-range Corral Facility Standards, Part V. A. 1-5

B.    General Handling

See Section 1. Off-range Corral Facility Standards, Part V. B. 1-7

C.    Handling Aids

See Section 1. Off-range Corral Facility Standards, Part V. C. 1-2

# REQUIRED DOCUMENTATION AND RESPONSIBILITIES
# OF AUTHORIZED OFFICERS

## REQUIRED DOCUMENTATION

| STANDARD | DOCUMENTATION |
|---|---|
| **Section 1** | **Off-Range Corral Facility Standards** |
| Part III. B. 5 | Any WH&B that is recumbent or dead upon arrival at the destination |
| Part IV. A. 1 | Record of visits by on-site/on-call veterinarian |
| Part IV. E. 4 | Any WH&B that dies or is euthanized at facility, including the circumstances, freeze brand ID if present, a description of the age, sex, color of the animal and the reason the animal was euthanized. A death record must be entered into the WHBPS. |
| **Section 2** | **Transportation Standards** |
| Part V | Refer to Section 1. Off-range Corral Facility Standards, Part III. B. 5, as above. |
| **Section 3** | **Adoption Event Standards** |
| Part IV | Refer to Section 1. Off-range Corral Facility Standards, Part IV. E. 4, as above |

## RESPONSIBILITIES

| STANDARD | RESPONSIBILITY |
|---|---|
| **Section 1** | **Off-Range Corral Facility Standards** |
| Parts III. B. 1 & V.B.1 | Approve use of supplemental lighting when sorting, loading, or unloading WH&Bs |
| Part III. B. 5 | Document any WH&B that is recumbent or dead upon arrival at the destination |
| Part IV. B. 1 | Consult with on-site/on-call veterinarian to establish and review biosecurity and health care decisions |
| Part IV. E. 1 | Direct decision regarding euthanasia and method of euthanasia for any WH&B; may consult with on-site/on-call veterinarian |
| Part IV. F. 1 | Ensure that appropriate procedures are in place for carcass disposal |
| Part V. C. 2. g | Approve use of electric prod more than three times, for exceptional cases only |

| STANDARD | RESPONSIBILITY |
|---|---|
| **Section 2** | **Transportation Standards** |
| Part II. D | Approve of transport and care during transport for weak or debilitated WH&B |
| | |
| **Section 3** | **Adoption Event Standards** |
| Part VI. B | Refer to Section 1. Off-range Corral Facility Standard, Part IV.B.1, above. |
| Part VI. C | Refer to Section 1. Off-range Corral Facility Standard, Part V.C.2.g, above. |

## PROPOSED CAWP COMPONENTS FOR OFF-RANGE CORRAL FACILITIES, TRANSPORTATION, AND ADOPTION EVENTS



**Education**
- Online
- Certification on completion
- Includes examples, videos

**Standards**
- Off-Range Corral Facilities
- Transportation
- Adoption Events

**Assessment Tool**
- Off-Range Corral Facilities
- Transportation
- Adoption Events

**Records**
- Summary
- Cumulative capacity
- Capacity to create different reports

**From:**        Stratton, Joseph A
**To:**          Shepherd, Alan B; Waddell, Holle
**Subject:**     Attached is Final Draft of CAWP SOP"s memo
**Date:**        Wednesday, January 17, 2018 10:56:50 AM
**Attachments:** Final-Draft-IM 2018-XXX, CAWP ORC-Transportation-Adoption-SOPs.docx
**Importance:**  High

Alan and Holle, I incorporated the IM changes into the "clean" copy attached below. Please look at it one more time before I send it to the state leads. Thanks. joe

U.S. DEPARTMENT OF THE INTERIOR BUREAU OF LAND MANAGEMENT

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C.   20240-0036
http://www.blm.gov

In Reply Refer To:
4750 (260) P

EMS TRANSMISSION
Instruction Memorandum No. 2018-XXX
Expires: 09/30/2021

To:           All Field Office Officials

From:         Assistant Director, Resources and Planning

Subject:      Comprehensive Animal Welfare Program for Wild Horse and Burro in Off-Range
Corrals, Transportation and Adoption Standard Operating Procedures.

Program Area: Wild Horse and Burro (WH&B) Program

Purpose: The purpose of this Instruction Memorandum (IM) is to establish policy for the Wild
Horse and Burro (WH&B) Comprehensive Animal Welfare Program (CAWP) for Off Range
Corrals (ORCs), Transportation and Adoption. This IM incorporates the standard operating
procedures for ORCs, transportation, and adoption and will serve as the basis going forward for
the  future development of the CAWP for ORC's, transportation and adoption including training
materials and assessment tools for each of the segments mentioned.

Policy/Action: The Bureau of Land Management (BLM) is committed to the well-being and
humane care of WH&Bs managed on and off the range.  At all times, the care and treatment
provided by the BLM, its contractors, and cooperators will be characterized by compassion and
concern for the animals' well-being and welfare needs.

All State, District and Field Offices are required to comply with the standard operating
procedures policy within their jurisdiction.

This IM incorporates three components:

1) Standard operating procedures for ORC's, Transportation, and Adoption. (Attachment 1).

2) Future training modules for all personnel, contractors, and cooperators involved in the care,
handling, and transportation of wild horses and burros at ORC's, ORP's and adoption events will
be developed. .

3) Future assessment tools as developed for ORCs, transportation and adoption.

The goal of this IM is to ensure that humane care and treatment of WH&Bs remains a high priority for the BLM, its contractors, and cooperators at all times. The BLM's objective is to use the best available science, husbandry and handling practices applicable for WH&Bs and to make improvements whenever possible, while also meeting our overall goals and objectives in accordance with current BLM policy, standard operating procedures and contract requirements. The CAWP and its associated components will be reviewed regularly and modified as necessary to enhance its transparency.

The primary party responsible for promptly addressing any actions that are inconsistent with the Standards set forth in the CAWP is the Authorized Officer, such as a ORC manager, Contracting Officer's Representative (COR) for ORC contracts and adoption event coordinators etc. The Authorized Officer may delegate responsibility to an alternate individual. The Authorized Officer will promptly notify the employees, contractors and cooperators if improper actions, which are not in compliance with the CAWP, are observed and will ensure that they are promptly corrected. It is the responsibility of the all individuals engaged in actions throughout the WH&B program to ensure that all aspects of the CAWP are fully implemented.

The hiring of a CAWP coordinator will assist in the implementation, development, and modification of all aspects of the CAWP including those developed to date as well as future components of the CAWP.

Timeframe: All portions of this policy are effective immediately and as they become finalized.

Budget Impact: This IM is implementing new policy and guidance with additional training and reporting requirements for personnel, contractors and cooperators. The cost for the required training is approximately $250 per person. CAWP program implementation, oversight, data compilation and reporting requirements will require an additional 12 to 15 work months per year.

Background: The authority for a Comprehensive Animal Welfare Program for WH&B is provided by Public Law 92-195, Wild Free-Roaming Horses and Burros Act of 1971 (as amended) and 43 CFR 4700.0-2.

The Comprehensive Animal Welfare Program for WH&B consolidates and highlights the BLM's policies, procedures and ongoing commitment to protect animal welfare; provide training for employees, contractors and cooperators on animal care and handling; and implement assessment tools which will be used to evaluate the agency's, contractor's and cooperator's adherence to the CAWP SOPs.

Manual/Handbook Sections Affected: This IM will not require Manual/Handbook Section changes but as the full CAWP is developed a new Manual/Handbook will need to be developed.

Coordination:  This IM was coordinated among WO-100, WO-200, WO-260, WO-600, WH&B State Leads and WH&B Specialists.

Contact: Jane Doe, CAWP Coordinator, WO-260.

**Commented [SJA1]:** I think it will be you at this point since you are the Off-Range Branch Chief and this applies to Off-Range?

**Commented [WH2]:** Who will be the POC?

Attachment 1

Standard Operating Procedures (SOPs)

| | |
|---|---|
| **From:** | Stratton, Joseph A |
| **To:** | Dumas, Amy; Shepherd, Alan B; Sharp, Robert N; Hopper, Robert G; Roger Oyler; Warr, Victor (Gus) A; Robbins, Christopher L; David Sjaastad; Leonard, Stephen P; Williams, Pat B; Wade, Beatrice A; Bryan Fuell; Neill, John J; Bybee, Jared M; Waddell, Holle; Deborah Collins; Bolstad, Dean O; Yurek, Karlee M; Lutterman, Jason W |
| **Cc:** | DeLorme, Ramona |
| **Subject:** | Attached is the CAWP SOP"s for Off-Range Corrals, Transportation and Adoption |
| **Date:** | Thursday, March 10, 2016 3:20:40 PM |
| **Attachments:** | CAWP STANDARDS Off Range Corral Transport Adoption_FINAL_2016-01-29.docx |
| **Importance:** | High |

All, I have been tasked with presenting where we are with the CAWP for Corrals, Transport and Adoption. Attached is the Standard Operating Procedures finalized after a team initially developed them, reviewed by State leads, and finalized by another group with UC-Davis' assistance.

I am requesting that you all bring a copy of it if you are interested in seeing it in the hard copy version for yourself. This will save Ramona from making copies.

I will also be showing using the computer and screen some Power point slides of the training modules and the Assessment tool.

Thanks. See you next week. joe

# COMPREHENSIVE ANIMAL WELFARE PROGRAM

# STANDARDS

## OFF-RANGE CORRAL FACILITIES

## TRANSPORTATION

## ADOPTION EVENTS

Developed by

The Bureau of Land Management
Wild Horse and Burro Program

in collaboration with

Carolyn L. Stull, PhD
Kathryn E. Holcomb, PhD
University of California, Davis
School of Veterinary Medicine

January 29, 2016

# TABLE OF CONTENTS

PREFACE ............................................................................................................. 2

**Section 1. OFF-RANGE CORRAL FACILITY STANDARDS** ........................................... **3**

    I.    FACILITY PERSONNEL ........................................................... 3
    II.   FACILITY DESIGN ................................................................. 3
    III.  RECEIVING WILD HORSE AND BURROS ................................ 5
    IV.  CARE OF WILD HORSE AND BURROS ................................... 6
    V.   HANDLING WILD HORSES AND BURROS ........................... 10

**Section 2. TRANSPORTATION STANDARDS TO ANOTHER OFF-RANGE CORRAL FACILITY, OFF-RANGE PASTURE, ECO-SANCTUARY, OR ADOPTION EVENT** ........................................... **13**

    I.    LOADING AND UNLOADING FACILITIES ............................ 13
    II.   CARE OF WILD HORSES AND BURROS DURING TRANSPORT PREPARATION PROCEDURES ................................................................... 14
    III.  VEHICLES ........................................................................ 14
    IV.  TRANSPORT PROCEDURES .............................................. 15
    V.   RECEIVING PROCEDURES ................................................. 16

**Section 3. ADOPTION EVENT STANDARDS** ........................................................ **17**

    I.    ADOPTION EVENT PERSONNEL ....................................... 17
    II.   SATELLITE FACILITY DESIGN ............................................ 17
    III.  EUTHANASIA  PROCEDURES AT SATELLITE FACILITIES....... 18
    IV.  CARCASS DISPOSAL AT SATELLITE FACILITIES ................... 19
    V.   CARE OF WILD HORSES AND BURROS RECEIVED AT SATELLITE FACILITIES........ 18
    VI.  HANDLING WILD HORSES AND BURROS AT SATELLITE FACILITIES .................... 19

**REQUIRED DOCUMENTATION AND RESPONSIBILITIES OF AUTHORIZED OFFICER** ................. **20**

**PROPOSED CAWP COMPONENTS FOR OFF-RANGE CORRAL FACILITIES, TRANSPORTATION, AND ADOPTION EVENTS** ............................................................. **22**

# PREFACE

The Bureau of Land Management (BLM) estimates that 58,150 wild horses and burros (WH&Bs) are roaming on BLM-managed rangelands in 10 Western states, based on the latest data available, compiled as of March 1, 2015. Wild horses and burros have virtually no natural predators and their herd sizes can double about every four years. As a result, the agency must remove thousands of animals from the range each year to control herd sizes.

The Bureau of Land Management manages many off-range corral facilities throughout the U.S. The primary mission of the off-range corral facilities is to act as a holding and preparation facility that accepts WH&Bs from gather/removal operations and prepares them for adoption to the public or placement into off-range pastures. As of November 2015, there are 16,182 WH&Bs in off-range corral facilities.

The design of each facility is organized to handle large numbers of WH&Bs with pens, corrals, alleys, and loading/unloading areas that facilitate animal movement. There are multiple pens and corrals to sort animals for compatibility and care upon arrival to the facility. Each pen or corral offers all animals continuous water accessibility and quality feed on a daily basis.

The BLM strives to place horses removed from the range into private homes that provide quality care. Horses placed in off-range corral facilities are made available to the public for adoption or sale at adoption events held throughout the U.S. and through the BLM's Adopt or Sales Program (http://www.blm.gov/wo/st/en/prog/whbprogram/adoption_program/schedule.html). The off-range corral facility transitions WH&Bs to hay diets, performs necessary vaccinations and deworming procedures, provides hoof care and may train WH&Bs. Other WH&Bs, due to age, temperament, or other factors, may not be adopted or sold and subsequently are placed in off-range pastures. These facilities are designed to provide unadoptable wild horses with humane life-long care in a natural setting off the public rangelands. There are approximately 46,016 WH&Bs being cared for in off-range pastures (November 2015). All WH&Bs residing in both off-range corral facilities and off-range pastures, like those roaming Western public rangelands, are protected by the BLM under the 1971 Wild Free-Roaming Horses and Burros Act, as amended.

The BLM has been criticized by the public and animal protection organizations on their handling and care of wild horses and burros especially during the gathering activities and transitioning of the horses from public lands to off-range facilities. Some of the issues include the transportation conditions of the horses, facility design, environmental conditions, handling practices, and nutrition. Agricultural and research animal industries have developed assessment or auditing programs to verify humane care and handling of their industry's animals. These industries are performing both internal and 3rd-party audits for animal welfare to assure their stakeholders and provide transparency on how these animals are provided care and proper handling. Assessment programs based on standards have multifaceted benefits in providing education to employees and assurance to societal entities that their programs are responsible for properly handling and providing care for the animals. An assessment welfare program reported routinely to the public will increase transparency concerning the humane treatment of BLM's WH&Bs, as recommended by the 2008 US Government Accountability Office.

STANDARDS

---

**Deficiency Definitions**

**Major Deficiency**: impacts welfare of WH&Bs; usually is a procedure. Appropriate wording is "must," "unacceptable," "prohibited."

**Minor Deficiency:** a reporting deficiency (lack of, not enough detail) or involves an uncontrollable situation. Appropriate wording is "should."

---

WH&Bs = Wild horses and burros

## SECTION 1.

## OFF-RANGE CORRAL FACILITY STANDARDS

I. **FACILITY PERSONNEL**

    A. Facility management establishes and implements standards of care, treatment, and handling of WH&Bs, and communicates expectations to all personnel to ensure the humane care and treatment of all WH&Bs at the facility. (**major**)

    ■ The facility must have employees with training, skills, and experience to observe, move, and handle the WH&Bs on the facility. (**major**)

    C. The facility must have personnel that can properly maintain the working chute systems and facility infrastructure to provide for the safe housing, movement, and processing of the WH&Bs. (**major**)

    ■ The facility should be staffed by appropriate office staff for record maintenance and recording. (minor)

II. **FACILITY DESIGN**

    ■ Facilities must be operated in a manner to provide a safe, clean and supportive environment for all WH&Bs. (**major**)

- WH&Bs must be allowed to exist in an undisturbed environment unless being prepared for health procedures, identification, adoption events, or transportation. (**major**)

- All WH&Bs must have adequate space to move freely within a pen enclosure. (**major**)

- The facility must have a sufficient number of pens available to sort WH&Bs according to sex, age, temperament, health status, or physical condition as needed. **(major)**

- Facility fences, gates, alleys, tubs, and working chutes must be constructed of stout materials and must be maintained in proper working condition. **(major)**

- Fences in pens, alleys, and working chute systems must be not less than 6 feet high for horses, 5 feet high for burros, and the bottom rail must not be more than 12 inches from ground level. **(major)**

- Fences must be of stout design and be maintained in proper condition with no holes, gaps, or sharp edges which could result in WH&Bs being injured. **(major )**

- All WH&Bs within a pen must have adequate dry space to rest. **(major)**

- Ground surfaces in pens must be maintained to promote drainage, reduce wet ground conditions, and allow for routine manure removal. **(major)**

- Watering systems in WH&B holding pens must provide unlimited access to clean water appropriate for livestock at all times. **(major)**

- Feeding areas must be accessible to all WH&Bs in the enclosure and maintained as a dry area without excessive manure accumulation. **(major)**

- An appropriate squeeze chute maintained in proper working order must be available for safely restraining WH&Bs for necessary procedures at the facility including hoof trimming. **(major)**

- Facilities must provide access to shade and shelter (wind breaks) in pens designated for compromised animals needing special care (i.e., injured or weak animals). Additional provisions for shade and shelter (wind breaks) will be evaluated and determined by managers as appropriate for their region, the function of their facility and the condition of the animals under their care. **(major)**

◼ Shelter structures should be designed or constructed to reduce the risk for injury of the WH&Bs and maintained to avoid excessive manure and mud. (minor)

## III.   RECEIVING WILD HORSES AND BURROS

◼ Loading and Unloading Facilities

1. Facilities in areas for loading and unloading WH&Bs must be maintained in a safe and proper working condition, including gates and doors that swing freely and latch or tie easily as designed. (**major**)

2. The side panels of the loading chute must be a minimum of 6 feet high and covered with materials such as plywood or metal without holes that may cause injury. (**major**)

3. There must be no holes, gaps or openings, protruding surfaces, or sharp edges present in fence panels or other structures that may cause escape or possible injury. (**major**)

4. Loading and unloading ramps must have a non-slip surface and be maintained in a safe and proper working condition to prevent slips and falls. Examples of non-slip floors would include, but not be limited to, rubber mats, sand, shavings, and steel reinforcement rods or rough surfaces built into the ramp. There must be no holes in flooring or items that cause an animal to trip. (**major**)

5. Trailers must be properly aligned with loading and unloading chutes and panels with no gaps between the chute/panel and floor or sides of the trailer creating a situation where a WH&B could injure itself. (**major**)

6. Stock trailers should be positioned for loading and unloading such that there is no more than 12" clearance between the ground and floor of the trailer for burros and 18" for horses. (minor)

◼ Receiving Procedures

1. All unloading of WH&Bs must be performed during daylight hours except when unforeseen circumstances develop and the Authorized Officer approves of the use of supplemental light. (**major**)

2. At the time of unloading, WH&Bs must be inspected by facility personnel to look for signs of infectious disease, sickness or injury and take appropriate steps if these conditions are observed. (**major**)

3. Any WH&B needing immediate veterinary attention must be identified and separated as necessary for examination, and a consultation with a veterinarian must be conducted within 4 hours. (**major**)

4. An authorized, properly trained, and experienced person, as well as euthanasia equipment and supplies, must be available immediately following unloading in the event that the emergency euthanasia of an animal is required. Euthanasia must be done in compliance with BLM Euthanasia policy. (**major**)

5. The receiving Authorized Officer must document any WH&B that is recumbent or dead upon arrival at the destination. (**major**)

6. Reporting of animals received from gather operations or from another BLM facility must be done in compliance with BLM policy. (**major**)

7. WH&Bs received from a gather must remain segregated from resident animals at the facility until a negative test for Equine Infectious Anemia (EIA) can be confirmed. (**major**)

8. Newly arrived WH&Bs must immediately be provided hay and water upon unloading. (**major**)

9. When WH&Bs are received from gather operations or from another facility, the receiving facility should unload them in a manner to minimize stress. (minor)

10. WH&Bs should be penned with WH&Bs of like age, sex, and temperament. (minor)

11. Newly arrived WH&Bs should be observed for signs that they may have difficulty transitioning to hay in a domestic setting. (minor)

IV.     **CARE OF WILD HORSE AND BURROS**

A. Veterinarian

1. Routine presence by an on-site or on-call veterinarian must be provided at each facility with records of those visits maintained at the facility. (**major**)

2. A veterinarian must be available to collect and submit blood samples for Equine Infectious Anemia (EIA) testing and rabies immunization. (**major**)

3. Health care protocols must be in accordance with Program guidelines and accepted by the facility veterinarian for preventive health care procedures (vaccinations, deworming, hoof trimming, freeze marking). Medical treatments will be prescribed by or performed under the supervision of a veterinarian. Surgical procedures will only be performed by a veterinarian. (**major**)

4. WH&B deaths in a facility should be discussed with the facility veterinarian to review the probable causes of death. (minor)

5. If multiple animals die due to a related cause or unknown cause(s), a post-mortem examination or necropsy should be performed by the facility's on-call or on-site veterinarian to identify the cause of death where possible. Laboratory testing should be performed when possible to aid in determining the cause of death or related underlying factors that may be present when these are not readily apparent during the gross examination. (minor)

6. If a series of unexplained deaths occurs, facility quarantine measures must be considered with input from the attending veterinarian until the cause has been determined or when indicated until adequate bio-security measures are in place to prevent the spread of disease. Coordination with State and/or Federal Animal Health Officials in consultation with the attending veterinarian must be done if this occurs. (**major**)

■ Bio-Security

1. Authorized Officers must consult with the on-site or on-call veterinarian(s) to establish and review biosecurity and health care decisions. (**major**)

2. Newly arrived WH&Bs from gather operations must not be co-mingled with resident animals at the facility. (**major**)

3. Pens should be provided to segregate sick, infectious, injured, or weak WH&Bs from other healthy individuals in the facility when possible. (minor )

4. Hazardous or infectious biological waste (i.e., sharps, needles, blood samples, etc.) must be properly disposed in labeled containers. (**major**)

5. Working chute and tub systems should be routinely cleaned and disinfected to reduce the risk of disease transmission, especially after moving contagious WH&Bs through the system. (minor)

C. Feed and Water

1. Quality hay must be provided daily to WH&Bs in the amount of 2-3% of their body weight per day. **(major)**

2. Fresh, clean water appropriate for livestock must be accessible to WH&Bs located in holding pens at all times. (**major**)

3. Water troughs and watering systems must be checked daily to ensure they are clean and operating correctly. (**major**)

4. Feeding sites must allow all WH&Bs within a pen simultaneous access to hay. (**major**)

5. Newly arrived WH&Bs from gather operations may be fed grass hay and transitioned to alfalfa. (minor)

6. Salt and/or mineral blocks should be provided in holding pens at all times. (minor)

7. Supplemental feeds should be provided to address the nutritional needs of the WH&Bs, if needed. (minor)

■ Preparation Procedures

1. Facilities must identify individual WH&Bs and maintain inventories in accordance with BLM policy. This includes unmarked WH&Bs as well as those provided a freeze-mark. **(major)**

2. Facilities must conduct Equine Infectious Anemia (EIA) testing and apply freeze-marks within 30 days of receiving WH&Bs, unless directed by the facility veterinarian when age or physical condition requires a delay. (**major**)

3. WH&Bs receiving a freeze-mark must be recorded on the animal preparation record using the approved Signalment Key. (**major**)

4. Foals born in the facility should be freeze-marked no earlier than 3 months of age. (minor)

5. WH&Bs must be evaluated daily by facility personnel to identify animals in poor body condition, poor hoof condition, injured, or in need of veterinary evaluation/treatment, and/or supplemental feeding. (**major**)

6. Facilities must adhere to the current BLM vaccination policy. (**major**)

7. Foals must be tested for EIA and vaccinated when weaned or at 6 months of age. (**major**)

8. Hoof trimming must be performed twice per year at minimum or as necessary to maintain hooves in a proper condition. (**major**)

9. Castration of stallions and jack burros must be performed by a veterinarian using general anesthesia. If a surgical plane of anesthesia is not reached initially animals must be re-dosed or the procedure postponed until the problem can be resolved. (**major**)

10. Stallions and jack burros should be castrated as soon as approved by the on-site veterinarian for the procedure in accordance with BLM policy. (minor)

11. WH&Bs being prepared for freeze-marking, blood collection, vaccination, hoof trimming, sorting, and other care treatments should be handled to minimize stress and injuries (minor).

■ Euthanasia Procedures

1. The decision to euthanize and method of euthanasia must be directed by the Authorized Officer(s) who may consult with the on-site/on-call veterinarian. (**major)**

2. Euthanasia must be done in compliance with BLM Euthanasia policy. (**major**)

3. An authorized, properly trained, and experienced person, as well as euthanasia equipment and supplies, must be available at off-range corral facilities in the event that the emergency euthanasia of an animal is required. (**major**)

4. Any WH&B that dies or is euthanized must be documented including the circumstances, freeze brand ID if present, a description of the age, sex, color of the animal and the reason the animal was euthanized. A death record must be entered into the WHBPS. (**major**)

5. If an animal is euthanized due to an unknown cause, a post-mortem examination or necropsy should be performed by the facility's on-call or on-site veterinarian to identify the cause of death where possible. Laboratory testing should be performed when possible to aid in determining the cause of death or related underlying factors that may be present when these are not readily apparent during the gross examination. (minor)

- ■ Carcass Disposal

    1. The Authorized Officer must ensure that appropriate procedures are in place for the timely disposal of carcasses when necessary at off-range corral facilities. (**major**)

    2. Disposal of carcasses must be in accordance with applicable state and local laws. (**major**)

## V.  HANDLING WILD HORSES AND BURROS

A. Willful Acts of Abuse

1. Hitting, kicking, or beating any WH&Bs in an abusive manner is prohibited. (**major**)

2. Dragging a recumbent WH&Bs without a sled, side board or slip sheet is prohibited. Ropes used for moving the recumbent animal must be attached to the sled, slide board, or slip sheet. (**major**)

3. There should be no deliberate driving of WH&Bs into other animals, closed gates, panels, or other equipment. (minor)

4. There should be no deliberate slamming of gates and doors on WH&Bs. (minor)

5. There should be no excessive noise (e.g., constant yelling) or sudden activity causing WH&Bs to become unnecessarily flighty, disturbed or agitated. (minor)

■ General Handling

1. All sorting, loading or unloading of WH&Bs must be performed during daylight hours except when unforeseen circumstances develop and the Authorized Officer approves of the use of supplemental light. (**major**)

2. Halters and ropes tied to a WH&B may be used to roll, turn, position, or load a recumbent animal, but a WH&B must not be dragged across the ground by a halter or rope attached to its body while in a recumbent position. (**major**)

3. WH&Bs should be moved into and out of pens in a manner that will minimize stress and injury. (minor)

4. When possible, WH&Bs should be allowed to move at their own pace to new pens or sorting/handling locations. (minor)

5. WH&Bs should be handled to enter runways or chutes in a forward direction. (minor)

6. Any unattended WH&Bs or a single WH&B should not remain in single-file alleyways, runways or chutes longer than 30 minutes. (minor)

7. No equipment should be operated in such a manner as to cause flighty behavior or injury to WH&Bs. (minor)

■ Handling Aids

1. Handling aids such as flags and shaker paddles must be the primary tools for driving and moving WH&Bs during handling and transport procedures. Contact of the flag or paddle end of primary handling aids with a WH&B is allowed. Ropes looped around the hindquarters may be used from horseback or on foot to assist in moving an animal forward or during loading. **(major)**

2. Electric prods must not be used routinely as a driving aid or handling tool. Electric prods may be used in limited circumstances only if the following guidelines are followed:

    a. Electric prods must only be a commercially available make and model that uses DC battery power with batteries fully charged at all times. (**major**)

    b. The electric prod device must never be disguised or concealed. (**major**)

c.  Electric prods must only be used after three attempts using other handling aids (flag, shaker paddle, voice or body position)  have been tried unsuccessfully to move the WH&Bs. (**major**)

d.  Electric prods must only be picked up when intended to deliver a stimulus; these devices are not constantly carried by the handlers. (**major**)

e.  Space in front of an animal should be available for the WH&B to move forward prior to application of the electric prod. (**major**)

f.  Electric prods must never be applied to the face, genitals, anus, or underside of the tail of a WH&B. (**major**)

g.  Electric prods must not be applied to any one WH&B more than three times during a procedure (e.g., sorting, loading) except in extreme cases with the approval of the Authorized Officer. Each exception must be approved at the time by the Authorized Officer. (**major**)

## SECTION 2.

## TRANSPORTATION STANDARDS TO ANOTHER OFF-RANGE CORRAL FACILITY, OFF-RANGE PASTURE, ECO-SANCTUARY OR ADOPTION EVENT

I. **LOADING AND UNLOADING FACILITIES**

■ Facilities in areas for loading and unloading WH&Bs must be maintained in a safe and proper working condition, including gates and doors that swing freely and latch or tie easily as designed. (**major**)

■ The side panels of the loading chute must be a minimum of 6 feet high and covered with materials such as plywood or metal without holes that may cause injury. (**major**)

■ There must be no holes, gaps or openings, protruding surfaces, or sharp edges present in fence panels or other structures that may allow escape or cause possible injury. (**major**)

■ Loading and unloading ramps must have a non-slip surface and be maintained in a safe and proper working condition to prevent slips and falls. Examples of non-slip floors would include, but not be limited to, rubber mats, sand, shavings, and steel reinforcement rods or rough surfaces built into the ramp. There must be no holes in flooring or items that cause an animal to trip. (**major**)

■ Trailers must be properly aligned with loading and unloading chutes and panels with no gaps between the chute/panel and floor or sides of the trailer creating a situation where a WH&B could injure itself. (**major**)

■ Stock trailers should be positioned for loading and unloading such that there is no more than 12" clearance between the ground and floor of the trailer for burros and 18" for horses. (minor)

II.   **CARE OF WILD HORSES AND BURROS DURING TRANSPORT PREPARATION PROCEDURES**

    A.   WH&Bs being transferred to another off-range corral facility, off-range pasture, eco-sanctuary or adoption event must have a current negative EIA test, be in a state of health appropriate for a Certificate of Veterinary Inspection (CVI), and be accompanied by appropriate paperwork as required by the laws of the receiving state. **(major)**

    B.   WH&Bs being transferred to another off-range corral facility, off-range pasture, eco-sanctuary or adoption event must be fit to endure the travel. (**major**)

        1.  WH&Bs that are non-ambulatory, blind in both eyes, or severely injured must not be loaded and shipped unless it is to receive immediate veterinary care or euthanasia (**major**)

        2.  WH&Bs that are weak or debilitated must not be transported without the approval of Authorized Officer in consultation with the on-site veterinarian. Appropriate actions for their care during transport must be taken according to the Authorized Officer. (**major**)

    C.   WH&Bs being transferred to another off-range corral facility, off-range pasture, eco-sanctuary, or adoption event must be sorted prior to shipping to ensure compatibility and minimize aggressive behavior that may cause injury during transport. (**major**)

    D.   Except for exceptional circumstances including but not limited to trap site adoptions, WH&Bs being offered for adoption should have received primary and booster vaccinations as well as deworming medications prior to adoption. (minor)

III.   **VEHICLES**

    A.   Straight deck trailers or stock trailers must be used for transporting WH&Bs to another off-range corral facility, off-range pasture, eco-sanctuary or adoption event. **(major)**

        1.  Two-tiered or double deck trailers are prohibited. **(major)**

        2.  Transport vehicles for WH&Bs must have a covered roof containing them such that WH&Bs cannot escape. **(major)**

B. WH&Bs must have adequate headroom during loading and unloading and must be able to maintain a normal posture with all four feet on the floor during transport without contacting the roof. **(major)**

C. The width and height of all gates and doors must allow WH&Bs to move through freely. **(major)**

D. All gates and doors must open and close easily and be able to be secured in a closed position. **(major)**

E. Loading and unloading ramps of vehicles must have a non-slip surface and be maintained in a safe and proper working condition to prevent slips and falls. Examples of non-slip flooring would include, but not be limited to, rubber mats, sand, shavings, and steel reinforcement rods built into ramp. There must be no holes in the flooring or items that can cause an animal to trip. **(major)**

F. Transport vehicles more than 18 feet and less than 40 feet in length must have a minimum of one partition gate providing two compartments; transport vehicles 40 feet or longer must have at least two partition gates to provide a minimum of three compartments. **(major)**

G. Partition gates in transport vehicles should be used to distribute the load into compartments during travel. (minor)

H. All partitions and panels inside of trailers must be free of sharp edges or holes that could cause injury to WH&Bs. **(major)**

I. The inner lining of all trailers must be strong enough to withstand failure by kicking that would lead to injuries. **(major)**

J. Surfaces and floors of trailers must be cleaned of dirt, manure and other organic matter prior to the beginning of a shipping event, and must have non-skid material on the trailer floor, such as, wood shavings, rubber non-skid mats etc. **(major)**

IV. **TRANSPORT PROCEDURES**

A. WH&Bs must be loaded at the following rates: **(major)**

1. 12 square feet per adult horse.

2. 6.0 square feet per dependent horse foal.

3. 8.0 square feet per adult burro or yearling horse.

4.  4.0 square feet per dependent burro foal

B.  Planned drive time from off-range corral facility to another off-range corral facility, off-range pasture, eco-sanctuary, or adoption must not exceed 24 hours without unloading. (**major**)

C.  Trucking companies or haulers must be provided directions and contact phone numbers for the facility or adoption location. **(major**)

D.  A transportation event that is longer than 24 hours will require unloading and a minimum rest period of 8 hours with access to hay and water prior to being re-loaded and sent to the final destination. **(major**)

E.  While in transit, WH&Bs must be observed by the transport driver a minimum of once every 8 hours. **(major)**

F.  Non-ambulatory or recumbent WH&Bs must be evaluated on the trailer and either euthanized or removed from the trailers using a sled, slide board or slip sheet. (**major**)

G.  WH&Bs should not be allowed to remain standing on straight-deck and stock trailers while not in transport for a combined period of greater than three (3) hours. (minor)

## V.    RECEIVING PROCEDURES

See Section 1. Off-range Corral Standards, Part III. B. 1-5 and 8-11.

SECTION 3.

# ADOPTION EVENT STANDARDS

I. **ADOPTION EVENT PERSONNEL**

    A. BLM establishes and implements standards of care, treatment, and handling of WH&Bs, and communicates expectations to all personnel to ensure the humane care and treatment of all WH&Bs at the adoption event. **(major)**

    B. The adoption event must have employees with training, skills, and experience to observe, move, and handle the WH&Bs at the event. **(major)**

    C. The adoption event must have maintenance staff that can properly maintain the facilities to provide for the safe housing, movement, and processing of the WH&Bs. **(major)**

II. **SATELLITE FACILITY DESIGN**

    A. All satellite facilities must be operated in a manner to provide a safe, clean and supportive environment for all WH&Bs. **(major)**

    B. The satellite facility must have a sufficient number of pens available to sort WH&Bs according to sex, temperament, or physical condition as needed. (**major**)

    C. The satellite facility's fences, gates, alleys, and working chutes must be constructed of stout materials and must be maintained in proper working condition. (**major**)

    D. Fences in adoption pens, alleys, and working chute systems must not be less than 6 feet high for horses and 5 feet high for burros. (**major**)

    E. Adoption pen fences must be of stout design and must be maintained in proper condition with no holes, gaps, or sharp edges that could result in WH&Bs being injured. (**major**)

    F. Watering systems in WH&B adoption holding pens must provide unlimited access to clean water appropriate for livestock at all times. (**major**)

    G. Adoption pen feeding areas must be accessible to all WH&Bs in the pen at the same time. (**major**)

    H. Ground surfaces in adoption pens should promote drainage to reduce wet ground conditions. (minor)

I.  WH&Bs in pens at the satellite facility should be maintained at a stocking density such that when at rest all WH&Bs occupy no more than half the pen area. (minor)

**III.  CARE OF WILD HORSES AND BURROS RECEIVED AT SATELLITE FACILITIES**

A.  Provisions to provide care by a veterinarian in a timely manner on-site, on call, or by transporting an animal to a veterinarian must be made in advance**. (major)**

B.  Provisions for medical care (treatments including euthanasia if necessary) at adoption events will be made in accordance with BLM policy and carried out as described above for preparation facilities (Section 1. Off-range Corral Facility Standards, Part IV. A. 1-6). (**major**)

C.  WH&Bs must be sorted upon arrival at adoption events into pens with animals of appropriate age and temperament such that animals can promptly begin a period of rest, eating, and drinking with limited disturbance. **(major)**

D.  All WH&Bs must have adequate space to move freely within an adoption facility pen. **(major)**

E.  WH&Bs, to the greatest extent possible, must be allowed to exist in an undisturbed environment after arriving at an adoption facility until the adoption event begins. **(major)**

F.  Quality hay must be provided to WH&Bs in the amount of 2-3% of their body weight per day upon unloading following transport and daily during the adoption event. **(major)**

G.  WH&Bs at adoption events may be supplemented with feed or water supplements to address the stress of transport. (minor)

H.  WH&Bs will be sorted during the adoption event in a manner to reduce stress and opportunity for injury. (minor)

I.  WH&Bs transported for more than 12 hours to an adoption event should be allowed a rest period of 5 hours or more prior to formal viewing by the adopting public. (minor)

**IV.  EUTHANASIA PROCEDURES AT SATELLITE FACILITIES**

See Section 1. Off-range Corral Facility Standards, Part IV. E. 1-4.

**V.    CARCASS DISPOSAL AT SATELLITE FACILITIES**

See Section 1. Off-range Corral Facility Standards, Part IV. F. 1-2.

**VI.    HANDLING WILD HORSES AND BURROS AT SATELLITE FACILITIES**

A.    Willful Actus of Abuse

See Section 1. Off-range Corral Facility Standards, Part V. A. 1-5

B.    General Handling

See Section 1. Off-range Corral Facility Standards, Part V. B. 1-7

C.    Handling Aids

See Section 1. Off-range Corral Facility Standards, Part V. C. 1-2

# REQUIRED DOCUMENTATION AND RESPONSIBILITIES
# OF AUTHORIZED OFFICERS

## REQUIRED DOCUMENTATION

| STANDARD | DOCUMENTATION |
|---|---|
| **Section 1** | **Off-Range Corral Facility Standards** |
| Part III. B. 5 | Any WH&B that is recumbent or dead upon arrival at the destination |
| Part IV. A. 1 | Record of visits by on-site/on-call veterinarian |
| Part IV. E. 4 | Any WH&B that dies or is euthanized at facility, including the circumstances, freeze brand ID if present, a description of the age, sex, color of the animal and the reason the animal was euthanized. A death record must be entered into the WHBPS. |
| **Section 2** | **Transportation Standards** |
| Part V | Refer to Section 1. Off-range Corral Facility Standards, Part III. B. 5, as above. |
| **Section 3** | **Adoption Event Standards** |
| Part IV | Refer to Section 1. Off-range Corral Facility Standards, Part IV. E. 4, as above |

## RESPONSIBILITIES

| STANDARD | RESPONSIBILITY |
|---|---|
| **Section 1** | **Off-Range Corral Facility Standards** |
| Parts III. B. 1 & V.B.1 | Approve use of supplemental lighting when sorting, loading, or unloading WH&Bs |
| Part III. B. 5 | Document any WH&B that is recumbent or dead upon arrival at the destination |
| Part IV. B. 1 | Consult with on-site/on-call veterinarian to establish and review biosecurity and health care decisions |
| Part IV. E. 1 | Direct decision regarding euthanasia and method of euthanasia for any WH&B; may consult with on-site/on-call veterinarian |
| Part IV. F. 1 | Ensure that appropriate procedures are in place for carcass disposal |
| Part V. C. 2. g | Approve use of electric prod more than three times, for exceptional cases only |

| STANDARD | RESPONSIBILITY |
|----------|----------------|
| **Section 2** | **Transportation Standards** |
| Part II. D | Approve of transport and care during transport for weak or debilitated WH&B |
| | |
| **Section 3** | **Adoption Event Standards** |
| Part VI. B | Refer to Section 1. Off-range Corral Facility Standard, Part IV.B.1, above. |
| Part VI. C | Refer to Section 1. Off-range Corral Facility Standard, Part V.C.2.g, above. |

## PROPOSED CAWP COMPONENTS FOR OFF-RANGE CORRAL FACILITIES, TRANSPORTATION, AND ADOPTION EVENTS

**Education**
- Online
- Certification on completion
- Includes examples, videos

**Standards**
- Off-Range Corral Facilities
- Transportation
- Adoption Events

**Assessment Tool**
- Off-Range Corral Facilities
- Transportation
- Adoption Events

**Records**
- Summary
- Cumulative capacity
- Capacity to create different reports

| | |
|---|---|
| **From:** | Stratton, Joseph A |
| **To:** | Easley, Anna-Maria; Waddell, Holle; Shepherd, Alan B |
| **Subject:** | Attached is the Final Draft IM for CAWP for ORC"s, transportation and Adoption. SOP"s also attached. |
| **Date:** | Friday, June 15, 2018 12:51:28 PM |
| **Attachments:** | Final-Draft-IM 2018-XXX, CAWP ORC-Transportation-Adoption-SOPs.docx |
| | CAWP STANDARDS Off Range Corral Transport Adoption_FINAL_2016-01-29.docx |

All, attached is the Final Draft IM  for CAWP. The IM has been reviewed by State Leads and WO staff. I only received comments from 3 states with relatively minor edits.

Joe

# COMPREHENSIVE ANIMAL WELFARE PROGRAM

# STANDARDS

## OFF-RANGE CORRAL FACILITIES

## TRANSPORTATION

## ADOPTION EVENTS

Developed by

The Bureau of Land Management
Wild Horse and Burro Program

in collaboration with

Carolyn L. Stull, PhD
Kathryn E. Holcomb, PhD
University of California, Davis
School of Veterinary Medicine

January 29, 2016

# TABLE OF CONTENTS

**PREFACE** ...................................................................................................................... 2

**Section 1. OFF-RANGE CORRAL FACILITY STANDARDS** ............................................... 3

    I.   FACILITY PERSONNEL ................................................................... 3
    II.  FACILITY DESIGN ......................................................................... 3
    III. RECEIVING WILD HORSE AND BURROS ...................................... 5
    IV. CARE OF WILD HORSE AND BURROS ......................................... 6
    V.  HANDLING WILD HORSES AND BURROS ................................. 10

**Section 2. TRANSPORTATION STANDARDS TO ANOTHER OFF-RANGE CORRAL FACILITY, OFF-RANGE PASTURE, ECO-SANCTUARY, OR ADOPTION EVENT** ........................................... 13

    I.   LOADING AND UNLOADING FACILITIES .................................. 13
    II.  CARE OF WILD HORSES AND BURROS DURING TRANSPORT PREPARATION PROCEDURES .................................................. 14
    III. VEHICLES ................................................................................. 14
    IV. TRANSPORT PROCEDURES ..................................................... 15
    V.  RECEIVING PROCEDURES ........................................................ 16

**Section 3. ADOPTION EVENT STANDARDS** ............................................................ 17

    I.   ADOPTION EVENT PERSONNEL .............................................. 17
    II.  SATELLITE FACILITY DESIGN ................................................... 17
    III. EUTHANASIA  PROCEDURES AT SATELLITE FACILITIES .......... 18
    IV. CARCASS DISPOSAL AT SATELLITE FACILITIES ....................... 19
    V.  CARE OF WILD HORSES AND BURROS RECEIVED AT SATELLITE FACILITIES ........ 18
    VI. HANDLING WILD HORSES AND BURROS AT SATELLITE FACILITIES .................... 19

**REQUIRED DOCUMENTATION AND RESPONSIBILITIES OF AUTHORIZED OFFICER** ................. 20

**PROPOSED CAWP COMPONENTS FOR OFF-RANGE CORRAL FACILITIES, TRANSPORTATION, AND ADOPTION EVENTS** ............................................................................. 22

# PREFACE

The Bureau of Land Management (BLM) estimates that 58,150 wild horses and burros (WH&Bs) are roaming on BLM-managed rangelands in 10 Western states, based on the latest data available, compiled as of March 1, 2015. Wild horses and burros have virtually no natural predators and their herd sizes can double about every four years. As a result, the agency must remove thousands of animals from the range each year to control herd sizes.

The Bureau of Land Management manages many off-range corral facilities throughout the U.S. The primary mission of the off-range corral facilities is to act as a holding and preparation facility that accepts WH&Bs from gather/removal operations and prepares them for adoption to the public or placement into off-range pastures. As of November 2015, there are 16,182 WH&Bs in off-range corral facilities.

The design of each facility is organized to handle large numbers of WH&Bs with pens, corrals, alleys, and loading/unloading areas that facilitate animal movement. There are multiple pens and corrals to sort animals for compatibility and care upon arrival to the facility. Each pen or corral offers all animals continuous water accessibility and quality feed on a daily basis.

The BLM strives to place horses removed from the range into private homes that provide quality care. Horses placed in off-range corral facilities are made available to the public for adoption or sale at adoption events held throughout the U.S. and through the BLM's Adopt or Sales Program (http://www.blm.gov/wo/st/en/prog/whbprogram/adoption_program/schedule.html). The off-range corral facility transitions WH&Bs to hay diets, performs necessary vaccinations and deworming procedures, provides hoof care and may train WH&Bs. Other WH&Bs, due to age, temperament, or other factors, may not be adopted or sold and subsequently are placed in off-range pastures. These facilities are designed to provide unadoptable wild horses with humane life-long care in a natural setting off the public rangelands. There are approximately 46,016 WH&Bs being cared for in off-range pastures (November 2015). All WH&Bs residing in both off-range corral facilities and off-range pastures, like those roaming Western public rangelands, are protected by the BLM under the 1971 Wild Free-Roaming Horses and Burros Act, as amended.

The BLM has been criticized by the public and animal protection organizations on their handling and care of wild horses and burros especially during the gathering activities and transitioning of the horses from public lands to off-range facilities. Some of the issues include the transportation conditions of the horses, facility design, environmental conditions, handling practices, and nutrition. Agricultural and research animal industries have developed assessment or auditing programs to verify humane care and handling of their industry's animals. These industries are performing both internal and 3rd-party audits for animal welfare to assure their stakeholders and provide transparency on how these animals are provided care and proper handling. Assessment programs based on standards have multifaceted benefits in providing education to employees and assurance to societal entities that their programs are responsible for properly handling and providing care for the animals. An assessment welfare program reported routinely to the public will increase transparency concerning the humane treatment of BLM's WH&Bs, as recommended by the 2008 US Government Accountability Office.

STANDARDS

---

**Deficiency Definitions**

**Major Deficiency**: impacts welfare of WH&Bs; usually is a procedure. Appropriate wording is "must," "unacceptable," "prohibited."

**Minor Deficiency:** a reporting deficiency (lack of, not enough detail) or involves an uncontrollable situation. Appropriate wording is "should."

---

WH&Bs = Wild horses and burros

## SECTION 1.

## OFF-RANGE CORRAL FACILITY STANDARDS

I. **FACILITY PERSONNEL**

   A. Facility management establishes and implements standards of care, treatment, and handling of WH&Bs, and communicates expectations to all personnel to ensure the humane care and treatment of all WH&Bs at the facility. (**major**)

   ■ The facility must have employees with training, skills, and experience to observe, move, and handle the WH&Bs on the facility. (**major**)

   C. The facility must have personnel that can properly maintain the working chute systems and facility infrastructure to provide for the safe housing, movement, and processing of the WH&Bs. (**major**)

   ■ The facility should be staffed by appropriate office staff for record maintenance and recording. (minor)

II. **FACILITY DESIGN**

   ■ Facilities must be operated in a manner to provide a safe, clean and supportive environment for all WH&Bs. (**major**)

- WH&Bs must be allowed to exist in an undisturbed environment unless being prepared for health procedures, identification, adoption events, or transportation. (**major**)

- All WH&Bs must have adequate space to move freely within a pen enclosure. (**major**)

- The facility must have a sufficient number of pens available to sort WH&Bs according to sex, age, temperament, health status, or physical condition as needed. **(major)**

- Facility fences, gates, alleys, tubs, and working chutes must be constructed of stout materials and must be maintained in proper working condition. **(major)**

- Fences in pens, alleys, and working chute systems must be not less than 6 feet high for horses, 5 feet high for burros, and the bottom rail must not be more than 12 inches from ground level. **(major)**

- Fences must be of stout design and be maintained in proper condition with no holes, gaps, or sharp edges which could result in WH&Bs being injured. **(major )**

- All WH&Bs within a pen must have adequate dry space to rest. **(major)**

- Ground surfaces in pens must be maintained to promote drainage, reduce wet ground conditions, and allow for routine manure removal. **(major)**

- Watering systems in WH&B holding pens must provide unlimited access to clean water appropriate for livestock at all times. **(major)**

- Feeding areas must be accessible to all WH&Bs in the enclosure and maintained as a dry area without excessive manure accumulation. **(major)**

- An appropriate squeeze chute maintained in proper working order must be available for safely restraining WH&Bs for necessary procedures at the facility including hoof trimming. **(major)**

- Facilities must provide access to shade and shelter (wind breaks) in pens designated for compromised animals needing special care (i.e., injured or weak animals). Additional provisions for shade and shelter (wind breaks) will be evaluated and determined by managers as appropriate for their region, the function of their facility and the condition of the animals under their care. **(major)**

■ Shelter structures should be designed or constructed to reduce the risk for injury of the WH&Bs and maintained to avoid excessive manure and mud. (minor)

### III. RECEIVING WILD HORSES AND BURROS

■ Loading and Unloading Facilities

1. Facilities in areas for loading and unloading WH&Bs must be maintained in a safe and proper working condition, including gates and doors that swing freely and latch or tie easily as designed. (**major**)

2. The side panels of the loading chute must be a minimum of 6 feet high and covered with materials such as plywood or metal without holes that may cause injury. (**major**)

3. There must be no holes, gaps or openings, protruding surfaces, or sharp edges present in fence panels or other structures that may cause escape or possible injury. (**major**)

4. Loading and unloading ramps must have a non-slip surface and be maintained in a safe and proper working condition to prevent slips and falls. Examples of non-slip floors would include, but not be limited to, rubber mats, sand, shavings, and steel reinforcement rods or rough surfaces built into the ramp. There must be no holes in flooring or items that cause an animal to trip. (**major**)

5. Trailers must be properly aligned with loading and unloading chutes and panels with no gaps between the chute/panel and floor or sides of the trailer creating a situation where a WH&B could injure itself. (**major**)

6. Stock trailers should be positioned for loading and unloading such that there is no more than 12" clearance between the ground and floor of the trailer for burros and 18" for horses. (minor)

■ Receiving Procedures

1. All unloading of WH&Bs must be performed during daylight hours except when unforeseen circumstances develop and the Authorized Officer approves of the use of supplemental light. (**major**)

2. At the time of unloading, WH&Bs must be inspected by facility personnel to look for signs of infectious disease, sickness or injury and take appropriate steps if these conditions are observed. (**major**)

3. Any WH&B needing immediate veterinary attention must be identified and separated as necessary for examination, and a consultation with a veterinarian must be conducted within 4 hours. (**major**)

4. An authorized, properly trained, and experienced person, as well as euthanasia equipment and supplies, must be available immediately following unloading in the event that the emergency euthanasia of an animal is required. Euthanasia must be done in compliance with BLM Euthanasia policy. (**major**)

5. The receiving Authorized Officer must document any WH&B that is recumbent or dead upon arrival at the destination. (**major**)

6. Reporting of animals received from gather operations or from another BLM facility must be done in compliance with BLM policy. (**major**)

7. WH&Bs received from a gather must remain segregated from resident animals at the facility until a negative test for Equine Infectious Anemia (EIA) can be confirmed. (**major**)

8. Newly arrived WH&Bs must immediately be provided hay and water upon unloading. (**major**)

9. When WH&Bs are received from gather operations or from another facility, the receiving facility should unload them in a manner to minimize stress. (minor)

10. WH&Bs should be penned with WH&Bs of like age, sex, and temperament. (minor)

11. Newly arrived WH&Bs should be observed for signs that they may have difficulty transitioning to hay in a domestic setting. (minor)

IV.    **CARE OF WILD HORSE AND BURROS**

A. Veterinarian

1. Routine presence by an on-site or on-call veterinarian must be provided at each facility with records of those visits maintained at the facility. (**major**)

2. A veterinarian must be available to collect and submit blood samples for Equine Infectious Anemia (EIA) testing and rabies immunization. (**major**)

3. Health care protocols must be in accordance with Program guidelines and accepted by the facility veterinarian for preventive health care procedures (vaccinations, deworming, hoof trimming, freeze marking). Medical treatments will be prescribed by or performed under the supervision of a veterinarian. Surgical procedures will only be performed by a veterinarian. (**major**)

4. WH&B deaths in a facility should be discussed with the facility veterinarian to review the probable causes of death. (minor)

5. If multiple animals die due to a related cause or unknown cause(s), a post-mortem examination or necropsy should be performed by the facility's on-call or on-site veterinarian to identify the cause of death where possible. Laboratory testing should be performed when possible to aid in determining the cause of death or related underlying factors that may be present when these are not readily apparent during the gross examination. (minor)

6. If a series of unexplained deaths occurs, facility quarantine measures must be considered with input from the attending veterinarian until the cause has been determined or when indicated until adequate bio-security measures are in place to prevent the spread of disease. Coordination with State and/or Federal Animal Health Officials in consultation with the attending veterinarian must be done if this occurs. (**major**)

■ Bio-Security

1. Authorized Officers must consult with the on-site or on-call veterinarian(s) to establish and review biosecurity and health care decisions. (**major**)

2. Newly arrived WH&Bs from gather operations must not be co-mingled with resident animals at the facility. (**major**)

3. Pens should be provided to segregate sick, infectious, injured, or weak WH&Bs from other healthy individuals in the facility when possible. (minor )

4. Hazardous or infectious biological waste (i.e., sharps, needles, blood samples, etc.) must be properly disposed in labeled containers. (**major**)

5. Working chute and tub systems should be routinely cleaned and disinfected to reduce the risk of disease transmission, especially after moving contagious WH&Bs through the system. (minor)

C. Feed and Water

1. Quality hay must be provided daily to WH&Bs in the amount of 2-3% of their body weight per day. **(major)**

2. Fresh, clean water appropriate for livestock must be accessible to WH&Bs located in holding pens at all times. (**major**)

3. Water troughs and watering systems must be checked daily to ensure they are clean and operating correctly. (**major**)

4. Feeding sites must allow all WH&Bs within a pen simultaneous access to hay. (**major**)

5. Newly arrived WH&Bs from gather operations may be fed grass hay and transitioned to alfalfa. (minor)

6. Salt and/or mineral blocks should be provided in holding pens at all times. (minor)

7. Supplemental feeds should be provided to address the nutritional needs of the WH&Bs, if needed. (minor)

■ Preparation Procedures

1. Facilities must identify individual WH&Bs and maintain inventories in accordance with BLM policy. This includes unmarked WH&Bs as well as those provided a freeze-mark. **(major)**

2. Facilities must conduct Equine Infectious Anemia (EIA) testing and apply freeze-marks within 30 days of receiving WH&Bs, unless directed by the facility veterinarian when age or physical condition requires a delay. (**major**)

3. WH&Bs receiving a freeze-mark must be recorded on the animal preparation record using the approved Signalment Key. (**major**)

4. Foals born in the facility should be freeze-marked no earlier than 3 months of age. (minor)

5. WH&Bs must be evaluated daily by facility personnel to identify animals in poor body condition, poor hoof condition, injured, or in need of veterinary evaluation/treatment, and/or supplemental feeding. (**major**)

6. Facilities must adhere to the current BLM vaccination policy. (**major**)

7. Foals must be tested for EIA and vaccinated when weaned or at 6 months of age. (**major**)

8. Hoof trimming must be performed twice per year at minimum or as necessary to maintain hooves in a proper condition. (**major**)

9. Castration of stallions and jack burros must be performed by a veterinarian using general anesthesia. If a surgical plane of anesthesia is not reached initially animals must be re-dosed or the procedure postponed until the problem can be resolved. (**major**)

10. Stallions and jack burros should be castrated as soon as approved by the on-site veterinarian for the procedure in accordance with BLM policy. (minor)

11. WH&Bs being prepared for freeze-marking, blood collection, vaccination, hoof trimming, sorting, and other care treatments should be handled to minimize stress and injuries (minor).

■ Euthanasia Procedures

1. The decision to euthanize and method of euthanasia must be directed by the Authorized Officer(s) who may consult with the on-site/on-call veterinarian. (**major**)

2. Euthanasia must be done in compliance with BLM Euthanasia policy. (**major**)

3. An authorized, properly trained, and experienced person, as well as euthanasia equipment and supplies, must be available at off-range corral facilities in the event that the emergency euthanasia of an animal is required. (**major**)

4. Any WH&B that dies or is euthanized must be documented including the circumstances, freeze brand ID if present, a description of the age, sex, color of the animal and the reason the animal was euthanized. A death record must be entered into the WHBPS. (**major**)

5. If an animal is euthanized due to an unknown cause, a post-mortem examination or necropsy should be performed by the facility's on-call or on-site veterinarian to identify the cause of death where possible. Laboratory testing should be performed when possible to aid in determining the cause of death or related underlying factors that may be present when these are not readily apparent during the gross examination. (minor)

■ Carcass Disposal

1. The Authorized Officer must ensure that appropriate procedures are in place for the timely disposal of carcasses when necessary at off-range corral facilities. (**major**)

2. Disposal of carcasses must be in accordance with applicable state and local laws. (**major**)

## V.    HANDLING WILD HORSES AND BURROS

A. Willful Acts of Abuse

1. Hitting, kicking, or beating any WH&Bs in an abusive manner is prohibited. (**major**)

2. Dragging a recumbent WH&Bs without a sled, side board or slip sheet is prohibited. Ropes used for moving the recumbent animal must be attached to the sled, slide board, or slip sheet. (**major**)

3. There should be no deliberate driving of WH&Bs into other animals, closed gates, panels, or other equipment. (minor)

4. There should be no deliberate slamming of gates and doors on WH&Bs. (minor)

5. There should be no excessive noise (e.g., constant yelling) or sudden activity causing WH&Bs to become unnecessarily flighty, disturbed or agitated. (minor)

■ General Handling

1. All sorting, loading or unloading of WH&Bs must be performed during daylight hours except when unforeseen circumstances develop and the Authorized Officer approves of the use of supplemental light. (**major**)

2. Halters and ropes tied to a WH&B may be used to roll, turn, position, or load a recumbent animal, but a WH&B must not be dragged across the ground by a halter or rope attached to its body while in a recumbent position. (**major**)

3. WH&Bs should be moved into and out of pens in a manner that will minimize stress and injury. (minor)

4. When possible, WH&Bs should be allowed to move at their own pace to new pens or sorting/handling locations. (minor)

5. WH&Bs should be handled to enter runways or chutes in a forward direction. (minor)

6. Any unattended WH&Bs or a single WH&B should not remain in single-file alleyways, runways or chutes longer than 30 minutes. (minor)

7. No equipment should be operated in such a manner as to cause flighty behavior or injury to WH&Bs. (minor)

■ Handling Aids

1. Handling aids such as flags and shaker paddles must be the primary tools for driving and moving WH&Bs during handling and transport procedures. Contact of the flag or paddle end of primary handling aids with a WH&B is allowed. Ropes looped around the hindquarters may be used from horseback or on foot to assist in moving an animal forward or during loading. **(major)**

2. Electric prods must not be used routinely as a driving aid or handling tool. Electric prods may be used in limited circumstances only if the following guidelines are followed:

   a. Electric prods must only be a commercially available make and model that uses DC battery power with batteries fully charged at all times. (**major**)

   b. The electric prod device must never be disguised or concealed. (**major**)

c.  Electric prods must only be used after three attempts using other handling aids (flag, shaker paddle, voice or body position)  have been tried unsuccessfully to move the WH&Bs. (**major**)

d.  Electric prods must only be picked up when intended to deliver a stimulus; these devices are not constantly carried by the handlers. (**major**)

e.  Space in front of an animal should be available for the WH&B to move forward prior to application of the electric prod. (**major**)

f.  Electric prods must never be applied to the face, genitals, anus, or underside of the tail of a WH&B. (**major**)

g.  Electric prods must not be applied to any one WH&B more than three times during a procedure (e.g., sorting, loading) except in extreme cases with the approval of the Authorized Officer. Each exception must be approved at the time by the Authorized Officer. (**major**)

## SECTION 2.

## TRANSPORTATION STANDARDS TO ANOTHER OFF-RANGE CORRAL FACILITY, OFF-RANGE PASTURE, ECO-SANCTUARY OR ADOPTION EVENT

I.   **LOADING AND UNLOADING FACILITIES**

- ■ Facilities in areas for loading and unloading WH&Bs must be maintained in a safe and proper working condition, including gates and doors that swing freely and latch or tie easily as designed. (**major**)

- ■ The side panels of the loading chute must be a minimum of 6 feet high and covered with materials such as plywood or metal without holes that may cause injury. (**major**)

- ■ There must be no holes, gaps or openings, protruding surfaces, or sharp edges present in fence panels or other structures that may allow escape or cause possible injury. (**major**)

- ■ Loading and unloading ramps must have a non-slip surface and be maintained in a safe and proper working condition to prevent slips and falls. Examples of non-slip floors would include, but not be limited to, rubber mats, sand, shavings, and steel reinforcement rods or rough surfaces built into the ramp. There must be no holes in flooring or items that cause an animal to trip. (**major**)

- ■ Trailers must be properly aligned with loading and unloading chutes and panels with no gaps between the chute/panel and floor or sides of the trailer creating a situation where a WH&B could injure itself. (**major**)

- ■ Stock trailers should be positioned for loading and unloading such that there is no more than 12" clearance between the ground and floor of the trailer for burros and 18" for horses. (minor)

II.    **CARE OF WILD HORSES AND BURROS DURING TRANSPORT PREPARATION PROCEDURES**

A.    WH&Bs being transferred to another off-range corral facility, off-range pasture, eco-sanctuary or adoption event must have a current negative EIA test, be in a state of health appropriate for a Certificate of Veterinary Inspection (CVI), and be accompanied by appropriate paperwork as required by the laws of the receiving state. **(major)**

B.    WH&Bs being transferred to another off-range corral facility, off-range pasture, eco-sanctuary or adoption event must be fit to endure the travel. (**major**)

1.  WH&Bs that are non-ambulatory, blind in both eyes, or severely injured must not be loaded and shipped unless it is to receive immediate veterinary care or euthanasia (**major**)

2.  WH&Bs that are weak or debilitated must not be transported without the approval of Authorized Officer in consultation with the on-site veterinarian. Appropriate actions for their care during transport must be taken according to the Authorized Officer. (**major**)

C.    WH&Bs being transferred to another off-range corral facility, off-range pasture, eco-sanctuary, or adoption event must be sorted prior to shipping to ensure compatibility and minimize aggressive behavior that may cause injury during transport. (**major**)

D.    Except for exceptional circumstances including but not limited to trap site adoptions, WH&Bs being offered for adoption should have received primary and booster vaccinations as well as deworming medications prior to adoption. (minor)

III.    **VEHICLES**

A.    Straight deck trailers or stock trailers must be used for transporting WH&Bs to another off-range corral facility, off-range pasture, eco-sanctuary or adoption event. **(major)**

1.  Two-tiered or double deck trailers are prohibited. **(major)**

2.  Transport vehicles for WH&Bs must have a covered roof containing them such that WH&Bs cannot escape. **(major)**

B. WH&Bs must have adequate headroom during loading and unloading and must be able to maintain a normal posture with all four feet on the floor during transport without contacting the roof. **(major)**

C. The width and height of all gates and doors must allow WH&Bs to move through freely. **(major)**

D. All gates and doors must open and close easily and be able to be secured in a closed position. **(major)**

E. Loading and unloading ramps of vehicles must have a non-slip surface and be maintained in a safe and proper working condition to prevent slips and falls. Examples of non-slip flooring would include, but not be limited to, rubber mats, sand, shavings, and steel reinforcement rods built into ramp. There must be no holes in the flooring or items that can cause an animal to trip. **(major)**

F. Transport vehicles more than 18 feet and less than 40 feet in length must have a minimum of one partition gate providing two compartments; transport vehicles 40 feet or longer must have at least two partition gates to provide a minimum of three compartments. **(major)**

G. Partition gates in transport vehicles should be used to distribute the load into compartments during travel. (minor)

H. All partitions and panels inside of trailers must be free of sharp edges or holes that could cause injury to WH&Bs. **(major)**

I. The inner lining of all trailers must be strong enough to withstand failure by kicking that would lead to injuries. **(major)**

J. Surfaces and floors of trailers must be cleaned of dirt, manure and other organic matter prior to the beginning of a shipping event, and must have non-skid material on the trailer floor, such as, wood shavings, rubber non-skid mats etc. **(major)**

IV. **TRANSPORT PROCEDURES**

A. WH&Bs must be loaded at the following rates: **(major)**

1. 12 square feet per adult horse.

2. 6.0 square feet per dependent horse foal.

3. 8.0 square feet per adult burro or yearling horse.

    4.  4.0 square feet per dependent burro foal

B. Planned drive time from off-range corral facility to another off-range corral facility, off-range pasture, eco-sanctuary, or adoption must not exceed 24 hours without unloading. (**major**)

C. Trucking companies or haulers must be provided directions and contact phone numbers for the facility or adoption location. **(major)**

D. A transportation event that is longer than 24 hours will require unloading and a minimum rest period of 8 hours with access to hay and water prior to being re-loaded and sent to the final destination. **(major)**

E. While in transit, WH&Bs must be observed by the transport driver a minimum of once every 8 hours. **(major)**

F. Non-ambulatory or recumbent WH&Bs must be evaluated on the trailer and either euthanized or removed from the trailers using a sled, slide board or slip sheet. (**major**)

G. WH&Bs should not be allowed to remain standing on straight-deck and stock trailers while not in transport for a combined period of greater than three (3) hours. (minor)

## V.   RECEIVING PROCEDURES

See Section 1. Off-range Corral Standards, Part III. B. 1-5 and 8-11.

<span style="color:blue">SECTION 3.</span>

## ADOPTION EVENT STANDARDS

I.   **ADOPTION EVENT PERSONNEL**

A.  BLM establishes and implements standards of care, treatment, and handling of WH&Bs, and communicates expectations to all personnel to ensure the humane care and treatment of all WH&Bs at the adoption event. **(major)**

B.  The adoption event must have employees with training, skills, and experience to observe, move, and handle the WH&Bs at the event. **(major)**

C.  The adoption event must have maintenance staff that can properly maintain the facilities to provide for the safe housing, movement, and processing of the WH&Bs. **(major)**

II.  **SATELLITE FACILITY DESIGN**

A.  All satellite facilities must be operated in a manner to provide a safe, clean and supportive environment for all WH&Bs. **(major)**

B.  The satellite facility must have a sufficient number of pens available to sort WH&Bs according to sex, temperament, or physical condition as needed. (**major**)

C.  The satellite facility's fences, gates, alleys, and working chutes must be constructed of stout materials and must be maintained in proper working condition. (**major**)

D.  Fences in adoption pens, alleys, and working chute systems must not be less than 6 feet high for horses and 5 feet high for burros. (**major**)

E.  Adoption pen fences must be of stout design and must be maintained in proper condition with no holes, gaps, or sharp edges that could result in WH&Bs being injured. (**major**)

F.  Watering systems in WH&B adoption holding pens must provide unlimited access to clean water appropriate for livestock at all times. (**major**)

G.  Adoption pen feeding areas must be accessible to all WH&Bs in the pen at the same time. (**major**)

H.  Ground surfaces in adoption pens should promote drainage to reduce wet ground conditions. (minor)

I.  WH&Bs in pens at the satellite facility should be maintained at a stocking density such that when at rest all WH&Bs occupy no more than half the pen area. (minor)

## III.  CARE OF WILD HORSES AND BURROS RECEIVED AT SATELLITE FACILITIES

A.  Provisions to provide care by a veterinarian in a timely manner on-site, on call, or by transporting an animal to a veterinarian must be made in advance**. (major)**

B.  Provisions for medical care (treatments including euthanasia if necessary) at adoption events will be made in accordance with BLM policy and carried out as described above for preparation facilities (Section 1. Off-range Corral Facility Standards, Part IV. A. 1-6). (**major**)

C.  WH&Bs must be sorted upon arrival at adoption events into pens with animals of appropriate age and temperament such that animals can promptly begin a period of rest, eating, and drinking with limited disturbance. **(major)**

D.  All WH&Bs must have adequate space to move freely within an adoption facility pen. **(major)**

E.  WH&Bs, to the greatest extent possible, must be allowed to exist in an undisturbed environment after arriving at an adoption facility until the adoption event begins. **(major)**

F.  Quality hay must be provided to WH&Bs in the amount of 2-3% of their body weight per day upon unloading following transport and daily during the adoption event. **(major)**

G.  WH&Bs at adoption events may be supplemented with feed or water supplements to address the stress of transport. (minor)

H.  WH&Bs will be sorted during the adoption event in a manner to reduce stress and opportunity for injury. (minor)

I.  WH&Bs transported for more than 12 hours to an adoption event should be allowed a rest period of 5 hours or more prior to formal viewing by the adopting public. (minor)

## IV.  EUTHANASIA PROCEDURES AT SATELLITE FACILITIES

See Section 1. Off-range Corral Facility Standards, Part IV. E. 1-4.

**V.    CARCASS DISPOSAL AT SATELLITE FACILITIES**

See Section 1. Off-range Corral Facility Standards, Part IV. F. 1-2.

**VI.    HANDLING WILD HORSES AND BURROS AT SATELLITE FACILITIES**

A.    Willful Actus of Abuse

See Section 1. Off-range Corral Facility Standards, Part V. A. 1-5

B.    General Handling

See Section 1. Off-range Corral Facility Standards, Part V. B. 1-7

C.    Handling Aids

See Section 1. Off-range Corral Facility Standards, Part V. C. 1-2

# REQUIRED DOCUMENTATION AND RESPONSIBILITIES
# OF AUTHORIZED OFFICERS

## REQUIRED DOCUMENTATION

| STANDARD | DOCUMENTATION |
|---|---|
| **Section 1** | **Off-Range Corral Facility Standards** |
| Part III. B. 5 | Any WH&B that is recumbent or dead upon arrival at the destination |
| Part IV. A. 1 | Record of visits by on-site/on-call veterinarian |
| Part IV. E. 4 | Any WH&B that dies or is euthanized at facility, including the circumstances, freeze brand ID if present, a description of the age, sex, color of the animal and the reason the animal was euthanized. A death record must be entered into the WHBPS. |
| **Section 2** | **Transportation Standards** |
| Part V | Refer to Section 1. Off-range Corral Facility Standards, Part III. B. 5, as above. |
| **Section 3** | **Adoption Event Standards** |
| Part IV | Refer to Section 1. Off-range Corral Facility Standards, Part IV. E. 4, as above |

## RESPONSIBILITIES

| STANDARD | RESPONSIBILITY |
|---|---|
| **Section 1** | **Off-Range Corral Facility Standards** |
| Parts III. B. 1 & V.B.1 | Approve use of supplemental lighting when sorting, loading, or unloading WH&Bs |
| Part III. B. 5 | Document any WH&B that is recumbent or dead upon arrival at the destination |
| Part IV. B. 1 | Consult with on-site/on-call veterinarian to establish and review biosecurity and health care decisions |
| Part IV. E. 1 | Direct decision regarding euthanasia and method of euthanasia for any WH&B; may consult with on-site/on-call veterinarian |
| Part IV. F. 1 | Ensure that appropriate procedures are in place for carcass disposal |
| Part V. C. 2. g | Approve use of electric prod more than three times, for exceptional cases only |

| STANDARD | RESPONSIBILITY |
|----------|----------------|
| **Section 2** | **Transportation Standards** |
| Part II. D | Approve of transport and care during transport for weak or debilitated WH&B |
| | |
| **Section 3** | **Adoption Event Standards** |
| Part VI. B | Refer to Section 1. Off-range Corral Facility Standard, Part IV.B.1, above. |
| Part VI. C | Refer to Section 1. Off-range Corral Facility Standard, Part V.C.2.g, above. |

## PROPOSED CAWP COMPONENTS FOR OFF-RANGE CORRAL FACILITIES,

## TRANSPORTATION, AND ADOPTION EVENTS

**Education**
- Online
- Certification on completion
- Includes examples, videos

**Standards**
- Off-Range Corral Facilities
- Transportation
- Adoption Events

**Assessment Tool**
- Off-Range Corral Facilities
- Transportation
- Adoption Events

**Records**
- Summary
- Cumulative capacity
- Capacity to create different reports

U.S. DEPARTMENT OF THE INTERIOR BUREAU OF LAND MANAGEMENT

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C.   20240-0036
http://www.blm.gov

In Reply Refer To:
4750 (260) P

EMS TRANSMISSION
Instruction Memorandum No. 2018-XXX
Expires: 09/30/2021

To:              All Field Office Officials

From:            Assistant Director, Resources and Planning

Subject:         Comprehensive Animal Welfare Program for Wild Horse and Burro in Off-Range
Corrals, Transportation and Adoption Standard Operating Procedures.

Program Area: Wild Horse and Burro (WH&B) Program

Purpose: The purpose of this Instruction Memorandum (IM) is to establish policy for the Wild
Horse and Burro (WH&B) Comprehensive Animal Welfare Program (CAWP) for Off Range
Corrals (ORCs), Transportation and Adoption. This IM incorporates the Standard Operating
Procedures (SOP's) for ORCs, transportation, and adoption and will serve as the basis going
forward for the  future development of the CAWP for ORC's, transportation and adoption
including training materials and assessment tools for each of the segments mentioned.

Policy/Action: The Bureau of Land Management (BLM) is committed to the well-being and
humane care of WH&Bs managed on and off the range.  At all times, the care and treatment
provided by the BLM, its contractors, and cooperators will be characterized by compassion and
concern for the animals' well-being and welfare needs.

All National, State, District and Field Offices are required to comply with the SOP policy within
their jurisdiction.

This IM incorporates three components:

1) SOP's for ORC's, Transportation, and Adoption. (Attachment 1).

2) Future training modules for all personnel, including contractors, partners, and cooperators
involved in the care, handling, and transportation of wild horses and burros at ORC's, ORP's and
adoption events will be developed. .

3) Future assessment tools as developed for ORCs, transportation and adoption.

The goal of this IM is to ensure that humane care and treatment of WH&Bs remains a high priority for the BLM, its contractors, and cooperators at all times. The BLM's objective is to use the best available science, husbandry and handling practices applicable for WH&Bs and to make improvements whenever possible, while also meeting our overall goals and objectives in accordance with current BLM policy, standard operating procedures and contract requirements. The CAWP and its associated components will be reviewed regularly and modified as necessary to enhance its transparency.

The primary party responsible for promptly addressing any actions that are inconsistent with the Standards set forth in the CAWP is the Authorized Officer, such as a ORC manager, Contracting Officer's Representative (COR) for ORC contracts and adoption event coordinators etc. The Authorized Officer may delegate responsibility to an alternate individual. The Authorized Officer will promptly notify the employees, contractors and cooperators if improper actions, which are not in compliance with the CAWP, are observed and will ensure that they are promptly corrected. It is the responsibility of all individuals engaged in actions throughout the WH&B program to ensure that all aspects of the CAWP are fully implemented.

The hiring of a CAWP coordinator will assist in the implementation, development, and modification of all aspects of the CAWP including those developed to date as well as future components of the CAWP.

Timeframe: All portions of this policy are effective immediately and as they become finalized.

Budget Impact: This IM is implementing new policy and guidance with additional training and reporting requirements for personnel, contractors and cooperators. The cost for the required training is approximately $250 per person. CAWP program implementation, oversight, data compilation and reporting requirements will require an additional 12 to 15 work months per year.

Background: The authority for a Comprehensive Animal Welfare Program for WH&B is provided by Public Law 92-195, Wild Free-Roaming Horses and Burros Act of 1971 (as amended) and 43 CFR 4700.0-2.

The Comprehensive Animal Welfare Program for WH&B consolidates and highlights the BLM's policies, procedures and ongoing commitment to protect animal welfare; provide training for employees, contractors and cooperators on animal care and handling; and implement assessment tools which will be used to evaluate the agency's, contractor's and cooperator's adherence to the CAWP SOPs.

Manual/Handbook Sections Affected: This IM will not require Manual/Handbook Section changes but as the full CAWP is developed a new Manual/Handbook will need to be developed.

Coordination:  This IM was coordinated among WO-100, WO-200, WO-260, WO-600, WH&B State Leads, WH&B Facility Managers and WH&B Specialists.

Contact: Holle Waddell, Off-Range Branch Chief, WO-262 at 405-579-1860.


Attachment 1

Standard Operating Procedures (SOPs)

| | |
|---|---|
| **From:** | Stratton, Joseph A |
| **To:** | Hall, John A; Johnson, Krystal F; Leonard, Stephen P; Dumas, Amy; Williams, Pat B; Thompson, Ruth A; Robbins, Christopher L; Sharp, Robert N; Hopper, Robert G; Bertola, Jerrie A; Warr, Victor (Gus) A; Wendlandt, June A; Waddell, Holle; Shepherd, Alan B; Albert J.Kane; Easley, Anna-Maria; Rittenhouse, Bruce H; Fluer, Scott L; Wade, Beatrice A; Neill, John J |
| **Subject:** | Attached is the IM to incorporate SOP"s for ORC"s, transportation and adoption |
| **Date:** | Wednesday, May 16, 2018 3:26:35 PM |
| **Attachments:** | Final-Draft-IM 2018-XXX, CAWP ORC-Transportation-Adoption-SOPs.docx<br>CAWP STANDARDS Off Range Corral Transport Adoption_FINAL_2016-01-29.docx |
| **Importance:** | High |

All, I have been tasked with creating the IM to institute the CAWP Standard Operating Procedures for Off-Range Corrals, Transportation and Adoptions. Since we don't have a CAWP coordinator to fully implement the training and assessment tool components we have chosen to incorporate SOP's and future training and assessments in this IM.

The CAWP SOP's have been reviewed and agreed to several times by now but they are the attachment to the IM, no need to review those, just the IM

Please make your comments back to me and involve your facility managers and adoption crews etc. as you see fit.

Please provide me your comments consolidated by state by COB June 1st, 2018.

Thanks. joe

U.S. DEPARTMENT OF THE INTERIOR BUREAU OF LAND MANAGEMENT

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C.   20240-0036
http://www.blm.gov

In Reply Refer To:
4750 (260) P

EMS TRANSMISSION
Instruction Memorandum No. 2018-XXX
Expires: 09/30/2021

To:            All Field Office Officials

From:          Assistant Director, Resources and Planning

Subject:       Comprehensive Animal Welfare Program for Wild Horse and Burro in Off-Range
Corrals, Transportation and Adoption Standard Operating Procedures.

Program Area: Wild Horse and Burro (WH&B) Program

Purpose: The purpose of this Instruction Memorandum (IM) is to establish policy for the Wild
Horse and Burro (WH&B) Comprehensive Animal Welfare Program (CAWP) for Off Range
Corrals (ORCs), Transportation and Adoption. This IM incorporates the standard operating
procedures for ORCs, transportation, and adoption and will serve as the basis going forward for
the  future development of the CAWP for ORC's, transportation and adoption including training
materials and assessment tools for each of the segments mentioned.

Policy/Action: The Bureau of Land Management (BLM) is committed to the well-being and
humane care of WH&Bs managed on and off the range.  At all times, the care and treatment
provided by the BLM, its contractors, and cooperators will be characterized by compassion and
concern for the animals' well-being and welfare needs.

All State, District and Field Offices are required to comply with the standard operating
procedures policy within their jurisdiction.

This IM incorporates three components:

1) Standard operating procedures for ORC's, Transportation, and Adoption. (Attachment 1).

2) Future training modules for all personnel, contractors, and cooperators involved in the care,
handling, and transportation of wild horses and burros at ORC's, ORP's and adoption events will
be developed. .

3) Future assessment tools as developed for ORCs, transportation and adoption.

The goal of this IM is to ensure that humane care and treatment of WH&Bs remains a high priority for the BLM, its contractors, and cooperators at all times. The BLM's objective is to use the best available science, husbandry and handling practices applicable for WH&Bs and to make improvements whenever possible, while also meeting our overall goals and objectives in accordance with current BLM policy, standard operating procedures and contract requirements. The CAWP and its associated components will be reviewed regularly and modified as necessary to enhance its transparency.

The primary party responsible for promptly addressing any actions that are inconsistent with the Standards set forth in the CAWP is the Authorized Officer, such as a ORC manager, Contracting Officer's Representative (COR) for ORC contracts and adoption event coordinators etc. The Authorized Officer may delegate responsibility to an alternate individual. The Authorized Officer will promptly notify the employees, contractors and cooperators if improper actions, which are not in compliance with the CAWP, are observed and will ensure that they are promptly corrected. It is the responsibility of the all individuals engaged in actions throughout the WH&B program to ensure that all aspects of the CAWP are fully implemented.

The hiring of a CAWP coordinator will assist in the implementation, development, and modification of all aspects of the CAWP including those developed to date as well as future components of the CAWP.

Timeframe: All portions of this policy are effective immediately and as they become finalized.

Budget Impact: This IM is implementing new policy and guidance with additional training and reporting requirements for personnel, contractors and cooperators. The cost for the required training is approximately $250 per person. CAWP program implementation, oversight, data compilation and reporting requirements will require an additional 12 to 15 work months per year.

Background: The authority for a Comprehensive Animal Welfare Program for WH&B is provided by Public Law 92-195, Wild Free-Roaming Horses and Burros Act of 1971 (as amended) and 43 CFR 4700.0-2.

The Comprehensive Animal Welfare Program for WH&B consolidates and highlights the BLM's policies, procedures and ongoing commitment to protect animal welfare; provide training for employees, contractors and cooperators on animal care and handling; and implement assessment tools which will be used to evaluate the agency's, contractor's and cooperator's adherence to the CAWP SOPs.

Manual/Handbook Sections Affected: This IM will not require Manual/Handbook Section changes but as the full CAWP is developed a new Manual/Handbook will need to be developed.

Coordination:  This IM was coordinated among WO-100, WO-200, WO-260, WO-600, WH&B State Leads and WH&B Specialists.

Contact: Holle Waddell, Off-Range Branch Chief, WO-262 at 405-579-1860.


Attachment 1

Standard Operating Procedures (SOPs)

# COMPREHENSIVE ANIMAL WELFARE PROGRAM

# STANDARDS

## OFF-RANGE CORRAL FACILITIES

## TRANSPORTATION

## ADOPTION EVENTS

Developed by

The Bureau of Land Management
Wild Horse and Burro Program

in collaboration with

Carolyn L. Stull, PhD
Kathryn E. Holcomb, PhD
University of California, Davis
School of Veterinary Medicine

January 29, 2016

## TABLE OF CONTENTS

**PREFACE** ................................................................................................................... 2

**Section 1. OFF-RANGE CORRAL FACILITY STANDARDS** ............................................ 3

    I.    FACILITY PERSONNEL ................................................................3
    II.   FACILITY DESIGN.......................................................................3
    III.  RECEIVING WILD HORSE AND BURROS ...................................5
    IV.  CARE OF WILD HORSE AND BURROS ......................................6
    V.   HANDLING WILD HORSES AND BURROS ................................10

**Section 2. TRANSPORTATION STANDARDS TO ANOTHER OFF-RANGE CORRAL FACILITY, OFF-RANGE PASTURE, ECO-SANCTUARY, OR ADOPTION EVENT** ............................................ 13

    I.    LOADING AND UNLOADING FACILITIES .................................13
    II.   CARE OF WILD HORSES AND BURROS DURING TRANSPORT PREPARATION PROCEDURES.........................................................................14
    III.  VEHICLES .................................................................................14
    IV.  TRANSPORT PROCEDURES .....................................................15
    V.   RECEIVING PROCEDURES ........................................................16

**Section 3. ADOPTION EVENT STANDARDS** ............................................................ 17

    I.    ADOPTION EVENT PERSONNEL .............................................17
    II.   SATELLITE FACILITY DESIGN ..................................................17
    III.  EUTHANASIA  PROCEDURES AT SATELLITE FACILITIES.........18
    IV.  CARCASS DISPOSAL AT SATELLITE FACILITIES .......................19
    V.   CARE OF WILD HORSES AND BURROS RECEIVED AT SATELLITE FACILITIES........18
    VI.  HANDLING WILD HORSES AND BURROS AT SATELLITE FACILITIES....................19

**REQUIRED DOCUMENTATION AND RESPONSIBILITIES OF AUTHORIZED OFFICER** ................. 20

**PROPOSED CAWP COMPONENTS FOR OFF-RANGE CORRAL FACILITIES, TRANSPORTATION, AND ADOPTION EVENTS** ............................................................... 22

# PREFACE

The Bureau of Land Management (BLM) estimates that 58,150 wild horses and burros (WH&Bs) are roaming on BLM-managed rangelands in 10 Western states, based on the latest data available, compiled as of March 1, 2015. Wild horses and burros have virtually no natural predators and their herd sizes can double about every four years. As a result, the agency must remove thousands of animals from the range each year to control herd sizes.

The Bureau of Land Management manages many off-range corral facilities throughout the U.S. The primary mission of the off-range corral facilities is to act as a holding and preparation facility that accepts WH&Bs from gather/removal operations and prepares them for adoption to the public or placement into off-range pastures. As of November 2015, there are 16,182 WH&Bs in off-range corral facilities.

The design of each facility is organized to handle large numbers of WH&Bs with pens, corrals, alleys, and loading/unloading areas that facilitate animal movement. There are multiple pens and corrals to sort animals for compatibility and care upon arrival to the facility. Each pen or corral offers all animals continuous water accessibility and quality feed on a daily basis.

The BLM strives to place horses removed from the range into private homes that provide quality care. Horses placed in off-range corral facilities are made available to the public for adoption or sale at adoption events held throughout the U.S. and through the BLM's Adopt or Sales Program (http://www.blm.gov/wo/st/en/prog/whbprogram/adoption_program/schedule.html). The off-range corral facility transitions WH&Bs to hay diets, performs necessary vaccinations and deworming procedures, provides hoof care and may train WH&Bs. Other WH&Bs, due to age, temperament, or other factors, may not be adopted or sold and subsequently are placed in off-range pastures. These facilities are designed to provide unadoptable wild horses with humane life-long care in a natural setting off the public rangelands. There are approximately 46,016 WH&Bs being cared for in off-range pastures (November 2015). All WH&Bs residing in both off-range corral facilities and off-range pastures, like those roaming Western public rangelands, are protected by the BLM under the 1971 Wild Free-Roaming Horses and Burros Act, as amended.

The BLM has been criticized by the public and animal protection organizations on their handling and care of wild horses and burros especially during the gathering activities and transitioning of the horses from public lands to off-range facilities. Some of the issues include the transportation conditions of the horses, facility design, environmental conditions, handling practices, and nutrition. Agricultural and research animal industries have developed assessment or auditing programs to verify humane care and handling of their industry's animals. These industries are performing both internal and 3rd-party audits for animal welfare to assure their stakeholders and provide transparency on how these animals are provided care and proper handling. Assessment programs based on standards have multifaceted benefits in providing education to employees and assurance to societal entities that their programs are responsible for properly handling and providing care for the animals. An assessment welfare program reported routinely to the public will increase transparency concerning the humane treatment of BLM's WH&Bs, as recommended by the 2008 US Government Accountability Office.

STANDARDS

---

**Deficiency Definitions**

**Major Deficiency**: impacts welfare of WH&Bs; usually is a procedure. Appropriate wording is "must," "unacceptable," "prohibited."

**Minor Deficiency:** a reporting deficiency (lack of, not enough detail) or involves an uncontrollable situation. Appropriate wording is "should."

---

WH&Bs = Wild horses and burros

## SECTION 1.

## OFF-RANGE CORRAL FACILITY STANDARDS

I.  **FACILITY PERSONNEL**

   A.  Facility management establishes and implements standards of care, treatment, and handling of WH&Bs, and communicates expectations to all personnel to ensure the humane care and treatment of all WH&Bs at the facility. (**major**)

   ■  The facility must have employees with training, skills, and experience to observe, move, and handle the WH&Bs on the facility. (**major**)

   C.  The facility must have personnel that can properly maintain the working chute systems and facility infrastructure to provide for the safe housing, movement, and processing of the WH&Bs. (**major**)

   ■  The facility should be staffed by appropriate office staff for record maintenance and recording. (minor)

II.  **FACILITY DESIGN**

   ■  Facilities must be operated in a manner to provide a safe, clean and supportive environment for all WH&Bs. (**major**)

- WH&Bs must be allowed to exist in an undisturbed environment unless being prepared for health procedures, identification, adoption events, or transportation. (**major**)

- All WH&Bs must have adequate space to move freely within a pen enclosure. (**major**)

- The facility must have a sufficient number of pens available to sort WH&Bs according to sex, age, temperament, health status, or physical condition as needed. **(major)**

- Facility fences, gates, alleys, tubs, and working chutes must be constructed of stout materials and must be maintained in proper working condition. **(major)**

- Fences in pens, alleys, and working chute systems must be not less than 6 feet high for horses, 5 feet high for burros, and the bottom rail must not be more than 12 inches from ground level. **(major)**

- Fences must be of stout design and be maintained in proper condition with no holes, gaps, or sharp edges which could result in WH&Bs being injured. **(major )**

- All WH&Bs within a pen must have adequate dry space to rest. **(major)**

- Ground surfaces in pens must be maintained to promote drainage, reduce wet ground conditions, and allow for routine manure removal. **(major)**

- Watering systems in WH&B holding pens must provide unlimited access to clean water appropriate for livestock at all times. **(major)**

- Feeding areas must be accessible to all WH&Bs in the enclosure and maintained as a dry area without excessive manure accumulation. **(major)**

- An appropriate squeeze chute maintained in proper working order must be available for safely restraining WH&Bs for necessary procedures at the facility including hoof trimming. **(major)**

- Facilities must provide access to shade and shelter (wind breaks) in pens designated for compromised animals needing special care (i.e., injured or weak animals). Additional provisions for shade and shelter (wind breaks) will be evaluated and determined by managers as appropriate for their region, the function of their facility and the condition of the animals under their care. **(major)**

■ Shelter structures should be designed or constructed to reduce the risk for injury of the WH&Bs and maintained to avoid excessive manure and mud. (minor)

## III.   RECEIVING WILD HORSES AND BURROS

■ Loading and Unloading Facilities

1. Facilities in areas for loading and unloading WH&Bs must be maintained in a safe and proper working condition, including gates and doors that swing freely and latch or tie easily as designed. (**major**)

2. The side panels of the loading chute must be a minimum of 6 feet high and covered with materials such as plywood or metal without holes that may cause injury. (**major**)

3. There must be no holes, gaps or openings, protruding surfaces, or sharp edges present in fence panels or other structures that may cause escape or possible injury. (**major**)

4. Loading and unloading ramps must have a non-slip surface and be maintained in a safe and proper working condition to prevent slips and falls. Examples of non-slip floors would include, but not be limited to, rubber mats, sand, shavings, and steel reinforcement rods or rough surfaces built into the ramp. There must be no holes in flooring or items that cause an animal to trip. (**major**)

5. Trailers must be properly aligned with loading and unloading chutes and panels with no gaps between the chute/panel and floor or sides of the trailer creating a situation where a WH&B could injure itself. (**major**)

6. Stock trailers should be positioned for loading and unloading such that there is no more than 12" clearance between the ground and floor of the trailer for burros and 18" for horses. (minor)

■ Receiving Procedures

1. All unloading of WH&Bs must be performed during daylight hours except when unforeseen circumstances develop and the Authorized Officer approves of the use of supplemental light. (**major**)

2. At the time of unloading, WH&Bs must be inspected by facility personnel to look for signs of infectious disease, sickness or injury and take appropriate steps if these conditions are observed. (**major**)

3. Any WH&B needing immediate veterinary attention must be identified and separated as necessary for examination, and a consultation with a veterinarian must be conducted within 4 hours. (**major**)

4. An authorized, properly trained, and experienced person, as well as euthanasia equipment and supplies, must be available immediately following unloading in the event that the emergency euthanasia of an animal is required. Euthanasia must be done in compliance with BLM Euthanasia policy. (**major**)

5. The receiving Authorized Officer must document any WH&B that is recumbent or dead upon arrival at the destination. (**major**)

6. Reporting of animals received from gather operations or from another BLM facility must be done in compliance with BLM policy. (**major**)

7. WH&Bs received from a gather must remain segregated from resident animals at the facility until a negative test for Equine Infectious Anemia (EIA) can be confirmed. (**major**)

8. Newly arrived WH&Bs must immediately be provided hay and water upon unloading. (**major**)

9. When WH&Bs are received from gather operations or from another facility, the receiving facility should unload them in a manner to minimize stress. (minor)

10. WH&Bs should be penned with WH&Bs of like age, sex, and temperament. (minor)

11. Newly arrived WH&Bs should be observed for signs that they may have difficulty transitioning to hay in a domestic setting. (minor)

IV.    **CARE OF WILD HORSE AND BURROS**

    A. Veterinarian

        1. Routine presence by an on-site or on-call veterinarian must be provided at each facility with records of those visits maintained at the facility. (**major**)

        2. A veterinarian must be available to collect and submit blood samples for Equine Infectious Anemia (EIA) testing and rabies immunization. (**major**)

        3. Health care protocols must be in accordance with Program guidelines and accepted by the facility veterinarian for preventive health care procedures (vaccinations, deworming, hoof trimming, freeze marking). Medical treatments will be prescribed by or performed under the supervision of a veterinarian. Surgical procedures will only be performed by a veterinarian. (**major**)

        4. WH&B deaths in a facility should be discussed with the facility veterinarian to review the probable causes of death. (minor)

        5. If multiple animals die due to a related cause or unknown cause(s), a post-mortem examination or necropsy should be performed by the facility's on-call or on-site veterinarian to identify the cause of death where possible. Laboratory testing should be performed when possible to aid in determining the cause of death or related underlying factors that may be present when these are not readily apparent during the gross examination. (minor)

        6. If a series of unexplained deaths occurs, facility quarantine measures must be considered with input from the attending veterinarian until the cause has been determined or when indicated until adequate bio-security measures are in place to prevent the spread of disease. Coordination with State and/or Federal Animal Health Officials in consultation with the attending veterinarian must be done if this occurs. (**major**)

    ■ Bio-Security

        1. Authorized Officers must consult with the on-site or on-call veterinarian(s) to establish and review biosecurity and health care decisions. (**major**)

2. Newly arrived WH&Bs from gather operations must not be co-mingled with resident animals at the facility. (**major**)

3. Pens should be provided to segregate sick, infectious, injured, or weak WH&Bs from other healthy individuals in the facility when possible. (minor )

4. Hazardous or infectious biological waste (i.e., sharps, needles, blood samples, etc.) must be properly disposed in labeled containers. (**major**)

5. Working chute and tub systems should be routinely cleaned and disinfected to reduce the risk of disease transmission, especially after moving contagious WH&Bs through the system. (minor)

C. Feed and Water

1. Quality hay must be provided daily to WH&Bs in the amount of 2-3% of their body weight per day. **(major)**

2. Fresh, clean water appropriate for livestock must be accessible to WH&Bs located in holding pens at all times. (**major**)

3. Water troughs and watering systems must be checked daily to ensure they are clean and operating correctly. (**major**)

4. Feeding sites must allow all WH&Bs within a pen simultaneous access to hay. (**major**)

5. Newly arrived WH&Bs from gather operations may be fed grass hay and transitioned to alfalfa. (minor)

6. Salt and/or mineral blocks should be provided in holding pens at all times. (minor)

7. Supplemental feeds should be provided to address the nutritional needs of the WH&Bs, if needed. (minor)

■ Preparation Procedures

1. Facilities must identify individual WH&Bs and maintain inventories in accordance with BLM policy. This includes unmarked WH&Bs as well as those provided a freeze-mark. **(major)**

2. Facilities must conduct Equine Infectious Anemia (EIA) testing and apply freeze-marks within 30 days of receiving WH&Bs, unless directed by the facility veterinarian when age or physical condition requires a delay. (**major**)

3. WH&Bs receiving a freeze-mark must be recorded on the animal preparation record using the approved Signalment Key. (**major**)

4. Foals born in the facility should be freeze-marked no earlier than 3 months of age. (minor)

5. WH&Bs must be evaluated daily by facility personnel to identify animals in poor body condition, poor hoof condition, injured, or in need of veterinary evaluation/treatment, and/or supplemental feeding. (**major**)

6. Facilities must adhere to the current BLM vaccination policy. (**major**)

7. Foals must be tested for EIA and vaccinated when weaned or at 6 months of age. (**major**)

8. Hoof trimming must be performed twice per year at minimum or as necessary to maintain hooves in a proper condition. (**major**)

9. Castration of stallions and jack burros must be performed by a veterinarian using general anesthesia. If a surgical plane of anesthesia is not reached initially animals must be re-dosed or the procedure postponed until the problem can be resolved. (**major**)

10. Stallions and jack burros should be castrated as soon as approved by the on-site veterinarian for the procedure in accordance with BLM policy. (minor)

11. WH&Bs being prepared for freeze-marking, blood collection, vaccination, hoof trimming, sorting, and other care treatments should be handled to minimize stress and injuries (minor).

■ Euthanasia Procedures

1. The decision to euthanize and method of euthanasia must be directed by the Authorized Officer(s) who may consult with the on-site/on-call veterinarian. (**major)**

2. Euthanasia must be done in compliance with BLM Euthanasia policy. (**major**)

3. An authorized, properly trained, and experienced person, as well as euthanasia equipment and supplies, must be available at off-range corral facilities in the event that the emergency euthanasia of an animal is required. (**major**)

4. Any WH&B that dies or is euthanized must be documented including the circumstances, freeze brand ID if present, a description of the age, sex, color of the animal and the reason the animal was euthanized. A death record must be entered into the WHBPS. (**major**)

5. If an animal is euthanized due to an unknown cause, a post-mortem examination or necropsy should be performed by the facility's on-call or on-site veterinarian to identify the cause of death where possible. Laboratory testing should be performed when possible to aid in determining the cause of death or related underlying factors that may be present when these are not readily apparent during the gross examination. (minor)

■ Carcass Disposal

1. The Authorized Officer must ensure that appropriate procedures are in place for the timely disposal of carcasses when necessary at off-range corral facilities. (**major**)

2. Disposal of carcasses must be in accordance with applicable state and local laws. (**major**)

## V.     HANDLING WILD HORSES AND BURROS

A. Willful Acts of Abuse

1. Hitting, kicking, or beating any WH&Bs in an abusive manner is prohibited. (**major**)

2. Dragging a recumbent WH&Bs without a sled, side board or slip sheet is prohibited. Ropes used for moving the recumbent animal must be attached to the sled, slide board, or slip sheet. (**major**)

3. There should be no deliberate driving of WH&Bs into other animals, closed gates, panels, or other equipment. (minor)

4. There should be no deliberate slamming of gates and doors on WH&Bs. (minor)

5. There should be no excessive noise (e.g., constant yelling) or sudden activity causing WH&Bs to become unnecessarily flighty, disturbed or agitated. (minor)

■ General Handling

1. All sorting, loading or unloading of WH&Bs must be performed during daylight hours except when unforeseen circumstances develop and the Authorized Officer approves of the use of supplemental light. (**major**)

2. Halters and ropes tied to a WH&B may be used to roll, turn, position, or load a recumbent animal, but a WH&B must not be dragged across the ground by a halter or rope attached to its body while in a recumbent position. (**major**)

3. WH&Bs should be moved into and out of pens in a manner that will minimize stress and injury. (minor)

4. When possible, WH&Bs should be allowed to move at their own pace to new pens or sorting/handling locations. (minor)

5. WH&Bs should be handled to enter runways or chutes in a forward direction. (minor)

6. Any unattended WH&Bs or a single WH&B should not remain in single-file alleyways, runways or chutes longer than 30 minutes. (minor)

7. No equipment should be operated in such a manner as to cause flighty behavior or injury to WH&Bs. (minor)

■ Handling Aids

1. Handling aids such as flags and shaker paddles must be the primary tools for driving and moving WH&Bs during handling and transport procedures. Contact of the flag or paddle end of primary handling aids with a WH&B is allowed. Ropes looped around the hindquarters may be used from horseback or on foot to assist in moving an animal forward or during loading. **(major)**

2. Electric prods must not be used routinely as a driving aid or handling tool. Electric prods may be used in limited circumstances only if the following guidelines are followed:

   a. Electric prods must only be a commercially available make and model that uses DC battery power with batteries fully charged at all times. (**major**)

   b. The electric prod device must never be disguised or concealed. (**major**)

c. Electric prods must only be used after three attempts using other handling aids (flag, shaker paddle, voice or body position) have been tried unsuccessfully to move the WH&Bs. (**major**)

d. Electric prods must only be picked up when intended to deliver a stimulus; these devices are not constantly carried by the handlers. (**major**)

e. Space in front of an animal should be available for the WH&B to move forward prior to application of the electric prod. (**major**)

f. Electric prods must never be applied to the face, genitals, anus, or underside of the tail of a WH&B. (**major**)

g. Electric prods must not be applied to any one WH&B more than three times during a procedure (e.g., sorting, loading) except in extreme cases with the approval of the Authorized Officer. Each exception must be approved at the time by the Authorized Officer. (**major**)

## SECTION 2.

## TRANSPORTATION STANDARDS TO ANOTHER OFF-RANGE CORRAL FACILITY, OFF-RANGE PASTURE, ECO-SANCTUARY OR ADOPTION EVENT

I.  **LOADING AND UNLOADING FACILITIES**

■ Facilities in areas for loading and unloading WH&Bs must be maintained in a safe and proper working condition, including gates and doors that swing freely and latch or tie easily as designed. (**major**)

■ The side panels of the loading chute must be a minimum of 6 feet high and covered with materials such as plywood or metal without holes that may cause injury. (**major**)

■ There must be no holes, gaps or openings, protruding surfaces, or sharp edges present in fence panels or other structures that may allow escape or cause possible injury. (**major**)

■ Loading and unloading ramps must have a non-slip surface and be maintained in a safe and proper working condition to prevent slips and falls. Examples of non-slip floors would include, but not be limited to, rubber mats, sand, shavings, and steel reinforcement rods or rough surfaces built into the ramp. There must be no holes in flooring or items that cause an animal to trip. (**major**)

■ Trailers must be properly aligned with loading and unloading chutes and panels with no gaps between the chute/panel and floor or sides of the trailer creating a situation where a WH&B could injure itself. (**major**)

■ Stock trailers should be positioned for loading and unloading such that there is no more than 12" clearance between the ground and floor of the trailer for burros and 18" for horses. (minor)

II.  **CARE OF WILD HORSES AND BURROS DURING TRANSPORT PREPARATION PROCEDURES**

    A.  WH&Bs being transferred to another off-range corral facility, off-range pasture, eco-sanctuary or adoption event must have a current negative EIA test, be in a state of health appropriate for a Certificate of Veterinary Inspection (CVI), and be accompanied by appropriate paperwork as required by the laws of the receiving state. **(major)**

    B.  WH&Bs being transferred to another off-range corral facility, off-range pasture, eco-sanctuary or adoption event must be fit to endure the travel. (**major**)

        1.  WH&Bs that are non-ambulatory, blind in both eyes, or severely injured must not be loaded and shipped unless it is to receive immediate veterinary care or euthanasia (**major**)

        2.  WH&Bs that are weak or debilitated must not be transported without the approval of Authorized Officer in consultation with the on-site veterinarian. Appropriate actions for their care during transport must be taken according to the Authorized Officer. (**major**)

    C.  WH&Bs being transferred to another off-range corral facility, off-range pasture, eco-sanctuary, or adoption event must be sorted prior to shipping to ensure compatibility and minimize aggressive behavior that may cause injury during transport. (**major**)

    D.  Except for exceptional circumstances including but not limited to trap site adoptions, WH&Bs being offered for adoption should have received primary and booster vaccinations as well as deworming medications prior to adoption. (minor)

III.  **VEHICLES**

    A.  Straight deck trailers or stock trailers must be used for transporting WH&Bs to another off-range corral facility, off-range pasture, eco-sanctuary or adoption event. **(major)**

        1.  Two-tiered or double deck trailers are prohibited. **(major)**

        2.  Transport vehicles for WH&Bs must have a covered roof containing them such that WH&Bs cannot escape. **(major)**

B. WH&Bs must have adequate headroom during loading and unloading and must be able to maintain a normal posture with all four feet on the floor during transport without contacting the roof. **(major)**

C. The width and height of all gates and doors must allow WH&Bs to move through freely. **(major)**

D. All gates and doors must open and close easily and be able to be secured in a closed position. **(major)**

E. Loading and unloading ramps of vehicles must have a non-slip surface and be maintained in a safe and proper working condition to prevent slips and falls. Examples of non-slip flooring would include, but not be limited to, rubber mats, sand, shavings, and steel reinforcement rods built into ramp. There must be no holes in the flooring or items that can cause an animal to trip. **(major)**

F. Transport vehicles more than 18 feet and less than 40 feet in length must have a minimum of one partition gate providing two compartments; transport vehicles 40 feet or longer must have at least two partition gates to provide a minimum of three compartments. **(major)**

G. Partition gates in transport vehicles should be used to distribute the load into compartments during travel. (minor)

H. All partitions and panels inside of trailers must be free of sharp edges or holes that could cause injury to WH&Bs. **(major)**

I. The inner lining of all trailers must be strong enough to withstand failure by kicking that would lead to injuries. **(major)**

J. Surfaces and floors of trailers must be cleaned of dirt, manure and other organic matter prior to the beginning of a shipping event, and must have non-skid material on the trailer floor, such as, wood shavings, rubber non-skid mats etc. **(major)**

IV. **TRANSPORT PROCEDURES**

A. WH&Bs must be loaded at the following rates: **(major)**

1. 12 square feet per adult horse.

2. 6.0 square feet per dependent horse foal.

3. 8.0 square feet per adult burro or yearling horse.

4.   4.0 square feet per dependent burro foal

B.   Planned drive time from off-range corral facility to another off-range corral facility, off-range pasture, eco-sanctuary, or adoption must not exceed 24 hours without unloading. (**major**)

C.   Trucking companies or haulers must be provided directions and contact phone numbers for the facility or adoption location. **(major**)

D.   A transportation event that is longer than 24 hours will require unloading and a minimum rest period of 8 hours with access to hay and water prior to being re-loaded and sent to the final destination. **(major**)

E.   While in transit, WH&Bs must be observed by the transport driver a minimum of once every 8 hours. **(major)**

F.   Non-ambulatory or recumbent WH&Bs must be evaluated on the trailer and either euthanized or removed from the trailers using a sled, slide board or slip sheet. (**major**)

G.   WH&Bs should not be allowed to remain standing on straight-deck and stock trailers while not in transport for a combined period of greater than three (3) hours. (minor)

## V.   RECEIVING PROCEDURES

See Section 1. Off-range Corral Standards, Part III. B. 1-5 and 8-11.

## SECTION 3.

## ADOPTION EVENT STANDARDS

I. **ADOPTION EVENT PERSONNEL**

    A. BLM establishes and implements standards of care, treatment, and handling of WH&Bs, and communicates expectations to all personnel to ensure the humane care and treatment of all WH&Bs at the adoption event. **(major)**

    B. The adoption event must have employees with training, skills, and experience to observe, move, and handle the WH&Bs at the event. **(major)**

    C. The adoption event must have maintenance staff that can properly maintain the facilities to provide for the safe housing, movement, and processing of the WH&Bs. **(major)**

II. **SATELLITE FACILITY DESIGN**

    A. All satellite facilities must be operated in a manner to provide a safe, clean and supportive environment for all WH&Bs. **(major)**

    B. The satellite facility must have a sufficient number of pens available to sort WH&Bs according to sex, temperament, or physical condition as needed. (**major**)

    C. The satellite facility's fences, gates, alleys, and working chutes must be constructed of stout materials and must be maintained in proper working condition. (**major**)

    D. Fences in adoption pens, alleys, and working chute systems must not be less than 6 feet high for horses and 5 feet high for burros. (**major**)

    E. Adoption pen fences must be of stout design and must be maintained in proper condition with no holes, gaps, or sharp edges that could result in WH&Bs being injured. (**major**)

    F. Watering systems in WH&B adoption holding pens must provide unlimited access to clean water appropriate for livestock at all times. (**major**)

    G. Adoption pen feeding areas must be accessible to all WH&Bs in the pen at the same time. (**major**)

    H. Ground surfaces in adoption pens should promote drainage to reduce wet ground conditions. (minor)

I. WH&Bs in pens at the satellite facility should be maintained at a stocking density such that when at rest all WH&Bs occupy no more than half the pen area. (minor)

## III. CARE OF WILD HORSES AND BURROS RECEIVED AT SATELLITE FACILITIES

A. Provisions to provide care by a veterinarian in a timely manner on-site, on call, or by transporting an animal to a veterinarian must be made in advance. **(major)**

B. Provisions for medical care (treatments including euthanasia if necessary) at adoption events will be made in accordance with BLM policy and carried out as described above for preparation facilities (Section 1. Off-range Corral Facility Standards, Part IV. A. 1-6). (**major**)

C. WH&Bs must be sorted upon arrival at adoption events into pens with animals of appropriate age and temperament such that animals can promptly begin a period of rest, eating, and drinking with limited disturbance. **(major)**

D. All WH&Bs must have adequate space to move freely within an adoption facility pen. **(major)**

E. WH&Bs, to the greatest extent possible, must be allowed to exist in an undisturbed environment after arriving at an adoption facility until the adoption event begins. **(major)**

F. Quality hay must be provided to WH&Bs in the amount of 2-3% of their body weight per day upon unloading following transport and daily during the adoption event. **(major)**

G. WH&Bs at adoption events may be supplemented with feed or water supplements to address the stress of transport. (minor)

H. WH&Bs will be sorted during the adoption event in a manner to reduce stress and opportunity for injury. (minor)

I. WH&Bs transported for more than 12 hours to an adoption event should be allowed a rest period of 5 hours or more prior to formal viewing by the adopting public. (minor)

## IV. EUTHANASIA PROCEDURES AT SATELLITE FACILITIES

See Section 1. Off-range Corral Facility Standards, Part IV. E. 1-4.

**V.    CARCASS DISPOSAL AT SATELLITE FACILITIES**

See Section 1. Off-range Corral Facility Standards, Part IV. F. 1-2.

**VI.    HANDLING WILD HORSES AND BURROS AT SATELLITE FACILITIES**

A.  Willful Actus of Abuse

See Section 1. Off-range Corral Facility Standards, Part V. A. 1-5

B.  General Handling

See Section 1. Off-range Corral Facility Standards, Part V. B. 1-7

C.  Handling Aids

See Section 1. Off-range Corral Facility Standards, Part V. C. 1-2

# REQUIRED DOCUMENTATION AND RESPONSIBILITIES
# OF AUTHORIZED OFFICERS

## REQUIRED DOCUMENTATION

| STANDARD | DOCUMENTATION |
|---|---|
| **Section 1** | **Off-Range Corral Facility Standards** |
| Part III. B. 5 | Any WH&B that is recumbent or dead upon arrival at the destination |
| Part IV. A. 1 | Record of visits by on-site/on-call veterinarian |
| Part IV. E. 4 | Any WH&B that dies or is euthanized at facility, including the circumstances, freeze brand ID if present, a description of the age, sex, color of the animal and the reason the animal was euthanized. A death record must be entered into the WHBPS. |
| **Section 2** | **Transportation Standards** |
| Part V | Refer to Section 1. Off-range Corral Facility Standards, Part III. B. 5, as above. |
| **Section 3** | **Adoption Event Standards** |
| Part IV | Refer to Section 1. Off-range Corral Facility Standards, Part IV. E. 4, as above |

## RESPONSIBILITIES

| STANDARD | RESPONSIBILITY |
|---|---|
| **Section 1** | **Off-Range Corral Facility Standards** |
| Parts III. B. 1 & V.B.1 | Approve use of supplemental lighting when sorting, loading, or unloading WH&Bs |
| Part III. B. 5 | Document any WH&B that is recumbent or dead upon arrival at the destination |
| Part IV. B. 1 | Consult with on-site/on-call veterinarian to establish and review biosecurity and health care decisions |
| Part IV. E. 1 | Direct decision regarding euthanasia and method of euthanasia for any WH&B; may consult with on-site/on-call veterinarian |
| Part IV. F. 1 | Ensure that appropriate procedures are in place for carcass disposal |
| Part V. C. 2. g | Approve use of electric prod more than three times, for exceptional cases only |

| STANDARD | RESPONSIBILITY |
|---|---|
| **Section 2** | **Transportation Standards** |
| Part II. D | Approve of transport and care during transport for weak or debilitated WH&B |
| **Section 3** | **Adoption Event Standards** |
| Part VI. B | Refer to Section 1. Off-range Corral Facility Standard, Part IV.B.1, above. |
| Part VI. C | Refer to Section 1. Off-range Corral Facility Standard, Part V.C.2.g, above. |

## PROPOSED CAWP COMPONENTS FOR OFF-RANGE CORRAL FACILITIES, TRANSPORTATION, AND ADOPTION EVENTS



**Education**
- Online
- Certification on completion
- Includes examples, videos

**Standards**
- Off-Range Corral Facilities
- Transportation
- Adoption Events

**Assessment Tool**
- Off-Range Corral Facilities
- Transportation
- Adoption Events

**Records**
- Summary
- Cumulative capacity
- Capacity to create different reports

| | |
|---|---|
| **From:** | Fluer, Scott L |
| **To:** | Stratton, Joseph A |
| **Cc:** | Waddell, Holle |
| **Subject:** | CAWP - Fluer edits |
| **Date:** | Thursday, August 18, 2016 1:49:45 PM |
| **Attachments:** | cawp fluer edits pasture.docx |
| **Importance:** | High |

Joe,

Here are the CAWP edits.  It looks like Carol and Kathryn already captured a lot of my comments when we had the site visits last spring.

One question I have, do we need to include monitoring as a section?  Monitoring would include inventory, body and pasture conditions.

Thanks

Scott

**Scott Fluer**
**WH&B** Off-Range Pasture Specialist/COR
**Wyoming Honor Farm - COR**
**WO - Lander Field Office**
**307-332-8413 - Office**
**307-714-1823 - Cell**

Comprehensive Animal Welfare Program

# STANDARDS

## OFF-RANGE PASTURE FACILITIES

## ECO-SANCTUARIES

Developed by

The Bureau of Land Management
Wild Horse and Burro Program

in collaboration with

Carolyn L. Stull, PhD
Kathryn E. Holcomb, PhD
University of California, Davis
School of Veterinary Medicine

Revision: May 10, 2016



TABLE OF CONTENTS

PREFACE ................................................................................................................... 4

Section 1. OFF-RANGE PASTURE AND ECO-SANCTUARY FACILITY STANDARDS

    I.    FACILITY PERSONNEL ................................................................................6

    II.    FACILITY DESIGN ..........................................................................................

               A.   GENERAL
               B.   CORRAL FACILITY
               C.   PASTURE FACILITY

    III.   CARE OF WILD HORSE AND BURROS ...........................................................

               A.   VETERINARIAN
               B.   BIOSECURITY
               C.   FEED AND WATER
               D.   PREPARATION PROCEDURES
               E.   EUTHANASIA
               F.   CARCASS DISPOSAL

    IV.   HANDLING WILD HORSES AND BURROS .......................................................

               A.   WILLFUL ACTS OF ABUSE
               B.   GENERAL HANDLING
               C.   HANDLING AIDS

Section 2. TRANSPORTATION STANDARDS TO OFF-RANGE CORRAL FACILITY, ANOTHER OFF RANGE PASTURE FACILITY, ECO-SANTUARY, OR ADOPTION EVENT

    I.LOADING AND UNLOADING FACILITIES...........................................................

    II.RECEIVING PROCEDURES............................................................................

    III.CARE OF WILD HORSES AND BURROS TRANSPORT PREPARATION PROCEDURES....................

    IV.VEHICLES..................................................................................................

    V.TRANSPORT PROCEDURES..........................................................................

Section 3. VISITOR EVENT STANDARDS ..........................................................

REQUIRED DOCUMENTATION AND RESPONSIBILITIES OF COR/PO...............................................

PROPOSED CAWP COMPONENTS FOR OFF-RANGE PASTURE AND ECO-SANCTUARY FACILITIES....

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

| | |
|---|---|
| **From:** | Stratton, Joseph A |
| **To:** | Stratton, Joseph A; Fluer, Scott L; Albert J.Kane; Warr, Victor (Gus) A; Bechtel, Glenn S; Fosse, Patricia A; Wade, Beatrice A; Johnson, Krystal F |
| **Cc:** | Waddell, Holle |
| **Subject:** | CAWP for Off Range Pastures and Eco-sanctuaries |
| **Date:** | Tuesday, June 7, 2016 3:50:30 PM |
| **Attachments:** | Off-range pastures and eco-sanctuary DRAFT SOPs_2016-05-10.docx |
| **Importance:** | High |

All, if you are receiving this email you are being invited to participate in the process to develop Standard Operating Procedures for animals on off-range pastures (ORP) and Eco-Sanctuaries (ES). You are being asked to participate because of your involvement with either assisting in the development of other aspects of the CAWP or your experience in being a COR or PI on off-range pasture contracts.

Attached you will find a draft of Standard Operating Procedures for ORP's and ES's. I am requesting that you provide comments in this document using track changes and sometime in the future we will have a conference call to begin to edit the document based on comments received.

Please provide me comments to this document by Monday June 27th.

If you cannot participate, please let me know. Thanks. joe

# COMPREHENSIVE ANIMAL WELFARE PROGRAM

# STANDARDS

# OFF-RANGE PASTURE FACILITIES

# ECO-SANCTUARIES

Developed by

The Bureau of Land Management
Wild Horse and Burro Program

in collaboration with

Carolyn L. Stull, PhD
Kathryn E. Holcomb, PhD
University of California, Davis
School of Veterinary Medicine

Revision: May 10, 2016



## TABLE OF CONTENTS

PREFACE ................................................................................................................................... **4**

**Section 1. OFF-RANGE PASTURE AND ECO-SANCTUARY FACILITY STANDARDS**

    I.   FACILITY PERSONNEL .....................................................................................................6

    II.   FACILITY DESIGN ..........................................................................................................

             A.  GENERAL
             B.  CORRAL FACILITY
             C.  PASTURE FACILITY

    III.   CARE OF WILD HORSE AND BURROS ..................................................................................

             A.  VETERINARIAN
             B.  BIOSECURITY
             C.  FEED AND WATER
             D.  PREPARATION PROCEDURES
             E.  EUTHANASIA
             F.  CARCASS DISPOSAL

    IV.   HANDLING WILD HORSES AND BURROS .............................................................................

             A.  WILLFUL ACTS OF ABUSE
             B.  GENERAL HANDLING
             C.  HANDLING AIDS

**Section 2. TRANSPORTATION STANDARDS TO OFF-RANGE CORRAL FACILITY, ANOTHER OFF RANGE PASTURE FACILITY, ECO-SANTUARY, OR ADOPTION EVENT**

    I.LOADING AND UNLOADING FACILITIES.....................................................................................

    II.RECEIVING PROCEDURES....................................................................................................

    III.CARE OF WILD HORSES AND BURROS TRANSPORT PREPARATION PROCEDURES....................

    IV.VEHICLES.......................................................................................................................

    V.TRANSPORT PROCEDURES.................................................................................................

**Section 3. VISITOR EVENT STANDARDS** .........................................................................................

**REQUIRED DOCUMENTATION AND RESPONSIBILITIES OF COR/PO**...............................................

**PROPOSED CAWP COMPONENTS FOR OFF-RANGE PASTURE AND ECO-SANCTUARY FACILITIES**....

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

| | |
|---|---|
| **From:** | Stratton, Joseph A |
| **To:** | Carolyn Stull; Kathy Holcomb; Albert J.Kane; Warr, Victor (Gus) A; Neill, John J; Williams, Pat B; Satica, Douglas W; Neugebauer, Jeremy M |
| **Cc:** | Waddell, Holle |
| **Subject:** | CAWP review of SOP"s for short term, adoption and transportation. |
| **Date:** | Friday, December 4, 2015 4:12:40 PM |
| **Attachments:** | MASTER-CAWP STANDARDS Short-term Transport Adoption for circulation.04242015.docx |
| **Importance:** | High |

All, attached is the SOP's with all comments from State Leads and APHIS. As I said in previous email, I have given credit for comments in the bullet boxes. Please read through it and be prepared to discuss.  I am thinking I would like to have a phone call to go through the comments the week of December 14th.

I would like to schedule a call for 0830 pacific, 0930 Mountain and 1030 central time for December 16th. Please let me know if this works. Thanks for the help. joe

# COMPREHENSIVE ANIMAL WELFARE PROGRAM

# STANDARDS:

## SHORT-TERM FACILITY

## TRANSPORTATION

## ADOPTION EVENTS

Developed by

The Bureau of Land Management
Wild Horse and Burro Program

in collaboration with

Carolyn L. Stull, PhD
Kathryn E. Holcomb, PhD
University of California, Davis
School of Veterinary Medicine

Revision April 17, 2015

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

Triple B 2019: After Roundup Action Review
Wild Horse Education CAWP Report


**Introduction**

Wild Horse Education has documented wild horse roundups for over a decade.
Documentation has been utilized to engage federal personnel, educate the public and to
litigate.

In 2011, at Triple B, our engagement with federal personnel was unproductive, yet
ensuing litigation was not. In addition to the orders of the court BLM's own inquiry into
Triple B found unacceptable behavior including, but not limited to, repetitive electric
shocking of wild horses, kicking a wild horse in the head and hitting (or nearly so) a wild
horse with the skids of a helicopter. BLM was divided if this constituted inhumane
handling, but the courts were not.

After repeated litigation BLM instituted the Comprehensive Animal Welfare Policy
(CAWP), updated IM-2015-151. This policy was intended to create a mechanism to
assess it's effectiveness of the policy and create/refine protocol to adhere with the
mandates in the Wild Free Roaming Horses and Burris Act (PUBLIC LAW 92-195).

In 2017 BLM was to assess the effectiveness of the CAWP policy and make findings
available both internally and externally. BLM has released no report, or proposed
revision, of CAWP.

At Triple B (2019) Wild Horse Education had three observers present. This report
represents and overview of the observation report and in comparison with others in the
database.


**Ongoing Repetitive Conduct**

Our teams have documented repetitive conduct that demonstrates that any intention
outlined by IM-2015-151 to prioritize humane and safe capture has become either

forgotten or misplaced. Our teams have documented multiple and repetitive instances since 2016 where hiding actions, excusing actions, have become commonplace. The most simplistic parameters of CAWP (ie temperature, size and capacity of holding pens, flagging barbed wire, dropping wire near gates wild horses are driven through) go ignored.

From IM2015-151: "The Lead COR is the primary party responsible for promptly addressing any actions that are inconsistent with the Standards set forth in the CAWP. The Lead COR may delegate responsibility to an alternate COR."

In multiple instances since 2016 we have documented COR personnel that appear to "miscommunicate" or fail to understand the simple directives. At capture operations if the COR, IC and PI are ill-trained, or personally feels certain parameters of CAWP are not necessary and disregards them, CAWP is meaningless.

Triple B 2019:
• A foal was run (without a break) for over one hour and fifteen minutes until it collapsed. It was only roped and brought into the trap later in the morning, after two additional groups had been captured and required thirty three minutes to be led to the trap.. It was communicated to us that the COR had left trap, transferred responsibility to alternate COR, and the run was not monitored from the trap location. The entire run was clearly visible, yet unseen and unaddressed when it the risk of potentially life-threading injury could have been avoided. (foals were euthanized throughout the operation).
• In another instance pens at the temporary corral were at capacity as outlined in CAWP. The COR was intending to ship only mares leaving the stallion pen at full capacity while adding more with the next days trapping. Our team had to inform the COR of the parameters in CAWP. Stallions were shipped the following day ad the stallion pen made larger, further crowding the young male pen.
• BLM COR insists that padding on overhead railing in the loading alley at the trap is not required in CAWP and that a 4-5 ft wide alley is not "single file." BLM COR insists 3 or 4 horses can move through "side by side." BLM needs to clearly define alley width and where padding is required. Horses can be 2-3 ft wide and a 4-5 ft alley with "3 or 4 horses" expected to go through "side by side" is called "overcrowding." In addition the section directly before the trailer is a common area for wild horses to panic and "rear up" indicating padding would be appropriate.

- In some instances wire was flagged and gates opened. Sections of wire near gates must also be flagged or dropped, not just when convenient.
- Communication between BLM COR and public affairs at the state office was so impaired that wild horses captured on the first day were noting as "starving" in the daily reports.
- Temperature guidelines were repeatedly pushed to limits, with no limits on distance. Our team documented distances of at least 14 miles for drives that were "runs," including multiple bands that included new foals. The "discretionary" aspect of temperature guidelines was intended to create an awareness of the dangers of extreme heat and cold, particularly on vulnerable band members.
- The day after trapping in an area criss crossed by barbed wire a wild horse was euthanized for severe lacerations across his chest. This is a clear indication the wild horse was run through barbed wire.

Multiple additional instances occurred to demonstrate that COR may feel CAWP is a burden, not needed because they "did it this way for a long time," or have other personal opinions on CAWP.

CAWP, and common sense, are repeatedly set aside for expediency. Rushed capture and loading is not acceptable. Hiding the trap from view does not inhibit the ability to document the time between capture and loading.

Trying to avoid compliance with all aspects of CAWP, by hiding handling and loading at the trap, is not appropriate. Traps were utilized that had been utilized in the past. Observation locations were changed and viewing obstructed.

## Summary

BLM Nevada has demonstrated a clear need to be retrained in all provisions and importance of CAWP.

CAWP is a policy framework for compliance with the law. Personal opinion, expediency or simply being uninformed is not justification for one single wild horse to be captured without every effort being made to ensure it's safety.

**BLM Nevada must immediately retrain all personnel that may serve as COR, IC and PI at roundup operations in the parameters of CAWP.**

**Our staff is available to provide detailed daily reports, video, vice recordings, outlining the deficits in communication and failures to acknowledge the standards outlined CAWP at Triple B 2019, and previous operations throughout the state, should it become necessary.**

## Triple B 2019: After Roundup Action Review
## Wild Horse Education CAWP Report

### Introduction

Wild Horse Education has documented wild horse roundups for oner a decade. Documentation has been utilized to engage federal personnel, educate the public and to litigate.

In 2011, at Triple B, our engagement with federal personnel was unproductive, yet ensuing litigation was not. In addition to the orders of the court BLM's own inquiry into Triple B found unacceptable behavior including, but not limited to, repetitive electric shocking of wild horses, kicking a wild horse in the head and hitting (or nearly so) a wild horse with the skids of a helicopter. BLM was divided if this constituted inhumane handling, but the courts were not.

After repeated litigation BLM instituted the Comprehensive Animal Welfare Policy (CAWP), IM-2015-151. This policy was intended to create a mechanism to assess it's effectiveness of the policy and create/refine protocol to adhere with the mandates in the Wild Free Roaming Horses and Burris Act (PUBLIC LAW 92-195).

In 2017 BLM was to assess the effectiveness of the CAWP policy and make findings available both internally an externally. BLM has released no report, or proposed revision, of CAWP.

At Triple B (2019) Wild Horse Education had three observers present.

### Ongoing Repetitive Conduct

Our teams have documented repetitive conduct that demonstrates that any intention outlined by IM-2015-151 to prioritize humane and safe capture has become either forgotten or misplaced. Our teams have documented multiple and repetitive instances since 2016 where hiding actions, excusing actions, have become commonplace. The most simplistic parameters of CAWP (ie temperature, size and capacity of holding pens, flagging barbed wire, dropping wire near gates wild horses are driven through) go ignored.

From IM2015-151: "The Lead COR is the primary party responsible for promptly addressing any actions that are inconsistent with the Standards set forth in the CAWP. The Lead COR may delegate responsibility to an alternate COR."

In multiple instances since 2016 we have documented COR personnel that appear to "miscommunicate" or fail to understand the simple directives. At capture operations if the COR is ill-trained, or personally feels certain parameters of CAWP are not necessary and disregards them, CAWP is meaningless.

Triple B 2019:
• A foal was run (without a break) for over one hour and fifteen minutes until it collapsed. It was only roped and brought into the trap at the end of the day. It was communicated to us that the COR had left trap, transferred responsibility to alternate COR, and the run was not monitored from the trap location. The entire run was clearly visible, yet unseen and unaddressed when it could have stopped potential fatal injury (foals were euthanized the following day and our continued inability to gain a clear view of animals in holding leaves the specific fatalities suspect).
• In another instance pens at the temporary corral were at capacity as outlined in CAWP. The COR was intending to ship only mares leaving the stallion pen at full capacity while adding more with the next days trapping. Our team had to inform the COR of the parameters in CAWP. Stallions were shipped the following day ad the stallion pen made larger, further crowding the young male pen.
• BLM COR insists that padding on overhead railing in the loading alley at the trap is not required in CAWP and that a 4-5 ft wide alley is not "single file." BLM COR insists 3 or 4 horses can move through "side by side." BLM needs to clearly define alley width and where padding is required. Horses can be 2-3 ft wide and a 4-5 ft alley with "3 or 4 horses" expected to go through "side by side" is called "overcrowding." In addition the section directly before the trailer is a common area for wild horses to panic and "rear up" indicating padding would be appropriate.
• In some instances wire was flagged and gates opened. Sections of wire near gates must also be flagged or dropped, not just when convenient.
• Communication between BLM COR and public affairs at the state office was so impaired that wild horses captured on the first day were noting as "starving" in the daily reports.

- Temperature guidelines were repeatedly pushed to limits, with no limits on distance. Our team documented distances of at least 14 miles for drives that were "runs," including multiple bands that included new foals. The "discretionary" aspect of temperature guidelines was intended to create an awareness of the dangers of extreme heat and cold, particularly on vulnerable band members.
- The day after trapping in an area criss crossed by barbed wire a wild horse was euthanized for severe lacerations across his chest. This is a clear indication the wild horse was run through barbed wire.

Multiple additional instances occurred to demonstrate that COR may feel CAWP is a burden, not needed because they "did it this way for a long time," or have other personal opinions on CAWP.

CAWP, and common sense, are repeatedly set aside for expediency. Rushed capture and loading is not acceptable. Hiding the trap from view does not inhibit the ability to document the time between capture and loading.

Trying to avoid compliance with all aspects of CAWP, by hiding handling and loading at the trap, is not appropriate. Traps were utilized that had been utilized in the past. Observation locations were changed and viewing obstructed.

### Summary

BLM Nevada has demonstrated a clear need to be retrained in all provisions and importance of CAWP.

CAWP is a policy framework for compliance with the law. Personal opinion, expediency or simply being uninformed is not justification for one single wild horse to be captured without every effort being made to ensure it's safety.

BLM Nevada must immediately retrain all personnel that may serve as COR at roundup operations in the parameters of CAWP.

Our staff is available to provide detailed daily reports, video, vice recordings, outlining the deficits in communication and failures to acknowledge the standards outlined CAWP

**at Triple B 2019, and previous operations throughout the state, should it become necessary.**

## Fwd: [EXTERNAL] Re: CAWP; Training of NV Personnel

### Thompson, Ruth A <rthompso@blm.gov>

Tue 8/13/2019 8:35 AM

**To:** Noyes, Benjamin F <bnoyes@blm.gov>; Thompson, Bruce W <b50thomp@blm.gov>

📎 1 attachments (37 KB)
FINAL CAWP postTripleB2019.pdf;

For your records

---------- Forwarded message ---------
From: **WildHorseEducation .** <wildhorseeducation@gmail.com>
Date: Tue, Aug 13, 2019 at 8:27 AM
Subject: [EXTERNAL] Re: CAWP; Training of NV Personnel
To: Shepherd, Alan <ashepher@blm.gov>, Thompson, Ruth <rthompso@blm.gov>


Attached is the final. I attached the draft to the first email.


On Tue, Aug 13, 2019 at 8:10 AM WildHorseEducation . <wildhorseeducation@gmail.com> wrote:
Attached find cover letter and draft WHE post-Triple B report.

Our database is demonstrating a clear and concise deterioration in comprehension and
implementation of CAWP.
Training of any personnel that will serve as COR is required. We hope you take this seriously and
implement training prior to any additional helicopter roundups.

Thank you.
Laura Leigh

--
*Laura Leigh*

Wild Horse Education
http://wildhorseeducation.org

*"Educating the mind without educating the heart is no education at all."*
  *Aristotle*

*The information contained in this e mail, as well as any attachments, is from Wild Horse Education® (WHE®) and is intended for use only by those addressee(s) named herein and may contain privileged and/or confidential information. If you are not the intended recipient(s) of this e mail, you are hereby notified that any dissemination, distribution, copying or use of the contents of this e mail, and any attachments hereto, is strictly prohibited unless authorized by the sender. If you have received this e mail in error, please immediately notify the sender by reply email and permanently delete this e mail and any printout thereof. Thank you.*

--
*Laura Leigh*

Wild Horse Education
http://wildhorseeducation.org

*"Educating the mind without educating the heart is no education at all."*
*Aristotle*

*The information contained in this e mail, as well as any attachments, is from Wild Horse Education® (WHE®) and is intended for use only by those addressee(s) named herein and may contain privileged and/or confidential information. If you are not the intended recipient(s) of this e mail, you are hereby notified that any dissemination, distribution, copying or use of the contents of this e mail, and any attachments hereto, is strictly prohibited unless authorized by the sender. If you have received this e mail in error, please immediately notify the sender by reply email and permanently delete this e mail and any printout thereof. Thank you.*

**Ruth Thompson**
**Wild Horse and Burro Program Lead**
**Bureau of Land Management**
**Nevada State Office**
**1340 Financial Blvd.**
**Reno, NV 89502**
**Phone: (775) 861-6469**
**Fax: (775) 861-6712**

**Winter is coming**

## Fwd: [EXTERNAL] CAWP; Training of NV Personnel

### Thompson, Ruth A <rthompso@blm.gov>

Tue 8/13/2019 8:34 AM

**To:** Noyes, Benjamin F <bnoyes@blm.gov>; Thompson, Bruce W <b50thomp@blm.gov>

📎 2 attachments (96 KB)
WHE CAWP Cover19.pdf; DRAFT CAWPReport 19.pdf;

For your Records

---------- Forwarded message ---------
From: **WildHorseEducation .** <wildhorseeducation@gmail.com>
Date: Tue, Aug 13, 2019 at 8:11 AM
Subject: [EXTERNAL] CAWP; Training of NV Personnel
To: Shepherd, Alan <ashepher@blm.gov>, Thompson, Ruth <rthompso@blm.gov>


Attached find cover letter and draft WHE post-Triple B report.

Our database is demonstrating a clear and concise deterioration in comprehension and implementation of CAWP.
Training of any personnel that will serve as COR is required. We hope you take this seriously and implement training prior to any additional helicopter roundups.

Thank you.
Laura Leigh

--
*Laura Leigh*

Wild Horse Education
http://wildhorseeducation.org

*"Educating the mind without educating the heart is no education at all."*
  *Aristotle*

*The information contained in this e mail, as well as any attachments, is from Wild Horse Education® (WHE®) and is intended for use only by those addressee(s) named herein and may contain privileged and/or confidential information. If you are not the intended recipient(s) of this e mail, you are hereby notified that any dissemination, distribution, copying or use of the contents of this e mail, and any attachments hereto, is strictly prohibited unless authorized by the sender. If you have received this e mail in error, please immediately notify the sender by reply email and permanently delete this e mail and any printout thereof. Thank you.*


**Ruth Thompson**

*Wild Horse and Burro Program Lead*
*Bureau of Land Management*
*Nevada State Office*
*1340 Financial Blvd.*
*Reno, NV 89502*
*Phone: (775) 861-6469*
*Fax: (775) 861-6712*

*Winter is coming*

| | |
|---|---|
| **From:** | Kane, Albert J - APHIS |
| **To:** | Waddell, Holle; Stratton, Joseph A; Fluer, Scott L; Bolstad, Dean O |
| **Subject:** | FW: CAWP |
| **Date:** | Thursday, January 21, 2016 6:17:37 PM |
| **Attachments:** | GS-13 CAWP Fuell_positiondescription_AJKcomments.docx |
| **Importance:** | High |

I hit reply to all earlier with my comments but your names didn't get included first time around … just FYI

– – – – – – – – – – – – – – – – – – – – – – – – – – – – –
Albert J. Kane, DVM, MPVM, PhD (epidemiology)
Senior Staff Veterinarian
Advisor, APHIS/BLM Wild Horse and Burro Partnership

USDA:APHIS:VS:Centers for Epidemiology and Animal Health
2150 Centre Avenue, Bldg B, Mailstop 2E6
Fort Collins, Colorado 80526-8117
USA

PH O: (970) 494-7234
Gov C: (970) 219-2409
Fax O: (970) 494-7174
Albert.J.Kane@aphis.usda.gov

**From:** Kane, Albert J - APHIS
**Sent:** Thursday, January 21, 2016 3:09 PM
**To:** 'Fuell, Bryan; Alan Shepherd; Victor (Gus) Warr
**Subject:** RE: CAWP

My comments attached.
Since it mentions Research Team maybe include Paul in review?

Unless you specify an advanced degree in animal WELFARE science I suspect you will get 100s of applicants that aren't really qualified and who knows how personnel will rank those. eg. USGS' recent experience with their population survey position … 100s of applicants (experience flying in helicopter) but none that their panel felt were qualified at all …. Even though they knew excellent applicants had applied … hard to hire in these areas ….

Good luck us all !
– – – – – – – – – – – – – – – – – – – – – – – – – – – – –
Albert J. Kane, DVM, MPVM, PhD (epidemiology)
Senior Staff Veterinarian
Advisor, APHIS/BLM Wild Horse and Burro Partnership

USDA:APHIS:VS:Centers for Epidemiology and Animal Health
2150 Centre Avenue, Bldg B, Mailstop 2E6
Fort Collins, Colorado 80526-8117
USA

PH O: (970) 494-7234
Gov C: (970) 219-2409
Fax O: (970) 494-7174
Albert.J.Kane@aphis.usda.gov

**From:** Fuell, Bryan [mailto:bfuell@blm.gov]
**Sent:** Tuesday, January 19, 2016 4:21 PM
**To:** Alan Shepherd; Victor (Gus) Warr; Kane, Albert J - APHIS
**Subject:** Fwd: CAWP

Would you gentlemen like to review the draft PD for the CAWP position
Comments back to me by Thursday
 Bryan


---------- Forwarded message ----------
From: **Fuell, Bryan** <bfuell@blm.gov>
Date: Tue, Jan 19, 2016 at 2:03 PM
Subject: CAWP
To: Dean O Bolstad <dbolstad@blm.gov>, Holle Hooks <hhooks@blm.gov>, Christopher
Robbins <clrobbins@blm.gov>

Enclosed is the CAWP PD draft comments by Thursday please

--

Bryan K Fuell

Branch Chief (On Range)

Wild Horse and Burro Division

775 861-6611 Office

775 934-1231 Cell

bfuell@blm.gov


"Everyday is a gift" - L. Barrett




--

Bryan K Fuell

Branch Chief (On Range)

Wild Horse and Burro Division

775 861-6611 Office

775 934-1231 Cell

bfuell@blm.gov

"Everyday is a gift" - L. Barrett

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

| | |
|---|---|
| **From:** | Johnson, Krystal F |
| **To:** | Waddell, Holle |
| **Subject:** | Fwd: CAWP IM and SOP Review-Eastern States Consolidated Feedback |
| **Date:** | Friday, June 8, 2018 9:32:02 AM |
| **Attachments:** | CAWP STANDARDS Off Range Corral Transport Adoption_FINAL_Eastern States Consolidated Feedback 6-1-2018.docx |
| | Final-Draft-IM 2018-XXX, CAWP ORC-Transportation-Adoption-SOPs-Eastern States Consolidated Comments 6-1-2018.docx |

FYI.


---------- Forwarded message ----------
From: **Stratton, Joseph** <jstratto@blm.gov>
Date: Wed, Jun 6, 2018 at 5:21 PM
Subject: Re: CAWP IM and SOP Review-Eastern States Consolidated Feedback
To: "Johnson, Krystal" <kfjohnso@blm.gov>


Krystal, I was not really asking for comments on the SOP's that has been hashed and rehashed previously. I was just looking for comments on the IM. The SOP's were just supporting information. Joe

On Wed, Jun 6, 2018 at 4:09 PM, Johnson, Krystal <kfjohnso@blm.gov> wrote:

> Hi Joe,
>
> How are you doing?  Thank you for working on this policy!  Attached below is our consolidated Eastern States feedback and questions within the draft IM and SOPs.   Please let me know if you have any questions.
>
> Thank you and have a good day!
>
>
>
> --
>
> ~Krystal
>
> Krystal Johnson
>
> Wild Horse and Burro Specialist/State Program Lead
> Eastern States Office
> 20 M Street, SE
> Washington DC 20003
>
> Office (202) 912-7741
> Cell (202) 329-4728

--

~Krystal

Krystal Johnson

Wild Horse and Burro Specialist/State Program Lead
Eastern States Office
20 M Street, SE
Washington DC 20003

Office (202) 912-7741
Cell (202) 329-4728

## COMPREHENSIVE ANIMAL WELFARE PROGRAM

# STANDARD OPERATING PROCEDURES

## OFF-RANGE CORRAL FACILITIES

## OFF-RANGE PASTURE FACILITIES

## ECOSANCTUARIES

## TRANSPORTATION

## EVENTS

Developed by

The Bureau of Land Management
Wild Horse and Burro Program

~~in~~In collaboration with

Carolyn L. Stull, PhD
Kathryn E. Holcomb, PhD
University of California, Davis
School of Veterinary Medicine

June 1, 2018

Commented [JKF1]: Update date

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

b(5) DPP

| | |
|---|---|
| **From:** | Stratton, Joseph A |
| **To:** | Waddell, Holle |
| **Subject:** | Fwd: here is a first draft of the ORC, Transportation, Adoption IM |
| **Date:** | Monday, January 8, 2018 2:21:31 PM |
| **Attachments:** | Draft-IM-ORC-Transportation-Adoption-SOPs.docx |
| **Importance:** | High |

Holle, I sent this to you in early november but I don't think you ever responded. Let me know if you have any comments or ideas to move the memo forward. Thanks. joe

---------- Forwarded message ----------
From: **Stratton, Joseph** <jstratto@blm.gov>
Date: Fri, Nov 3, 2017 at 12:41 PM
Subject: here is a first draft of the ORC, Transportation, Adoption IM
To: Holle Hooks <hwaddell@blm.gov>


Holle, I am interested in your opinion of what I have done so far. It might help with considering how we move forward.

I did look at the training slides for ORC and there are a few slides discussing how the SOP's are used in the assessment tool.

Have a good weekend. joe

U.S. DEPARTMENT OF THE INTERIOR BUREAU OF LAND MANAGEMENT

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C.   20240-0036
http://www.blm.gov

In Reply Refer To:
4750 (260) P

EMS TRANSMISSION
Instruction Memorandum No. 2018-XXX
Expires: 09/30/2021

To:          All Field Office Officials

From:        Assistant Director, Resources and Planning

Subject:     Comprehensive Animal Welfare Program for Wild Horse and Burro in Off-Range
Corrals, Transportation and Adoption Standard Operating Procedures.

Program Area: Wild Horse and Burro (WH&B) Program

b(5) DPP



Manual/Handbook Sections Affected: None. (I am not sure this is accurate any longer; we may need to do a Manual/Handbook section to incorporate the CAWP as a stand-alone Program).

Coordination:  This IM was coordinated among WO-100, WO-200, WO-260, WO-600, WH&B State Leads and WH&B Specialists.

Contact: Jane Doe, CAWP Coordinator, WO-260.

| From: | Bolstad, Dean O |
|---|---|
| To: | Bybee, Jared M; Waddell, Holle |
| Subject: | Fwd: Proposed Schedule for Thursday Morning Working Groups |
| Date: | Wednesday, August 10, 2016 4:00:03 PM |
| Attachments: | BLM working group September Mtg Schedule.pdf |

In the upcoming week we need to chat and determine who will be available to the Work Groups. Ginger is the lead for the Herd Area Repopulation Work Group. She said she wants someone knowledgeable about the reasons why we don't manage and the whole process. Jared could represent us well. More discussion. Need to decide a BLM contact for each work group.


Dean Bolstad
Division Chief, Wild Horse and Burro Program
Washington Office (WO-260)
(202) 912-7648 Office
(775) 750-6362 Cell

---------- Forwarded message ----------
From: **McDonnell, Sue** <suemcd@vet.upenn.edu>
Date: Wed, Aug 10, 2016 at 4:53 PM
Subject: Proposed Schedule for Thursday Morning Working Groups
To: Fred Woehl <prtfred@gmail.com>, Julie Weikel <jweikeldvm@yahoo.com>, Jen Sall <jen.sall@gmail.com>, June Sewing <mustangs@infowest.com>, "R. E. Cope" <cowdoc75@hotmail.com>, Ginger Kathrens <ginger.kathrens@thecloudfoundation.org>, Ben Masters <benmasters88@gmail.com>, Leslie Yardley <steven.leslieyardley@yahoo.com>
Cc: "Bolstad, Dean" <dbolstad@blm.gov>, Dorothea Boothe <dboothe@blm.gov>


Hello all,

Attached is schedule for the Thursday morning working group meetings that I believe allows all attending that day to participate fully in their two or more working group meetings. Please read over and send any corrections or suggestions my way. Julie, I am counting on you for any corrections. (:

Sue

## BLM Wild Horse & Burro Advisory Board
## Thursday Morning September 8, 2016
## Stockman's Hotel, Elko, NV

| 7:00 am - 7:45 am  Discussion of Working Group & Meeting Protocols, Rules of Engagement, Etc. All Board Members, Kathy Libby | | | | |
|---|---|---|---|---|
| **7:45 am - 9:30 am  Working Group Session 1** | | | | |
| WORKING GROUP | LEADER | ADDITIONAL MEMBERS | | |
| Resources (Room A) | COPE | Julie | Ben | Steven** |
| Herd Area Repopulation (Room B) | GINGER | June | Sue | Steven** |
| **9:30 am - 11:15 am  Working Group Session 2** | | | | |
| Population Growth Suppression (Room A) | SUE | Julie | Cope | Ginger |
| Volunteers (Room B) | JENN or FRED* | June | Ben | |
| **11:15 noon - 1:00 pm  Working Group Session 3** | | | | |
| Adoptions (Room A) Working Lunch | BEN | Jenn | Ginger | Fred |
| Lunch (Room B) - Sue, June, Julie, Cope | | | | |

**If unable to attend, FRED will lead    **unable to attend*

In our August 10 phone conference it was decided that there was no need for the board-formed Public Comment working group or the BLM-formed CAWP (Comprehensive Animal Welfare Program) working group to meet as this time. I am awaiting confirmation from Dean regarding the need for the other BLM formed working group, Adoptions, to meet. If not, we will have just two sessions of two hours each and some wiggle room for lunch and unexpected discussion needs.

**Efficient Work Strategy**

Our face-to-face working time will go quickly, so please coordinate with members in advance of the meeting to have an outline any potential discussion topics. Feel free to get started on discussion as a team before these face-to-face sessions.  It may help to come prepared with any background information we may anticipate needing for these discussions.

Our goal is for each working group to have any suggested recommendations, including your 1st draft of proposed wording, ready for presentation to and discussion with the full board at the Friday afternoon public meeting.

**From:**          Stratton, Joseph A
**To:**            Bolstad, Dean O; Waddell, Holle; Shepherd, Alan B; Anna-Maria Easley
**Subject:**       Pertinent to our CAWP discussion tomorrow
**Date:**          Thursday, April 27, 2017 12:46:36 PM
**Attachments:**   CAWP-ImplementationPlan-draft-2015-05-31.docx
**Importance:**    High

All, attached is a timeline document I asked Kahty Holcomb to put together last summer regarding moving forward with the CAWP program. Maybe it will facilitate some the discussion. joe

**Comprehensive Animal Welfare Program (CAWP)**
**BLM Wild Horse and Burro Program**

**Proposed 4-Year Implementation Plan**
**Kathryn Holcomb, PhD**
**Carolyn Stull, PhD**
**University of California, Davis**

| YEAR 1 | |
| --- | --- |
| Timeframe | Activity |









# ATTACHMENT 1:  COMPREHENSIVE ANIMAL WELFARE PROGRAM FOR WILD HORSE AND BURRO GATHERS

# STANDARDS

Developed by

The Bureau of Land Management
Wild Horse and Burro Program

in collaboration with

Carolyn L. Stull, PhD
Kathryn E. Holcomb, PhD
University of California, Davis
School of Veterinary Medicine

June 30, 2015

# WELFARE ASSESSMENT STANDARDS for GATHERS

# CONTENTS

**Welfare Assessment Standards**

I.    FACILITY DESIGN ...................................................................................... 2

    A.    Trap Site and Temporary Holding Facility ............................................. 2

    B.    Loading and Unloading Areas................................................................. 4

II.   CAPTURE TECHNIQUE ............................................................................. 5

    A.    Capture Techniques ................................................................................. 5

    B.    Helicopter Drive Trapping ..................................................................... 5

    C.    Roping ..................................................................................................... 7

    D.    Bait Trapping.......................................................................................... 8

III.  WILD HORSE AND BURRO CARE............................................................ 8

    A.    Veterinarian ............................................................................................ 8

    B.    Care ........................................................................................................ 9

    C.    Biosecurity ........................................................................................... 11

IV.   HANDLING ............................................................................................... 12

    A.    Willful Acts of Abuse ........................................................................... 12

    B.    General Handling .................................................................................. 12

    C.    Handling Aids ....................................................................................... 12

V.    TRANSPORTATION ................................................................................. 13

    A.    General .................................................................................................. 13

    B.    Vehicles ................................................................................................ 14

    C.    Care of WH&Bs during Transport Procedures .................................... 15

VI.   EUTHANASIA or DEATH ......................................................................... 16

    A.    Euthanasia Procedures during Gather Operations................................ 16

    B.    Carcass Disposal .................................................................................. 17

**Required documentation and responsibilities of Lead COR/COR/PI at gathers** ................ 18

**Schematic of CAWP Gather Components** ................................................ 20

## STANDARDS

> **Standard Definitions**
>
> **Major Standard:** Impacts the health or welfare of WH&Bs. Relates to an alterable equipment or facility standard or procedure. Appropriate wording is "must," "unacceptable," "prohibited."
>
> **Minor Standard:** unlikely to affect WH&Bs health or welfare or involves an uncontrollable situation. Appropriate wording is "should."

**Lead COR** = Lead Contracting Officer's Representative

**COR** = Contracting Officer's Representative

**PI** = Project Inspector

**WH&Bs** = Wild horses and burros

## I.  FACILITY DESIGN

### A. Trap Site and Temporary Holding Facility

1. The trap site and temporary holding facility must be constructed of stout materials and must be maintained in proper working condition, including gates that swing freely and latch or tie easily. (**major**)

2. The trap site should be moved close to WH&B locations whenever possible to minimize the distance the animals need to travel.(minor)

3. If jute is hung on the fence posts of an existing wire fence in the trap wing, the wire should be either be rolled up or let down for the entire length of the jute in such a way that minimizes the possibility of entanglement by WH&Bs unless otherwise approved by the Lead COR/COR/PI. (minor)

4. Fence panels in pens and alleys must be not less than 6 feet high for horses, 5 feet high for burros, and the bottom rail must not be more than 12 inches from ground level. (**major**)

5. The temporary holding facility must have a sufficient number of pens available to sort WH&Bs according to gender, age, number, temperament, or physical condition. (**major**)

    a. All pens must be assembled with capability for expansion. (**major**)

    b. Alternate pens must be made available for the following: (**major**)

        1) WH&Bs that are weak or debilitated

        2) Mares/jennies with dependent foals

    c. WH&Bs in pens at the temporary holding facility should be maintained at a proper stocking density such that when at rest all WH&Bs occupy no more than half the pen area. (minor)

6. An appropriate chute designed for restraining WH&Bs must be available for necessary procedures at the temporary holding facility. This does not apply to bait trapping operations unless directed by the Lead COR/COR/PI. (**major**)

7. There must be no holes, gaps or openings, protruding surfaces, or sharp edges present in fence panels or other structures that may cause escape or possible injury. (**major**)

8. Padding must be installed on the overhead bars of all gates and chutes used in single file alleys. (**major**)

9. Hinged, self-latching gates must be used in all pens and alleys except for entry gates into the trap, which may be secured with tie ropes. (**major**)

10. Finger gates (one-way funnel gates) used in bait trapping must be constructed of materials approved by the Lead COR/COR/PI. Finger gates must not be constructed of materials that have sharp ends that may cause injuries to WH&Bs, such as "T" posts, sharpened willows, etc. (**major**)

11. Water must be provided at a minimum rate of ten gallons per 1000 pound animal per day, adjusted accordingly for larger or smaller horses, burros and foals, and environmental conditions, with each trough placed in a separate location of the pen (i.e. troughs at opposite ends of the pen). Water must be refilled at least every morning and evening. (**major**)

12. The design of pens at the trap site and temporary holding facility should be constructed with rounded corners. (minor)

13. All gates and panels in the animal holding and handling pens and alleys of the trap site must be covered with materials such as plywood, snow fence, tarps, burlap, etc. approximately 48" in height to provide a visual barrier for the animals. All materials must be secured in place.(**major**)

These guidelines apply:

   a. For exterior fences, material covering panels and gates must extend from the top of the panel or gate toward the ground.(**major** )

   b. For alleys and small internal handling pens, material covering panels and gates should extend from no more than 12 inches below the top of the panel or gate toward the ground to facilitate visibility of animals and the use of flags and paddles during sorting. (minor)

   c. The initial capture pen may be left uncovered as necessary to encourage animals to enter the first pen of the trap. (minor)

14. Non-essential personnel and equipment must be located to minimize disturbance of WH&Bs. (**major**)

15. Trash, debris, and reflective or noisy objects should be eliminated from the trap site and temporary holding facility. (minor)

**B. Loading and Unloading Areas**

1. Facilities in areas for loading and unloading WH&Bs at the trap site or temporary holding facility must be maintained in a safe and proper working condition, including gates that swing freely and latch or tie easily. (**major**)

2. The side panels of the loading chute must be a minimum of 6 feet high and fully covered with materials such as plywood or metal without holes that may cause injury. (**major**)

3. There must be no holes, gaps or openings, protruding surfaces, or sharp edges present in fence panels or other structures that may cause escape or possible injury. (**major**)

4. All gates and doors must open and close easily and latch securely. (**major**)

5. Loading and unloading ramps must have a non-slip surface and be maintained in a safe and proper working condition to prevent slips and falls. Examples of non-slip flooring would include, but not be limited to, rubber mats, sand, shavings, and steel reinforcement rods built into ramp. There must be no holes in the flooring or items that can cause an animal to trip. (**major**)

6. Trailers must be properly aligned with loading and unloading chutes and panels such that no gaps exist between the chute/panel and floor or sides of the trailer creating a situation where a WH&B could injure itself. (**major**)

7. Stock trailers should be positioned for loading or unloading such that there is no more than 12" clearance between the ground and floor of the trailer for burros and 18" for horses. (minor)

## II.  CAPTURE TECHNIQUE

### A.  Capture Techniques

1. WH&Bs gathered on a routine basis for removal or return to range must be captured by the following approved procedures under direction of the Lead COR/COR/PI. (**major**)

   a.  Helicopter

   b.  Bait trapping

2. WH&Bs must not be captured by snares or net gunning. (**major**)

3. Chemical immobilization must only be used for capture under exceptional circumstances and under the direct supervision of an on-site veterinarian experienced with the technique. (**major**)

### B.  Helicopter Drive Trapping

1. The helicopter must be operated using pressure and release methods to herd the animals in a desired direction and should not repeatedly evoke erratic behavior in the WH&Bs causing injury or exhaustion. Animals must not be pursued to a point of exhaustion; the on-site veterinarian must examine WH&Bs for signs of exhaustion. (**major**)

2. The rate of movement and distance the animals travel must not exceed limitations set by the Lead COR/COR/PI who will consider terrain, physical barriers, access limitations, weather, condition of the animals, urgency of the operation (animals facing drought, starvation, fire, etc.) and other factors. (**major**)

   a. WH&Bs that are weak or debilitated must be identified by BLM staff or the contractors. Appropriate gather and handling methods should be used according to the direction of the Lead COR/COR/PI. (**major**)

   b. The appropriate herding distance and rate of movement must be determined on a case-by-case basis considering the weakest or smallest animal in the group (e.g., foals, pregnant mares, or horses that are weakened by body condition, age, or poor health) and the range and environmental conditions present. (**major**)

   c. Rate of movement and distance travelled must not result in exhaustion at the trap site, with the exception of animals requiring capture that have an existing severely compromised condition prior to gather. Where compromised animals cannot be left on the range or where doing so would only serve to prolong their suffering, euthanasia will be performed in accordance with BLM policy. (**major**)

3. WH&Bs must not be pursued repeatedly by the helicopter such that the rate of movement and distance travelled exceeds the limitation set by the Lead COR/COR/PI. Abandoning the pursuit or alternative capture methods may be considered by the Lead COR/COR/PI in these cases. (**major**)

4. When WH&Bs are herded through a fence line en route to the trap, the Lead COR/COR/PI must be notified by the contractor. The Lead COR/COR/PI must determine the appropriate width of the opening that the fence is let down to allow for safe passage through the opening.  The Lead COR/COR/PI must decide if existing fence lines require marking to increase visibility to WH&Bs.  (**major**)

5. The helicopter must not come into physical contact with any WH&B. The physical contact of any WH&B by helicopter must be documented by Lead COR/COR/PI along with the circumstances. (**major**)

6. WH&Bs may escape or evade the gather site while being moved by the helicopter. If there are mare/dependent foal pairs in a group being brought to a trap and half of an identified pair is thought to have evaded capture, multiple attempts by helicopter may

be used to bring the missing half of the pair to the trap or to facilitate capture by roping. In these instances, animal condition and fatigue must be evaluated by the Lead COR/COR/PI or on-site veterinarian on a case-by-case basis to determine the number of attempts that can be made to capture an animal.(**major**)

7. Horse captures must not be conducted when ambient temperature at the trap site is below 10ºF or above 95ºF without approval of the Lead COR/COR/PI. Burro captures must not be conducted when ambient temperature is below 10ºF or above 100ºF without approval of the Lead COR/COR/PI. The Lead COR/COR/PI will not approve captures when the ambient temperature exceeds 105 ºF. (**major**)

## C. Roping

1. The roping of any WH&B must be approved prior to the procedure by the Lead COR/COR/PI. (**major**).

2. The roping of any WH&B must be documented by the Lead COR/COR/PI along with the circumstances. WH&Bs may be roped under circumstances which include but are not limited to the following: reunite a mare or jenny and her dependent foal; capture nuisance, injured or sick WH&Bs or those that require euthanasia; environmental reasons such as deep snow or traps that cannot be set up due to location or environmentally sensitive designation; and public and animal safety or legal mandates for removal. (**major**)

3. Ropers should dally the rope to their saddle horn such that animals can be brought to a stop as slowly as possible and must not tie the rope hard and fast to the saddle so as to intentionally jerk animals off their feet. (**major**)

4. WH&Bs that are roped and tied down in recumbency must be continuously observed and monitored by an attendant at a maximum of 100 feet from the animal. (**major**)

5. WH&Bs that are roped and tied down in recumbency must be untied within 30 minutes. (**major**)

6. If the animal is tied down within the wings of the trap, helicopter drive trapping within the wings will cease until the tied-down animal is removed. (**major**)

7. Sleds, slide boards, or slip sheets must be placed underneath the animal's body to move and/or load recumbent WH&Bs. (**major**)

8. Halters and ropes tied to a WH&B may be used to roll, turn, position or load a recumbent animal, but a WH&B must not be dragged across the ground by a halter or rope attached to its body while in a recumbent position. (**major**)

9. Animals captured by roping must be evaluated by the on-site/on-call veterinarian within four hours after capture, marked for identification at the trap site, and be re-evaluated periodically as deemed necessary by the on-site/on-call veterinarian. (**major**)

## D. Bait Trapping

1. WH&Bs may be lured into a temporary trap using bait (feed, mineral supplement, water) or sexual attractants (mares/jennies in heat) with the following requirements:

   a. The period of time water sources other than in the trap site are inaccessible must not adversely affect the wellbeing of WH&Bs, wildlife or livestock, as determined by the Lead COR/COR/PI. (**major**)

   b. Unattended traps must not be left unobserved for more than 12 hours. (**major**)

   c. Mares/jennies and their dependent foals must not be separated unless for safe transport. (**major**)

   d. WH&Bs held for more than 12 hours must be provided with accessible clean water at a minimum rate of ten gallons per 1000 pound animal per day, adjusted accordingly for larger or smaller horses, burros and foals and environmental conditions. (**major**)

   e. WH&Bs held for more than 12 hours must be provided good quality hay at a minimum rate of 20 pounds per 1000 pound adult animal per day, adjusted accordingly for larger or smaller horses, burros and foals. (**major**)

      1) Hay must not contain poisonous weeds, debris, or toxic substances. (**major**)

      2) Hay placement must allow all WH&Bs to eat simultaneously. (**major**)

# III.  WILD HORSE AND BURRO CARE

## A. Veterinarian

1. On-site veterinary support must be provided for all helicopter gathers and on-site or on-call support must be provided for bait trapping. (**major**)

2. Veterinary support must be under the direction of the Lead COR/COR/PI. The on-site/on-call veterinarian will provide consultation on matters related to WH&B health, handling, welfare, and euthanasia at the request of the Lead COR/COR/PI. All decisions regarding medical treatment or euthanasia will be made by the on-site Lead COR/COR/PI. (**major**)

## B. Care

1. Feeding and Watering

   a. Adult WH&Bs held in traps or temporary holding pens for longer than 12 hours must be fed every morning and evening with water available at all times other than when animals are being sorted or worked. (**major**)

   b. Water must be provided at a minimum rate of ten gallons per 1000 pound animal per day, adjusted accordingly for larger or smaller horses, burros and foals, and environmental conditions, with each trough placed in a separate location of the pen (i.e. troughs at opposite ends of the pen). . (**major**)

   c. Good quality hay must be fed at a minimum rate of 20 pounds per 1000 pound adult animal per day, adjusted accordingly for larger or smaller horses, burros and foals. (**major**)

      i. Hay must not contain poisonous weeds or toxic substances. (**major**)

      ii. Hay placement must allow all WH&Bs to eat simultaneously. (**major**)

   d. When water or feed deprivation conditions exist on the range prior to the gather, the Lead COR/COR/PI should adjust the watering and feeding arrangements in consultation with the onsite veterinarian as necessary to provide for the needs of the animals. (minor)

2. Dust abatement

   a. Dust abatement by spraying the ground with water must be employed when necessary at the trap site and temporary holding facility. (**major**)

3. Trap Site

    a. Dependent foals or weak/debilitated animals must be separated from other WH&Bs at the trap site to avoid injuries during transportation to the temporary holding facility. Separation of dependent foals from mares must not exceed four hours unless the Lead COR/COR/PI authorizes a longer time or a decision is made to wean the foals. (**major**)

4. Temporary Holding Facility

    a. All WH&Bs in confinement must be observed at least once daily to identify sick or injured WH&Bs and ensure adequate food and water. (**major**)

    b. Foals must be reunited with their mares/jennies at the temporary holding facility within four hours of capture unless the Lead COR/COR/PI authorizes a longer time or foals are old enough to be weaned during the gather. (**major**)

    c. Non-ambulatory WH&Bs must be located in a pen separate from the general population and must be examined by the BLM horse specialist and/or on-call or on-site veterinarian as soon as possible, no more than four hours after recumbency is observed. Unless otherwise directed by a veterinarian, hay and water must be accessible to an animal within six hours after recumbency.(**major**)

    d. Alternate pens must be made available for the following: (**major**)

        1) WH&Bs that are weak or debilitated

        2) Mares/jennies with dependent foals

    e. Aggressive WH&Bs causing serious injury to other animals should be identified and relocated into alternate pens when possible. (minor)

    f. WH&Bs in pens at the temporary holding facility should be maintained at a proper stocking density such that when at rest all WH&Bs occupy no more than half the pen area. (minor)

**C. Biosecurity**

1. Health records for all saddle and pilot horses used on WH&B gathers must be provided to the Lead COR/COR/PI prior to joining a gather, including: (**major**)

   a. Certificate of Veterinary Inspection (Health Certificate, within 30 days).

   b. Proof of:

      1) A negative test for equine infectious anemia (Coggins or EIA ELISA test) within 12 months.

      2) Vaccination for tetanus, eastern and western equine encephalomyelitis, West Nile virus, equine herpes virus, influenza, *Streptococcus equi*, and rabies within 12 months.

2. Saddle horses, pilot horses and mares used for bait trapping lures must not be removed from the gather operation (such as for an equestrian event) and allowed to return unless they have been observed to be free from signs of infectious disease for a period of at least three weeks and a new Certificate of Veterinary Examination is obtained after three weeks and prior to returning to the gather. (**major**)

3. WH&Bs, saddle horses, and pilot horses showing signs of infectious disease must be examined by the on-site/on-call veterinarian. (**major**)

   a. Any saddle or pilot horses showing signs of infectious disease (fever, nasal discharge, or illness) must be removed from service and isolated from other animals on the gather until such time as the horse is free from signs of infectious disease and approved by the on-site/on-call veterinarian to return to the gather. (**major**)

   b. Groups of WH&Bs showing signs of infectious disease should not be mixed with groups of healthy WH&Bs at the temporary holding facility, or during transport. (minor)

4. Horses not involved with gather operations should remain at least 300 yards from WH&Bs, saddle horses, and pilot horses being actively used on a gather. (minor)

## IV.    HANDLING

### A.  Willful Acts of Abuse

1.  Hitting, kicking, striking, or beating any WH&B in an abusive manner is prohibited. (**major**)

2.  Dragging a recumbent WH&B without a sled, slide board or slip sheet is prohibited. Ropes used for moving the recumbent animal must be attached to the sled, slide board or slip sheet unless being loaded as specified in Section II. C. 8. (**major**)

3.  There should be no deliberate driving of WH&Bs into other animals, closed gates, panels, or other equipment. (minor)

4.  There should be no deliberate slamming of gates and doors on WH&Bs. (minor)

5.  There should be no excessive noise (e.g., constant yelling) or sudden activity causing WH&Bs to become unnecessarily flighty, disturbed or agitated. (minor)

### B.  General Handling

1.  All sorting, loading or unloading of WH&Bs during gathers must be performed during daylight hours except when unforeseen circumstances develop and the Lead COR/CO/PI approves the use of supplemental light. (**major**)

2.  WH&Bs should be handled to enter runways or chutes in a forward direction. (minor)

3.  WH&Bs should not remain in single-file alleyways, runways, or chutes longer than 30 minutes. (minor)

4.  Equipment except for helicopters should be operated and located in a manner to minimize flighty behavior . (minor)

### C.  Handling Aids

1.  Handling aids such as flags and shaker paddles must be the primary tools for driving and moving WH&Bs during handling and transport procedures. Contact of the flag or paddle end of primary handling aids with a WH&B is allowed. Ropes looped around the hindquarters may be used from horseback or on foot to assist in moving an animal forward or during loading. (**major**)

2. Electric prods must not be used routinely as a driving aid or handling tool. Electric prods may be used in limited circumstances only if the following guidelines are followed:

   a. Electric prods must only be a commercially available make and model that uses DC battery power and batteries should be fully charged at all times. (**major**)

   b. The electric prod device must never be disguised or concealed. (**major**)

   c. Electric prods must only be used after three attempts using other handling aids (flag, shaker paddle, voice or body position) have been tried unsuccessfully to move the WH&Bs. (**major**)

   d. Electric prods must only be picked up when intended to deliver a stimulus; these devices must not be constantly carried by the handlers. (**major**)

   e. Space in front of an animal must be available to move the WH&B forward prior to application of the electric prod. (**major**)

   f. Electric prods must never be applied to the face, genitals, anus, or underside of the tail of a WH&B. (**major**)

   g. Electric prods must not be applied to any one WH&B more than three times during a procedure (e.g., sorting, loading) except in extreme cases with approval of the Lead COR/COR/PI. Each exception must be approved at the time by the Lead COR/COR/PI. (**major**)

   h. Any electric prod use that may be necessary must be documented daily by the Lead COR/COR/PI including time of day, circumstances, handler, location (trap site or temporary holding facility), and any injuries (to WH&B or human). (**major**)

## V.  TRANSPORTATION

### A.  General

1. All sorting, loading, or unloading of WH&Bs during gathers must be performed during daylight hours except when unforeseen circumstances develop and the Lead COR/CO/PI approves the use of supplemental light. (**major**)

2. WH&Bs identified for removal should be shipped from the temporary holding facility to a BLM facility within 48 hours. (minor)

   a. Shipping delays for animals that are being held for release to range or potential on-site adoption must be approved by the Lead COR/COR/PI. (**major**)

3. Shipping should occur in the following order of priority; 1) debilitated animals, 2) pairs, 3) weanlings, 4) dry mares and 5) studs. (minor)

4. Planned

5. transport time to the BLM preparation facility from the trap site or temporary holding facility must not exceed 10 hours. (**major**)

6. WH&Bs should not wait in stock trailers and/or semi-trailers at a standstill for more than a combined period of three hours during the entire journey. (minor)

**B. Vehicles**

1. Straight-deck trailers and stock trailers must be used for transporting WH&Bs. (**major**)

   a. Two-tiered or double deck trailers are prohibited. (**major**)

   b. Transport vehicles for WH&Bs must have a covered roof or overhead bars containing them such that WH&Bs cannot escape. (**major**)

2. WH&Bs must have adequate headroom during loading and unloading and must be able to maintain a normal posture with all four feet on the floor during transport without contacting the roof or overhead bars. (**major**)

3. The width and height of all gates and doors must allow WH&Bs to move through freely. (**major**)

4. All gates and doors must open and close easily and be able to be secured in a closed position. (**major**)

5. The rear door(s) of the trailers must be capable of opening the full width of the trailer. (**major**)

6. Loading and unloading ramps must have a non-slip surface and be maintained in proper working condition to prevent slips and falls. (**major**)

7. Transport vehicles more than 18 feet and less than 40 feet in length must have a minimum of one partition gate providing two compartments; transport vehicles 40 feet or longer must have at least two partition gates to provide a minimum of three compartments. (**major**)

8. All partitions and panels inside of trailers must be free of sharp edges or holes that could cause injury to WH&Bs. (**major**)

9. The inner lining of all trailers must be strong enough to withstand failure by kicking that would lead to injuries. (**major**)

10. Partition gates in transport vehicles should be used to distribute the load into compartments during travel. (minor)

11. Surfaces and floors of trailers must be cleaned of dirt, manure and other organic matter prior to the beginning of a gather. (**major**)

## C. Care of WH&Bs during Transport Procedures

1. WH&Bs that are loaded and transported from the temporary holding facility to the BLM preparation facility must be fit to endure travel. (**major**)

   a. WH&Bs that are non-ambulatory, blind in both eyes, or severely injured must not be loaded and shipped unless it is to receive immediate veterinary care or euthanasia. (**major**)

   b. WH&Bs that are weak or debilitated must not be transported without approval of the Lead COR/COR/PI in consultation with the on-site veterinarian. Appropriate actions for their care during transport must be taken according to direction of the Lead COR/COR/PI. (**major**)

2. WH&Bs should be sorted prior to transport to ensure compatibility and minimize aggressive behavior that may cause injury. (minor)

3. Trailers must be loaded using the minimum space allowance in all compartments as follows: (**major**)

   a. 12 square feet per adult horse.

   b. 6.0 square feet per dependent horse foal.

   c. 8.0 square feet per adult burro.

   d. 4.0 square feet per dependent burro foal.

4.  The Lead COR/COR/PI in consultation with the receiving Facility Manager must document any WH&B that is recumbent or dead upon arrival at the destination. (**major**)

    a.  Non-ambulatory or recumbent WH&Bs must be evaluated on the trailer and either euthanized or removed from the trailers using a sled, slide board or slip sheet. (**major**)

5.  Saddle horses must not be transported in the same compartment with WH&Bs. (**major**)

## VI.    EUTHANASIA OR DEATH

### A.  Euthanasia Procedure during Gather Operations

1.  An authorized, properly trained, and experienced person as well as a firearm appropriate for the circumstances must be available at all times during gather operations. When the travel time between the trap site and temporary holding facility exceeds one hour or if radio or cellular communication is not reliable, provisions for euthanasia must be in place at both the trap site and temporary holding facility during the gather operation. (**major**)

2.  Euthanasia must be performed according to American Veterinary Medical Association euthanasia guidelines (2013) using methods of gunshot or injection of an approved euthanasia agent. (**major**)

3.  The decision to euthanize and method of euthanasia must be directed by the Authorized Officer or their Authorized Representative(s) that include but are not limited to the Lead COR/COR/PI who must be on site and may consult with the on-site/on-call veterinarian. (**major**)

4.  Photos needed to document an animal's condition should be taken prior to the animal being euthanized. No photos of animals that have been euthanized should be taken. An exception is when a veterinarian or the Lead COR/COR/PI may want to document certain findings discovered during a postmortem examination or necropsy. (minor)

5.  Any WH&B that dies or is euthanized must be documented by the Lead COR/COR/PI including time of day, circumstances, euthanasia method, location, a

description of the age, gender, and color of the animal and the reason the animal was euthanized. (**major**)

6. The on-site/on-call veterinarian should review the history and conduct a postmortem physical examination of any WH&B that dies or is euthanized during the gather operation. A necropsy should be performed whenever feasible if the cause of death is unknown. (minor)

**B. Carcass Disposal**

1. The Lead COR/COR/PI must ensure that appropriate equipment is available for the timely disposal of carcasses when necessary on the range, at the trap site, and temporary holding facility. (**major**)

2. Disposal of carcasses must be in accordance with state and local laws. (**major**)

3. WH&Bs euthanized with a barbiturate euthanasia agent must be buried or otherwise disposed of properly. (**major**)

4. Carcasses left on the range should not be placed in washes or riparian areas where future runoff may carry debris into ponds or waterways. Trenches or holes for buried animals should be dug so the bottom of the hole is at least 6 feet above the water table and 4-6 feet of level earth covers the top of the carcass with additional dirt mounded on top where possible. (minor)

# CAWP

## REQUIRED DOCUMENTATION AND RESPONSIBILITIES OF LEAD COR/COR/PI

### Required Documentation

| Section | Documentation |
|---|---|
| II.B.5 | Helicopter contact with any WH&B. |
| II.C.2 | Roping of any WH&B. |
| III.B.3.a and III.B.4.b | Reason for allowing longer than four hours to reunite foals with mares/jennies. Does not apply if foals are being weaned. |
| III.C.1 | Health status of all saddle and pilot horses. |
| IV.C.2.h | All uses of electric prod. |
| V.C.4 | Any WH&B that is recumbent or dead upon arrival at destination following transport. |
| VI.A.5 | Any WH&B that dies or is euthanized during gather operation. |

### Responsibilities

| Section | Responsibility |
|---|---|
| I.A.10 | Approve materials used in construction of finger gates in bait trapping |
| II.A.1 | Direct gather procedures using approved gather technique. |
| II.B. 2 | Determine rate of movement and distance limitations for WH&B helicopter gather. |
| II.B.2.a | Direct appropriate gather/handling methods for weak or debilitated WH&B. |
| II.B.3 | Determine whether to abandon pursuit or use other capture method in order to avoid repeated pursuit of WH&B. |
| II.B.4 | Determine width and need for visibility marking when using opening in fence en route to trap. |
| II.B.6 | Determine number of attempts that can be made to capture the missing half of a mare/foal pair that has become separated. |
| II.B.7 | Determine whether to proceed with gather when ambient temperature is outside the range of 10°F to 95°F for horses or 10°F to 100°F for burros. |
| II.C.1 | Approve roping of any WH&B. |
| II.D.1.a | Determine period of time that water outside a bait trap is inaccessible such that wellbeing of WH&Bs, wildlife, or livestock is not adversely affected. |
| III.A.2 | Direct and consult with on-site/on-call veterinarian on any matters related to WH&B health, handling, welfare and euthanasia. |

| III.B.1.e | Adjust feed/water as necessary, in consultation with onsite/on call veterinarian, to provide for needs of animals when water or feed deprivation conditions exist on range. |
| III.B.4.c | Determine provision of water and hay to non-ambulatory animals. |
| IV.C.2.g | Approve use of electric prod more than three times, for exceptional cases only. |
| V.A.1 | Approve sorting, loading, or unloading at night with use of supplemental light. |
| V.A.2.a | Approve shipping delays of greater than 48 hours from temporary holding facility to BLM facility. |
| V.C.1.b | Approve of transport and care during transport for weak or debilitated WH&B. |
| VI.A.3 | Direct decision regarding euthanasia and method of euthanasia for any WH&B; may consult with on-site/on-call veterinarian. |
| VI.B.1 | Ensure that appropriate equipment is available for carcass disposal. |

| | |
|---|---|
| From: | Kane, Albert J - APHIS |
| To: | Shepherd, Alan B; Ruhs, Amy G; Easley, Anna-Maria; Wade, Beatrice A; Debbie Collins (dacollin@blm.gov); Waddell, Holle; Anderson, Jacky L; Lutterman, Jason W; Neill, John J; Stratton, Joseph A; Reiland, Michael J; Griffin, Paul C; Roberson, Peter (PJ) L; Hall, Salina M; Sarah McElroy; Fluer, Scott L |
| Cc: | Thompson, Ruth A; Warr, Victor (Gus) A; Mitchell, Melanie L |
| Subject: | RE: CAWP - Gathers IM |
| Date: | Monday, March 19, 2018 7:00:28 PM |
| Importance: | High |

b(5) DPP ███████████████████████████

I also agree with Joe that since b(5) DPP ██████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████

My recommendation at this time: b(5) DPP ████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████

FWIW …

And PS – for those who weren't around when this started or if you want a review of what the CAWP is supposed to be see below …

Steps in an animal welfare auditing program, modified a little for BLM, include:
1) Establish the SOPS
2) write policy and contracts requiring people follow the SOPs (specific to BLM)
3) educate staff on SOPs
4) develop auditing tools, schedule etc.
5) internal audits
6) feedback loop to repeat 1-4 as needed
7) repeat internal audits
8) communicate internal audit results with public (congress)
9) external audits
10) feedback loop to repeat 1-4

11) repeat external audits
12) communicate external audit results to public (congress)

These 12 steps need to be repeated for 5 parts: 1) on range, 2) gathers, 3)corrals, transportation, adoptions, 4) ORPs and 5) post adoption compliance.
The 5 parts, from range to post adoption compliance are what is meant by the word "Comprehensive".

12steps x 5parts = 60 steps to full implementation and completion of the CAWP

As far as I can tell at this time BLM has taken gathers as far as step 3 and half of 4 (we have a tool but not a plan for how and when audits will be conducted), and has taken corrals/transportation/adoptions as far as step 1.

-------------------------------------

Albert Kane, DVM, MPVM, PhD (epi)
Advisor, APHIS/BLM WH&B Partnership
USDA APHIS Veterinary Services
2150 Centre Ave, Bldg B, MS 2E6
Ft Collins, CO 80526-8117
PH O: (970) 494-7234    Gov C: (970) 219-2409

---

**From:** Anna-Maria Easley [mailto:ameasley@blm.gov]
**Sent:** Monday, March 19, 2018 6:00 AM
**To:** Stratton, Joseph <jstratto@blm.gov>
**Cc:** Alan Shepherd <ashepher@blm.gov>; Kane, Albert J - APHIS <Albert.J.Kane@aphis.usda.gov>; Ruth Thompson <rthompso@blm.gov>; Victor A Warr <gwarr@blm.gov>; Joseph Stratton <Joe_Stratton@blm.gov>
**Subject:** Re: CAWP - Gathers IM

Good morning Joe,

Sure, that's an easy change!

Do you (or anyone else) have any additional comments?

Thanks!
Anna-Maria

On Mar 2, 2018, at 12:26, Stratton, Joseph <jstratto@blm.gov> wrote:

Anna Maria, I haven't read the IM yet but just first off I question b(5) DPP

b(5) DPP

Just my initial thoughts. joe

On Thu, Mar 1, 2018 at 5:03 PM, Easley, Anna-Maria <ameasley@blm.gov>
wrote:

> Good afternoon!
>
> I'd like to get some of your suggestions on this IM before it goes out to the
> group for review.  I've made some initial edits and added some questions in the
> margin, but I don't know the history.  I'll be gone the next 2 weeks, but if you
> could review during that time, I'll set up a conference call when I get back for
> further discussions.  We have a month before it's scheduled to go to the group.
>
> Thanks for your help!
> Anna-Maria
>
> Sr. Wild Horse and Burro Specialist
> DOI - Bureau of Land Management
> Washington, DC
> WO - 260
> O: 202.912.7296

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

| | |
|---|---|
| **From:** | Stratton, Joseph A |
| **To:** | Foster, Kimberlee D |
| **Cc:** | Benson, Jacob K; Bolstad, Dean O; Waddell, Holle |
| **Subject:** | Re: CAWP and SOP |
| **Date:** | Tuesday, October 10, 2017 11:55:32 AM |
| **Importance:** | High |

You are more than welcome, good luck. joe

On Tue, Oct 10, 2017 at 11:47 AM, Foster, Kimberlee <kfoster@blm.gov> wrote:
Thanks Joe. This was exactly what I needed.

Kimberlee Foster
Field Manager
BLM Rock Springs Field Office
kfoster@blm.gov
307-352-0201 office
307-371-1174 cell

On Tue, Oct 10, 2017 at 10:24 AM, Stratton, Joseph <jstratto@blm.gov> wrote:
Sure, Kimberly, we have completed standard operating procedures for the operation of our corrals. We have not finalized an Instruction Memo for the Comprehensive Animal Welfare Program for Corrals, Adoptions and transportation. We do not currently have a CAWP coordinator to finalize all the training and auditing requirements for finalizing the CAWP program. We have tried to hire this position but have run into some issues with hiring and then the national hiring freeze also put us behind.

The current operations are mandated using the Preparation Handbook, Gelding IM and Animal Health, Maintenance, Evaluation.... If you have any questions, you can contact Dean Bolstad, Division Chief, or Holle Waddell, Off-range Branch Chief. Joe

On Tue, Oct 10, 2017 at 9:59 AM, Benson, Jacob <jbenson@blm.gov> wrote:
Joe,

Kimberlee Foster (FM) is asking if the WH&B facilities have CAWP or SOP in place.

Can you answer/provide Kimberlee with information?

Thanks,

--
Jake Benson
Supervisory WH&B Specialist
HDD, Rock Springs, WY
307-352-0286
307-350-0002

| | |
|---|---|
| **From:** | Shepherd, Alan B |
| **To:** | Waddell, Holle |
| **Cc:** | Stratton, Joseph A |
| **Subject:** | Re: CAWP IM (ORCs, Adoption and Transportation) |
| **Date:** | Wednesday, January 17, 2018 7:07:46 AM |
| **Attachments:** | Draft-IM 2018-XXX, CAWP ORC-Transportation-Adoption-SOPs_abs.docx |
| **Importance:** | High |

A few thoughts on the CAWP IM for today's discussion

Thanks,
Alan

Alan Shepherd
Acting Division Chief (WO260)
National WH&B Program
20 M St SE
Washington, DC 20003

Office #: (202) 912-7648
Cell #: (775) 530-2784

email: ashepher@blm.gov
http://www.blm.gov/programs/wild-horse-and-burro

On Wed, Jan 10, 2018 at 6:57 PM, Waddell, Holle <hwaddell@blm.gov> wrote:
> Alan - I am scheduling a brief meeting next week to address a key element of
> moving forward with the attached CAWP IM.
>
> Thank you,
>
> Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |
>
> Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hwaddell@blm.gov
>
>
> "A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by
> shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift
> your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood
> 

U.S. DEPARTMENT OF THE INTERIOR BUREAU OF LAND MANAGEMENT

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
WASHINGTON, D.C.   20240-0036
http://www.blm.gov

In Reply Refer To:
4750 (260) P

EMS TRANSMISSION
Instruction Memorandum No. 2018-XXX
Expires: 09/30/2021

To:          All Field Office Officials

From:        Assistant Director, Resources and Planning

Subject:     Comprehensive Animal Welfare Program for Wild Horse and Burro in Off-Range
Corrals, Transportation and Adoption Standard Operating Procedures.

Commented [SAB1]: And Pastures?

Program Area: Wild Horse and Burro (WH&B) Program

b(5) DPP

Commented [SAB2]: b(5) DPP

Commented [SAB3]: b(5) DPP

Commented [WH4]:



b(5) DPP

Commented [SJA5]: b(5) DPP

Commented [WH6R5]: b(5) DPP

Commented [SAB7]: b(5) DPP

Commented [WH8]: b(5) DPP

Commented [SAB9]: b(5) DPP



Manual/Handbook Sections Affected: None. b(5) DPP

Commented [WH10]: b(5) DPP

Coordination:  This IM was coordinated among WO-100, WO-200, WO-260, WO-600, WH&B State Leads and WH&B Specialists.

Contact: Jane Doe, CAWP Coordinator, WO-260.

Commented [WH11]: Who will be the POC?

Attachment 1

Standard Operating Procedures (SOPs)

| | |
|---|---|
| **From:** | Cowan, Crystal S |
| **To:** | Collins, Deborah |
| **Cc:** | Waddell, Holle; Stratton, Joseph A; Bolstad, Dean O; Bryan Fuell |
| **Subject:** | Re: CAWP Update for AB book and/or meeitng |
| **Date:** | Tuesday, April 5, 2016 10:14:34 AM |
| **Attachments:** | Working Groups_AB formed_and_BLM_formed_2014_7_20_15.xlsx |
| **Importance:** | High |

This is the latest version I could find.

Please let me know who wants to be who on the updated list.

On Tue, Apr 5, 2016 at 10:11 AM, Collins, Deborah <dacollin@blm.gov> wrote:
> Good question. Where is the BLM POC's? I'm supposed to be their BLM POC for the
> adoption group but I've never heard from them. At one time, I was also the POC for the
> Public Comment but then they got rid of that group.
>
> I think we probably need to update our groups too. I don't know if they have been updated
> since Zach left and he was tied to several.
>
>
> **Debbie Collins**
> **Bureau of Land Management - National WH&B Program**
> **405-234-5935/918-625-5292 - dacollin@blm.gov**
> **200 NW 4th St, Room 2401, OKC,OK, 73102**
>
> On Tue, Apr 5, 2016 at 9:52 AM, Hooks, Holle <hhooks@blm.gov> wrote:
> > Thank you Crystal. Does this not include a BLM POC?
> >
> >
> > Thank you,
> >
> > Holle' Hooks │ Branch Chief │ Division of Wild Horses and Burros │ Bureau of Land Management
> >
> > │ 200 NW 4th Street, Room 2401 Oklahoma City, OK
> >
> > 73102 │ 405.234.5932 (O) │ 405.234.5949 (F) │ hhooks@blm.gov
> >
> >
> > "For every positive change you make in your life, something else also changes for the better; it creates a chain
> > reaction." - Leon Brown
> >
> > On Tue, Apr 5, 2016 at 9:51 AM, Cowan, Crystal <ccowan@blm.gov> wrote:
> > > Yes, I'm going to update our spreadsheet.
> > >
> > > CAWP :    Cope   Chair
> > >              Julie
> > >              Sue
> > >              Fred
> > >
> > > Increasing Adoptions:  Ben   Chair

```
                          Jen
                          Steven
                          Fred

Eco Sanctuary        June    Chair
                          Ginger
                          Steven
                          Ben

Resources            Steven  Chair
                          Julie
                          Jen
                          Ben

Public Comment       Jen     Chair
                          Ginger
                          June
                          Fred

Volunteer Resource   Julie   Chair
                          Cope
                          June
                          Fred

Population Growth
Suppression          Sue   Chair
                          Ginger
                          Cope
                          Julie

Herd Repopulation    Ginger   Chair
                          June
                          Sue
                          Ben
```

On Tue, Apr 5, 2016 at 9:48 AM, Hooks, Holle <hhooks@blm.gov> wrote:

Crystal - Is there an active list of the advisory board working groups and their members?

Thank you,

Holle' Hooks | Branch Chief | Division of Wild Horses and Burros | Bureau of Land Management

| 200 NW 4th Street, Room 2401 Oklahoma City, OK

73102 | 405.234.5932 (O) | 405.234.5949 (F) | hhooks@blm.gov

"For every positive change you make in your life, something else also changes for the better; it creates a chain reaction." - Leon Brown

On Tue, Apr 5, 2016 at 9:35 AM, Stratton, Joseph <jstratto@blm.gov> wrote:
> Ok, so you tell me this as if I am supposed to know who that is. I sent the stuff to
> you before the state lead meeting. The SOP's are attached to this email. I will let
> Crystal or anyone else send them to whoever needs them. Joe

> On Tue, Apr 5, 2016 at 9:32 AM, Bolstad, Dean <dbolstad@blm.gov> wrote:
>> Joe,
>> Coincidentally, I just sent an email asking you to send the draft SOPs to the new CAWP Work
>> Group.  Now about 5 minutes later Crystal sends a message from the Board asking for a CAWP
>> update.
>>
>> This seals the deal, we need to get the SOPs to the Board Chair and CAWP work group ASAP.
>>
>> Thanks
>>
>> Dean Bolstad
>> Division Chief, Wild Horse and Burro Program
>> Washington Office (WO-260)
>> (202) 912-7648 Office
>> (775) 750-6362 Cell
>>
>> ---------- Forwarded message ----------
>> From: **Cowan, Crystal** <ccowan@blm.gov>
>> Date: Tue, Apr 5, 2016 at 10:21 AM
>> Subject: CAWP Update for AB book and/or meeitng
>> To: Dean Bolstad <dbolstad@blm.gov>, Holle Hooks <hhooks@blm.gov>, Bryan
>> Fuell <bfuell@blm.gov>, Deborah Collins <dacollin@blm.gov>, Jason Lutterman
>> <jlutterman@blm.gov>
>>
>>
>> Hello,
>>
>> The Board has asked for a CAWP update. Is there one available?
>>
>> If so, we can get it in the book today.
>>
>> Crystal
>>
>> --
>> Crystal Cowan
>> Wild Horse & Burro Specialist
>> Bureau of Land Management
>> 405.234.5938
>> 405.826.3057

--
Crystal Cowan
Wild Horse & Burro Specialist
Bureau of Land Management
405.234.5938
405.826.3057

--
Crystal Cowan
Wild Horse & Burro Specialist
Bureau of Land Management
405.234.5938
405.826.3057

| BLM POCs | Email | Phone |
|----------|-------|-------|
| Dean Bolstad | dbolstad@blm.gov | 202-912-7297 |
| Debbie Collins | dacollin@blm.gov | 405-234-5935 |
| Holle' Hooks | hhooks@blm.gov | 405-790-1066 |
| Sarah Bohl | stbohl@blm.gov | 202-912-7263 |

| | |
|---|---|
| **From:** | Lutterman, Jason W |
| **To:** | Waddell, Holle |
| **Subject:** | Re: Cloud Press Release on Mare Incident |
| **Date:** | Thursday, March 2, 2017 11:46:31 AM |
| **Importance:** | High |

I was in contact with Janet in the lead up, yes. We provided her with information on the gather and future Utah gathers, trying to pitch that Cedar Mtn was a good fertility control program. Didn't make it to their press release it would seem. I haven't yet sent her the response that we don't know how many times these mares were treated...

--
Jason Lutterman
Public Affairs Specialist (On Range)
National Wild Horse and Burro Program
Bureau of Land Management
Office: (775) 861-6614
Mobile: (202) 304-0967

On Thu, Mar 2, 2017 at 9:27 AM, Hooks, Holle <hhooks@blm.gov> wrote:
> Did you respond?
>
> Thank you,
>
> Holle' Waddell | Branch Chief | Division of Wild Horses and Burros |
>
> Bureau of Land Management | 405.579.1860 (O) | 405.579.7102 (F) | hhooks@blm.gov
>
>
> "Vow not to spend time sweating the *"small stuff"* and exerting unnecessary energy on things you cannot control. Instead, **FOCUS** your energy on the things you **CAN** change and improve in your life." - Cheryl Wood
>
> On Thu, Mar 2, 2017 at 11:10 AM, Lutterman, Jason <jlutterman@blm.gov> wrote:
>> Came out yesterday if you didn't catch it:

## BLM VIOLATES OWN WILD HORSE WELFARE STANDARDS

on 01 March 2017.

### *Roundup Incident Sparks Outcry*

**COLORADO SPRINGS, CO** – (Feb. 28,2017) On February 12, the Bureau of Land Management (BLM) conducted a helicopter roundup of wild horses at Cedar Mountain Herd Management Area (HMA) in Utah.  The Cloud Foundation (TCF) and advocates across the

country contend that BLM's actions at the roundup violate standards in their own **Comprehensive Animal Welfare Program (CAWP)**.

Eyewitness, Mosie Trewhitt, a professional horse trainer, photographed the incident of a lone pinto mare being driven by a helicopter. The mare could not keep up with her band but the helicopter kept pushing her. Then a wrangler joined the pursuit and both helicopter and wrangler chased the mare on a dead run along a barbed wire fence line. The wrangler tried to rope her numerous times and was finally successful. The mare lurched and flipped over or tried to jump the fence. She became entangled in the barbed wire, and ended up on the other side of the fence.

The mare escaped, dragging the rope behind her and has not been seen since the incident according to BLM who also contend she was uninjured. Trewhitt's blog, **Voices of the Herd**, documents the incident with vivid photographs. Fears persist that this mare who appears to be pregnant may be strangled by the rope or suffer from infection due to an obvious gash on her right rear leg.

"I've witnessed roundups since 1994 in which inhumane actions were common and often ignored," states Ginger Kathrens, the Executive Director of the Cloud Foundation and the BLM's Humane Advocate on the National Wild Horse and Bureau Advisory Board. "To their credit BLM responded to growing concerns about the inhumane treatment of wild horses and burros during and after roundups by creating the CAWP."

In 2011 BLM began the process of creating humane roundup standards.  The final product, published in 2015, tried to reduce incidents like this.  "Years were spent on this document at considerable expense, but the document does no good if the BLM does not follow or enforce the standards," adds Paula King, TCF Communications Director.

After extensive review, TCF cites the following violations of the CAWP:

1.  **II. Capture Techniques. B Helicopter Drive Trapping, Para.**

**1** *"Regarding helicopter driving, the standards state "the helicopter must be operated using pressure and release methods to herd the animals… and should not repeatedly evoke erratic behavior in the WH&Bs causing injury or exhaustion. "*

2.    **II. Capture Techniques. B Helicopter Drive Trapping, Para. 4** *"When WH&Bs are herded through a fence line en route to the trap, the Lead COR must be notified by the contractor.  The Lead COR must determine the appropriate width of the opening that the fence is let down to allow for safe passage through the opening."*

3.    **II. Capture Techniques. C. Roping, Para.1** *"The roping of any WH&B must be approved prior to the procedure by the Lead COR."*

4.    **II. Capture Techniques. C. Roping, Para.3** *"Ropers should dally the rope to their saddle such that the animals can be brought to a stop as slowly as possible and must not tie the rope hard and fast to the saddle so as to intentionally jerk animals off their feet."*

5.    **Instruction Memorandum No. 2015-151 Policy/Action** *"At all times, the care and treatment provided by the BLM and our contractors should be characterized by compassion and concern for the animal's well-being and welfare needs."*

6.    **Instruction Memorandum 2013-60** *"The Incident Command will ensure that everyone involved in gather operations receives a copy of these expectations prior to the start of the gather and the Lead Cor and all BLM employees present shall ensure that gather operations are conducted in compliance with these expectations."*

7.    **Instruction Memo 20133-59** *"…animal condition and fatigue will be evaluated on a case-by-case basis to determine the number*

*of attempts that can be made to capture the animal.  Animals will not be pursued to a point of exhaustion or distress."*

BLM issued a statement about the account but has made no mention of any disciplinary actions they plan to take against the COR, the helicopter contractor, the wrangler or the BLM staff at the trap.

"Who is responsible? Who was the COR on this operation? Why are contractors not required to comply with standards?  Why is no one held accountable for these abuses?" King asks."This should never have happened.  Responsible parties must be named and held accountable," she concluded.

Eyewitness Trewhitt writes: *"With the impact, the cuts she must have gotten from the barbed wire and the trailing noose around her neck… there is no saying what could happen out there.  I hate to think about it, but we need to understand the consequences of these actions."*

"I have a basic question: what was the reason to endlessly pursue this terrified, pregnant mare to exhaustion?" Kathrens asked.

"This contractor has been rounding up wild horses for nearly 40 years, and should be aware of BLM's humane standards," states Lisa Friday, TCF Board Member who has extensive experience with wild horse herds in Utah. "Their helicopter pilot must have known that the mare was exhausted. Yet he continued the pursuit, and when a wrangler on horseback was dispatched the mare was run some more. This is a clear violation of the CAWP."

"Contractors make millions of dollars at the expense of our beloved wild horse families – and at the expense of the American taxpayers," Kathrens concludes. "They should not be rewarded for this kind of inhumane behavior and we ask that penalties be imposed on those involved."

### 

--
Jason Lutterman
Public Affairs Specialist (On Range)
National Wild Horse and Burro Program
Bureau of Land Management

Office: (775) 861-6614
Mobile: (202) 304-0967

| | |
|---|---|
| **From:** | Bird, Steven W |
| **To:** | Bolstad, Dean O |
| **Cc:** | Waddell, Holle; Shepherd, Alan B |
| **Subject:** | Re: Facility Compliance Inspection On Line Training |
| **Date:** | Wednesday, March 1, 2017 3:49:07 PM |
| **Importance:** | High |

This is perfect thank you Dean.
I will definitely ask Holle and Alan to join in on this.

I am working on the Compliance training and it does include a module on Facility Inspection of an Adopter's facility.
This training will be an online training and I hope to have this completed by the end of this FY, I hope.

Steve Bird
Training Coordinator
Range Program
Wild Horse and Burro Program
Desk: 602-906-5544
BLM National Training Center | 9828 N 31st Ave | Phoenix, AZ  85051
sbird@blm.gov

"The difficult we do daily, the impossible just takes a little more time"

***WHBPS SHARE POINT SITE***

***RANGELAND SHARE POINT SITE***

On Wed, Mar 1, 2017 at 2:33 PM, Bolstad, Dean <dbolstad@blm.gov> wrote:
> Hmmm, I'd like to loop Holle' into this.  We had a contractor develop both SOPs for animal care and facility hardware (corrals, chutes, etc) through our Comprehensive Animal Welfare Program (CAWP).  The contractor also developed a training program that is intended to be an on line training.  We have an IM to issue to implement the SOPs and the requirement for the training.  We'll need your help to cue up the training course.
>
> As far as Pastures and Ecosanctuaries, we again will have SOPs and an eventual training course developed through our CAWP Program course but neither has been started yet.  We need to hire a CAWP Coordinator.
>
> What I've heard discussion of and a need for is to stand up the onld Compliance training that does include a module on Facility Inspection of an Adopter's facility.
>
> The animals at the corral facilities are the responsibility of the Corral Facility Managers who consult with contract vets and occasionally with our APHIS veterinarian.  The animals and facilities at Pastures and Ecosanctuaries are the responsibilities of the Project Inspectors and COR.
>
> I'd like to consult with Holle' and Alan to see if their thoughts on the WHB Program's need are the same as mine.

We are going to assign someone on our staff to work with you to prioritize our program's needs for training. You'll have one contact and won't have to shoot in the dark on our needs.

Stand by until I consult with Alan and Holle'.  This is mostly in Holle's Off-Range Program but Alan supervises two corrals.

Dean Bolstad
Division Chief, Wild Horse and Burro Program
Washington Office (WO-260)
(202) 912-7648 Office
(775) 750-6362 Cell

On Wed, Mar 1, 2017 at 4:12 PM, Bird, Steven <sbird@blm.gov> wrote:

> Dean-
>
> I am working on getting together a "Facility Compliance" On Line Training for Short Term, Long Term and Ecosanctuaries.
>
> This training would be for BLM to be consistent with inspections and reporting wherever we have these types of facilities.
>
> I see this as a "compliance inspection of the Facility" itself and has nothing to do with the health or condition of the animals at the facility.
>
> As I understand, (and I may be wrong) the animals at the facilities are under the purview of the manager of the facility and/or the USGS vet or other vet assigned to the area.
>
>
> Please let me know your thoughts on this.
>
> Thank you
>
>
>
> Steve Bird
> Training Coordinator
> Range Program
> Wild Horse and Burro Program
> Desk: 602-906-5544
> BLM National Training Center | 9828 N 31st Ave | Phoenix, AZ  85051
> sbird@blm.gov
>
> "The difficult we do daily, the impossible just takes a little more time"
>
> *WHBPS SHARE POINT SITE*
>
> *RANGELAND SHARE POINT SITE*

| | |
|---|---|
| **From:** | Collins, Deborah |
| **To:** | Waddell, Holle |
| **Subject:** | Re: having trouble getting text to go through |
| **Date:** | Thursday, April 21, 2016 6:25:56 PM |
| **Importance:** | High |

You got offline before my IM went through We are in AZ and will be there in a few hours.

b(6) ████████████████████████████████

████████████████████ LOL.


**Debbie Collins**
**Bureau of Land Management - National WH&B Program**
**405-234-5935/918-625-5292 - dacollin@blm.gov**
**200 NW 4th St, Room 2401, OKC,OK, 73102**

On Thu, Apr 21, 2016 at 6:22 PM, Hooks, Holle <hhooks@blm.gov> wrote:
> Oh no! I don't know for sure but just checked the SL calendar invite and that name
> is listed in the invitee section.
>
> Thank you,
>
> Holle' Hooks | Branch Chief | Division of Wild Horses and Burros | Bureau of Land Management
>
> | 200 NW 4th Street, Room 2401 Oklahoma City, OK
> 73102 | 405.234.5932 (O) | 405.234.5949 (F) | hhooks@blm.gov
>
>
> "For every positive change you make in your life, something else also changes for the better; it creates a chain
> reaction." - Leon Brown
>
> On Thu, Apr 21, 2016 at 6:19 PM, Collins, Deborah <dacollin@blm.gov> wrote:
>> Sounds good.  Hey isn't the AK SL Eric Geisler? I'm sending out soemthing to the state
>> leads about TIP and BIP and I have forgotten to include AK in past notes.
>>
>>
>> **Debbie Collins**
>> **Bureau of Land Management - National WH&B Program**
>> **405-234-5935/918-625-5292 - dacollin@blm.gov**
>> **200 NW 4th St, Room 2401, OKC,OK, 73102**
>>
>> On Thu, Apr 21, 2016 at 6:14 PM, Hooks, Holle <hhooks@blm.gov> wrote:
>>> Thank you for the feedback. I made some adjustments and believe it flows
>>> better. Discussion is tomorrow, finalizing then uploading.
>>>
>>> Thank you,
>>>
>>> Holle' Hooks | Branch Chief | Division of Wild Horses and Burros | Bureau of Land Management

| 200 NW 4th Street, Room 2401 Oklahoma City, OK
73102 | 405.234.5932 (O) | 405.234.5949 (F) | hhooks@blm.gov

"For every positive change you make in your life, something else also changes for the better; it creates a chain reaction." - Leon Brown

On Thu, Apr 21, 2016 at 4:39 PM, Collins, Deborah <dacollin@blm.gov> wrote:

**Please see my edits and/or questions in blue. I was pretty direct in my edits because I feel we have to make some significant changes in the directives or everything we are trying to move forward with the marketing firm and demand study will be unattainable because we have no other policy to refer them to for implementation. At least the directives are tied to budget. Just my thoughts. See what you think.**

**Off-Range: (Long Term Direction)**
- Maintain and increase partnerships between BLM and private foundations and state and federal prison inmate training programs to train and place more animals into private care through adoptions, sales and transfers; (Are we going to be able to "transfer"  animals to the foundations and prisons now too? I thought that was just for the other state/federal agencies?)
- Utilize the most cost-effective means and methods to maximize placement of animals into private care including the internet, current partnerships and sales program;
- Reduce holding costs by transferring animals from corral facilities (off-range corrals?) to newly acquired, less expensive eco-sanctuaries and private pasture holding contracts (off-range pastures?);
- Implement national comprehensive animal welfare (CAWP) standards for off-range corrals and adoption events, conduct CAWP training and begin internal audits; (Are we going to add anything about the CAWP standards being developed for off-range pastures?) and
- Conduct compliance inspections on untitled animals and respond to public concerns related to animal welfare.

**Program Direction**

- States will continue oversight including inspections and humane care for animals in holding facilities (off-range corrals?) private land eco-sanctuaries.(When I read the last part, I interpret it to say that the States have primary oversight over the eco-sanctuaries again?)
- States with new eco-sanctuary or off-range pasture proposals are directed to support these projects by providing NEPA analysis and public affairs support as requested.(So, just checking. The contract NEPA work is going to be temporary  only.?)
- States should prioritize the most effective satellite adoptions and emphasize facility adoptions, maximize opportunities to place animals into private care and increase participation in the internet events. (This is where I would say the new adoption coordinator will work with the states to identify approved locations and prioritize them. This reads as nothing is going to change. I recommend we prepare a draft schedule with their input and then finalize first quarter of next fiscal year no later than June of each year.and remaining schedule for the next fiscal year no later than September of each year.It really should be a year out, but this is a starting point.)
- States should support all program marketing and advertising efforts for consistent messaging which includes materials involving placement of animals into private care, training and cross promotion of events between offices of jurisdiction/organizations.(I would suggest: States will coordinate with off-range branch outreach specialist and contract marketing firm to coordinate all program marketing and advertising efforts for consistent messaging which

includes materials involving placement of animals into private care, training and cross promotion of events between offices of jurisdiction/organizations. (Could add something that references the use of the marketing funds they receive.)

- States should increase the visibility of opportunities and incentives available to place animals into private care as well as improve the timing of event scheduling for an increase of public awareness.(I would wrap this into bullet #3 because they compliment each other..)
- States should conduct inspections of untitled animals in various training, foster and volunteer programs.
- States should coordinate efforts with the national, state and local organizations to increase adoptions and sales of trained animals and maximize visibility. (I would wrap this into bullet #3 too. They need to understand that the schedule needs to reflect all available opportunities.)
- States should complete available comprehensive animal welfare program training.
- All States should continue working with interested publics, NGOs, private foundations and prison inmate training programs to prepare and place more animals in private care through adoptions and sales. Emphasis should be placed on programs that produce trained animals.(Seems like bullets #7 and #9 are same, just references different list of groups, but overall direction should be the same. We want more trained animals in the pipeline.)
- The NOC will continue providing support for the Wild Horse and Burro Program System (WHBPS) by supplying field user support, training for field users, coordinating system training development through NTC, completing system enhancements and correcting software issues to the database, including the system uploading to the Performance Management Data System. Priorities will be identified by the Project Management Change Board.
- The NOC is responsible for initiating monthly updates from WHBPS to an upload into the Performance Management Data System (PMDS) for designated PEs.
- States are required to enter data for all modules of WHBPS within timeframes outlined in program policy. (Should we reference the current IM# to reinforce this since it continues to be a problem?)
- NTC will coordinate with the WO to initiate the development of program wide training planning.


**Debbie Collins**
**Bureau of Land Management - National WH&B Program**
**405-234-5935/918-625-5292 - dacollin@blm.gov**
**200 NW 4th St, Room 2401, OKC,OK, 73102**

On Thu, Apr 21, 2016 at 3:58 PM, Hooks, Holle <hhooks@blm.gov> wrote:

Please review the following items. I believe I've captured everything. I am currently on a call with Dean and Bryan so just email me your thoughts if you have any edits.


**Off-Range: (Long Term Direction)**
- Maintain and increase partnerships between BLM and private foundations and state and federal prison inmate training programs to train and place more animals into private care through adoptions, sales and transfers;
- Utilize the most cost-effective means and methods to maximize placement of animals into private care including the internet;
- Reduce holding costs by transferring animals from corral facilities

to newly acquired, less expensive eco-sanctuaries and private pasture holding contracts;
● Implement national comprehensive animal welfare (CAWP) standards for off-range corrals and adoption events, conduct CAWP training and begin internal audits; and
● Conduct compliance inspections on untitled animals and respond to public concerns related to animal welfare.


## Program Direction


● States will continue oversight including inspections and humane care for animals in holding facilities and private land eco-sanctuaries.
● States with new eco-sanctuary or off-range pasture proposals are directed to support these projects by providing NEPA analysis and public affairs support as requested.
● States should prioritize the most effective satellite adoptions and emphasize facility adoptions, maximize opportunities to place animals into private care and increase participation in the internet events.
● States should support all program marketing and advertising efforts for consistent messaging which includes materials involving placement of animals into private care, training and cross promotion of events between offices of jurisdiction/organizations.
● States should increase the visibility of opportunities and incentives available to place animals into private care as well as improve the timing of event scheduling for an increase of public awareness.
● States should conduct inspections of untitled animals in various training, foster and volunteer programs.
● States should coordinate efforts with the national, state and local organizations to increase adoptions and sales of trained animals and maximize visibility.
● States should complete available comprehensive animal welfare program training.
● All States should continue working with interested publics, NGOs, private foundations and prison inmate training programs to prepare and place more animals in private care through adoptions and sales. Emphasis should be placed on programs that produce trained animals.
● The NOC will continue providing support for the Wild Horse and Burro Program System (WHBPS) by supplying field user support, training for field users, coordinating system training development through NTC, completing system enhancements and correcting software issues to the database, including the system uploading to the Performance Management Data System. Priorities will be identified by the Project Management Change Board.

- The NOC is responsible for initiating monthly updates from WHBPS to an upload into the Performance Management Data System (PMDS) for designated PEs.
- States are required to enter data for all modules of WHBPS within timeframes outlined in program policy.
- NTC will coordinate with the WO to initiate the development of program wide training planning.

Thank you,

Holle' Hooks │ Branch Chief │ Division of Wild Horses and Burros │ Bureau of Land Management

│ 200 NW 4th Street, Room 2401 Oklahoma City, OK

73102 │ 405.234.5932 (O) │ 405.234.5949 (F) │ hhooks@blm.gov

"For every positive change you make in your life, something else also changes for the better; it creates a chain reaction." - Leon Brown

On Thu, Apr 21, 2016 at 3:53 PM, Collins, Deborah <dacollin@blm.gov> wrote:
You want to forward it to me? I brought my budget stuff with me.

**Debbie Collins**
**Bureau of Land Management - National WH&B Program**
**405-234-5935/918-625-5292 - dacollin@blm.gov**
**200 NW 4th St, Room 2401, OKC,OK, 73102**

**From:**      Bolstad, Dean O
**To:**         Reiland, Michael J
**Cc:**         Waddell, Holle; Shepherd, Alan B; Anna-Maria
**Subject:**   Re: Policy Updates
**Date:**      Wednesday, October 18, 2017 11:18:52 PM
**Importance:** High

All,

My edits are in blue font for the last two bullets.  Unless others have comments, Michael please send this forward.

Thanks, Dean

- **Wild Horse and Burro - Population Inventory and Estimation IM** - This policy update will reinforce BLM's policy to utilize its improved survey methods when inventorying populations within HMAs.  This will improve population gather estimates and help support BLM gather EAs when challenged in court.
- **Wild Horse and Burro - Genetic Baseline Sampling Protocols IM** - This IM will help support the BLM's on the range  wild horse and burro management in regards to genetic health, including supporting the BLM in court cases related to genetic diversity of herds.
- **Wild Horse and Burro Gathers - Internal and External Communicating and Planning IM** - This policy will guide BLM's communication with States and local governments as well the public during planning and execution of gathers.  In addition, it will improve the Program's communication structure within the Bureau itself, so that all levels of the Bureau and the Department will be well-informed on issues related to gathers.
- **Wild Horse and Burro Gathers - Management by Incident Command System IM** - This policy guides BLM's management of its gather operations by clearly identifying the management structure and duties of all personnel involved.
- **Wild Horse and Burro Gathers - Public and Media Management IM** - This policy will improve the BLM's ability to get a consistent and up-to-date message to the media and public in general.
- **Wild Horse and Burro - Gathers Policy Selective Removal Criteria and Management Consideration for Reducing Population Growth Rates using fertility control methods IM** - This policy will reinforce the BLM's policy to treat mares that are returned to the range instead of being removed.  This will help decrease population growth and further support the long-term goal of achieving and maintaining AMLs on all HMAs. Selective removal guidelines will facilitate removal of more adoptable animals to reduce the number of animals in holding.
- **Wild Horse and Burro - Required Timelines and Naming Conventions for Entering Data into the Wild Horse and Burro Program System and Recording/Reporting Requirements for Other Data IM** - This policy will help support the BLM's efforts to produce timely consistent and accurate information to those within the Department, the Bureau, States and local governments, and the public in general.  Along with the Public and Media Management IM, this IM will further the Program's transparency and ensure accuracy.
- **Wild Horse and Burro - Exemption for the Purchase of Promotional Items IM** - This IM supports the BLM in developing a visible brand for Wild Horses and Burros to continue outreach efforts to educate the public on every component of the program.  These promotional items help in marketing the brand to potential customers.
- **Guidance for the Sale of Wild Horses and Burros IM** - This policy update will clarify current practices and provide direction to the program, increasing the BLM's ability to place more animals into private care through the sale program under the current authorities.  This will allow for more animals to leave BLM managed and contracted corrals and into private care, saving the BLM funding that can be used for on-range management actions.
- **Wild Horse and Burro Herd Area and Herd Management Area Data Standard** IM - This policy will help support the BLM's efforts to produce consistent and accurate information to those within the Department, the Bureau, States and local governments, and the public in general.  Along with the Public and Media Management IM, this IM will further the Program's transparency and ensure accuracy.
- **The Bureau of Land Management's (BLM) Partnership with the Mustang Heritage Foundation IM** - This policy will be revised to provide better clarity and direction in working with Mustang Heritage Foundation
- **Wild Horse and Burro Gather Decisions IM** - This IM is meant to identify BLM's NEPA and decision process and timelines to support the logical and systematic removal of animals from HMAs, considering multiple factors from both a local and national perspective.  This will help the BLM both get HMAs to AML and maintain them at AML once achieved.
- **Managing Gathers Resulting from Escalating Problems and Emergency Situations IM** - This IM is meant to identify BLM's decision process to address the management of imperiled animals from HMAs impacted by extreme weather conditions and wildlfire.

**Microchipping IM** - This IM will direct the BLM's initial useof microchips in both on- and off-range actions. Improving the BLM's ability to identify animals, without having to read brands, will help with fertility control treatments as well as sorting of animals within our holding facilities and at adoptions.

- **Comprehensive Animal Welfare Plan (CAWP) for Animal Care at Maintenance at Corrals, Adoptions, Pastures and Transportation.** This IM will establish SOPs, required training and a process for internal and external audits determine if SOPs are adequate ad being adhered to. Humane care and handling is paramount to all program operations. This IM is a companion to the already issued WHB Gather CAWP IM.
- **Standard Operating Procedures for Contraceptive Vaccine Darting IM** - This IM will establish the required training; vaccine storage and mixing protocols; required equipment, and safety protocols to guide field darting operations for the application contraceptive vaccines via field darting.


Dean Bolstad
Division Chief, Wild Horse and Burro Program
Washington Office (WO-260)
(202) 912-7648 Office
(775) 750-6362 Cell

On Wed, Oct 18, 2017 at 5:45 PM, Reiland, Michael <mreiland@blm.gov> wrote:
Ok, here's the "final" product. Still have questions on the bottom two. Let me know if I missed anything.

- **Wild Horse and Burro - Population Inventory and Estimation IM** - This policy update will reinforce BLM's policy to utilize its improved survey methods when inventorying populations within HMAs. This will improve population gather estimates and help support BLM gather EAs when challenged in court.
- **Wild Horse and Burro - Genetic Baseline Sampling Protocols IM** - This IM will help support the BLM's on the range wild horse and burro management in regards to genetic health, including supporting the BLM in court cases related to genetic diversity of herds.
- **Wild Horse and Burro Gathers - Internal and External Communicating and Planning IM** - This policy will guide BLM's communication with States and local governments as well the public during planning and execution of gathers. In addition, it will improve the Program's communication structure within the Bureau itself, so that all levels of the Bureau and the Department will be well-informed on issues related to gathers.
- **Wild Horse and Burro Gathers - Management by Incident Command System IM** - This policy guides BLM's management of its gather operations by clearly identifying the management structure and duties of all personnel involved.
- **Wild Horse and Burro Gathers - Public and Media Management IM** - This policy will improve the BLM's ability to get a consistent and up-to-date message to the media and public in general.
- **Wild Horse and Burro - Gathers Policy Selective Removal Criteria and Management Consideration for Reducing Population Growth Rates using fertility control methods IM** - This policy will reinforce the BLM's policy to treat mares that are returned to the range instead of being removed. This will help decrease population growth and further support the long-term goal of achieving and maintaining AMLs on all HMAs. Selective removal quidelines will facilitate removal of more adoptable animals to reduce the number of animals in holding.
- **Wild Horse and Burro - Required Timelines and Naming Conventions for**

**Entering Data into the Wild Horse and Burro Program System and Recording/Reporting Requirements for Other Data IM** - This policy will help support the BLM's efforts to produce timely consistent and accurate information to those within the Department, the Bureau, States and local governments, and the public in general.  Along with the Public and Media Management IM, this IM will further the Program's transparency and ensure accuracy.

- **Wild Horse and Burro - Exemption for the Purchase of Promotional Items IM** - This IM supports the BLM in developing a visible brand for Wild Horses and Burros to continue outreach efforts to educate the public on every component of the program. These promotional items help in marketing the brand to potential customers.
- **Guidance for the Sale of Wild Horses and Burros IM** - This policy update will clarify current practices and provide direction to the program, increasing the BLM's ability to place more animals into private care through the sale program under the current authorities.  This will allow for more animals to leave BLM managed and contracted corrals and into private care, saving the BLM funding that can be used for on-range management actions.
- **Wild Horse and Burro Herd Area and Herd Management Area Data Standard IM** - This policy will help support the BLM's efforts to produce consistent and accurate information to those within the Department, the Bureau, States and local governments, and the public in general.  Along with the Public and Media Management IM, this IM will further the Program's transparency and ensure accuracy.
- **The Bureau of Land Management's (BLM) Partnership with the Mustang Heritage Foundation IM** - This policy will be revised to provide better clarity and direction in working with Mustang Heritage Foundation
- **Wild Horse and Burro Gather Decisions IM** - This IM is meant to identify BLM's NEPA and decision process and timelines to support the logical and systematic removal of animals from HMAs, considering multiple factors from both a local and national perspective.  This will help the BLM both get HMAs to AML and maintain them at AML once achieved.
- **Managing Gathers Resulting from Escalating Problems and Emergency Situations IM** - This IM is meant to identify BLM's decision process to address the management of imperiled animals from HMAs impacted by extreme weather conditions and wildlfire.
- **Microchipping IM** - This IM will direct the BLM's initial useof microchips in both on- and off-range actions.  Improving the BLM's ability to identify animals, without having to read brands, will help with fertility control treatments as well as sorting of animals within our holding facilities and at adoptions.
- **SOP's for Adoption, Transportation, and Corrals IM** – Is this one IM, multiple IMs?
- **SOP for Darting IM** – Why isn't this included with the fertility control IM above?

Thanks,

Michael

On Wed, Oct 18, 2017 at 1:18 AM, Waddell, Holle <hwaddell@blm.gov> wrote:

Michael - Please see my edits in red:

- **Wild Horse and Burro - Required Timelines and Naming Conventions for Entering Data into the Wild Horse and Burro Program System and Recording/Reporting Requirements for Other Data IM** - This policy will support the BLM's efforts to produce consistent, timely and accurate information to those within the Department, the Bureau, States and local governments, and the public in general.  Along with the Public and Media Management IM, this IM will further the Program's transparency and ensure accuracy.
- **Wild Horse and Burro - Exemption for the Purchase of Promotional Items IM** - This IM supports the BLM in developing a visible brand for Wild Horses and Burros to continue outreach efforts to educate the public on every component of the program. These promotional items help in marketing the brand to potential customers.
- **Guidance for the Sale of Wild Horses and Burros IM** - This policy update will clarify current practices and provide direction to the program, increasing BLM's ability to place more animals into private care through the sale program under the current authorities.  This will allow for more animals to leave BLM managed and contracted corrals and into private care, saving the BLM funding that can be used for on-range management actions.
- **The Bureau of Land Management's (BLM) Partnership with the Mustang Heritage Foundation IM** - This policy will be revised to provide direction in working with Mustang Heritage Foundation.
- **Requirements for Selection of Wild Horses for Mustang Heritage Foundation Competitive Events IM** - ?? Why is this separate to the other MHF IM? THIS CAN BE DELETED

These are the new IMs on our list, but I'm not sure these are all IMs

- SOP's for adoption, transportation, and corrals - CAWP policy
- Sales without limitations - As discussed, we are not including this.
- Euthanasia without limitations - As discussed we are not including this.
- Research and form for proposals - Is this an IM?
- Fertility Control SOP - Isn't this included within the IM above?
- ORC/ORP updates - Are these current IMs? This I am not sure of...REMOVE for now
- SOP for darting - Why isn't this included in the Fertility Control IM?
- Feeding - Is this an IM? This I am not sure of...REMOVE for now
- Viewing distances - Not sure what this one is actually about viewing what? This I am not sure of...REMOVE for now
- Bio-security -  Not sure what this one is actually about? A plan at off-range corrals and pastures. Scott and Al are vetting out. REMOVE for now
- Firearms Authorization - I thought there was little support for this at the State level.  Are we pushing for it any way? Yes however can be removed for now

Thank you,

Holle' Waddell ⎪ Branch Chief ⎪ Division of Wild Horses and Burros ⎪

Bureau of Land Management ⎪ 405.579.1860 (O) ⎪ 405.579.7102 (F) ⎪ hwaddell@blm.gov

"A positive outlook, regardless of how bleak the circumstances may look, is a **CHOICE**. Each day, start by shifting your thoughts to develop and demonstrate an internal gratitude for all blessings you have. When you shift your thoughts, your actions will follow suit and you will begin to create the reality you desire." - Cheryl Wood



On Tue, Oct 17, 2017 at 10:09 PM, Reiland, Michael <mreiland@blm.gov> wrote:
To All:

Here's the updated list:

- **Wild Horse and Burro - Population Inventory and Estimation IM** - The outcome of this policy update will reinforce BLM's actions on populations witihin HMAs.  This will improve gather removal estimates and help support BLM gather EAs when challenged in court.
- **Wild Horse and Burro - Genetic Baseline Sampling Protocols IM** - This IM will help support the BLM's research efforts related to wild horse and burro management, including supporting the BLM in court cases related to genetic diversity of herds.
- **Wild Horse and Burro Gathers - Internal and External Communicating and Planning IM** - This policy will help support BLM's ability to communicate with States and local governments during planning for gathers.  In addition, it will improve the Program's communication structure within the Bureau itself, so that all levels of the Bureau and the Department will be well-informed on issues related to gathers.
- **Wild Horse and Burro Gathers - Management by Incident Command System IM** - ??
- **Wild Horse and Burro Gathers - Public and Media Management IM** - This policy will improve the BLM's ability to get a consistent and up-to-date message to the media and public in general.
- **Wild Horse and Burro - Gathers Policy Selective Removal Criteria and Management Consideration for Reducing Population Growth Rates using fertility control methods IM** - This policy will help reinforce the BLM's policy to treat mares gathered, but returned to the range instead of removed.  This will help decrease population growth and further support the long-term goal of achieving AML on all HMAs.
- **Wild Horse and Burro - Required Timelines and Naming Conventions for Entering Data into the Wild Horse and Burro Program System and Recording/Reporting Requirements for Other Data IM** - This policy will help support the BLM's efforts to produce consistent and accurate information to those within the Department, the Bureau, States and local governments, and the public in general.  Along with the Public and Media Management IM, this IM will further the Program's transparency and ensure accuracy.
- **Wild Horse and Burro - Exemption for the Purchase of Promotional Items IM** - This IM supports the BLM in developing a visible brand for Wild Horses and Burros.  It is important that for both the educational and private care placement portions of the program.  These promotional items help in marketing the brand to potential customers.
- **Guidance for the Sale of Wild Horses and Burros IM** - This policy update is meant to increase the BLM's ability to place more animals into private care through the sale program under the current authorities.  This will allow for more animals to leave BLM managed and contracted corrals and into private care, saving the BLM funding that can be used for on-range management actions.
- **Wild Horse and Burro Herd Area and Herd Management Area Data Standard** - This policy will help support the BLM's efforts to produce consistent and accurate information to those within the Department, the Bureau, States and local governments, and the public in general.  Along with the Public and Media Management IM, this IM will further the Program's transparency and ensure accuracy.
- **The Bureau of Land Management's (BLM) Partnership with the Mustang Heritage Foundation IM** - ??
- **Wild Horse and Burro Gather Decisions** - This IM is meant to further support the logical and systematic removal of animals from HMAs, considering multiple factors from both a local and national perspective.  This will help the BLM both get HMAs to AML and maintain them at AML once achieved.
- **Requirements for Selection of Wild Horses for Mustang Heritage Foundation Competitive Events IM** - ?? Why is this separate to the other MHF IM?
- **Managing Gathers Resulting from Escalating Problems and Emergency**

**Situations IM** - ?? Probably similar to the "Gather Decisions" IM?
- **Microchipping IM** - This IM will help the BLM in initially testing the uses of microchips in both on- and off-range actions. Improving the BLM's ability to identify animals without having to read brands. This can help with fertility control treatments as well as sorting and adoptions.

These are the new IMs on our list, but I'm not sure these are all IMs

- SOP's for adoption, transportation, and corrals - Is this an IM?
- Sales without limitations - As discussed, we are not including this.
- Euthanasia without limitations - As discussed we are not including this.
- Research and form for proposals - Is this an IM?
- Fertility Control SOP - Isn't this included within the IM above?
- ORC/ORP updates - Are these current IMs?
- SOP for darting - Why isn't this included in the Fertility Control IM?
- Feeding - Is this an IM?
- Viewing distances - Not sure what this one is actually about viewing what?
- Bio-security - Not sure what this one is actually about?
- Firearms Authorization - I thought there was little support for this at the State level. Are we pushing for it any way?

Thanks

Michael

On Tue, Oct 17, 2017 at 2:52 PM, Reiland, Michael <mreiland@blm.gov> wrote:
Alan/Holle,

Please see below. I have tried to explain why these IMs are important to the BLM. Please take a look and let me know if you would like to add/change anything. There are two that I'm not sure about exactly. And one that we probably shouldn't include in any list for now.

- **Wild Horse and Burro - Population Inventory and Estimation IM** - The outcome of this policy update will reinforce BLM's actions on populations witihin HMAs. This will improve gather removal estimates and help support BLM gather EAs when challenged in court.
- **Wild Horse and Burro - Genetic Baseline Sampling Protocols IM** - This IM will help support the BLM's research efforts related to wild horse and burro management, including supporting the BLM in court cases related to genetic diversity of herds.
- **Wild Horse and Burro Gathers - Internal and External Communicating and Planning IM** - This policy will help support BLM's ability to communicate with States and local governments during planning for gathers. In addition, it will improve the Program's communication structure within the Bureau itself, so that all levels of the Bureau and the Department will be well-informed on issues related to gathers.
- **Wild Horse and Burro Gathers - Management by Incident Command**

System IM - ??
- **Wild Horse and Burro Gathers - Public and Media Management IM** - This policy will improve the BLM's ability to get a consitent and up-to-date message to the media and public in general.
- **Wild Horse and Burro - Gathers Policy Selective Removal Criteria and Management Consideration for Reducing Population Growth Rates using fertility control methods IM** - This policy will help reinforce the BLM's policy to treat mares gathered, but returned to the range instead of removed. This will help decrease population growth and further support the long-term goal of achieving AML on all HMAs.
- **Wild Horse and Burro - Required Timelines and Naming Conventions for Entering Data into the Wild Horse and Burro Program System and Recording/Reporting Requirements for Other Data IM** - This policy will help support the BLM's efforts to produce consistent and accurate information to those within the Department, the Bureau, States and local governments, and the public in general.  Along with the Public and Media Management IM, this IM will further the Program's transparency and ensure accuracy.
- **Wild Horse and Burro - Guidance for the Sale and Euthanasia of Wild Horses and Burros IM** - Should we really be including this in this list at this point?
- **Wild Horse and Burro - Exemption for the Purchase of Promotional Items IM** - ??

Thanks,

--
Michael Reiland
WO-260 Budget-Analyst
202-912-7261
202-794-2479

--
Michael Reiland
WO-260 Budget-Analyst
202-912-7261
202-794-2479

--
Michael Reiland
WO-260 Budget-Analyst
202-912-7261
202-794-2479

| | |
|---|---|
| **From:** | Shepherd, Alan B |
| **To:** | Kane, Albert J - APHIS |
| **Cc:** | Waddell, Holle; Warr, Victor (Gus) A; Neill, John J; Fluer, Scott L; Stratton, Joseph A; Easley, Anna-Maria |
| **Subject:** | Re: UPDATE: WHB IMs |
| **Date:** | Monday, January 29, 2018 4:54:12 PM |
| **Importance:** | High |

CAWP Policy IM for Gather has been extended a couple times and currently expires in Sept 2018

Thanks,
Alan

Alan Shepherd
Acting Division Chief (WO260)
National WH&B Program
20 M St SE
Washington, DC 20003

Office #: (202) 912-7648
Cell #: (775) 530-2784

email: ashepher@blm.gov
http://www.blm.gov/programs/wild-horse-and-burro

On Mon, Jan 29, 2018 at 5:43 PM, Kane, Albert J - APHIS <Albert.J.Kane@aphis.usda.gov> wrote:

> I might have missed it but I didn't see these on the Directorate list of will do by end of FY2018:
>
> IM No. 2015-070,  Animal Health, Maintenance, Evaluation and Response, expires 9/30/18
>
> We discussed breaking this into 2 IMs. As mentioned I think we should name them as Follows:
>
> IM No. 2018 - ###, Euthanasia of Wild Horses and Burros Related to Acts of Mercy, Health and Safety
>
> And
>
> IM No. 2018-###, Animal Health, Maintenance and Evaluation
>
> (this would need to be reworked to include Henneke evaluation as a stand-alone procedure … maybe needed because not everyone does it the same way …)

Also didn't see

IM No. 2013-059, Wild Horse and Burro Gathers: Comprehensive Animal Welfare Policy expired 9/30/2014

Which is referenced as a companion to the CAWP IM for facilities, adoptions and transportation


FWIW

_____

--------

Albert Kane, DVM, MPVM, PhD (epi)

Advisor, APHIS/BLM WH&B Partnership

USDA APHIS Veterinary Services

2150 Centre Ave, Bldg B, MS 2E6

Ft Collins, CO 80526-8117

PH O: (970) 494-7234    Gov C: (970) 219-2409


**From:** Google Calendar [mailto:calendar-notification@google.com] **On Behalf Of** hwaddell@blm.gov
**Sent:** Monday, January 29, 2018 3:24 PM
**To:** gwarr@blm.gov; jneill@blm.gov; sfluer@blm.gov; jstratto@blm.gov; ashepher@blm.gov; ameasley@blm.gov; mkueck@blm.gov; Kane, Albert J - APHIS <Albert.J.Kane@aphis.usda.gov>; jlutterman@blm.gov; bwade@blm.gov; dacollin@blm.gov; pgriffin@blm.gov
**Subject:** UPDATE: WHB IMs


Hello all and thanks to everyone that participated during today's IM update/discussion. We have a large task ahead of us and by now you should have received the "Priority" IMs from Alan that are expected to be completed, meaning approved, by September 30, 2018.

As discussed, drafts of IMs you are leading are to be completed and ready for circulation by April 1, 2018. I will send the IM template received October 2017 by Robert WIlliams, BLM

directives staff, to all as well. Remember Anna-Maria will be the POC for the directives/IM process so feel free to reach out to her with any questions.

---

**UPDATE: WHB IMs**

Hello all! As previously stated, the program is in the process of updating/revising/developing guidance. The attached list identifies the IMs, who has been assigned to lead the effort and due dates. We will be discussing the following:
* Status Updates re: IMs you are leading
* Tentative dates (Due Dates)
* Questions on what is needed
* Next steps

| | |
|---|---|
| When | Mon Jan 29, 2018 2pm – 3:30pm Central Time |
| Where | Conference Line: 877.973.6205 Passcode: 9821164# (map) |
| Video call | https://plus.google.com/hangouts/_/doi.gov/hwaddell |
| Who | • hwaddell@blm.gov - organizer |
| | • jlutterman@blm.gov |
| | • gwarr@blm.gov |
| | • dacollin@blm.gov |
| | • pgriffin@blm.gov |
| | • ashepher@blm.gov |
| | • bwade@blm.gov |
| | • mkueck@blm.gov |
| | • ameasley@blm.gov |
| | • jstratto@blm.gov |
| | • albert.j.kane@aphis.usda.gov |
| | • jneill@blm.gov |
| | • sfluer@blm.gov |
| Attachments | WHB_IMs_LIST_Spread by Branch_2018.01.18.xlsx |

---

This electronic message contains information generated by the USDA solely for the

intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

**EXHIBIT E**

 

# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Washington, D.C.  20240
http://www.blm.gov

*July 22, 2025*

*In Reply Refer To:*
1278-FOIA (640)
FOIA# 2019-001585

Via email: laura@wildhorseeducation.org

Wild Horse Education (WHE)
Laura Leigh
216 Lemmon Dr
Reno, NV 89506

Dear Ms. Leigh:

This letter is a supplemental response to your Freedom of Information Act (FOIA) request, dated September 28, 2019. The tracking number is 2019-001585. In your letter, you asked for the following:

> "Any and all correspondence, meeting notes, telephone records, operation evaluation sheets, pertaining to the evaluation, training, proposed changes, effectiveness of the Comprehensive Animal Welfare Policy (CAWP)."

For this final response, BLM is providing 21 pages which is determined to be responsive to your request. We are providing (15) pages which are being released in full. Additionally, (6) pages are withheld in part, under Exemption 5 of the FOIA.

Exemption 5 allows an agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party ... in litigation with the agency."  5 U.S.C. § 552(b)(5).  Exemption 5 therefore incorporates the privileges that protect materials from discovery in litigation, including the deliberative process, attorney work-product, attorney-client, and commercial information privileges.  We are withholding the requested record in full under Exemption 5 because it qualifies to be withheld both because it meets the Exemption 5 threshold of being inter-agency or intra-agency and under the following privilege.

*Deliberative Process Privilege*

The deliberative process privilege protects the decision-making process of government agencies and encourages the frank exchange of ideas on legal or policy matters by ensuring agencies are not forced to operate in a fishbowl.  A number of policy purposes have been attributed to the

deliberative process privilege, such as: (1) assuring that subordinates will feel free to provide the decisionmaker with their uninhibited opinions and recommendations; (2) protecting against premature disclosure of proposed policies; and (3) protecting against confusing the issues and misleading the public.

The deliberative process privilege protects materials that are both predecisional and deliberative. The privilege covers records that reflect the give-and-take of the consultative process and may include recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency.

The materials that have been withheld under the deliberative process privilege of Exemption 5 are both predecisional and deliberative. They do not contain or represent formal or informal agency policies or decisions. They are the result of frank and open discussions among employees of the Department of the Interior. Their contents have been held confidential by all parties and public dissemination of this information would expose the agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine its ability to perform its mandated functions.

The deliberative process privilege does not apply to records created 25 years or more before the date on which the records were requested.

If you have any questions regarding this request, please contact Kenneth Perry, BLM Government Information Specialist, at (720) 281-1649 or via email at BLM_WO_FOIA@blm.gov.

Sincerely,
Ryan Witt
FOIA Officer
Bureau of Land Management

## Please Review! IM for CAWP Gathers

### Easley, Anna Maria <ameasley@blm.gov>
Tue 3/27/2018 1:21 PM

**To:** Dumas, Amy <adumas@blm.gov>; Robbins, Christopher L <clrobbins@blm.gov>; Warr, Victor (Gus) A <gwarr@blm.gov>; Bertola, Jerrie A <jbertola@blm.gov>; Wendlandt, June A <jwendlan@blm.gov>; Johnson, Krystal F <kfjohnso@blm.gov>; Lovec, Laria J <llovec@blm.gov>; Williams, Pat B <pbwillia@blm.gov>; Sharp, Robert N <rsharp@blm.gov>; Hopper, Robert G <rhopper@blm.gov>; Thompson, Ruth A <rthompso@blm.gov>; Smith, Benjamin D <bdsmith@blm.gov>; Hall, John A <JAHall@blm.gov>; Axtell, John D <jaxtell@blm.gov>; Leonard, Stephen P <sleonard@blm.gov>; Neill, John J <jneill@blm.gov>; Stratton, Joseph A <jstratto@blm.gov>; Shepherd, Alan B <ashepher@blm.gov>; Al Kane <albert.j.kane@aphis.usda.gov>; Waddell, Holle <hwaddell@blm.gov>

📎 2 attachments (1 MB)

TempIM GatherCAWP.docx; TempIM GatherCAWPstandards.pdf;

Good afternoon!

Attached, please find the updated IM for CAWP for WHB Gathers. (I've included the referenced CAWP Standards, but unless there are major changes, the Standards will not be updated at this time, just the IM). Please share with appropriate BLM staff and provide consolidated, substantive comments in track changes to me by April 11th. I will assume you think it's perfect if I don't receive comments!

Please respect this is a draft, internal working document and not appropriate for public distribution at this time.

Please let me know if you have any questions.


Thanks!
Anna Maria

Sr. Wild Horse and Burro Specialist
DOI   Bureau of Land Management
Washington, DC
WO   260
O: 202.912.7296

*Internal Working Document – Not for Distribution*



## United States Department of the Interior

**BUREAU OF LAND MANAGEMENT**
Washington, D.C.  20240
https://www.blm.gov



Signature Date

In Reply Refer To:
4720 (260) P

**Permanent Instruction Memorandum No. 2018-XXX**

Commented [TRA1]: b(5) DPP ████████
██████████████

To:         All Field Office Officials (except Alaska)

From:       Assistant Director, Resources and Planning

Subject:    Comprehensive Animal Welfare Program for Wild Horse and Burro Gathers

**Program Area:** Wild Horse and Burro Program

**Purpose:** b(5) DPP ████████████████████
████████████████████████
████████████████████

████████████████████████    Commented [TRA2]: b(5) DPP ████████
██████████████                                    ████████████
███████████                                       Commented [ame3]: b(5) DPP ██████

████████████████████

■ ████████████████████████
████████████████████████
████████████████████████
████████████                 Commented [ame4]: b(5) DPP ████████

■ ████████████████████████
████████████████████████

■ ████████████████████████
████████████████████        Commented [ame5]: b(5) DPP ████████



*Internal Working Document – Not for Distribution*

b(5) DPP

**Pages of Manual/ Handbook Sections Affected:**  None.

**Instruction Memorandums Affected:** This IM supersedes IM No. 2015-151.

**Contact:** XXXXXX, On-Range Branch Chief, Wild Horse and Burro Program at 775-861-6611.

_____
Signing Official Name
Directorate (**NOTE:** If the signing official is acting, please include "Acting" before the position title.)

Attachment
(Title of attachment and number of pages- i.e., 1p)

Attachment 1 – CAWP Gather Standards? Fix typos?
Attachment 2 – screen shots…still applicable? Need updating?

> **Commented [ame8]:** Are these still applicable or need updating?

## Re: CAWP - Gathers IM

**Thompson, Ruth A <rthompso@blm.gov>**

Mon 3/19/2018 9:31 AM

**To:** Easley, Anna-Maria <ameasley@blm.gov>
**Cc:** Shepherd, Alan B <ashepher@blm.gov>; Al Kane <albert.j.kane@aphis.usda.gov>; Warr, Victor (Gus) A <gwarr@blm.gov>; Stratton, Joseph A <jstratto@blm.gov>

📎 2 attachments (1 MB)
PermIM CAWP 3 19 18.docx; PermIM CAWP Atmt1 3 19 18 2.pdf;

Anna Maria,

Attached are my comments

On Thu, Mar 1, 2018 at 3:03 PM, Easley, Anna-Maria <ameasley@blm.gov> wrote:
> Good afternoon!
>
> I'd like to get some of your suggestions on this IM before it goes out to the group for review. I've made some initial edits and added some questions in the margin, but I don't know the history. I'll be gone the next 2 weeks, but if you could review during that time, I'll set up a conference call when I get back for further discussions. We have a month before it's scheduled to go to the group.
>
> Thanks for your help!
> Anna-Maria
>
> Sr. Wild Horse and Burro Specialist
> DOI - Bureau of Land Management
> Washington, DC
> WO - 260
> O: 202.912.7296

--
*Winter is coming*

## RE: CAWP - Gathers IM

### Kane, Albert J    APHIS <Albert.J.Kane@aphis.usda.gov>

Tue 3/20/2018 12:17 PM

**To:** Easley, Anna-Maria <ameasley@blm.gov>
**Cc:** Warr, Victor (Gus) A <gwarr@blm.gov>; Thompson, Ruth A <rthompso@blm.gov>; Shepherd, Alan B <ashepher@blm.gov>; Stratton, Joseph A <jstratto@blm.gov>

🔗 1 attachments (751 KB)

PermIM CAWP AJKcomments.docx;

See attached ... mostly just delete references to audits and the Assessment Tool ...

----------------------------------------
Albert Kane, DVM, MPVM, PhD (epi)
Advisor, APHIS/BLM WH&B Partnership
USDA APHIS Veterinary Services
2150 Centre Ave, Bldg B, MS 2E6
Ft Collins, CO 80526-8117
PH O: (970) 494-7234    Gov C: (970) 219-2409


**From:** Easley, Anna-Maria [mailto:ameasley@blm.gov]
**Sent:** Tuesday, March 20, 2018 12:52 PM
**To:** Kane, Albert J - APHIS <Albert.J.Kane@aphis.usda.gov>
**Cc:** Warr, Victor (Gus) <gwarr@blm.gov>; Thompson, Ruth <rthompso@blm.gov>; Alan Shepherd <ashepher@blm.gov>; Joseph Stratton <Joe_Stratton@blm.gov>
**Subject:** Re: CAWP - Gathers IM

Al and Joe,

If you could incorporate all your comments as track changes, I'll consolidate and send back to this group and we might not need a phone discussion. Making it temporary vs permanent is little more than adding an expiration date, so consider that done. I'm serving as the blind shepherd on this one, so please make it awesome and then I'll send it out to everyone else next week!

Thanks for your help!
Anna-Maria


On Tue, Mar 20, 2018 at 1:47 PM, Kane, Albert J - APHIS <Albert.J.Kane@aphis.usda.gov> wrote:

> I think revision of the "Standards" document is beyond the scope of renewing the IM. Most of the changes I
> see highlighted are minor, mostly discretionary, grammatical things so I don't really think it needs any changes.
> My impression is reissuing the IM is to say gathers must follow the CAWP standards ... not a chance to redo the
> standards. Rewriting the standards would be a larger part of the CAWP itself and should only be after initial
> audits and review by the same type of team we had when we wrote the standards. If I'm wrong then we can
> certainly discuss and/or fix things that have been brought up as a problem, but I'm not really interested in
> rehashing the details just because the IM is being reissued?

At this point I'd like to know if the field has any major problems with the Standards before we even think of making changes.

So is a call needed? I don't know …

--------------------------------------
Albert Kane, DVM, MPVM, PhD (epi)
Advisor, APHIS/BLM WH&B Partnership
USDA APHIS Veterinary Services
2150 Centre Ave, Bldg B, MS 2E6
Ft Collins, CO 80526-8117
PH O: (970) 494-7234    Gov C: (970) 219-2409

**From:** Easley, Anna-Maria [mailto:ameasley@blm.gov]
**Sent:** Tuesday, March 20, 2018 11:35 AM
**To:** Warr, Victor (Gus) <gwarr@blm.gov>
**Cc:** Thompson, Ruth <rthompso@blm.gov>; Alan Shepherd <ashepher@blm.gov>; Kane, Albert J - APHIS <Albert.J.Kane@aphis.usda.gov>; Joseph Stratton <Joe_Stratton@blm.gov>
**Subject:** Re: CAWP - Gathers IM

Great, thanks for your comments!  I would like to try to stay on-track and send it to everyone next week, so I'll send out a meeting invite for a follow-up discussion shortly.

Thanks for your help!
Anna-Maria

On Tue, Mar 20, 2018 at 11:21 AM, Warr, Victor (Gus) <gwarr@blm.gov> wrote:

> OK ... I'm the last to get my preliminary comments in on this IM - sorry.  I've attached a the draft IM with a few edits and comments.
>
> I did not edit the PDF Standards document.  There is a bunch of highlighted stuff that I don't understand what has been done there. Maybe we will get on a call to discuss. ???
>
> I agree with the comments about not being a permanent IM, and taking out the assessment tool sections.
>
> Anna-Maria - I'm out all of next week for a call, but will participate if we can find a time to discuss.  I didn't send this out to the entire WO-260 group.  Are you still trying to have this going out to the States on the 28th of March? Per your Excel spreadsheet schedule.

On Mon, Mar 19, 2018 at 10:31 AM, Thompson, Ruth <rthompso@blm.gov> wrote:

> Anna Maria,
>
> Attached are my comments
>
> On Thu, Mar 1, 2018 at 3:03 PM, Easley, Anna-Maria  ameasley@blm.gov  wrote:
>
>> Good afternoon!
>>
>> I'd like to get some of your suggestions on this IM before it goes out to the group for review.
>> I've made some initial edits and added some questions in the margin, but I don't know the
>> history.  I'll be gone the next 2 weeks, but if you could review during that time, I'll set up a
>> conference call when I get back for further discussions.  We have a month before it's scheduled
>> to go to the group.
>>
>> Thanks for your help!
>> Anna-Maria
>>
>> Sr. Wild Horse and Burro Specialist
>> DOI - Bureau of Land Management
>> Washington, DC
>> WO - 260
>> O: 202.912.7296
>
>
> --
> *Winter is coming*

--
**Thanks~**
**/gus**

Wild Horse & Burro Specialist / Utah WH&B Program Manager
BLM-Utah State Office (UT-933)
440 W. 200 S., Suite 500 -Salt Lake City, Utah  84101-1345

Desk:  801.539.4057
Cell:    801.824.1632
Fax:     801.539.4074
gwarr@blm.gov
https://www.blm.gov/programs/wild-horse-and-burro

--

Thanks!
Anna-Maria

Sr. Wild Horse and Burro Specialist
DOI - Bureau of Land Management
Washington, DC
WO - 260
O: 202.912.7296

This electronic message contains information generated by the USDA solely for the intended
recipients. Any unauthorized interception of this message or the use or disclosure of the information it
contains may violate the law and subject the violator to civil or criminal penalties. If you believe you
have received this message in error, please notify the sender and delete the email immediately.

--
Thanks!
Anna-Maria

Sr. Wild Horse and Burro Specialist
DOI - Bureau of Land Management
Washington, DC
WO - 260
O: 202.912.7296

## Re: CAWP - Gathers IM

### Easley, Anna Maria <ameasley@blm.gov>

Fri 3/23/2018 8:59 AM

**To:** Stratton, Joseph A <jstratton@blm.gov>
**Cc:** Kane, Albert J - APHIS <Albert.J.Kane@aphis.usda.gov>; Warr, Victor (Gus) A <gwarr@blm.gov>; Thompson, Ruth A <rthompso@blm.gov>; Shepherd, Alan B <ashepher@blm.gov>; Stratton, Joseph A <jstratto@blm.gov>

📎 1 attachments (748 KB)
TempIM GatherCAWP.docx;

Good morning everyone!

I've incorporated your feedback.  Please take one more quick look and make sure you love it before I send it out to everyone else next week.

Thanks for your help!
Anna-Maria

On Wed, Mar 21, 2018 at 11:50 AM, Stratton, Joseph <jstratto@blm.gov> wrote:
> I agree with Al's edits. joe

> On Tue, Mar 20, 2018 at 2:17 PM, Kane, Albert J - APHIS <Albert.J.Kane@aphis.usda.gov> wrote:

>> See attached ... mostly just delete references to audits and the Assessment Tool ...

>> ----------------------------------------
>> Albert Kane, DVM, MPVM, PhD (epi)
>> Advisor, APHIS/BLM WH&B Partnership
>> USDA APHIS Veterinary Services
>> 2150 Centre Ave, Bldg B, MS 2E6
>> Ft Collins, CO 80526-8117
>> PH O: (970) 494-7234    Gov C: (970) 219-2409

>> **From:** Easley, Anna-Maria [mailto:ameasley@blm.gov]
>> **Sent:** Tuesday, March 20, 2018 12:52 PM
>> **To:** Kane, Albert J - APHIS <Albert.J.Kane@aphis.usda.gov>
>> **Cc:** Warr, Victor (Gus) <gwarr@blm.gov>; Thompson, Ruth <rthompso@blm.gov>; Alan Shepherd

<<u>ashepher@blm.gov</u>>; Joseph Stratton <<u>Joe_Stratton@blm.gov</u>>
**Subject:** Re: CAWP - Gathers IM

Al and Joe,

If you could incorporate all your comments as track changes, I'll consolidate and send back to this group and we might not need a phone discussion. Making it temporary vs permanent is little more than adding an expiration date, so consider that done. I'm serving as the blind shepherd on this one, so please make it awesome and then I'll send it out to everyone else next week!

Thanks for your help!

Anna Maria

On Tue, Mar 20, 2018 at 1:47 PM, Kane, Albert J - APHIS <<u>Albert.J.Kane@aphis.usda.gov</u>> wrote:

> I think revision of the "Standards" document is beyond the scope of renewing the IM. Most of the changes I see highlighted are minor, mostly discretionary, grammatical things so I don't really think it needs any changes. My impression is reissuing the IM is to say gathers must follow the CAWP standards ... not a chance to redo the standards. Rewriting the standards would be a larger part of the CAWP itself and should only be after initial audits and review by the same type of team we had when we wrote the standards. If I'm wrong then we can certainly discuss and/or fix things that have been brought up as a problem, but I'm not really interested in rehashing the details just because the IM is being reissued?
>
> At this point I'd like to know if the field has any major problems with the Standards before we even think of making changes.
>
> So is a call needed? I don't know ...
>
> -------------------------------------
>
> Albert Kane, DVM, MPVM, PhD (epi)
>
> Advisor, APHIS/BLM WH&B Partnership

USDA APHIS Veterinary Services

2150 Centre Ave, Bldg B, MS 2E6

Ft Collins, CO 80526-8117

PH O: (970) 494-7234    Gov C: (970) 219-2409

**From:** Easley, Anna-Maria [mailto:ameasley@blm.gov]
**Sent:** Tuesday, March 20, 2018 11:35 AM
**To:** Warr, Victor (Gus) <gwarr@blm.gov>
**Cc:** Thompson, Ruth <rthompso@blm.gov>; Alan Shepherd <ashepher@blm.gov>; Kane, Albert J - APHIS <Albert.J.Kane@aphis.usda.gov>; Joseph Stratton <Joe_Stratton@blm.gov>
**Subject:** Re: CAWP - Gathers IM

Great, thanks for your comments!  I would like to try to stay on-track and send it to everyone next week, so I'll send out a meeting invite for a follow-up discussion shortly.

Thanks for your help!
Anna-Maria

On Tue, Mar 20, 2018 at 11:21 AM, Warr, Victor (Gus) <gwarr@blm.gov> wrote:

> OK ... I'm the last to get my preliminary comments in on this IM - sorry.  I've attached a the draft IM with a few edits and comments.
>
> I did not edit the PDF Standards document.  There is a bunch of highlighted stuff that I don't understand what has been done there.  Maybe we will get on a call to discuss. ???

I agree with the comments about not being a permanent IM, and taking out the assessment tool sections.

Anna-Maria - I'm out all of next week for a call, but will participate if we can find a time to discuss. I didn't send this out to the entire WO-260 group. Are you still trying to have this going out to the States on the 28th of March? Per your Excel spreadsheet schedule.

On Mon, Mar 19, 2018 at 10:31 AM, Thompson, Ruth <rthompso@blm.gov> wrote:

> Anna Maria,
>
> Attached are my comments
>
> On Thu, Mar 1, 2018 at 3:03 PM, Easley, Anna-Maria <ameasley@blm.gov> wrote:
>
> > Good afternoon!
> >
> > I'd like to get some of your suggestions on this IM before it goes out to the group for review. I've made some initial edits and added some questions in the margin, but I don't know the history. I'll be gone the next 2 weeks, but if you could review during that time, I'll set up a conference call when I get back for further discussions. We have a month before it's scheduled to go to the group.
> >
> > Thanks for your help!
> >
> > Anna-Maria

Sr. Wild Horse and Burro Specialist

DOI - Bureau of Land Management

Washington, DC

WO - 260

O: 202.912.7296

--

*Winter is coming*

--

**Thanks~**
**/gus**

Wild Horse & Burro Specialist / Utah WH&B Program Manager
BLM-Utah State Office (UT-933)
440 W. 200 S., Suite 500 -Salt Lake City, Utah  84101-1345

Desk:  801.539.4057
Cell:    801.824.1632
Fax:    801.539.4074
gwarr@blm.gov
https://www.blm.gov/programs/wild-horse-and-burro

--

Thanks!

Anna-Maria

Sr. Wild Horse and Burro Specialist

DOI - Bureau of Land Management

Washington, DC

WO - 260

O: 202.912.7296

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

--

Thanks!

Anna-Maria

Sr. Wild Horse and Burro Specialist

DOI   Bureau of Land Management

Washington, DC

WO   260

O: 202.912.7296

--

Thanks!
Anna-Maria

Sr. Wild Horse and Burro Specialist
DOI - Bureau of Land Management
Washington, DC
WO - 260
O: 202.912.7296

*Internal Working Document – Not for Distribution*



## United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Washington, D.C.  20240
https://www.blm.gov



Signature Date

In Reply Refer To:
4720 (260) P

**Permanent Instruction Memorandum No. 2018-XXX**

To:            All Field Office Officials (except Alaska)

From:        Assistant Director, Resources and Planning

Subject:     Comprehensive Animal Welfare Program for Wild Horse and Burro Gathers

**Program Area:** Wild Horse and Burro Program

**Purpose:** b(5) DPP



Commented [TRA1] b(5) DPP

Commented [WV(A] b(5) DPP

Commented [WV(A3] b(5) DPP

Commented [TRA4] b(5) DPP

Commented [ame5]: b(5) DPP

Commented [ame6]: b(5) DPP

Commented [WV(A7R6]: b(5) DPP

Commented [WV(A8]: b(5) DPP

*Internal Working Document – Not for Distribution*



*Internal Working Document – Not for Distribution*

b(5) DPP

**Pages of Manual/ Handbook Sections Affected:** None.

**Instruction Memorandums Affected:** This IM supersedes IM No. 2015-151.

**Contact:** XXXXXX, On-Range Branch Chief, Wild Horse and Burro Program at 775-861-6611.

_____
Signing Official Name
Directorate (**NOTE**: If the signing official is acting, please include "Acting" before the position title.)

Attachment
(Title of attachment and number of pages- i.e., 1p)

Attachment 1 – CAWP Gather Standards? Fix typos?
Attachment 2 – screen shots…still applicable? Need updating?

**Commented [ame13]:** Are these still applicable or need updating?

Re: CAWP - Gathers IM

## Easley, Anna Maria <ameasley@blm.gov>

Tue 3/20/2018 10:34 AM

**To:** Warr, Victor (Gus) A <gwarr@blm.gov>
**Cc:** Thompson, Ruth A <rthompso@blm.gov>; Shepherd, Alan B <ashepher@blm.gov>; Al Kane
<albert.j.kane@aphis.usda.gov>; Stratton, Joseph A <jstratto@blm.gov>

Great, thanks for your comments!  I would like to try to stay on-track and send it to everyone next
week, so I'll send out a meeting invite for a follow-up discussion shortly.

Thanks for your help!
Anna-Maria


On Tue, Mar 20, 2018 at 11:21 AM, Warr, Victor (Gus) <gwarr@blm.gov> wrote:

OK ... I'm the last to get my preliminary comments in on this IM   sorry.  I've
attached the draft IM with a few edits and comments.

I did not edit the PDF Standards document.  There is a bunch of highlighted stuff
that I don't understand what has been done there.  Maybe we will get on a call to
discuss. ???

I agree with the comments about not being a permanent IM, and taking out the
assessment tool sections.

Anna  Maria   I'm out all of next week for a call, but will participate if we can find a
time to discuss.  I didn't send this out to the entire WO 260 group.  Are you still
trying to have this going out to the States on the 28th of March? Per your Excel
spreadsheet schedule.


On Mon, Mar 19, 2018 at 10:31 AM, Thompson, Ruth <rthompso@blm.gov> wrote:

Anna Maria,

Attached are my comments

On Thu, Mar 1, 2018 at 3:03 PM, Easley, Anna-Maria <ameasley@blm.gov> wrote:

Good afternoon!

I'd like to get some of your suggestions on this IM before it goes out to the group for review.
I've made some initial edits and added some questions in the margin, but I don't know the
history.  I'll be gone the next 2 weeks, but if you could review during that time, I'll set up a

conference call when I get back for further discussions. We have a month before it's scheduled to go to the group.

Thanks for your help!
Anna-Maria

Sr. Wild Horse and Burro Specialist
DOI - Bureau of Land Management
Washington, DC
WO - 260
O: 202.912.7296

--
*Winter is coming*

--
**Thanks~**
**/gus**

Wild Horse & Burro Specialist / Utah WH&B Program Manager
BLM-Utah State Office (UT-933)
440 W. 200 S., Suite 500 -Salt Lake City, Utah  84101-1345

Desk:  801.539.4057
Cell:     801.824.1632
Fax:     801.539.4074
gwarr@blm.gov
https://www.blm.gov/programs/wild-horse-and-burro

--
Thanks!
Anna-Maria

Sr. Wild Horse and Burro Specialist
DOI - Bureau of Land Management
Washington, DC
WO - 260
O: 202.912.7296

# EXHIBIT F

---------- Forwarded message ---------
From: **Perry, Kenneth L** <kperry@blm.gov>
Date: Mon, Dec 4, 2023 at 3:53AM
Subject: DOI-BLM-2019-001585
To: laura@wildhorseeducation.org <laura@wildhorseeducation.org>

Ms. Leigh

This letter is in regard to your Freedom of Information Act ("FOIA") request dated October 7, 2019,  assigned tracking number DOI-BLM-2019-001585 . Please cite this number in any future communications with our office regarding your request. You are seeking documents for From November 2015 to Sept. 30, 2019: correspondence, meeting notes, telephone records, operation evaluation sheets, pertaining to the evaluation, training, proposed changes, effectiveness of the Comprehensive Animal Welfare Policy (CAWP). The Bureau of Land Management is experiencing a backlog of FOIA requests that has impacted our ability to process your request. Please know that the Bureau's management is very committed to providing responses to FOIA requests and remedying the FOIA backlog

Given the passage of time, this communication is to confirm whether you are still interested in having the attached FOIA requests processed. If upon review, you are still interested in having your request processed, please notify me at kperry@blm.gov; if we do not hear from you within 5 workdays, we will accept your non-response as a withdrawal of your FOIA request and close your requests appropriately.

*Kenneth L. Perry*
*FOIA Specialist*

*Department of the Interior, Bureau of Land Management*

*HQ640, External Affairs (Communications Division)*

*1849 C Street, NW*

*Washington, DC 20240*

*Office/Cell: (240) 475-9160*

**EXHIBIT G**

---------- Forwarded message ---------
On Mon, Feb 10, 2025 at 6:54 AM Perry, Kenneth L <kperry@blm.gov> wrote:

Good Morning

As part of the Department of Interior's (DOI) FOIA Support Team (FST) deployed to the Bureau of Land Management (BLM) to assist with processing FOIA requests in BLM's HQ backlog, we have been reviewing the status of the open FOIA requests filed on or before September 28, 2019. During this process, we reviewed your open FOIA request that you filed with the BLM. (See Attached)

As background, the BLM is experiencing a backlog of FOIA requests that has impacted our ability to process this request. Please know that the BLM's management is very committed to providing responses to FOIA requests and remedying the FOIA backlog. Given the passage of time, this communication is to confirm whether you are still interested in having the request described above processed. If you are still interested in having your request processed, please notify us via email at kperry@blm.gov.

If we do not receive a response from you within **30 workdays**, we will presume you are no longer interested in pursuing the request and will administratively close it.

*Kenneth L. Perry*

*FOIA Specialist*

*Department of the Interior, Bureau of Land Management*

*HQ640, External Affairs (Communications Division)*

*1849 C Street, NW*

*Washington, DC 20240*

*Office/Cell: (720) 281-1649*